UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

ABS BREAKBULK SERVICES GMBH,

                Plaintiff,

          - against -

TOTALMAR NAVIGATION CORP.

                Defendant.

-------------------------------------------------------X

ECF CASE

08 Civ 4997 (JSR)

**DECLARATION OF RAHUL WANCHOO
IN SUPPORT OF MOTION TO
REDUCE MARITIME ATTACHMENT**

RAHUL WANCHOO hereby declares the following pursuant to 28 U.S.C. § 1746:

1.      I am a member of the Bar of the State of New York, and I am admitted to practice before this Honorable Court.

2.      I am a principal in the firm of Law Offices of Rahul Wanchoo, attorneys for Defendant, Totalmar Navigation Corp. ("Totalmar"). I am fully familiar with the matters set forth in this affidavit, and my knowledge of the matters set forth in this affidavit is based on information provided to me by Totalmar, its agents and attorneys and my own independent research.

3.      I submit this affidavit in support of Totalmar's motion to reduce the amount of security awarded to Plaintiff, ABS Breakbulk Services Gmbh ("ABS") pursuant to the Court's ex parte Order for Issuance of a Process of Maritime Attachment dated May 30, 2008 ("Attachment Order").

4.      On May 30, 2008 ABS filed a Verified Complaint in the Southern District of New York to secure and satisfy its claim that Defendant, Totalmar allegedly breached a

contract of affreightment ("COA") dated December 7, 2007 in the amount of

$4,678,434.07, plus estimated attorneys' fees and arbitration costs and interest of

$1,492,797.75, for a total of $6,171,231.82. Annexed hereto as **Exhibits 1 and 2**,

respectively are true and correct copies of the Verified Complaint and the Attachment

Order.

5.      Annexed hereto as **Exhibit 3** is a true and correct copy of ABS' Claim

Submissions dated July 3, 2008.

6.      The COA between ABS and Totalmar provides for London arbitration and

English law. Thus, English substantive maritime law governs ABS' damages for its lost

profit claim.  Annexed hereto as **Exhibit 4** is a true and correct copy of the English Court

of Appeal's decision in SIB International SRL v. Metallgesellschaft Corp., [1989] 1

Lloyd's Rep 361 (Court of Appeal 1988), which enunciates the principle in calculating

owners' damages for charterers' cancellation of the charter.

7.      I declare under the penalty of perjury that the foregoing is true and correct.

_Rahul Wanchoo_
_____
Rahul Wanchoo


New York, New York
Dated: August 1, 2008

**LAW OFFICES OF RAHUL WANCHOO**
350 Fifth Avenue, 59th Floor
New York, New York 10118
Phone:  (646) 593-8866
Fax:     (212) 618-0213
E-mail: rwanchoo@wanchoolaw.com


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABS BREAKBULK SERVICES GMBH, | |
| Plaintiff, | **ECF CASE** |
| -against- | **08 CV 4997 (JSR)** |
| TOTALMAR NAVIGATION CORP. | |
| Defendant | |

### NOTICE OF FOREIGN LAW PURSUANT TO F.R. CIV. P. RULE 44.1

PLEASE TAKE NOTICE THAT, Defendant TOTALMAR NAVIGATION CORP.,

pursuant to F.R. Civ. P. Rule 44.1 intends to raise issue of foreign law, namely of English law, as

set out in the attached declaration of Rahul Wanchoo dated August 1, 2008.


Date:   New York, New York
          August 1, 2008


Respectfully submitted,

LAW OFFICES OF RAHUL WANCHOO
Attorneys for Defendant

By:  Rahul Wanchoo
       Rahul Wanchoo

# EXHIBIT 1

JUDGE RAKOFF

08 CV 4997

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
ABS BREAKBULK SERVICES GMBH
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600
Fax:  (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

ABS BREAKBULK SERVICES GMBH,

                    Plaintiff,

      v.

TOTALMAR NAVIGATION CORP.,

                    Defendant.
----------------------------------------------------------------X



08 CV

**VERIFIED COMPLAINT**

      Plaintiff ABS BREAKBULK SERVICES GMBH (hereinafter "ABS

BREAKBULK"), by its attorneys, Chalos, O'Connor & Duffy, as and for its Verified

Complaint against the Defendant, TOTALMAR NAVIGATION CORP., (hereinafter

"TOTALMAR") alleges upon information and belief as follows:


                                JURISDICTION

    1.      This is an admiralty and maritime claim within the meaning of Rule 9(h)

of the Federal Rules of Civil Procedure, and also falls under this Court's admiralty and

maritime jurisdiction pursuant to 28 U.S.C. § 1333.

THE PARTIES

2.     At all times material hereto, plaintiff ABS BREAKBULK was and still is a foreign business entity duly organized and existing pursuant to the laws of a foreign country operating under foreign law with a place of business in Germany.

3.     The plaintiff ABS BREAKBULK was the owner, disponent owner and/or potential disponent owner of several vessels including the M/V GO STAR and the M/V PROTECTOR, and the business of ABS BREAKBULK is to charter its vessels to others for the carriage of cargo in exchange for payments of hire or freight.

4.     At all times material hereto, defendant TOTALMAR was and still is a foreign corporation organized under and existing by virtue of the laws of the Republic of Panama and with offices in Venezuela.

5.     The defendant TOTALMAR is engaged in the business of chartering and operating vessels for the carriage of goods by sea.

AS AND FOR A CAUSE OF ACTION
FOR BREACH OF MARITIME CONTRACT

6.     On December 7, 2007, plaintiff ABS BREAKBULK, as owner, entered into a contract of affreightment with defendant TOTALMAR, as charterer, whereby defendant TOTALMAR agreed to charter vessels for two (2) definite shipments with the option for four (4) additional shipments between Shanghai, China and Maracaibo, Venezuela, the first two on specific dates and the four remaining shipments to occur in January of 2008.

7.     The contract of affreightment between plaintiff ABS BREAKBULK and defendant TOTALMAR is a maritime contract entered into on a Baltic and International

2

Maritime Council "GENCON" form with additional rider clauses appended thereto and incorporated by reference (hereinafter collectively referred to as the "maritime contract").

8.    In accordance with the maritime contract, the first shipment was nominated by the defendant TOTALMAR, loaded and transported by plaintiff ABS BREAKBULK aboard the M/V MARJATTA P, and successfully discharged.

9.    In accordance with the maritime contract, the second shipment was nominated by the defendant TOTALMAR, loaded and transported by plaintiff ABS BREAKBULK aboard the M/V GO STAR, and successfully discharged.

10.    At the conclusion of the first two (2) shipments under the maritime contract defendant TOTALMAR owed a balance of $42,192.21 to plaintiff ABS BREAKBULK in deadfreight and tally expenses.

11.    Further, defendant TOTALMAR exercised the option for the four (4) additional shipments by nominating a third cargo for shipment under the maritime contract.

12.    In breach of the maritime contract, defendant TOTALMAR then failed to produce any cargo for the remaining four (4) shipments in January of 2008 having exercised the option for the four (4) additional shipments.

13.    As nearly as can now be estimated, this resulted in a total lost profit to plaintiff ABS BREAKBULK of $4,636,241.76.

14.    TOTALMAR's failure to produce and/or nominate any further cargo for the remaining four shipments in January of 2008 as it was required to do under the maritime contract constitutes a breach of the maritime contract and, therefore, plaintiff

3

ABS BREAKBULK has an *in personam* maritime claim against defendant TOTALMAR
for said breach.

15.    The maritime contract between the plaintiff ABS BREAKBULK and
defendant TOTALMAR, dated December 7, 2007 provides at Box 25 that any disputes
arising out of the maritime contract shall be governed by English law and shall be
referred to arbitration in London.

16.    Interest and costs, including attorneys' fees, are routinely awarded to the
prevailing party in London arbitration because they are recoverable damages in
arbitration pursuant to the London Maritime Arbitration Association's rules.

17.    In accordance with the terms and conditions of the charter party, the
plaintiff ABS BREAKBULK is preparing to initiate arbitration proceedings against
defendant TOTALMAR in London.

18.    As best as can now be estimated, the plaintiff ABS BREAKBULK expects
to recover the following amounts in London arbitration from the defendant
TOTALMAR:

| | | | |
|---|---|---|---|
| A. | Claim for deadfreight on the MV GO STAR | $ | 42,192.31 |
| B. | Claim for lost profit on four voyages | | $4,636,241.76 |
| B. | Estimated interest on claims A and B 3 years at 8.5%, compounded quarterly | | $1,342,797.75 |
| C. | Estimated attorneys' fees: | | $ 100,000.00 |
| D. | Estimated arbitration costs/expenses: | | $ 50,000.00 |
| **Total** | | | **$6,171,231.82** |

PRAYER FOR RELIEF

18.    Notwithstanding the fact that the liability of the Defendant is subject to

determination by arbitration in London, there are now, or will be during the pendency of

this action, certain assets, accounts, freights, monies, charter hire, credits, effects,

payment for bunkers, goods or services, bills of lading, cargo and the like belonging to or

claimed by the Defendant within this District and held by various parties, as garnishees.

19.    Plaintiff ABS BREAKBULK believes that some of these assets, *to wit*:

bank accounts; payments from the purchasers of other cargoes; freight and/or hire

payments being made to other vessel owners U.S. dollars; freight and hire payments from

other charterers or shippers of cargo; and/or Clearing House Interbank Payment System

(CHIPS) credits; and/or funds being transferred through intermediary banks are located in

this District in the possession of garnishees, namely banks or financial institutions located

in New York.

20.    As set forth in the accompanying affidavit of George E. Murray, the

Defendant cannot be found within this District within the meaning of Rule B of the

Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil

Procedure.

21.    Because this Verified Complaint sets forth an *in personam* maritime claim

against the Defendant and because the Defendant cannot be found within this District

within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime

Claims of the Federal Rules of Civil Procedure, the requirements for a Rule B attachment

and garnishment are met and Plaintiff seeks the issuance of process of maritime

attachment so that it may obtain security for its claims against the Defendant and/or *quasi*

*in rem* jurisdiction over the property of the Defendant so that an eventual judgment and/or award can be satisfied.

WHEREFORE, Plaintiff prays as follows:

A.    That the Defendant be summoned to appear and answer this Verified Complaint;

B.    That the Defendant not being found within this District, as set forth in the Affidavit of George E. Murray, then all of its assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to or claimed by the Defendant within this District up to the amount sued for herein be attached pursuant to Supplemental Rule B and to pay Plaintiff's damages;

C.    That this Court retain jurisdiction over this matter through the entry of a judgment either by this Court, and/or the London arbitration panel, so that judgment may be entered in favor of Plaintiff for the amount of its claim with costs, *i.e.* **$6,171,231.82**, and that a judgment of condemnation and sale be entered against the property arrested and attached herein in the amount of Plaintiff's claim, plus costs to be paid out of the proceeds thereof; and

D.    That Plaintiff has such other and further relief as the Court may determine to be just and proper under the circumstances.

Dated: Port Washington, New York
       May 30, 2008

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,

By:    _George E. Murray_____
       George E. Murray (GM-4172)

6

Owen F. Duffy (OD-3144)
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600
Fax:  (516) 767-3605

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
ABS BREAKBULK SERVICES GMBH,
366 Main Street
Port Washington, New York 11050
Tel: (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

ABS BREAKBULK SERVICES GMBH,

                        Plaintiff,

                                                        08 CV _____ (____)

            v.
                                                        **VERIFICATION**

TOTALMAR NAVIGATION CORP.,

                        Defendant.
------------------------------------------------------------------X
STATE OF NEW YORK        :
                        : ss.
COUNTY OF NASSAU         :

        BEFORE ME, the undersigned authority, personally came and appeared George

E. Murray, who, after being duly sworn, did depose and state:

        1.      That he is an associate in the law firm of Chalos, O'Connor & Duffy LLP,

counsel for the Plaintiff, ABS BREAKBULK SERVICES GMBH, herein;

        2.      That he has read the foregoing complaint and knows the contents thereof;

        3.      That he believes the matters to be true based on documents and

information obtained from employees and representatives of the Plaintiff through its

agents, underwriters and attorneys; and

4.    That the reason that this verification was made by deponent and not by the Plaintiff is because the officers' verification of Plaintiff could not be obtained within the time constraints presented by the circumstances of this case.

Dated: Port Washington, New York
       May 29, 2008

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
ABS BREAKBULK SERVICES GMBH

By: _____
    George E. Murray (GM-4172)
    Owen F. Duffy (OD-3144)
    366 Main Street
    Port Washington, New York 11050
    Tel:  (516) 767-3600
    Fax:  (516) 767-3605

Subscribed and sworn to before me this
May 29, 2008

_____
Notary Public, State of New York

TIMOTHY SEMENORO
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02SE6112804
QUALIFIED IN NASSAU COUNTY
COMMISSION EXPIRES JULY 12, 2008

2

# EXHIBIT 2

JUDGE RAKOFF

08 CV 4997

RAKOFF, J

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
ABS BREAKBULK SERVICES GMBH
366 Main Street
Port Washington, New York 11050
Tel: (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5·30·08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ABS BREAKBULK SERVICES GMBH,

                                    Plaintiff,

                    v.                                             08 CV _____ ( ___ )

TOTALMAR NAVIGATION CORP.,                                         **ORDER FOR
                                                                   ISSUANCE OF A
                                                                   PROCESS OF MARITIME**
                                    Defendant.                     **ATTACHMENT**
-----------------------------------------------------------------X

      Upon reading the Verified Complaint requesting issuance of Process of Maritime

Attachment and Garnishment, and the Affidavit of George E. Murray, Esq. attached

thereto, and the Court finding that the conditions for an attachment under Rule B of the

Supplemental Rules for Admiralty or Maritime Claims Admiralty to the Federal Rules of

Civil Procedure appear to exist, it is this day, by the United States District Court for the

Southern District of New York, hereby

      **ORDERED** that the Clerk shall issue a Process of Maritime Attachment and

Garnishment as prayed for in the Verified Complaint; and it is further

      **ORDERED** that the Process of Attachment issued by the Clerk shall be against all

property, tangible or intangible, including funds, goods, chattels, credits, effects, debts

owned by or owed to the Defendant, TOTALMAR NAVIGATION CORP., or monies to

be paid to discharge a debt owed to the Defendant, including monies being electronically

transferred by or to TOTALMAR NAVIGATION CORP. which are in the possession or

control of, or being transferred through any garnishee within this District, including, without

limitation, property held by or in the possession or control of the following garnishee(s):

1.  ABN Amro Bank N.V.
    55 East 52nd Street
    New York, New York 10055

2.  American Express Bank Ltd.
    c/o Zeichner Ellman & Krause, LLP
    Legal Counsel for Bank of America
    575 Lexington Avenue, 10th floor
    New York, New York 10022

3.  Bank of America, National Association
    c/o Zeichner Ellman & Krause, LLP
    Legal Counsel for Bank of America, N.A.
    575 Lexington Avenue, 10th floor
    New York, New York 10022

4.  Bank of China
    410 Madison Avenue
    New York, New York 10017

5.  Bank of New York
    120 Broadway, 19th Floor
    New York, New York

6.  Barclays Bank
    200 Park Avenue
    New York, New York 10166

7.  BNP Paribas SA
    The Equitable Tower,
    787 Seventh Avenue
    New York, New York 10019

8.  Citibank, N.A.
    Legal Service Intake Unit
    1 Court Square, 7th Floor
    Long Island City, NY 11120

9.    Deutsche Bank Trust Company Americas
      60 Wall Street
      New York, New York 10005

10.   HSBC Bank U.S.A., National Association
      452 Fifth Avenue
      New York, New York

11.   JPMorgan Chase Bank, National Association
      One Chase Manhattan Plaza
      New York, New York 10081

12.   Standard Chartered Bank
      One Madison Avenue
      New York, NY 10010

13.   UBS AG
      299 Park Avenue
      New York, New York, 10017

14.   Wachovia Bank, National Association
      375 Park Avenue
      New York, New York

or any of their affiliates and any other garnishee(s) within this district upon whom a copy

of the Process of Maritime Attachment and Garnishment herein may be served, in an

amount up to the amount sued for, *i.e.*, **US$6,171,231.82**, it is further

**ORDERED** that any person claiming an interest in the property attached or

garnished pursuant to said Order shall, upon application to the Court, be entitled to a

prompt hearing at which the plaintiff shall be required to show why the attachment and

garnishment should not be vacated or other relief granted, and it is further

**ORDERED** that a copy of this Order be attached to and served with the said

Process of Maritime Attachment and Garnishment, and it is further

**ORDERED** that pursuant to Fed. R. Civ. P., Supplemental Rules for Admiralty

or Maritime Claims, Rule B(1)(d)(ii)(C), the Writ of Attachment may be served by any

3

person, who is not less than 18 years old, and who is not a party to this action, and it is further

ORDERED that service on any garnishee(s) (i.e. any original garnishee or any garnishee herein) is deemed to be effective and continuous service throughout the remainder of the day upon which such service is made commencing from the time of such service through the opening of the garnishee's business the next business day, and it is further

ORDERED that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D), that following initial service upon any garnishee by the United States Marshal or any other person designated by Order to make service in this action, supplemental service of the Process of Maritime Attachment and Garnishment shall thereafter be made by way of service of a copy of the Process of Maritime Attachment and Garnishment via facsimile transmission or other verifiable electronic means, including e-mail, to each garnishee so personally served, and it is further

ORDERED that supplemental process enforcing this Order may be issued by the Clerk and served without further Order of the Court.


Dated: New York, New York
      May 3ͻ, 2008

                              SO ORDERED:

                              _____
                              U. S. D. J.

4

# EXHIBIT 3

# ReedSmith

FAX TRANSMITTAL

Reed Smith
Beaufort House
15 St Botolph Street
London EC3A 7EE
Phone: +44 (0)20 7247 6555
Fax: +44 (0)20 7247 5091
DX1066 City / DX18 London
reedsmith.com

**From: Mark O'Neil/Amy Dominguez**
Direct Phone: +44 (0)20 7772 5883/5874
Email: moneil@reedsmith.com/
adominguez@reedsmith.com

**Total Number Of Pages Including Cover Page**

3 July 2008

**Fax to:**

| Name | Company | Fax Number | Phone Number |
|------|---------|-----------|--------------|
| Captain Leftakis | | 01480 437567 | |
| Mr. Alan Oakley | | 01279 771968 | |
| **Copy to:** | | | |
| Laurence Marron | | 0208 382 3792 | |

**Our Ref:**    AD\KKN\755121.02099

---

**Contract of Affreightment dated 7 December 2007 ("COA")**

We should be grateful if the Tribunal would accept this fax as Owners' Claim Submissions. All page references are to the supporting documents attached to these submissions.

**Background**

1.  On 7 December 2007 ABS Breakbulk Services GmbH ("Owners") entered into a Contract of Affreightment ("COA") on an amended Gencon 1994 form with Totalmar Navigation Corp. of Venezuela ("Charterers") pursuant to which the Charterers agreed to charter vessels from Owners for two definite shipments with the option for four additional shipments between Shanghai, China and Maracaibo, Venezuela. A copy of the COA is attached at pages 1-8.

2.  Owners will seek to rely on the terms of the COA. In particular, Owners refer to:

    *Box 13 – Freight Rate*

    *USD 103.00 PER CBM FIOS LSD*

---

Reed Smith is a trade name of Reed Smith Richards Butler LLP

Reed Smith Richards Butler LLP is a limited liability partnership registered in England and Wales with registered number OC300620 and its registered office at Beaufort House, Tenth Floor, 15 St Botolph Street, London EC3A 7EE. Reed Smith Richards Butler LLP is regulated by the Solicitors Regulation Authority. A list of the members of Reed Smith Richards Butler LLP, and their professional qualifications, is available at the registered office. The term partner is used to refer to a member of Reed Smith Richards Butler LLP or an employee of equivalent standing.

Reed Smith Richards Butler LLP is associated with Reed Smith LLP of Delaware, USA and the offices referred to below are offices of either Reed Smith Richards Butler LLP or Reed Smith LLP.

NEW YORK ♦ LONDON ♦ HONG KONG ♦ CHICAGO ♦ WASHINGTON, D.C. ♦ BEIJING ♦ PARIS ♦ LOS ANGELES ♦ SAN FRANCISCO ♦ PHILADELPHIA ♦ PITTSBURGH
OAKLAND ♦ MUNICH ♦ ABU DHABI ♦ PRINCETON ♦ NORTHERN VIRGINIA ♦ WILMINGTON ♦ BIRMINGHAM ♦ DUBAI ♦ CENTURY CITY ♦ RICHMOND ♦ GREECE

LONDON-4723779.2-ADOMINGU

> *Clause 4 Payment of Freight*
>
> > *(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.*
>
> ### *Clause 22: Cargo Description*
>
> > *1st Shipment: minimum 400 pieces carriers' option upto vessel full, under/on deck*
> >
> > *capacity of polycarbonate pipes in loose, dimensions 12.192 m length x 2.6 m*
> >
> > *diameter/ 12.3 mt uw each where as Charterers guarantee 82.4179 CBM per piece..."*
>
> ### *Clause 23: Loading & Discharging Port*
>
> > *Loading Port: 1 SPSB AAAA SHANGHAI*
> >
> > *Discharge Port: 1 SPSB AAAA MARACAIBO, where 8 m SW Draft*
>
> ### *Clause 25: ETA & LAYCAN*
>
> > *LAYCAN:        1st Shipment 20/24 December 2007*
> >
> > *2nd Shipment 26/31 December 2007*
> >
> > *Then 4 shipments in January 2008 in Charterers' option with laydays to be agreed mutually between parties. All nominations to be latest 5 days prior to start of first layday.*
>
> ### *Clause 35: Freight Payment & Banking Details*
>
> > *"Freight: USD103.00 per CBM FIOS LSD...."*

3.    On a true construction of Clause 25 of the COA, Charterers' option, if exercised, was for four further shipments, not for "up to" four shipments.

**The Voyages**

4.    In order for Owners to be able to perform their obligations under the COA, Owners were to time charter suitable vessels.

5.    Owners were guaranteed at least two fixtures under the COA and possibly four further fixtures in January 2008 at Charterers' option.

**M/V "MARJATTA P"**

6.    The first nomination by Charterers for a shipment was performed by the M/V "MARJATTA P" in accordance with the terms of the COA.

**M/V "GO STAR"**

7.    The second shipment was nominated by Charterers and performed by the M/V "GO STAR".

LONDON-4723779.2-ADOMINGU

8.    With regard to this nomination, the parties had agreed a different minimum quantity, a different freight rate and laydays with the addition that "terms and conditions as per COA" as set out in the email exchanges of 18, 21 and 27 December 2007 at pages 9-10.

9.    The vessel was on demurrage at Shanghai during this fixture for a period of 0.55903 days (invoice and laytime statement attached at 11)  and pursuant to clause 7 of the COA Owners now claim $20,963.63 in respect of this period (invoice attached at page 12).

10.   Further, it is clear from the correspondence (at pages 13-14) that Charterers confirmed that the minimum amount of the cargo loaded for this shipments would be 410 pieces of pipes, each with a diameter of 2.4 m.

11.   However, pursuant to the terms of the COA, the pipes loaded should have had a diameter of 2.6m. As a result, Charterers failed to load the quantity of cargo specified in the COA and the Owners are entitled to and now claim deadfreight in the sum of US$72,332.68 (invoice attached at page 15).

**Tally Expenses**

12.   In addition, Owners now claim the outstanding sum of US$40,006.00 for the agreed tally expenses. (Copies of Charterers' agreement to pay this sum and of the relevant tally expenses invoices are attached at  pages 16-25).

**Further Nominations**

13.   In December 2007/January 2008 the parties started liaising about future fixtures. Pursuant to Clause 25 of the COA the contemporaneous correspondence shows that Charterers elected to exercise their option for the four more shipments/fixtures in emails dated 27 and 28 December and on 8 January and 14 January.  (Copies of relevant correspondence are attached at pages 26-30).

14.   Despite exercising their option for four further shipments, and in breach of their obligations under the COA, Charterers failed to provide cargoes for lifting during January 2008 or at all. Please see attached correspondence at pages 31-35.

15.   As a direct consequence of Charterers' breach as aforesaid, Owners have suffered losses equivalent to the loss of profit on each of the four declared option shipments amounting to $4,626,241.76 based on a profit of $1,159,060.44 per voyage (as set out in the attached table at page 36).

16.   And Owners claim:-

   (a)    Demurrage of $20,963.63, or alternatively damages; and

   (b)    Deadfreight in the sum of US$61,449.39 or alternatively damages; and

   (c)    Tally expenses in the sum of US$40,006.00 or alternatively damages; and

   (d)    The sum of $4,636,241.76, alternatively damages for the claims set out in paragraph 15 above; and

    (e)      Interest in accordance with section 49 of the Arbitration Act 1996; and

    (f)      Costs.

Yours faithfully

Mark O'Neil/Amy Dominguez
Partner/Associate
Shipping Group
**Reed Smith**

**If you do not receive all of the pages, please call us at +44 (0)20 7816 3160.**

**PLEASE NOTE:** The information contained in this facsimile message may be privileged and confidential, and is intended only for the use of the individual(s) or entity named above who has been specifically authorised to receive it. If the reader is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return all pages to the address shown above. Thank you.

LONDON-4723779.2-ADOMINGU

| 1. Shipbroker<br>**OSS GENERAL TRADING LLC., DUBAI** | **RECOMMENDED**<br>**THE BALTIC AND INTERNATIONAL MARITIME COUNCIL**<br>**UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994)**<br>(To be used for trades for which no specially approved form is in force)<br>**CODE NAME: "GENCON"**                Part I |
|---|---|
| | 2. Place and Date<br>**LONDON      7TH DECEMBER 2007** |
| 3. Owners/Place of business (Cl. 1)<br>**ABS BREAKBULK SERVICES GMBH, ROSTOCK, GERMANY** | 4. Charterers/Place of business (Cl. 1)<br>**TOTALMAR NAVIGATION CORP, VENEZUELA** |
| 5. Vessel's name (Cl. 1)<br>**ABS TBN** | 6. GT/NT (Cl. 1) |
| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1) | 8. Present position (Cl. 1) |
| 9. Expected ready to load (abt.) (Cl. 1)<br>**1ST SHIPMENT - 20TH DECEMBER 2007** | |
| 10. Loading port or place (Cl. 1)<br>**1 SPSB AAAA SHANGHAI** | 11. Discharging port or place (Cl. 1)<br>**1 SPSB AAAA MARACAIBO WHERE 8 M SW DRAFT** |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1)<br>**1ST SHIPMENT MINIMUM 400 PIECES CARRIERS OPTION UPTO VESSEL FULL, UNDER/ON DECK CAPACITY OF POLYCARBONATE PIPES IN LOOSE, DIMENSIONS 12.192 M LENGTH X 2.6 M DIA./12.3 MT UW EACH WHERE AS CHARTERERS GUARANTEE 82.4179 CBM PER PIECE** | |
| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4)<br>**USD 103.00 PER CBM FIOS LSD** | 14. Freight payment (state currency and method of payment; also state beneficiary and bank account) (Cl. 4) |
| 15. State if vessel's cargo handling gear shall not be used (Cl. 5) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl. 6) |
| 17. Shippers/Place of business (Cl. 6) | (a) Laytime for loading<br>**5 DAYS SHINC** |
| 18. Agents (loading) (Cl. 6)<br>**CARRIERS' AGENTS** | (b) Laytime for discharging<br>**4 DAYS SATPM SHEX** |
| 19. Agents (discharging)( Cl. 6)<br>**CHARTERERS' AGENTS SUBJECT APPROVAL OF D.A. INCLUDING AGENCY FEE BY CARRIERS** | (c) Total laytime for loading and discharging |
| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7)<br>**DEMURRAGE TO BE ADVISED BUT MAXIMUM USD 60,000 PD/PR/HD BENDS** | 21. Cancelling date (Cl. 9)<br>**1ST SHIPMENT - 24TH DECEMBER 2007** |
| | 22. General Average to be adjusted at (Cl. 12) |
| 23. Freight Tax (state if for the Owners' account (Cl. 13 (c)) | 24. Brokerage commission and to whom payable (Cl. 15)<br>**3.75 % ON FREIGHT/DEADFREIGHT/DEMURRAGE WILL BE DEDUCTED FROM OCEAN FREIGHT AND PAYABLE BY CHARTERERS TO OSS DUBAI** |
| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19 (a) shall apply) (Cl. 19)<br>**LONDON AND ENGLISH LAW TO APPLY** | |
| (a) State maximum amount for small claims/shortened arbitration (Cl. 19) | 26. Additional clauses covering special provisions, if agreed<br>**NOS. 22 to 51** |

*Printed by BIMCO's idea*

*Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen*

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## "Gencon" Charter (As Revised 1922, 1976 and 1994)

**1.** It is agreed between the party mentioned in Box 3 as the Owners of the Vessel 1
named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number 2
of metric tons of deadweight capacity all told on summer loadline stated in Box 3
7, now in position as stated in Box 8 and expected ready to load under this 4
Charter Party about the date indicated in Box 9, and the party mentioned as the 5
Charterers in Box 4 that: 6
The said Vessel shall, as soon as her prior commitments have been completed, 7
proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as 8
she may safely get and lie always afloat, and there load a full and complete 9
cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and 10
responsibility) as stated in Box 12, which the Charterers bind themselves to 11
ship, and being so loaded the Vessel shall proceed to the discharging port(s) or 12
place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near 13
thereto as she may safely get and lie always afloat, and there deliver the cargo. 14

**2.** **Owners' Responsibility Clause** 15
The Owners are to be responsible for loss of or damage to the goods or for 16
delay in delivery of the goods only in case loss, damage or delay has been 17
caused by personal want of due diligence on the part of the Owners or their 18
Manager to make the Vessel in all respects seaworthy and to secure that she is 19
properly manned, equipped and supplied, or by the personal act or default of 20
the Owners or their Manager. 21
And the Owners are not responsible for loss, damage or delay arising from any 22
other cause whatsoever, even from the neglect or default of the Master or crew 23
or some other person employed by the Owners on board or ashore for whose 24
acts they would, but for this Clause, be responsible, or from unseaworthiness of 25
the Vessel on loading or commencement of the voyage or at any time 26
whatsoever. 27

**3.** **Deviation Clause** 28
The Vessel has liberty to call at any port or ports in any order, for any purpose, 29
to sail without pilots, to tow and/or assist Vessels in all situations, and also to 30
deviate for the purpose of saving life and/or property. 31

**4.** **Payment of Freight** 32
(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the 33
intaken quantity of cargo. 34
(b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be 35
deemed earned and non-returnable, Vessel and/or cargo lost or not lost. 36
Neither the Owners nor their agents shall be required to sign or endorse bills of 37
lading showing freight prepaid unless the freight due to the Owners has 38
actually been paid. 39
~~(c) On delivery. If according to Box 13 freight, or part thereof, is payable at~~ 40
~~destination it shall not be deemed earned until the cargo is thus delivered.~~ 41
~~Notwithstanding the provisions under (a), if freight or part thereof is payable on~~ 42
~~delivery of the cargo the Charterers shall have the option of paying the freight~~ 43
~~on delivered weight/quantity provided such option is declared before breaking~~ 44
~~bulk and the weight/quantity can be ascertained by official weighing machine,~~ 45
~~joint draft survey or tally.~~ 46
~~Cash for Vessel's ordinary disbursements at the port of loading to be advanced~~ 47
~~by the Charterers, if required, at highest current rate of exchange, subject to~~ 48
~~two (2) per cent to cover insurance and other expenses. See also Clause 35.~~ 49

**5.** **Loading/Discharging** 50
(a) Costs/Risks 51
The cargo shall be brought into the holds, loaded, stowed and/or trimmed, 52
tallied, lashed and/or secured and taken from the holds and discharged by the 53
Charterers, free of any risk, liability and expense whatsoever to the Owners. 54
The Charterers shall provide and lay all dunnage material as required for the 55
proper stowage and protection of the cargo on board, the Owners allowing the 56
use of all dunnage available on board. The Charterers shall be responsible for 57
and pay the cost of removing their dunnage after discharge of the cargo under 58
this Charter Party and time to count until dunnage has been removed. 59
(b) Cargo Handling Gear 60
Unless the Vessel is gearless or unless it has been agreed between the parties 61
that the Vessel's gear shall not be used and stated as such in Box 15, the 62
Owners shall throughout the duration of loading/discharging give free use of 63
the Vessel's cargo handling gear and of sufficient motive power to operate all 64
such cargo handling gear. All such equipment to be in good working order. 65
Unless caused by negligence of the stevedores, time lost by breakdown of the 66
Vessel's cargo handling gear or motive power - pro rata the total number of 67
cranes/winches required at that time for the loading/discharging of cargo 68
under this Charter Party - shall not count as laytime or time on demurrage. 69
~~On request the Owners shall provide free of charge cranemen/winchmen from~~ 70
~~the crew to operate the Vessel's cargo handling gear, unless local regulations~~ 71
~~prohibit this, in which latter event shore labourers shall be for the account of the~~ 72
~~Charterers. Cranemen/winchmen shall be under the Charterers' risk and~~ 73
~~responsibility and as stevedores to be deemed as their servants but shall~~ 74
~~always work under the supervision of the Master.~~ 75
(c) Stevedore Damage 76

The Charterers shall be responsible for damage (beyond ordinary wear and 77
tear) to any part of the Vessel caused by Stevedores. Such damage shall be 78
notified as soon as reasonably possible by the Master to the Charterers or their 79
agents and to their Stevedores, failing which the Charterers shall not be held 80
responsible. The Master shall endeavour to obtain the Stevedores' written 81
acknowledgement of liability. 82
The Charterers are obliged to repair any stevedore damage prior to completion 83
of the voyage, but must repair stevedore damage affecting the Vessel's 84
seaworthiness or class before the Vessel sails from the port where such 85
damage was caused or found. All additional expenses incurred shall be for the 86
account of the Charterers and any time lost shall be for the account of and shall 87
be paid to the Owners by the Charterers at the demurrage rate. 88

See Clause 33.

**6.** **Laytime** 89
* (a) Separate laytime for loading and discharging 90
The cargo shall be loaded within the number of running days/hours as 91
indicated in Box 16, weather permitting, Saturday p.m.,Sundays and holidays 92
included, ~~excepted~~, 
unless used, in which event time used shall count. 93
The cargo shall be discharged within the number of running days/hours as 94
indicated in Box 16, weather permitting, Sundays and holidays excepted, 95
unless used, in which event time used shall count. 96
~~* (b) Total laytime for loading and discharging~~ 97
~~The cargo shall be loaded and discharged within the number of total running~~ 98
~~days/hours as indicated in Box 16, weather permitting, Sundays and holidays~~ 99
~~excepted, unless used, in which event time used shall count.~~ 100
(c) Commencement of laytime (loading and discharging) 101
Laytime for loading and discharging shall commence at 14.00 hours, if 102
NOR is given upto and including 12.00 hours, and at 08.00 hours next day if
NOR given after 12.00 hours. ~~at 13.00 hours, unless~~
~~readiness is given up to and including 12.00 hours, and at 06.00 hours next~~ 103
~~working day if notice given during office hours after 12.00 hours.~~ Notice of 104
readiness at loading port to be given to the Shippers named in Box 17 or if not 105
named, to the Charterers or their agents named in Box 18. Notice of readiness 106
at the discharging port to be given to the Receivers or, if not known, to the 107
Charterers or their agents named in Box 19. 108
If the loading/discharging berth is not available on the Vessel's arrival at or off 109
the port of loading/discharging, the Vessel shall be entitled to give notice of 110
readiness within ordinary office hours on arrival there, whether in port or not, 111
whether in berth or not, whether in free pratique 
or not, whether customs cleared or not. Laytime or time on demurrage shall 112
then count as if she were in berth and in all respects ready for loading/ 113
discharging provided that the Master warrants that she is in fact ready to load/ 114
discharge provided that the loading/discharging berth shall not count as laytime. 115
If, after inspection, the Vessel is found not to be ready in all respects to load/ 116
discharge time lost after the discovery thereof until the Vessel is again ready to 117
load/discharge shall not count as laytime. 118
Time used before commencement of laytime shall count. 119
* Indicate alternative (a) or (b) as agreed, in Box 16. 120

**7.** **Demurrage** 121
Demurrage at the loading and discharging port is payable by the Charterers at 122
the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for 123
any part of a day. Demurrage shall fall due day by day and shall be payable as 124
per Clause 27. 125
upon receipt of the Owners' invoice. 126
In the event the demurrage is not paid in accordance with the above, the 127
Owners shall give the Charterers 96 running hours written notice to rectify the 128
failure. If the demurrage is not paid at the expiration of this time limit and if the 129
vessel is in or at the loading port, the Owners are entitled at any time to 130
terminate the Charter Party and claim damages for any losses caused thereby. 131

**8.** **Lien Clause** 132
The Owners shall have a lien on the cargo and on all sub-freights payable in 133
respect of the cargo, for freight, deadfreight, demurrage, claims for damages 134
and for all other amounts due under this Charter Party including costs of 135
recovering same. 136

**9.** **Cancelling Clause** 137
(a) Should the Vessel not be ready to load (whether in berth or not) on the 138
cancelling date indicated in Box 21, the Charterers shall have the option of 139
cancelling this Charter Party. 140
(b) Should the Owners anticipate that, despite the exercise of due diligence, 141
the Vessel will not be ready to load by the cancelling date, they shall notify the 142
Charterers thereof without delay stating the expected date of the Vessel's 143
readiness to load and asking whether the Charterers will exercise their option 144
of cancelling the Charter Party, or agree to a new cancelling date. 145

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2

## PART II
## "Gencon" Charter (As Revised 1922, 1976 and 1994)

Such option must be declared by the Charterers within 48 running hours after 146
the receipt of the Owners' notice. If the Charterers do not exercise their option 147
of cancelling, then this Charter Party shall be deemed to be amended such that 148
the seventh day after the new readiness date stated in the Owners' notification 149
to the Charterers shall be the new cancelling date. 150
The provisions of sub-clause (b) of this Clause shall operate only once, and in 151
case of the Vessel's further delay, the Charterers shall have the option of 152
cancelling the Charter Party as per sub-clause (a) of this Clause. 153

**10. Bills of Lading** 154

Bills of Lading shall be presented and signed by the Master as per the 155
"Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter 156
Party, or by the Owners' agents provided written authority has been given by 157
Owners to the agents, a copy of which is to be furnished to the Charterers. The 158
Charterers shall indemnify the Owners against all consequences or liabilities 159
that may arise from the signing of bills of lading as presented to the extent that 160
the terms or contents of such bills of lading impose or result in the imposition of 161
more onerous liabilities upon the Owners than those assumed by the Owners 162
under this Charter Party. 163

**11. Both-to-Blame Collision Clause** 164

If the Vessel comes into collision with another vessel as a result of the 165
negligence of the other vessel and any act, neglect or default of the Master, 166
Mariner, Pilot or the servants of the Owners in the navigation or in the 167
management of the Vessel, the owners of the cargo carried hereunder will 168
indemnify the Owners against all loss or liability to the other or non-carrying 169
vessel or her owners in so far as such loss or liability represents loss of, or 170
damage to, or any claim whatsoever of the owners of said cargo, paid or 171
payable by the other or non-carrying vessel or her owners to the owners of said 172
cargo and set-off, recouped or recovered by the other or non-carrying vessel 173
or her owners as part of their claim against the carrying Vessel or the Owners. 174
The foregoing provisions shall also apply where the owners, operators or those 175
in charge of any vessel or vessels or objects other than, or in addition to, the 176
colliding vessels or objects are at fault in respect of a collision or contact. 177

**12. General Average and New Jason Clause** 178

General Average shall be adjusted in London unless otherwise agreed in Box 179
22 according to York-Antwerp Rules 1994 and any subsequent modification 180
thereof. Proprietors of cargo to pay the cargo's share in the general expenses 181
even if same have been necessitated through neglect or default of the Owners' 182
servants (see Clause 2). 183
If General Average is to be adjusted in accordance with the law and practice of 184
the United States of America, the following Clause shall apply: "In the event of 185
accident, danger, damage or disaster before or after the commencement of the 186
voyage, resulting from any cause whatsoever, whether due to negligence or 187
not, for which, or for the consequence of which, the Owners are not 188
responsible, by statute, contract or otherwise, the cargo shippers, consignees 189
or the owners of the cargo shall contribute with the Owners in General Average 190
to the payment of any sacrifices, losses or expenses of a General Average 191
nature that may be made or incurred and shall pay salvage and special charges 192
incurred in respect of the cargo. If a salving vessel is owned or operated by the 193
Owners, salvage shall be paid for as fully as if the said salving vessel or vessels 194
belonged to strangers. Such deposit as the Owners, or their agents, may deem 195
sufficient to cover the estimated contribution of the goods and any salvage and 196
special charges thereon shall, if required, be made by the cargo, shippers, 197
consignees or owners of the goods to the Owners before delivery.". 198

**13. Taxes and Dues Clause (See Clauses 31 & 46)** 199

(a) ~~On Vessel~~ -The Owners shall pay all dues, charges and taxes customarily 200
levied on the Vessel, howsoever the amount thereof may be assessed. 201
(b) ~~On cargo~~ -The Charterers shall pay all dues, charges, duties and taxes 202
customarily levied on the cargo, howsoever the amount thereof may be 203
assessed. 204
(c) ~~On freight~~ -Unless otherwise agreed in Box 23, taxes levied on the freight 205
shall be for the Charterers' account. 206

**14. Agency** 207

In every case the Owners shall appoint their own Agent both at the port of 208
loading and the port of discharge. 209

**15. Brokerage** 210

A brokerage commission at the rate stated in Box 24 on the freight, dead-freight 211
and demurrage earned is due to the party mentioned in Box 24. 212
In case of non-execution 1/3 of the brokerage on the estimated amount of 213
freight to be paid by the party responsible for such non-execution to the 214
Brokers as indemnity for the latter's expenses and work. In case of more 215
voyages the amount of indemnity to be agreed. 216

**16. General Strike Clause** 217

(a) If there is a strike or lock-out affecting or preventing the actual loading of the 218

cargo, or any part of it, when the Vessel is ready to proceed from her last port or 219
at any time during the voyage to the port or ports of loading or after her arrival 220
there, the Master or the Owners may ask the Charterers to declare, that they 221
agree to reckon the laydays as if there were no strike or lock-out. Unless the 222
Charterers have given such declaration in writing (by telegram, if necessary) 223
within 24 hours, the Owners shall have the option of cancelling this Charter 224
Party. If part cargo has already been loaded, the Owners must proceed with 225
same, (freight payable on loaded quantity only) having liberty to complete with 226
other cargo on the way for their own account. 227
(b) If there is a strike or lock-out affecting or preventing the actual discharging 228
of the cargo on or after the Vessel's arrival at or off port of discharge and same 229
has not been settled within 48 hours, the Charterers shall have the option of 230
keeping the Vessel waiting until such strike or lock-out is at an end against 231
paying half demurrage after expiration of the time provided for discharging 232
until the strike or lock-out terminates and thereafter full demurrage shall be 233
payable until the completion of discharging, or of ordering the Vessel to a safe 234
port where she can safely discharge without risk of being detained by strike or 235
lock-out. Such orders to be given within 48 hours after the Master or the 236
Owners have given notice to the Charterers of the strike or lock-out affecting 237
the discharge. On delivery of the cargo at such port, all conditions of this 238
Charter Party and of the Bill of Lading shall apply and the Vessel shall receive 239
the same freight as if she had discharged at the original port of destination, 240
except that if the distance to the substituted port exceeds 100 nautical miles, 241
the freight on the cargo delivered at the substituted port to be increased in 242
proportion. 243
(c) Except for the obligations described above, neither the Charterers nor the 244
Owners shall be responsible for the consequences of any strikes or lock-outs 245
preventing or affecting the actual loading or discharging of the cargo. 246

**17. War Risks ("Voywar 1993")** 247

(1) For the purpose of this Clause, the words: 248
(a) The "Owners" shall include the shipowners, bareboat charterers, 249
disponent owners, managers or other operators who are charged with the 250
management of the Vessel, and the Master; and 251
(b) "War Risks" shall include any war (whether actual or threatened), act of 252
war, civil war, hostilities, revolution, rebellion, civil commotion, warlike 253
operations, the laying of mines (whether actual or reported), acts of piracy, 254
acts of terrorists, acts of hostility or malicious damage, blockades 255
(whether imposed against all Vessels or imposed selectively against 256
Vessels of certain flags or ownership, or against certain cargoes or crews 257
or otherwise howsoever), by any person, body, terrorist or political group, 258
or the Government of any state whatsoever, which, in the reasonable 259
judgement of the Master and/or the Owners, may be dangerous or are 260
likely to be or to become dangerous to the Vessel, her cargo, crew or other 261
persons on board the Vessel. 262
(2) If at any time before the Vessel commences loading, it appears that, in the 263
reasonable judgement of the Master and/or the Owners, performance of 264
the Contract of Carriage, or any part of it, may expose, or is likely to expose, 265
the Vessel, her cargo, crew or other persons on board the Vessel to War 266
Risks, the Owners may give notice to the Charterers cancelling this 267
Contract of Carriage, or may refuse to perform such part of it as may 268
expose, or may be likely to expose, the Vessel, her cargo, crew or other 269
persons on board the Vessel to War Risks; provided always that if this 270
Contract of Carriage provides that loading or discharging is to take place 271
within a range of ports, and at the port or ports nominated by the Charterers 272
the Vessel, her cargo, crew, or other persons onboard the Vessel may be 273
exposed, or may be likely to be exposed, to War Risks, the Owners shall 274
first require the Charterers to nominate any other safe port which lies 275
within the range for loading or discharging, and may only cancel this 276
Contract of Carriage if the Charterers shall not have nominated such safe 277
port or ports within 48 hours of receipt of notice of such requirement. 278
(3) The Owners shall not be required to continue to load cargo for any voyage, 279
or to sign Bills of Lading for any port or place, or to proceed or continue on 280
any voyage, or on any part thereof, or to proceed through any canal or 281
waterway, or to proceed to or remain at any port or place whatsoever, 282
where it appears, either after the loading of the cargo commences, or at 283
any stage of the voyage thereafter before the discharge of the cargo is 284
completed, that, in the reasonable judgement of the Master and/or the 285
Owners, the Vessel, her cargo (or any part thereof), crew or other persons 286
on board the Vessel (or any one or more of them) may be, or are likely to be, 287
exposed to War Risks. If it should so appear, the Owners may by notice 288
request the Charterers to nominate a safe port for the discharge of the 289
cargo or any part thereof, and if within 48 hours of the receipt of such 290
notice, the Charterers shall not have nominated such a port, the Owners 291
may discharge the cargo at any safe port of their choice (including the port 292
of loading) in complete fulfilment of the Contract of Carriage. The Owners 293
shall be entitled to recover from the Charterers the extra expenses of such 294
discharge and, if the discharge takes place at any port other than the 295
loading port, to receive the full freight as though the cargo had been 296

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

3

**PART II**
**"Gencon" Charter (As Revised 1922, 1976 and 1994)**

carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight. 297 298 299 300 301

(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route. 302 303 304 305 306 307 308 309 310 311 312 313

(5) The Vessel shall have liberty:- 314

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions; 315 316 317 318 319 320 321

(b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance; 322 323 324

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement; 325 326 327 328 329 330

(d) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier; 331 332

(e) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions; 333 334 335

(f) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route. 336 337 338 339 340

(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage. 341 342 343 344

**18. General Ice Clause** 345

*Port of loading* 346

(a) In the event of the loading port being inaccessible by reason of ice when the Vessel is ready to proceed from her last port or at any time during the voyage or on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the Master for fear of being frozen in is at liberty to leave without cargo, and this Charter Party shall be null and void. 347 348 349 350 351

(b) If during loading the Master, for fear of the Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for the Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter Party to be forwarded to destination at the Vessel's expense but against payment of freight, provided that no extra 352 353 354 355 356 357

expenses be thereby caused to the Charterers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per this Charter Party. 358 359 360

(c) In case of more than one loading port, and if one or more of the ports are closed by ice, the Master or the Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under section (b) or to declare the Charter Party null and void unless the Charterers agree to load full cargo at the open port. 361 362 363 364 365

*Port of discharge* 366

(a) Should ice prevent the Vessel from reaching port of discharge the Charterers shall have the option of keeping the Vessel waiting until the re-opening of navigation and paying demurrage or of ordering the Vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the impossibility of reaching port of destination. 367 368 369 370 371 372 373

(b) If during discharging the Master for fear of the Vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge. 374 375 376

(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion. 377 378 379 380 381

**19. Law and Arbitration** 382

* (a) This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party and the arbitrators so appointed shall appoint a third arbitrator, the decision of the three-man tribunal thus constituted or any two of them, shall be final. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall be final. 383 384 385 386 387 388 389 390 391 392 393

For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association. 394 395 396 397

* (b) This Charter Party shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.. 398 399 400 401 402 403 404 405 406

For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc.. 407 408 409 410

* (c) Any dispute arising out of this Charter Party shall be referred to arbitration at the place indicated in Box 25, subject to the procedures applicable there. The laws of the place indicated in Box 25 shall govern this Charter Party. 411 412 413

(d) If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply. 414

* (a), (b) and (c) are alternatives; indicate alternative agreed in Box 25. 415

** Where no figure is supplied in Box 25 in Part I, this provision only shall be void but the other provisions of this Clause shall have full force and remain in effect. 416 417

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**RIDER CLAUSES TO CHARTER PARTY DATED 7TH DECEMBER 2007**
**ALBATROSS TBNS**
**LOADING: SHANGHAI  DISPORT: MARACAIBO**
**CARGO OF PIPES**

**CLAUSE 22: CARGO DESCRIPTION**
1ST SHIPMENT: MINIMUM 400 PIECES CARRIERS' OPTION UPTO VESSEL FULL, UNDER/ON
DECK CAPACITY OF POLYCARBONATE PIPES IN LOOSE, DIMENSIONS 12.192 M LENGTH X
2.6 M DIAMETER/ 12.3 MT UW EACH WHERE AS CHARTERERS GUARANTEE 82.4179 CBM.
PER PIECE.
UNDER/ON DECK WITH MAXIMUM 5 TIERS LIMITS UPTO VESSEL'S CAPACITY.
MASTER/OWNERS TO DECLARE QUANTITY TO BE LOADED PRIOR TO VESSEL'S ARRIVAL
LOAD PORT TO CHARTERERS AND CHARTERERS' AGENTS.
NO PART CARGO OPTION.
CARGO WILL BE LOADED UNDER/ON DECK AT CARRIER'S OPTION.
CARGO ON DECK BILL(S) OF LADING TO BE MARKED 'SHIPPED ON DECK, WITHOUT ANY
RESPONSIBILITY TO OWNERS FOR LOSS OR DAMAGE HOWSOEVER CAUSED SAME TO BE
FOR CHARTERERS/SHIPPERS/RECEIVERS' RISK AND ACCOUNT.


**CLAUSE 23: LOADING & DISCHARGING PORTS**
LOADING PORT: 1 SPSB AAAA SHANGHAI

DISCHARGE PORT: 1 SPSB AAAA MARACAIBO, WHERE 8 M SW DRAFT

**CLAUSE 24: PRE-ARRIVAL NOTICES**
CARRIERS/MASTER TO PROVIDE APPROXIMATE 5/3/2/1 DAYS ETA NOTICE AT BOTH
ENDS.

**CLAUSE 25: ETA & LAYCAN**
LAYCAN: 1ST SHIPMENT   20/24  DECEMBER 2007
              2ND SHIPMENT  26/31 DECEMBER 2007
THEN 4 SHIPMENTS IN JANUARY 2008 IN CHARTERERS' OPTION WITH LAYDAYS TO BE
AGREED MUTUALLY BETWEEN PARTIES.
ALL NOMINATIONS TO BE LATEST 5 DAYS PRIOR TO START OF FIRST LAYDAY.

**CLAUSE 26: LAYTIME**
LOAD/DISCHARGE RATE 5 TOTAL DAYS SHINC LOAD/4 DAYS SAT PM SHEX UU
DISCHARGE.

**CLAUSE 27: DEMURRAGE**
ALL TIME USED LOAD/DISCHARGE/WAITING AFTER LAYTIME EXPIRES AT LOADPORT OR
DISCHARGE PORT WILL COUNT AS DEMURRAGE  TO BE ADVISED UPON NOMINATION
AND WILL BE PAID BY CHARTERERS BUT AT THE RATE OF MAXIMUM  USD60,000.00 PER
DAY PRO RATA FOR PART OF THE DAY.

AT BOTH LOAD AND DISCHARGE PORTS ANY DEMURRAGE TO BE PAID TO OWNERS
WITHIN 14  CALENDAR DAYS AFTER COMPLETION DISCHARGE AGAINST FULL
SUPPORTED DOCUMENTS PRESENTED BY CARRIERS TO CHARTERERS.

MASTER TO SIGN NOTICE OF READINESS AND STATEMENT OF FACTS AT EACH PORT.

HALF DESPATCH ALL PORTS.

**CLAUSE 28:**
OWNERS TO GUARANTEE VESSEL`S EQUIPMENT IN GOOD WORKING ORDER, VESSEL TO
GIVE FREE USE OF ENERGY, SUPPLY LIGHTS AS ONBOARD FOR NIGHT WORK, IF
REQUIRED, FREE OF EXPENSES TO THE CHARTERERS.

**CLAUSE 29: OVERTIME**
OVERTIME TO BE FOR THE PARTY ORDERING SAME, EXCEPT CREW`S AND OFFICERS
OVERTIME WHICH IS ALWAYS FOR OWNERS ACCOUNT.

2

OVERTIME ORDERED BY PORT          AUTHORITIES AT LOAD/DISCHARGE PORTS
TO BE FOR CHARTERERS ACCOUNT.

**CLAUSE 30: ARBITRATION**
DELETED.


**CLAUSE 31: TAXES AND DUES**
ANY TAXES / DUES / DUTIES ON FRT A/O CARGO OR CALCULATED ON SAME TO BE FOR
CHARTERER'S ACCOUNT BENDS.

ANY TAXES / DUES / DUTIES ON VESSEL'S FLAG/CREW/OWNERSHIP TO BE FOR
CARRIERS' ACCOUNT BENDS.

**CLAUSE 32:**
OWNERS GUARANTEE VESSEL COMPLIES WITH NORMAL REGULATIONS/CERTIFICATES
(ISM/DOC/SMC/ISPS/P&I, ETC.) TO PERFORM SUCH VOYAGE AND ANY DELAYS OR
EXPENSES RESULTING THEREAFTER SHALL BE FOR OWNERS ACCOUNT.

**CLAUSE 33:**
CHARTERERS ARE TO LOAD/STOW, LASH, UNLASH, SECURE, UNSECURE, TALLY
AND DISCHARGE THE CARGO AT THEIR RISK AND EXPENSE UNDER THE SUPERVISION
OF THE CAPTAIN.
CHARTERERS TO BE RESPONSIBLE FOR STOWING CARGO AT THEIR RISK / EXPENSE.

CHARTERERS TO BE RESPONSIBLE FOR ANY STEVEDORES DAMAGE DONE TO THE
VESSEL. IF ANY DAMAGE, SAME TO BE SETTLED/PAID BY CHARTERERS WITHIN FIFTEEN
15) DAYS.

CLAUSE 5 PARAGRAPH C TO APPLY AND SUPERCEDES WHERE APPLICABLE.

**CLAUSE 34:**
NEW JASON CLAUSE, NEW BOTH TO BLAME COLLISION CLAUSE, P&I BUNKER
DEVIATION CLAUSE AND GENERAL CLAUSE PARAMOUNT, WHEN APLICABLE, TO BE
INCORPORATED IN THIS CHARTER PARTY.

**CLAUSE 35: FREIGHT PAYMENT & BANKING DETAILS**
FREIGHT: USD103.00 PER CBM FIOS LSD.  100% LESS COMMISSION TO BE PAID DIRECTLY
TO OWNERS' NOMINATED ACCOUNT WITHIN 5 BANKING DAYS AFTER COMPLETED
LOADING OF CARGO AND SIGNING/RELEASING OF BILLS OF LADING MARKED 'FREIGHT
PAYABLE AS PER CHARTER PARTY'.
FREIGHT TO BE DEEMED EARNED UPON LOAD AND DISCOUNTLESS, NON-RETURNABLE
VESSEL A/O CARGO LOST OR NOT LOST.

OWNERS BANKING DETAILS:




**CLAUSE 36**
CARRIERS PERFORMER VESSEL TBN HOWEVER PERFORMING VESSEL TO BE GEARED,
SINGLEDECK/BULKCARRIER, MAXIMUM 25 YEARS, HIGHEST CLASS LLOYDS OR
EQUIVALENT.

OWNERS NOMINATE THE FOLLOWING VESSEL OR SIMILAR SUBSTITUTE FOR 1ST CARGO:

M/V 'MAIROULI' OR SIMILAR SUBSTITUTE ETA SHANGHAI 20TH AGW WP
53.206MTS DWT ON 12.303M SSW, BLT 2005
BC - 4X30.5CR - GRAIN : 68.927,4 CBF
PANAMA FLAG

FINAL PERFORMING VESSEL TO BE CONFIRMED LATEST 5 DAYS PRIOR 1ST LAYDAY.

3

ALL SUBJECTS STEM APPROVAL TO BE        LIFTED FROM CHARTERERS' SIDE WITHIN
24 HOURS AFTER RECEIPT OF NOMINATION OF PERFORMING VESSEL AND NOT TO BE
UNREASONABLY WITHHELD.


**CLAUSE 37: AGENCY**
CARRIERS' AGENTS LOADPORT/ CHARTERERS' AGENTS DISCHARGE PORT SUBJECT
APPROVAL OF D.A. INCLUDING AGENCY FEE BY CARRIERS.


**CLAUSE 38:**
BILL OF LADING FIGURES TO BE USED AS PER SHIPPERS QUANTITY.
BILL OF LADING TO BE MARKED  "FREIGHT PAYABLE AS PER CHARTER PARTY"

IN CASE OF REMARKS ON MATE'S RECEIPT, CARRIER ISSUE CLEAN ON BOARD BILLS OF
LADING AGAINST CHARTERERS' AND SHIPPERS' LOI IN OWNERS' P&I CLUB WORDING
(CARGO NEW PRODUCED).   THIS APPLIES FOR  'NORMAL' CARGO REMARKS BUT NOT
FOR HEAVILY DAMAGED CARGO.  IN CASE OF HEAVY DAMAGES, MASTER IS ENTITLED
TO REJECT THE CARGO.
IF BILL(S) OF LADING MARKED FREIGHT PREPAID WILL BE HELD WITH LOADPORT
AGENTS' CUSTODY UNTIL CHARTERERS' SWIFT CONFIRMATION OF FULL FREIGHT
RECEIVED BY CARRIERS BY THEM.

**CLAUSE 39: LEGAL PRIORITY**
CHARTER PARTY TERMS SHALL ALWAYS SUPERSEDE BILL OF LADING TERMS
WHENEVER CONTRADICTORY.


**CLAUSE 40:**
DELETED.


**CLAUSE 41: CLEANING HOLDS**
THE CHARTERERS SHALL PROVIDE AND LAY ALL DUNNAGE MATERIAL AS REQUIRED
FOR THE PROPER STOWAGE AND PROTECTION OF THE CARGO ONBOARD, THE OWNERS
ALLOWING USE OF ALL DUNNAGE AVAILABLE ON BOARD. THE CHARTERERS SHALL BE
RESPONSIBLE FOR AND PAY THE COST OF REMOVING THEIR DUNNAGE AFTER
DISCHARGE OF THE CARGO UNDER THIS CHARTER PARTY AND TIME TO COUNT UNTIL
DUNNAGE HAS BEEN REMOVED.


**CLAUSE 42: DETENTION**
DETENTION, IF ANY, DUE NON PRODUCTION CARGO AND/OR DOCUMENTS NOT READY,
SHOULD BE SAME AMOUNT AS DEMURRAGE AND HAS TO BE  SETTLED EVERY 10
CALENDAR DAYS IN ARREAR FROM EACH LOAD/DISCHARGE PORTS AGAIN WITH FULL
SUPPORTED DOCUMENTS PRESENTED BY CARRIERS TO CHARTERERS.


**CLAUSE 43: SHIFTING**
ANY SHIFTING REQUIRED TO BE FOR ACCOUNT AND TIME OF PARTY ORDERING SAME.


**CLAUSE 44: ORIGINAL BILL OF LADING**
IF ORIGINAL BILL(S) OF LADING IS NOT AVAILABLE AT DISCHARGING PORT UPON
VESSEL'S ARRIVAL, THE CARRIERS/MASTER TO ALLOW DISCHARGE OF CARGO INTO
CUSTODY OF THE PORT AGAINST CHARTERERS' AND RECEIVERS' LOI AS PER OWNERS' P
AND I WORDING.


**CLAUSE 45: OVERTIME**
OVERTIME, IF ANY, TO BE PAID BY ORDERING PARTY.

**CLAUSE 46: EXTRA INSURANCE**
EXTRA INSURANCE DUE TO VESSEL'S AGE AND/OR FLAG, IF ANY, FOR CHARTERERS'
ACCOUNT BOTH ENDS.

EXTRA WAR RISK PREMIUM, IF ANY, TO BE FOR CHARTERERS' ACCOUNT BOTH ENDS.

4

**CLAUSE 47:**
TERMS AND CONDITIONS TO BE KEPT STRICTLY CONFIDENTIAL AND IF ANY BREACH OF
CHARTER PARTY WITHOUT FORCE MAJEURE CONDITIONS, THE PARTY CAUSING THIS
BREACH WILL BE FULLY RESPONSIBLE.

**CLAUSE 48:**
CARGO WILL BE LOADED UNDER/OPN DECK.  CARRIERS' OPTION CARGO ON DECK.
BILLS OF LADING TO BE MARKED 'SHIPPED ON DECK WITHOUT ANY RESPONSIBILITY TO
OWNERS FOR LOSS OR DAMAGE HOWSOEVER CAUSED' AND SAME TO BE FOR
CHARTERERS/SHIPPERS/RECEIVERS' RISK AND ACCOUNT.

**CLAUSE 49:**
IN THIS WHOLE CONTRACT OCEAN FREIGHT LEVEL NOT TO CHANGE WHATEVER
WHETHER INTERNATIONAL MARITIME MARKETING SITUATION CHANGES OR NOT.

**CLAUSE 50:**
DELETED.

**CLAUSE 51:  SHIPPERS**
SHIPPERS ARE
JIAFANG STEEL PIPES CO., LTD.
818 JINHANG RD. PUDONG NEW DISTRICT
SHANGHAI, PRC
ATTENTION: FLETCHER XI - ++ 86 - 139 - 0191 9501

CONSIGNEES ARE
ATN INDUSTRIES.

CARRIERS ARE
ABS BREAKBULK SERVICES GMBH, ROSTOCK, GERMANY.

8

Doc-No. 1091799  18/DEC/2007  18:41 (UTC +0100) JT

ANDREW / JUERGEN

RE: PIPES SHANGHAI / MARACAIBO
--

THKS YRS BELOW. OWNERS AGREE TO CHANGE LAYDAYS FOR NEXT LOT TO 3RD WEEK JAN 2008, I.E. 14/20.01 WITH LOADING SHANGHAI AND TERMS AND CONDITIONS AS PER COA. AS DISCUSSED ENDAVOUR TO NOMINATE 7 DAYS IN ADVANCE AND SHALL KEEP CHRTRS CLOSELY INFORMED

ACCORDING TO OUR TELCON ALSO UNDERSTOOD THAT THE LOT THEREAFTER IS SCHEDULED FOR WEEK 4, I.E. 21/27.01.08 WHICH KINDLY CONFIRM.

BESTREGARDS

STA BREMEN
JUERGEN TORBECK

+


----------Original message----------

TO..: "see transport agentur gmbh"
FROM: Thurlestone Shipping Ltd
DATE: 18-DEC-2007 17:17
MSG.: 2265981
Panamax@Thurlestone-shipping.com


juergen / andrew
pertelcon

Rcvd flwg fm chrs:

In view of the difficulty in loading at Ningbo, Charterers propose the following to Owners to shift the Laycan of first week of Jan 2008 for 3rd week of Jan 2008 and loading will take place at Shangahi as previously agreed to load about 430 pipes.

Please confirm ok and when vessel can be nominated

Await your news


Unquote



rgrds

9

Doc-No. 1095402  27/DEC/2007  09:53 (UTC +0100) JT

ANDREW / JUERGEN

RE: PIPES CONTRACT CHINA / MARACAIBO
--

STILL HAVE TO COME BACK TO BELOW MESSAGE. REGRET DELAY IN REPLY , WHICH WAS
DUE TO THE X-MAS HOLIDAYS HERE.

FOR GOOD ORDERS SAKE WLD LIKE TO POINT OUT FOLL

- THE TWO JANUARY LOTS ARE NOT SUB STEM BUT ONLY SUBJECT TO CHRTRS / SHIPPERS /
RECVSR APPROVAL OF VSL, WHICH NOT TO BE UNREASONABLY WITHHELD.
- CHANGED DIMENSIONS NOTED, HOWEVER,  MIN FRT TO BE BASED ON PIPES AS PER
CP-DESCR. ALSO HAVE TO SEE WHETHER THE PRESENT PIPES AGAIN HAVE A DIA OF
ABT 2,70 MTRS, IN WHICH CASE OWNERS MIGHT  COME BACK ON THIS ISSUE.

BRGDS

STA BREMEN
JUERGEN TORBECK


------------Original message-------------

TO..: "see transport agentur gmbh"
FROM: Thurlestone Shipping Ltd
DATE: 21-DEC-2007 15:32
MSG.: 2272999
Panamax@Thurlestone-shipping.com


juergen / andrew

dear andrew

re pipes contract

foll rcvd
quote

Be advised following:

For end jan two lots booked earlier , still sub stem/chrts/shippers/rcvrs approval

pipes dimmensions slightly changed

OD 2.4 x 12.192 mt x 14.50 mm / 10.3 TONS
Max 5 tiers high loading

otherwise as agreed

pls be guided accordingly

unquote

rgrds

10





LAYTIME STATEMENT
## MV "GO STAR" ABS 1054
LOADING AT SHANGHAI
ACCT: TOTALMAR NAVIGATION CORP. - C/P DD 07.12.07

**SHANGHAI**

| | | | |
|---|---|---|---|
| VSL ARRIVED ROADS | SUNDAY | 20.01.2008 | 10:00 hrs |
| NOR TENDERED | SUNDAY | 20.01.2008 | 10.00 hrs |
| NOR ACCEPTED | | as per c/p | |
| TIME STARTS TO COUNT | SUNDAY | 20.01.2008 | 14:00 hrs |
| COMMENCED LOADING | THURSDAY | 24.01.2008 | 20.00 hrs |
| COMPLETED LOADING | SATURDAY | 26.01.2008 | 12.00 hrs |
| COMPLETED LASHING | SATURDAY | 26.01.2008 | 12:30hrs |

| D | H | M |
|---|---|---|
| | | |

| | | | D | H | M |
|---|---|---|---|---|---|
| TIME ALLOWED | 5 DAYS SHINC | | 5 | 0 | 0 |

**TIME USED**

| DAY | DATE | FROM | TO | REMARKS | D | H | M |
|---|---|---|---|---|---|---|---|
| **SHANGHAI** | | | | | | | |
| SUNDAY | 20.01.2008 | 14:00 | 24.00 | | 0 | 10 | 0 |
| MONDAY | 21.01.2008 | 00.00 | 24:00 | | 1 | 0 | 0 |
| TUESDAY | 22.01.2008 | 00:00 | 24.00 | | 1 | 0 | 0 |
| WENSDAY | 23.01.2008 | 00:00 | 24.00 | | 1 | 0 | 0 |
| THURSDAY | 24.01.2008 | 00:00 | 08.45 | | 0 | 8 | 45 |
| | | 08.45 | 17.50 | NTC SHIFTING | 0 | 0 | 0 |
| | | 17.50 | 24.00 | | 0 | 6 | 10 |
| FRIDAY | 25.01.2008 | 00.00 | 24.00 | | 1 | 0 | 0 |
| SATURDAY | 26.01.2008 | 00.00 | 12:30 | | 0 | 12 | 30 |

| | | | D | H | M |
|---|---|---|---|---|---|
| TOTAL TIME USED | | | 5 | 13 | 25 |

| | | | D | H | M |
|---|---|---|---|---|---|
| TIME ON DEMURRAGE | | 0,55903 days | 0 | 13 | 25 |

| | |
|---|---|
| DEMM USD.37.500,- PDPR / HD => | 20.963,63 USD |

DT / JL
29.01.2008

CC                    CALC
                      FI





SEE TRANSPORT AGENTUR GMBH

STA See Transport Agentur GmbH – Martinistraße 29 – D-28195 Bremen

TOTALMAR NAVIGATION CORP
VENEZUELA

Liner Service
Operating
Chartering
Transport Contracting
Agents
- Transport Consulting

BREMEN, 29TH JANUARY 2008
DT / JL

INVOICE NO. 4810 /01 /2008

MV "GO STAR" / ABS 1054
SHANGHAI / MARACAIBO
GENCON C/P DATED 07.12.2007

TO:  DEMURRAGE SHANGHAI                                           **D E B I T**

AS PER ATTACHED LAYTIME STATEMENT
0,55903 DAYS AT US$ 37.500,00 PER DAY / PRO RATA            US$ 20.963,63

IN FAVOUR OF ABS                                                 US$ 20.963,63
                                                                 E. & O. E.

**PAYABLE WITHIN 14 DAYS**

PLEASE INSTRUCT YOUR BANKERS TO SEND PAYMENT ORDER BY TESTED TELEX / CABLE OR
SWIFT DIRECTLY AS FIRST GERMAN BANK – WITHOUT INTERMEDIARY OF ANOTHER BANK – TO:

BANKHAUS NEELMEYER, BREMEN  (GERMANY)
SWIFT / BIC:  NEELDE22
IBAN: DE09 290 200 00 0000 20 4319
ACCT. NO.: 204319
IN FAVOUR OF:  STA SEE TRANSPORT AGENTUR GMBH

CC: CALC.   CC: FIN.   CC: BOOK

Martinistraße 29, D-28195 Bremen
Telefon: 0421 / 339 46 -0
Telefax: 0421 / 337 82 88
Telex: 244 307
E-mail: info@sta-seetransport.de
www.sta-seetransport.de

Bankhaus Neelmeyer, Bremen
BLZ 290 200 00
SWIFT/BIC: NEELDE22
IBAN:
DE97 290 200 00 0000 01 5324
Kto-Nr. 15324

Geschäftsführer:
B. Hansing, J. Torbeck, A. Hansing
Amtsgericht Bremen HRB 87 42
VAT-Nr. DE 11 44 31 615

member of



12

Doc-No. 1096675  28/DEC/2007  22:28 (UTC +0100) JT

ANDREW / JUERGEN

RE: PIPES CHINA / MARACAIBO
--

RECVD YRS BELOW. NOTED CHRTRS COMMENT RE NINGBO CARGO AND ALSO RE SHANGHAI LOTS END JAN.
FULLY APPRECIATE CHRTRS COMMENTS AND LET'S TRY TO SORT OUT ONCE WE ARE HAVING " NORMAL "
WORKING PERIODS AGAIN. IT WLD BE APPRECIATED IF CHRTRS CAN CONFIRM THAT SHIPPERS FOR SHANGHAI
LOTS WILL BE SAME AS FOR PRESENT SHIPMENTS.

KNOW THAT CHRTRS ARE IN CONTACT WITH OWNERS REP AS WELL AND CAN ASSURE THEM THAT WE ARE TRYING
BEST TO SOLVE THE MATTERS IN THE MUTUAL INTERESTS.


+

RE MV MARJATTA P
--

AGAIN CAN ONLY CONFIRM THAT WE ARE TRYING UTMOST TO SOLVE THIS MATTER IN CHINA. ARE AWARE OF
THE PROBELMS WHICH CAN ARISE IF THE PIPES WILL NOT BE LOADED, HOWEVER, A DECISION OF THE PORT
AUTHORITY IS BEYOND OUR CONTROL. WE AS WELL THINK, THAT IT IS RIDICOLOUS NOT TO LOAD
OUTSTANDING PIPES ON HOLD NO 5 WHEN WE HAVE LOADED ON TOP OF THE OTHER HOLDS.
HAVING SAID THAT, WE ARE OF THE OPINION THAT THE VSL SHLD SAIL IN CASE NO POSITIVE REACTION
FROPM PORT AUTHORITIES CAN BE REACHED BY TOMORROW IN ORDER TO MINIMIZE DAMAGES. IF CHRTRS ARE
OF DIFFERENT OPINION THEY HAVE TO LET US KNOW BY RETURN. CHRTRS CAN BE ASSURED THAT WE ARE
TRYING OUR UTMOST TO SOLVE THE PROBLEM, THEMORESO AS THEY ALSO HAVE BEEN IN DIRECT CONTACTG
WITH OUR REPRESENTATIVE.

IF CHRTRS INSIST TO LET VSL WAIT FOR INDEFINITE TIME  WE NEED TO HAVE THEIR INSTRUCTIONS BY
RETURN - OTHERWISE WE WILL PROCEED AS ABOVE.

ANDREW, PLS CALL ME, IF YOU HAVE GOT INSTRUCTIONS FROM CHRTRS AS I AM NOT WATCHING THE
COMPUTER ALL THE NIGHT

BEST REGARDS

STA BREMEN
JUERGEN TORBECK


------------Original message--------------

TO..: "see transport agentur gmbh"
FROM: Thurlestone Shipping Ltd
DATE: 28-DEC-2007 21:02
MSG.: 2277349
Panamax@Thurlestone-shipping.com


juergen / andrew



re  ningbo contract

it seems that mic at atn usa has left for holidays and will not be back before 4th jan when we
can continue and try finalize the deal, plse try keep carriers calm until then , chrts
promised will start firm negotiations

re shanghai lots ex end jan

chrts rcvd confirmation for ttl 820 pipes (OD 2.4 x 12.192 mt x 14.50 mm / 10.3 TONS)  for end
jan dates , therefore they asking ows to nominate min/max 410 pipes vsl for 20/25 jan and
min/max 410 pipes vsl for 26/31 jan dates , pls confirm owners agreement to above , however
after albatross advised , factory not confirming same it may delay to beg february dates ,
they need to make double check to be safe side once more with factory and can come back
confirmation latest 4 or 5th jan or even trying to reach mic via mobile for earlier , however
what chrts says , all pipes out of shanghai will be given to albatross as per contract agreed
bcs they are happy with albatross,  if no loading end jan then beg feb or slight later but at
the end definetly loading with albatross

re marjetta p - missing 17 pieces

owners comments noted. we have checked from our source as well there seems to be a problem in
the port and chrs are asking owners full cooperation to convince the port authority to load
balance 17 pcs since this is a big vessel and 17 pcs more cannot be the cause of a problem. it
will be become a big problems for chrs if these pcs are left behind. there is going to be new
shift tomorrow 8 am and hopefully problem can be solved with owners assistance.

chrts request tomorrow as soon as marjatta p complete loading and sailed , asking ows to send

frt invoice and advising actual qtty loaded pipes

please keep us informed

rgrds

14



STA See Transport Agentur GmbH – Martinistraße 29 – D-28195 Bremen

TOTALMAR NAVIGATION CORP
VENEZUELA

Liner Service
Operating
Chartering
Transport Contracting
Agents
Transport Consulting

BREMEN, 26TH JANUARY 2008
DT / -

INVOICE NO. 4809 /01 /2008

MV "GO STAR" / ABS 1054
SHANGHAI / MARACAIBO
GENCON C/P DATED 07.12.2007

TO:   SEAFREIGHT                                                      **D E B I T**

LOADED
400 PCS (DIA 2,40M) = 28.090,368 CBM / ABT 4.160,0 MTS
 31 PCS (DIA 2,60M) =  2.554,956 CBM / ABT   381,3 MTS
430 PCS            = 30.645,324 CBM / ABT 4.541,3 MTS

AT US$ 103,00 PER CBM FIOS L/S/D – L/D 5DAYS SHINC / 4DAYS SHEX      US$ 3.156.468,37

PLUS  10 PIPES (DIA 2,4M) SHORT SHIPPED TTL 702,259CBM

AT US$ 103,00 PER CBM                                                US$    72.332,68
                                                                    US$ 3.228.801,05

LESS 3,75 % COMMISSION                                               US$   121.080,04

IN FAVOUR OF ABS                                                     US$ 3.107.721,01
                                                                    E. & O. E.



**PAYABLE WITHIN 5 BANKINGDAYS AFTER COMPLETION OF LOADING**

PLEASE INSTRUCT YOUR BANKERS TO SEND PAYMENT ORDER BY TESTED TELEX / CABLE OR
SWIFT DIRECTLY AS FIRST GERMAN BANK – WITHOUT INTERMEDIARY OF ANOTHER BANK – TO:

BANKHAUS NEELMEYER, BREMEN (GERMANY)
SWIFT / BIC:  NEELDE22
IBAN: DE09 290 200 00 0000 20 4319
ACCT. NO.: 204319
IN FAVOUR OF: STA SEE TRANSPORT AGENTUR GMBH

Martinistraße 29, D-28195 Bremen
Telefon: 0421 / 339 46 -0
Telefax: 0421 / 337 82 88
Telex: 244 307
E-mail: info@sta-seetransport.de
www.sta-seetransport.de

Bankhaus Neelmeyer, Bremen
BLZ 290 200 00
SWIFT/BIC: NEELDE22
IBAN:
DE97 290 200 00 0000 01 5324
Kto-Nr. 15324

Geschäftsführer:
B. Hansing, J. Torbeck, A. Hansing
Amtsgericht Bremen HRB 87 42
VAT-Nr. DE 11 44 31 615

member of

15

Juergen / Reyes

Many thanks for message bellow, content duly noted and Totalmar can propose following in reply to your bellow message:

As you know we are presently seeking compensation from ATN for various incidents that occurred between them and Totalmar during the shipments of pipes that were carried out for them as for contracts that both parties signed to fulfill such business, it happened that after they had confirmed verbally to us that Totalmar would perform the 6th shipment something occurred and they decided to do it with somebody else that is why we are trying to get the dead freight out of the 5th shipment (go star) which as per our charter party with them we have sufficient evidence to demonstrate in and arbitration proceeding that they did not comply with charter party terms. In this respect we are prepare to offer Owners as indicated previously that even though we inform the Owners in advanced that we did not had the 6th shipment confirmed to us so Owners did not really incurred in any lost we are prepare to offer the following as Totalmar has already started the Arbitration proceeding against ATN for various matters as demurrage claims that ATN has failed to paid and dead freight on the first shipment M/V Skala and the dead freight of the M/V Go Star; Totalmar offers Owners to give Owners 50 % of the amount of dead freight pending from ATN to Totalmar for the dead freight of the Go Star's  claim and the confirmation that all shipments that Totalmar gets from China will be negotiated with Owners at a reasonable rate for both parties.

The dates and rates will be negotiated as soon as Totalmar gets the final written confirmation from our client which is not ATN whom may or may not get part of the pipes that will come from China as per information that we know.

Above is firm to Owners as long as Owners will lift the legal proceeding that they had started against Totalmar, also Totalmar confirms that will remit the outstanding US$ 40,006.00 immediately.

Await your prompt confirmation to above.

Best regards

Eng. Reyes Hernández
Totalmar Group
e-mail: totalmar@cantv.net
Ph: +58 212 2868686
Fax: +58 212 2870115
Mob: +58 414 3057475

-----Mensaje original-----
De: info@sta-seetransport.de [mailto:info@sta-seetransport.de]
Enviado el: Viernes, 06 de Junio de 2008 10:38 a.m.
Para: totalmar@cantv.net
Asunto: Doc-No. 1224164

Doc-No. 1224164  6/JUN/2008  16:37 (UTC +0200) JT

TO: TOTALMAR CARACAS

REYES / JUERGEN

RE: PIPES SHANGHAI / MARACAIBO
     CP DD 07/12/07
--

RECVD YR MESSAGE OF YESTERDAY NIGHT.

16



STA See Transport Agentur GmbH – Martinistraße 29 – D-28195 Bremen

**TOTALMAR NAVIGATION CORP.**
Avda. Francisco de Miranda
Centro Plaza
Piso 18, Oficina F, Los Palos Grandes
Caracas
Venezuela

Liner Service
Operating
Chartering
Transport Contracting
Agents
Transport Consulting

BREMEN, 9TH JUNE, 2008
DT / -

INVOICE NO. 4864/06/2008

MV "ATLANTICA" / ASL 905

TO:

|  | **D E B I T** |
|---|---|
| TALLY EXPENSES AS PER ATTACHED INVOICE | RMB 141.541,50 |
| LESS CREDIT RECEIVED | RMB   42.462,45 |
|  | RMB   99.079,05 |

AT ROE 7,35

IN FAVOUR OF STA                                         US$   13.480,14
                                                          E. & O. E.

**BENEFICIARY BANK: BANKHAUS NEELMEYER (BREMEN, GERMANY)**
**SWIFT: NEELDE22**
**IBAN: DE09 290 200 00 0000 20 4319**
**ACCT. NO.: 204319**
**IN FAVOUR OF: STA SEE TRANSPORT AGENTUR GMBH**

**CORRESPONDENT BANK: BANK OF NEW YORK**
**SWIFT: IRVTUS3NXXX**

CC: CALC,   CC: FIN,   CC: BOOK

Martinistraße 29, D-28195 Bremen
Telefon: 0421 / 339 46 -0
Telefax: 0421 / 337 92 88
Telex: 244 307
E-mail: info@sta-seetransport.de
www.sta-seetransport.de

Bankhaus Neelmeyer, Bremen
BLZ 290 200 00
SWIFT/BIC: NEELDE22
IBAN:
DE97 290 200 00 0000 01 5324
Kto-Nr. 15324

Geschäftsführer:
B. Hansing, J. Torbeck, A. Hansing
Amtsgericht Bremen HRB 87 42
VAT-Nr. DE 11 44 31 615

member of



17



HEAD OFFICE
1. East De Zhanog Dong Li, Chaoyang
Disriot, Beijing, P.R.China
Post code: 100022  Fax: (010) 65922047
Tel: (010) 65922049 65942049

SHANGHAI BRANCH
STATE PATENT NO.
95318815.9

中国 外 轮 理 货 公 司
CHINA OCEAN SHIPPING TALLY COMPANY

## STATEMENT OF TALLY ACCOUNT

0705081325
Date of Inst.: 12/27/2007

Vessel: MA XXX    Voy.No. 905.    Nationality: MA/TA    Date of Inst.: 12/27/2007
Tally commenced on: 12/13/2007    Tally completed on: 12/16/2007

| Tally items | Quantity | Unit | Charging rate | Amount (Yuan) |
|---|---|---|---|---|
| Basic tallying for break-bulk cargo | | | | |
| Kinds of cargo No. 4 | 35863 | R/T | 2.10 | 75,291.30 |
| Surcharges for sunday/holiday cargo | | | | |
| Kinds of cargo No. 4 | 6017 | R/T | 2.10 | 12,635.70 |
| Surcharges for night shift | | | | |
| Kinds of cargo No. 4 | 14497 | R/T | 1.05 | 14,865.66 |
| Surcharges for overweight/lengthy cargo | | | | |
| Kinds of cargo No. 4 | 35862 | R/T | 1.05 | 37,644.60 |
| Charges of preparing tally papers | 5871 | | | 769.06 |
| Traffic expenses by land | | | | 315.00 |

Amount totalled(in words)  one hundred and forty one thousand five hundred and forty one yuan fifty fen

No: 1040  E    ¥141,541.50

In charge: _____  Checked by: _____  Prepared by: 樊美英    1/1

CT-FROM-16

OF241-882

中国外轮理货总公司
上海分公司
COSTACO SHANGHAI



## 上海中外运船务代理有限公司
### CHINA MARINE SHIPPING AGENCY SHANGHAI CO.,LTD.

# CREDIT NOTE

DATE:2008-05-26

**TO: STA BREMEN**

**M.V ATLANTICA  904/905**

| CONTENTS | AMOUNT (RMB) |
|---|---|
| 30%DISCOUNT FOR TALLY FEE | RMB42462.45 |
| TOTAL | RMB42462.45 SAY FORTY TWO THOUSAND FOUR HUNDRED AND SIXTY TWO POINT FOUR FIVE RMB ONLY |

CHINA MARINE SHIPPING AGENCY SHANGHAI COMPANY LTD

电话总机：021-63757000转接各部      地址：上海市福建中路188号，中外运大厦
Tel:0086-21-63757000  Sinotrans Mansion No.188 Fujian Rd.(C)200001 Shanghai,China

19



STA See Transport Agentur GmbH – Martinistraße 29 – D-28195 Bremen

Liner Service
Operating
Chartering
Transport Contracting
Agents
Transport Consulting

TOTALMAR NAVIGATION CORP.
Avda. Francisco de Miranda
Centro Plaza
Piso 18, Oficina F, Los Palos Grandes
Caracas
Venezuela

BREMEN, 9TH JUNE, 2008
JT/FG

INVOICE NO. 4865/06/2008

MV "MARJATTA P" / ABS 1053

TO:

|  |  | **D E B I T** |
|---|---|---|
| TALLY EXPENSES AS PER ATTACHED INVOICE | | RMB 155.401,74 |
| LESS CREDIT RECEIVED | | RMB   46.620,51 |
| | | RMB 108.781,23 |
| | AT ROE 7,32 | |
| IN FAVOUR OF STA | | US$   14.860,82 |
| | | E. & O. E. |

BENEFICIARY BANK: BANKHAUS NEELMEYER (BREMEN, GERMANY)
SWIFT:  NEELDE22
IBAN: DE09 290 200 00 0000 20 4319
ACCT. NO.: 204319
IN FAVOUR OF:  STA SEE TRANSPORT AGENTUR GMBH

CORRESPONDENT BANK: BANK OF NEW YORK
SWIFT: IRVTUS3NXXX

CC: CALC,  CC: FIN,   CC: BOOK

Martinistraße 29, D-28195 Bremen
Telefon: 0421 / 339 48 -0
Telefax: 0421 / 337 82 88
Telex: 244 307
E-mail: info@sta-seetransport.de
www.sta-seetransport.de

Bankhaus Neelmeyer, Bremen
BLZ 290 200 00
SWIFT/BIC: NEELDE22
IBAN:
DE97 290 200 00 0000 01 5324
Kto-Nr. 15324

Geschäftsführer:
B. Hansing, J. Torbeck, A. Hansing
Amtsgericht Bremen HRB 87 42
VAT-Nr. DE 11 44 31 615

member of



20



HEAD OFFICE
1. Tianqiaonan Dong Li, Chaoyang District, Beijing, P.R.China
Post code: 100016  Fax: (010) 65206247
Tel: (010) 65202048 65948700

中 国 外 轮 理 货 公 司
CHINA OCEAN SHIPPING TALLY COMPANY

SHANGHAI BRANCH
STATE PATENT NO. 9531881969

0800005830

## STATEMENT OF TALLY ACCOUNT

Vessel: MARIATTA P          Voy. No. 1083          Nationality: MALTA          Date of list: 01/08/2008
Tally commenced on: 12/26/2007          Tally completed on: 12/29/2007

| Tally items | Quantity | Unit | Charging rate | Amount (Yuan) |
|---|---|---|---|---|
| Basic tallying for break-bulk cargo | | | | |
| Kinds of cargo No.1 | 2 | R/T | 4.28 | 8.56 |
| Kinds of cargo No.4 | 41293 | R/T | 2.10 | 86,715.30 |
| Surcharges for night shift | | | | |
| Kinds of cargo No.4 | 23078 | R/T | 1.05 | 24,231.90 |
| Surcharges for non-cargo holds | | | | |
| Kinds of cargo No.1 | 2 | R/T | 2.14 | 4.28 |
| Surcharges for overweight/lengthy cargo | | | | |
| Kinds of cargo No.4 | 41293 | R/T | 1.05 | 43,357.65 |
| Charges of preparing tally papers | 6186 | | | 769.05 |
| Traffic expenses by land | | | | -315.00 |
| Amount totalled(in words)one hundred and fifty five thousand four hundred and one yuan seventy four fen | | | | Y155,401.74 |

In charge:          Checked by:          任燕萍          Prepared by: 翡翠英          No.1040  E — 08000005480
CT-FROM-16                                                                1/1

CF241-887

QF241-887



上海中外运船务代理有限公司
CHINA MARINE SHIPPING AGENCY SHANGHAI CO.,LTD.

# CREDIT NOTE

DATE:2008-05-26

**TO: STA BREMEN**

**M.V MARJATTA P   1052/1053**

| CONTENTS | AMOUNT (RMB) |
|---|---|
| 30%DISCOUNT FOR TALLY FEE | RMB46620.51 |
| TOTAL | RMB46620.51 SAY FORTY SIX THOUSAND SIX HUNDRED AND TWENTY POINT FIVE ONE RMB ONLY |

CHINA MARINE SHIPPING AGENCY SHANGHAI COMPANY LTD

电话总机: 021-63757000转接各部      地址: 上海市福建中路188号, 中外运大厦
Tel:0086-21-63757000  Sinotrans Mansion No.188 Fujian Rd.(C)200001 Shanghai,China

22



STA See Transport Agentur GmbH – Martinistraße 29 – D-28195 Bremen

TOTALMAR NAVIGATION CORP.
Avda. Francisco de Miranda
Centro Plaza
Piso 18, Oficina F, Los Palos Grandes
Caracas
Venezuela

Liner Service
Operating
Chartering
Transport Contracting
Agents
Transport Consulting

BREMEN, 9TH JUNE, 2008
JT/FG

INVOICE NO. 4866/06/2008

MV "GO STAR" / ABS 1054

TO:

|  | **D E B I T** |
|---|---|
| TALLY EXPENSES AS PER ATTACHED INVOICE | RMB 119.982,90 |
| LESS CREDIT RECEIVED | RMB   35.994,87 |
|  | RMB   83.988,03 |
| AT ROE 7,20 |  |
| IN FAVOUR OF STA | US$    11.665,04 |
|  | E. & O. E. |

BENEFICIARY BANK: BANKHAUS NEELMEYER (BREMEN, GERMANY)
SWIFT:  NEELDE22
IBAN: DE09 290 200 00 0000 20 4319
ACCT. NO.: 204319
IN FAVOUR OF:  STA SEE TRANSPORT AGENTUR GMBH

CORRESPONDENT BANK: BANK OF NEW YORK
SWIFT: IRVTUS3NXXX

CC: CALC,   CC: FIN,   CC: BOOK

Martinistraße 29, D-28195 Bremen
Telefon: 0421 / 339 46 -0
Telefax: 0421 / 337 82 83
Telex: 244 307
E-mail: info@sta-seetransport.de
www.sta-seetransport.de

Bankhaus Neelmeyer, Bremen
BLZ 290 200 00
SWIFT/BIC: NEELDE22
IBAN:
DE97 290 200 00 0000 01 5324
Kto-Nr. 15324

Geschäftsführer:
B. Hansing, J. Torbeck, A. Hansing
Amtsgericht Bremen HRB 8742
VAT-Nr. DE 11 44 31 615

member of



23

STATE PATENT NO. 95318815.9

中 国 外 轮 理 货 公 司

OCEAN SHIPPING TALLY COMPANY

## STATEMENT OF TALLY ACCOUNT

0800016687

Vessel: CO-STAR (S)    Voy. No. : 1054    Nationality: MALTA    Date of list : 02/08/2008

Tally commenced on: 01/24/2008    Tally completed on:    01/26/2008

| Tally items | Quantity | Unit | Charging rate | Amount(Yuan) |
|---|---|---|---|---|
| Basic tallying for break-bulk cargo | 30648 | R/T | 2.10 | 64,360.80 |
| Kinds of cargo  No. 4 | | | | |
| Surcharges for sunday/holiday cargo | 5365 | R/T | 2.10 | 11,266.50 |
| Kinds of cargo  No. 4 | | | | |
| Surcharges for night shift | 10746 | R/T | 1.05 | 11,283.30 |
| Kinds of cargo  No. 4 | | | | |
| Surcharges for overweight/lengthy cargo | 30648 | R/T | 1.05 | 32,180.40 |
| Kinds of cargo  No. 4 | 4543 | | | 576.90 |
| Charges of preparing tally papers | | | | 315.00 |
| Traffic expenses by land | | | | |

Amount totalled(in words) one hundred and nineteen thousand nine hundred and eighty two yuan and ninety fen    No:1040  E    ¥119,982.90

In charge:                Checked by:                Prepared by: 蒋素英    1/1

CT-FROM-16

HEAD OFFICE
北京市东直街东直门北小街2号
邮政编码 100025   Fax: (010) 65902547
Tel: (010) 65902549  65904700

QF241-582

中国外轮理货总公司
0800016687 海 关 专 用 章
上海分公司
COSTACO SHANGHAI

24



上海远东环球国际船舶代理有限公司
SHANGHAI FAREAST INTERNATIONAL SHIPPING AGENCY LTD.

15E NORTH TIANTONG ROAD,SHANGHAI
TEL: 021-63641475
FAX: 021-63547576
TLX:1932725SASH CN

# CREDIT NOTE

26TH MAY, 2008.

Messrs. ASL C/O STA BREMEN

MV. "GO STAR"

| Contents | Amount |
|---|---|
| 30% DISCOUNT FOR TALLY FEE | RMB35,994.87 |
| **TOTAL** | **RMB35,994.87** SAY: THIRTY FIVE THOUSAND NINE HUNDRED AND NINETY FOUR POINT EIGHT SEVEN RMB ONLY |

Shanghai Fareast International Shipping Co., Ltd.

*MA LI JHAO*

(Signature N stamp)

25

TO..: "see transport agentur gmbh"
FROM: Thurlestone Shipping Ltd
DATE: 27-DEC-2007 13:54
MSG.: 2275981


Panamax@Thurlestone-shipping.com


juergen / andrew

GOT FOLL REPLIES FOR YOU


REF NINGBO


2. FOR ALL OPERATORS SHOWING INTEREST ON NINGBO PIPES CONTRACT , DUE LINER
IN OWS AGENTS OWS TO SATISFY
   WITH LOADPORT RESTRICTIONS

3. ALBATROSS SHOULD MAKE UP MIND AND BRING THEIR LINER IN FREIGHT FOR NINGBO
URGENTLY OR SHOULD ADVISE
   SORRY WE ARE OUT AND IF THEY ARE INTERESTED , SHOULD INVESTIGATE , ASK
WHY 25000 DWT RESTRICTION UN WHICH
   BASE REASON , FYG CHRTS THKS OWS COMMENTS AND WILL ARRANGE
STEVEDORING/LABOURS/LASHING MATERIALS ETC

4. MARJATTA - WE NEED URGENTLY OWS/MASTER CONFIRMATION 500 PIECES WILL BE
LOADED WITHOUT ANY PROBLEM

5. END JANUARY 2 LOTS EX SHANGHAI 20/25 JAN AND 25/30 JAN , CHRTS CAN ADVISE
20/25 JAN ARE THERE BUT 25/30 JAN
   MAY POSTPONE TO FEBRUARY DATES OR CHRTS MAY CHANGE LOAD PORT , AS NOT TO
BE CONSIDER FULLY FIRM UNTIL
   THINGS ARE CLEAR , EXPECTING CHRTS OFFICIAL RESPONSE ON SAME INCLUDING
2.7M DIAMETER CASE


RGRDS

26

Doc-No. 1095944  27/DEC/2007  17:15 (UTC +0100) JT

TO: THURLESTONE

ANDREW / JUERGEN

RE: PIPE CONTRACT CHINA / MARACAIBO
–

RECVD YR TODAYS MESSAGE WITH THE VARIOUS ITEMS RAISED. MEANWHILE HAVE
ALREADY REPLIED TO ITEMS 2/3 AND ITEM 4.

COMING TO ITEM 5 WLD LIKE TO COMMENTS AS FOLLOWS

- CONSIDER THE 2 SHIPMENTS EX SHANGHAI AS FULLY AND FIRM FIXED IN ACCORDANCE
WITH EARLIER REACPS. IN CASE OF LATER SHIPMENT DATES FOR 2ND OUSTANDING
SHIPMENT, HAVE TO SEE ONCE WE ARE NEARER TO THE ACTUAL DATES.
CLD CHRTRS KINDLY CONFIRM TO US WHETHER SHIPPERS FOR THESE CONSIGNMENTS ARE
AGAIN " SHANGHAI JIAFANG STEEL PIPE CO. LTD ".

THKS AND BEST REGARDS

STA BREMEN
JUERGEN TORBECK

27

TO..: "see transport agentur gmbh"
FROM: Thurlestone Shipping Ltd
DATE: 08-JAN-2008 11:15
MSG.: 2298010
Panamax@Thurlestone-shipping.com

daniel / andrew
cc andreas

foll rcvd

quote

Marjetta p – frt payment

According to chrs, they have instructed yesterday their bankers to facilitate the payment accordingly. As
soon as they have swift copy will forward same , however usualy
ows seen the money before we send swift copy

ref 2 lots ex shanghai end jan dates

20/25 jan shipment is confirmed with 410 pipes. With dia 2.4m for sure pls nominate vsl as per cp

26/31 jan shipment awaiting confirmation on dates , most probably will move to beg feb and most
probably also 410 pieces reverting with more details

ref Ningbo coa
Chrs are awaiting reply fm shippers when they will finalize all the documents required. Hope to be able
to get some negotiation ongoing , will revert on their opening

unquote

rgrds

28

Doc-No. 1106615  14/JAN/2008  16:48 (UTC +0100) JT

to: thurlestone

andrew / juergen

to: oss dubai - attn ozi

re: pipes shanghai / maracaibo
--

being back in the office right now, wld like to in form you ( and at the same time confirm to chrtrs ) our discussions.

first of all wld like to thank chrtrs very much for enabling me to them / the port and last but not least venezuela. thks for the nice reception and assistance given during my stay over there.

coming to the outstanding items wld like to summarize / comments as follows:

- mv go star has been confirmed by chrtrs for 410 pcs pipes at 2,40 mtrs of plus 30 pcs pipes at 2,60 od. frt will be based on actual cubic ( 410 X 2,40 mtrs pipes plus 30 x 2,60 mtrs pipes)  at the agreed rate of usd 103,- p cbm fios lsd.

stowage plan has been sent to you earlier - however with 31 pcs of 2,60 mts od ( instead of 30 ), as this is the info we had got fm china earlier
on this basis we can only load an additional 15 pcs nested pipes on deck.

however, our chinese contact tell us that it might be that not all of the 2,40 mtrs od pipes are ready but only abt 390 pcs. if this is the case, we cld load additionally 30 pcs nested pipes on deck.

- next vsl bss end jan ex shanghai

have calculated on bss of marjatta p the intake. the 410 pcs of pipes with 1,40 mtrs dia can all be loaded under deck. this wld leave the deck open for nested pipes. that vsl cld take 105 pcs nested pipes on deck. so basically, one shld calculated with abt 100 pcs nested pipes on deck for such a vsl.

trust this is of assistance. awaiting chrtrs confirmation.

- frt payment. are glad to be able to finally confirm receipt of freight. so our bankers are even more fast to trace the money than chrtrs bankers to sent the swift confirmation. anyhow, money recvd and one headache less. thks

that's it for the time being

best regards
sta bremen
juergen torbeck

29

TO..: "see transport agentur gmbh"
FROM: Thurlestone Shipping Ltd
DATE: 14-JAN-2008 16:08
MSG.: 2313887
Panamax@Thurlestone-shipping.com

Attn Juergen

Below crossing with yrs just now:


foll rcvd

qte

5th nomination laycan 20/25 jan.
6th nomination laycan 26/31 jan but as said on the phone this shipment has not been confirmed by the
rcvrs yet which we are working on. I have informed
Chrs that vessel similar to marjetta p can load about 100 nested pipes on deck and they are working on
same

uqte

Await yours

Rgds

TO..: "see transport agentur gmbh"
FROM: Thurlestone Shipping Ltd
DATE: 18-JAN-2008 21:05
MSG.: 2325385
Panamax@Thurlestone-shipping.com

juergen/andrew

shipment jan 26/31 ex shanghai

rcvd flwg fm chrts

quote

kindly be advised that shippers have not cargo ready for referred laydays, they will inform new laydays
when cargo ready for shipment.

we have already informed mr. juergen of als, whom confirmed ok, but we should advice the new laydays
once we know them.
be advised accordingly.

unquote

rgrds

TO..: "see transport agentur gmbh"
FROM: Thurlestone Shipping Ltd
DATE: 22-JAN-2008 09:06
MSG.: 2332721
Panamax@Thurlestone-shipping.com

JUERGEN / ANDREW

ozi / andrew

finally got hold of juergen

1sty he comments that chrts already nominated the 6th lifting 25-31jan and only friday did they say they could not make the dates
now chrts seem to want a liner in rate , which albatross  will investigate but they firstly need
to know from shippers/charterers

1) what agreement shippers are having in relation to port cost under the c.o.a
2) if albatross are able to negotiate with the terminal that shippers are already having or are they bound
   to agree with costs already agreed between shippers and terminal
3) if above is no then can albatross use their own berth under liner in terms ?

once we have this info then albatross can give chrts a liner in optional rate


++

coming back to ningbo

it is albatross sole intention to transport pipes to shanghai

have shippers confirmed that they happy for this procedure?

before they can arrange the transportation they need to know urgently

are shippers intending to bed/nest the pipes from factory

location of factory

how many pipes can the factory produce on daily basis

+

also need to know value of the pipes for insurance purposes

it is albatross int to load one nested pipe per truck and reckon 1shipment every  5-7 days

can shippers provide enough pipes ( 250-270 pieces) every 5-7 days ?

plse urgently advise in order to get everything in line
rgds



> ========= Original Message ======== <
rcvd foll
quote.

ref 6th lot ex shanghai

urgently adv ows best min rate liner in free out bss against usd 103 fios

++

re ningbo contract

Kindly please request Albatross to offer firm for the Ningbo contract with the option to take cargo from Ningbo port and ex factory Ningbo and Shangahi to deliver same to Maracaibo basis liner in free out as discussed.

Above offer should include Owners commitment to truck cargo from Factory Ningbo to Shanghai and to place on handy maxes vessel; please indicate maximum intake per vessel from either port.

also advise route and daily transportation qtty

Appreciate very much your prompt reply.

unquote

rgrds
ozi

33

Doc-No. 1112738  22/JAN/2008  11:11 (UTC +0100) JT

TO: THURLESTONE

ANDREW / JUERGEN

RE:  PIPES CHINA / MARACAIBO
--

RECVD CHRTRS LAST MESSAGE OF YESTERDAY NIGHT. WLD LIKE TO COMMENT AS
FOLLOWS:

- NEXT LOT EX SHANGHAI: FRANKLY ARE A BIT SURPRISED ABOUT THE QUESTION ASKED.
THIS LIFTING HAD ALREADY BEEN NOMINATED TO OWNERS SEVERAL TIMES, LAST TIME
WITH DATES 26/30.01 AND IS A CLEAR FIXTURE WITH ABS. ONLY ON FRIDAY LAST OWNERS
HAVE BEEN INFORMED THAT DATES APPARENTLY CANNOT BE KEPT AND NEW DATES TO BE
ADVISED. NOW ALL OF A SUDDEN THERE IS THE QUESTION OF " LINER IN " ?

ANYHOW, CAN ADVISE THAT WE HAVE GOT INDICATION OF LINER IN EXPENSES AT
SHIPPERS TERMINAL NO 14 OF ABT USD 4,80 P CBM GROSS. THIS IS NOT CONSIDERING THE
TIME FACTOR.

- CARGO EX NINGBO
WERE OFFERING ON FRIDAY LAST FOR THESE SHIPMENTS BASED ON TRANSSHIPMENT VIA
SHANGHAI.  AT THAT TIME CHRTRS STATED THAT THEY SOFAR DID NOT TAKE UP
TRANSSHIPMENT BY TRUCK  WITH SHIPPERS AND THAT THEY WLD HAVE TO CHECK
WHETHER SAME WLD BE ALLOWED. THIS DESPITE THE FACT THAT WE WERE DISCUSSING
ALSO TO LOAD NESTED PIPES IN TRANSSHIPMENT ON DECK OF THE NEXT SHANGHAI
LOADER. HAVE NOT HEARD FROM CHRTRS IN THIS RESPECT.

THE OFFER OF FRIDAY LAST CLD BE AMENDED IN THE WAY THAT IT IS ABS OPTION TO LOAD
EITHER AT NINGBO OR SHANGHAI. THE INTAKES HAD BEEN DISCUSSED AND AVDISED
EARLIER: FROM NINGBO IT WAS ABT 150/170 PCS AND FROM SHANGHAI ABT 250/270 PCS.

FOR ARRANGING AND NEGOTIATING TRANSSHIPMENT FINALLY DO NEED FIRM COMMITMENT
OF CHRTRS AND FOLL INFO
- LOCATION OF FACTORY
- CONDITIONS OF SHIPPER: ? FOT INCL BEDDING  ?
- HOW MANY PIPES CAN BE LOADED BY SHIPPERS PER DAY
- VALUE OF PIPES

AS A GUIDE IN RESPECT TO TRANSSHIPMENT CAN INFORM CHRTRS THAT PRESENTLY ABS
WLD EMPLOY ABT 35 / 40 TRUCKS PER DAY, ROUTE WLD BE VIA HIGHWAY.

TRUST ABOVE OF ASSISTANCE. AWAIT CHRTRS FIRM CONFIRMATION

BEST REGARDS

STA BREMEN
JUERGEN TORBECK

Doc-No. 1116353  26/JAN/2008  13:55 (UTC +0100) JT

TO: THURLESTONE, LONDON - ATTN ANDREW
TO: OSS DUBAI - ATTN OZI

TOP URGENT !!

RE: PIPES SHANGHAI / MARACAIBO
--

INDERSTOOD FROM CHINA THAT THE NEXT SHIPMENT OF PÜIPES EX SHANGHAI ALLEGEDLY MIS BEING FIXED
WITH ARMADA ON MV " KANG CHING ". CAN HARDLY BELIEVE THIS BUT ASK YOU TO URGENTLY CHECK WITH
CHRTRS.

IN CASE THIS INFORMATION IS TRUE, WE WOUILD NOT ONLY BE DISAPPOINTED, BUT ARE HOLDING CHRTRS
FULLY RESPONSIBILE FOR ALL CONSEQUENCES OUT OF THEIR BREACH OF CONTRACT AND ARE RESERVING ALL
OWNERS RIGHTS ALSO OUT OF THE FIRST SHIPMENTS.

AWAIT YOURS URGENTLY

BEST REGARDS

STA BREMEN
JUERGEN TORBECK

35



36

# EXHIBIT 4

FOCUS - 13 of 33 DOCUMENTS

SIB INTERNATIONAL SRL v METALLGESELLSCHAFT CORPO-
RATION (THE "NOEL BAY")

COURT OF APPEAL (CIVIL DIVISION)

*[1989] 1 Lloyd's Rep 361*

**HEARING-DATES:** 9 December 1988

9 December 1988

**CATCHWORDS:**

Charter-party (Voyage) -- Repudiation -- Charterers in breach -- Owners concluded substitute
charter -- Whether owners entitled to claim demurrage they would have earned -- Whether owners
could claim expenses of ballast voyage.

**HEADNOTE:**

By a charter-party dated May 8, 1987 the disponent owners let their vessel Noel Bay to the
charterers for the carriage of a part cargo of clean unleaded gasoil from a port or ports on the west
coast of Italy (including Italian islands) to a wide range of European ports. The charter provided
inter alia that the total laytime in running hours was 72 hours, demurrage was to be at the rate of US
$8,500 per day and that the charterers' were to nominate a loading port before the vessel left her
previous port of call or on the signing of the charter if she had already sailed. Freight was payable
at a percentage over Worldscale.

The vessel finished her previous employment at Malta on May 29, at 17 12 hours. That was the
latest time for the charterers to give orders for a loading port but they did not do so.

On the same day at 18 24 hours she anchored off Malta awaiting instructions for a loading port.
On May 30 at 11 24 hours she sailed for Augusta in Sicily and arrived at the roads at 17 42 hours.

On June 1 the charterers gave notice that they were withdrawing from the charter which they
considered to be cancelled. The owners, on June 3 accepted that conduct as a repudiation and con-
cluded a substitute charter for the carriage of a cargo from Tuapse on the eastern shore of the Black
Sea to Banias in Syria. The vessel arrived at Tuapse on June 7 and completed discharge at Banias
on June 17.

The owners claimed damages from the charterers. It was assumed that the charterers would
have ordered the vessel to load at Augusta and to discharge at Lavera in the South of France and
that such voyage would have started on June 3 and ended on June 9. The owners claimed a profit
of $35,543 they would have made on the voyage; $27,766 by way of demurrage in that the 72 hours
would have been consumed in the loading and discharging in addition to the four and a half days
spent waiting for orders; and $17,444 being the expenses incurred in the ballast voyage from Au-

gusta to Tuapse.   The owners contended that the proportion which would have been earned up to June 9 when the notional voyage to Lavera ended was $12,538 and they gave credit for this amount.

The charterers accepted that a profit of $35,543 would have been made but they rejected the owners' claims for demurrage and the expenses incurred on the ballast voyage.   They argued that the approach voyage from Augusta to Tuapse should be considered as part of the voyage from Tuapse to Banias which on their calculation resulted in a profit of $3606 per day.   The charterers claimed that they were entitled to credit at the rate of $3606 per day for the period of overlap between the notional voyage from Augusta to Lavera and the actual voyage from Augusta via Tuapse to Banias.

Held, by QB (Com Ct) (PHILLIPS, J), that the owners were only entitled to $35,543.72 plus interest.

The owners appealed contending that they should have been awarded $68,216.66.

Held, by CA (BALCOMBE, STOCKER and STAUGHTON, LJJ), that (1) the owners claim for $17,444 failed; the approach voyage from Augusta to Tuapse was part of the process of earning freight under the substitute charter; the expenses of it should be added to those that were incurred in subsequent stages at Tuapse and Banias and on the loaded voyage, the total was then deducted from the freight to ascertain the profit of the substitute voyage as a whole and this gave a daily rate of profit of $3606 for the venture; the owners were only obliged to give credit at that rate during the overlap period; they could not claim separately for the $17,444 expenses of the ballast voyage (see p 366, col 2; p 367, col 1);

(2) (per BALCOMBE and STOCKER LJJ), that at no time was it ever pleaded that there had been a breach of cl 4 of the charter which gave rise to a right to damages for detention which had accrued before the charter was terminated by the owners' acceptance of the charterers' repudiation, as well as to general damages for loss of freight; the claim as pleaded was simply for damages for repudiation of the charter and the learned Judge was right to say that the owners had suffered no loss beyond the $35,543 for loss of freight; the appeal would be dismissed (see p 367, cols 1 and 2; p 368, cols 1 and 2).

**CASES-REF-TO:**

Johnson v Agnew, (HL) [1980] AC 367;

Maredelanto Compania Naviera SA v Bergbau-Handel GmbH (The Mihalis Angelos) (CA) [1970] 2 Lloyd's Rep 43; [1971] 1 QB 164;

Rheinoel GmbH v Huron Libenan Co (The Concordia C), [1985] 2 Lloyd's Rep 55;

Saxon Steamship Co Ltd v Union Steamship Co Ltd (1898) 4 Com Cas 29; (1900) 5 Com Cas 381;

Zim Israel Navigation Co Ltd v Tradax Export SA, (CA) [1971] 2 Lloyd's Rep 91; [1970] 2 Lloyd's Rep 409.

**INTRODUCTION:**

[1989] 1 Lloyd's Rep 361

This was an appeal by the disponent owners SIB International SRL from the decision of Mr Justice Phillips awarding them $35,543.72 against the charterers Metallgesellschaft Corporation for the wrongful repudiation of the charter.

The further facts are stated in the judgment of Lord Justice Staughton.

## COUNSEL:

Mr Julian Cooke for the owners; Mr Paul Walker for the charterers.

**PANEL:** Lord Justice BALCOMBE, Lord Justice STOCKER and Lord Justice STAUGHTON

**JUDGMENTBY-1:** Lord Justice STAUGHTON

## JUDGMENT-1:

Lord Justice STAUGHTON: In 1987 the plaintiffs, SIB International SRL, were time chartered owners of the mt Noel Bay. I shall call them "the owners". By a charter-party dated May 8, 1987 they chartered the vessel to the defendants, Metallgesellschaft Corporation ("the charterers") for the carriage of a part cargo of clean, unleaded gasoil from a port or ports on the west coast of Italy (including Italian islands) to a wide range of European ports. On June 1, 1987 the charterers purported to withdraw from the charter-party, saying that they considered it cancelled. The owners on June 3 treated that conduct as a wrongful repudiation and accepted it as such.

On July 2 the owners issued a writ claiming damages from the charterers. It became apparent that liability was not disputed, and that the only issue was as to damages. That was tried by Mr Justice Phillips, and on Apr 19 he gave judgment for the owners for $35,543.72 and interest. From that judgment the owners now appeal. They say in their notice of appeal that they should have been awarded $68,216.66. It is a refreshing change to have a case on such recent facts before this Court.

The charter-party

This provided for laydays not to commence before May 20, and for a cancelling date of May 24 if the vessel were not ready by then; but those dates were extended by agreement. There were the following further terms:

H. Total laytime in running hours 72

I. Demurrage per day: US dollars 8,500 per day or pro rata.

4. (a) Prior to the Vessel's readiness to sail from the last previous port of call or on signing this charter if the Vessel has already sailed, Charterer shall nominate the port(s) of loading or port(s) of discharge, as the case may be, or order the Vessel to one of the following destinations for wireless orders naming such port(s):

Quoin Island

Land's End

Gibraltar

Suez

[1989] 1 Lloyd's Rep 361

Aruba

If the Vessel is ordered to one of such destinations for orders, Charterer shall thereafter nominate the actual loading or discharged port(s) by wireless as soon as practicable.

(b) After loading or discharging port(s) have been nominated, Charterer may change such port(s) and/or vary their rotation consistent with Part 1 and bills of lading, if any, and Owner shall issue instructions necessary to give effect to such change.   If such change is made, or a destination for wireless orders is given, any time by which the steaming time to the port(s) to which the Vessel is finally ordered exceeds that which would have been taken if the Vessel had been ordered to proceed to such port(s) in the first instance shall count as laytime or, if the Vessel is on demurrage, as time on demurrage . . .

6.   Upon arrival at customary anchorages at each port of loading or discharge, the Master shall give the Charterer notice by letter, telegraph, wireless or telephone thta the Vessel is ready to load or discharge cargo, berth or no berth, and laytime or, if the Vessel is on demurrage, time on demurrage shall commence upon the expiration of six (6) hours after receipt of such notice . . .

8.   Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part 1(1) for all time that laytime therein specified is exceeded by the time taken to load and discharge cargo and the time which, under the provisions of this Charter, counts as laytime or time on demurrage.

Freight was payable at a percentage over Worldscale, which of course makes provision for voyages from any of a great many loading ports to any of a great many discharging ports.

Further facts

The vessel finished her previous employment at Malta, on May 29 at 17 12 hours when she cleared outwards.   That was the latest time for the charterers to give orders for a loading port pursuant to cl 4(a), or for one of the other destinations mentioned in that clause.   But they did not do so.

On the same day at 18 24 hours she anchored off Malta awaiting instructions for a loading port. On May 30 at 11 24 hours she sailed for Augusta (which is in Sicily).   On the same day at 17 42 hours she arrived at Augusta roads and waited there.   On June 1, as already mentioned, the charterers gave notice that they withdrew from the charter-party.   And on June 3 the owners accepted that conduct as a repudiation, and concluded a substitute charter for the carriage of a cargo from Tuapse (on the eastern shore of the Black Sea) to Banias in Syria.   The vessel arrived at Tuapse pursuant to that charter-party on June 7, and completed discharge at Banias on June 17.

The principles involved

At first sight the owners' claim for damages fell to be assessed on well-settled principles, albeit with a good deal of tiresome attention to detail.   The owners are entitled to be placed in the same position, financially, as they would have enjoyed if the contract had not been broken.   That involves a comparison of the money they would have earned, less expenses, on the contract voyage with the money they in fact earned, less expenses, on the substitute voyage.   Fixed items, such as insurance, crew wages and repairs, which can more or less accurately be described as overheads for this purpose, may be disregarded since they are the same on both sides of the account.   But one problem that almost invariably arises, and does in this case, is that the substitute voyage lasts for longer than the voyage under the original charter-party.   The solution commonly adopted is to take

a proportion of the profits on the substitute voyage to set off against the profits lost on the original voyage; otherwise one would be involved in calculations to the end of the ship's working life.

Another problem is that the vessel may have been better -- or worse -- placed for future employment at the end of one voyage than at the end of the other. That is commonly a factor which is said to be relevant. But there is nothing to suggest that it has any importance in this case.

A third difficulty arises where the charterer -- the guilty party -- had an option as to the way in which he could require the original contract to be performed. In such a case it is established law that, at any rate if the option has not already been exercised at the date of the breach, the charterer must be assumed to have exercised the option in a way most favourable to himself. Here the calculation of the profit that would have been made on the original voyage is based on the assumption that the charterers would have ordered the vessel to load at Augusta, and to discharge at Lavera in the South of France. There has been no dispute about that; both sides agree that the calculation must be based on that assumption.

There is one unusual feature of this case, which gives rise to the main issue in dispute. It is that, when repudiation was accepted on June 3, the charterers had already been in breach for five days by failing to give loading port orders. In consequence the vessel had been idle for the greater part of the period; all that she had accomplished was the short voyage from Malta to Augusta, in two stages occupying some seven and a half hours in all. It is the treatment of that period of idleness which causes the greatest problem.

The rival calculations

The owners' claim is in four parts. Part A considers a notional voyage starting on June 3 (when repudiation was accepted) from Augusta with cargo to Lavera. It would have taken 6.17 days, ending on June 9; the freight payable would have been $90,350, and the expenses (other than fixed expenses which I have described as overheads) $54,806; the profit $35,543.

Part B is controversial. It alleges that, in meal or in malt, the owners would have earned $27,766 by way of demurrage on that voyage, because 72 hours would have been consumed in loading and discharging in addition to the period of over four and a half days spent waiting for orders. The precise formulation of this claim, and in particular whether it is meal (demurrage as such) or malt (damages in the like amount) will need careful attention later.

Part C claims the expenses of the voyage from Augusta to Tuapse, in the sum of $17,444. This sum is said to have been spent by the owners in <u>mitigation</u> of their loss, in order to take up substitute employment.

Part D allows credit for a proportion of the profit earned on the substantive voyage. The calculation starts on arrival of the vessel at Tuapse, and ends on discharge at Banias. The figures are:

Duration of voyage 9.77 days

Freight $125,019

Expenses 56,618

Profit $68,480, or $7,000 per day.

There is a minor error in that calculation, of no consequence.   The proportion which would have been earned up to June 9, when the notional voyage to Lavera would have ended, is $12,538. For that the owners give credit.

The charterers' calculation accepts, at any rate in this Court, part A of the owners' claim -- the profit of $35,543 that would have been made on the notional voyage from Augusta to Lavera.   Before the Judge the charterers argued that there should be deducted the expenses of the voyage from Malta to Augusta; but the Judge rejected that argument, and there is no cross-appeal.   He was plainly right to do so, for the owners did not save or avoid those expenses when they accepted the charterers' repudiation; the expenses had already been incurred.   Another way of putting the same point is that, if one is comparing what actually happened with what would have happened if the contract had been performed, those expenses occur on both sides.   So they can be left out of account.

The charterers altogether reject part B of the owners' claim (demurrage or damages in the like amount that would have been payable on the notional voyage), and the Judge agreed with them. His reasoning will be considered later.

On Parts C and D the charterers adopted a different method.   They argued that the approach voyage from Augusta to Tuapse should be considered as part of the cargo voyage from Tuapse to Banias.   Their figures are:

Duration of voyage 14.15 days

Freight $125,019

Expenses 74,062

Profit $51,036, or $3,606 per day.

There is a minor error in arithmetic, as there is in the owners' calculation.   The charterers say that they are entitled to credit at the rate of $3606 per day for the period of overlap between the notional voyage from Augusta to Lavera, and the actual voyage from Augusta via Tuapse to Banias. If they can uphold the Judge's treatment of the notional voyage, which is considered later, the overlap is only two days, and the charterers waive their claim for any credit.   But if they do not uphold the Judge's treatment they do claim credit, for an overlap of six days.

The first issue

This arises on the owners' claim B.   Before the Judge it was put in this way:

If orders for the loading port had been given in accordance with clause 4 of the charter, the vessel would have been able to arrive at Augusta and tender NOR by not later than 0200 on 30th May, with the result that laytime would have commenced on 0800 on 30th May and expired at 0800 on 3rd June.

Thus by 1424 on 3rd June the vessel would have been on demurrage for 6 hours 24 minutes, and on the ba is that a further three days (the allowed lay-time) had been used in loading and discharging, the vessel would have earned demurrage as follows: 3,266666 days x $8,500 = $27,766.66.

Thus it was argued that the owners could recover not only $35,543 under claim A as damages for repudiation of the charter-party, but also the additional sum of $27,766 as lost demurrage.   The

precise calculation is explained, for the curious, by the fact that May 31, 1987 was a Sunday and so excepted from laytime.

Mr Walker for the charterers submits, and the Judge accepted, that there are two answers to this claim. The first is that the notional voyage in performance of the charter-party must be calculated on the hypothesis that there was no breach of any kind by the charterers, and in particular no failure to give prompt orders for a loading port. On that basis the notional voyage would have begun on May 29 at Malta, continued to Augusta for loading, and ended at Lavera on June 5. That, Mr Walker submits, is the true no-breach assessment. The owners recover their loss of $35,543 and no more.

There are in my judgment two answers to that contention: it is not law, and it is not just. As to the law, I accept the submission of Mr Cooke for the owners that the value of the contract which they lost must be assessed as at June 3, the date when repudiation was accepted and they lost it. Whatever events had already occurred by then are facts, and cannot be altered by hypothesising. By that time the charterers had been in breach of contract for five days, and the owners had an accrued right to complain of that breach. (I leave aside for the moment whether they had any accrued right to damages or demurrage.) I find support for this treatment in Maredelanto Compania Naviera Sa v Bergbau-Handel GmbH (The Mihalis Angelos), [1970] 2 Lloyd's Rep 43; [1971] 1 QB 164. There Lord Justice Megaw said (at p 58; p 209):

In my view, where there is an anticipatory breach of contract, the breach is the repudiation once it has been accepted, and the other party is entitled to recover by way of damages the true value of the contractual rights which he has thereby lost, subject to his duty to mitigate. If the contractual rights which he has lost were capable by the terms of the contract of being rendered either less valuable or valueless in certain events, and if it can be shown that those events were, at the date of acceptance of the repudiation, predestined to happen, then in my view the damages which he can recover are not more than the true value, if any, of the rights which he has lost, having regard to those predestined events.

See also Johnson v Agnew, [1980] AC 367, a case concerning a contract for the sale of land where there had evidently been a substantial charge in its market value. The House of Lords held that the damages should be assessed on the date when the remedy of specific performance became aborted (eg per Lord Wilberforce at p 401).

Guidance is said also to be found in Rheinoel GmbH v Huron Liberian Co (The Concordia C), [1985] 2 Lloyd's Rep 55. There Mr Justice Bingham was faced with an award of arbitrators for both freight differential and damages for detention. The Judge varied the award. However, it is impossible to ascertain from the report precisely what the arbitrators awarded and on what facts. Whatever it was, Mr Justice Bingham did not wholly agree with it. So I cannot regard the case as of assistance on this particular point.

As to the justice of the treatment proposed by Mr Walker and accepted by the Judge, it seems to me that on other facts it could be most unjust. Suppose that the owners had reasonably waited not five days but 15 days for orders, and then accepted the charterers' conduct as a repudiation. Their damages would still by Mr Walker's method have been $35,543 and no more; that method would still have required a hypothesis of no breach at all, so that the notional voyage would have begun on May 29 and ended on June 5. But the repudiation would in fact only have been accepted on June 13 (after waiting 15 days for orders), and the owners would only have been free to take other em-

[1989] 1 Lloyd's Rep 361

ployment for their vessel on that date.   They would receive no compensation at all for the period from June 5 to 13.

Since preparing this judgment I have seen in draft the judgment to be delivered by Lord Justice Balcombe.   I agree that the owners' points of claim did not accord with the way that their case was put at the trial; they contained no calculations such as were later to be found in parts A to D of the claim at trial; instead the figures in par 8 (which Lord Justice Balcombe sets out) were calculated on a different basis, which I would have thought difficult to sustain.

It seems to me that by allowing parts A to D of the claim to be put forward, the Judge must by implication have been allowing any necessary amendment to the points of claim.   So I feel entitled to conclude that the owners are, in principle, entitled to the loss which they suffered by delay for five days through the charterers' breach of contract, as well as the loss by repudiation amounting to $35,543.   But Mr Walker's second argument, which the Judge also accepted, is that the damages for five days' delay must be assessed by reference to the vessel's earning capacity at the market rate, and not by the liquidated sum of $8,500 per day payable as demurrage.

As will appear shortly, I agree with that treatment; and the result of it is that the owners' claim for additional loss is extinguished by the credit which they must give for profit earned on a proportion of the substitute voyage.   Consequently the difference of view between Lord Justice Balcombe and myself is not material to the outcome of this appeal.

In support of the demurrage figure Mr Cooke sought to rely on three arguments not put forward in the Court below.   The first was that the charterers had in fact ordered the vessel to wait off Malta; as such an order could only be given for one of the destinations named in cl 4(a), Malta must be deemed to have been one of the destinations; in consequence time lost waiting should be treated as laytime by reason of cl 4(b).   That argument might well face difficulty in law.   But it also requires a basis of fact which was not pleaded and not found by Mr Justice Phillips, viz that the charterers did order the vessel to wait off Malta.   In the circumstances this Court ruled that the argument could not be pursued.

The second point was that, as failure to give any orders at all is worse than a change of orders or an interim order to one of the destinations mentioned in cl 4(a), it ought a fortiori to be included in the events which cause laytime to run under cl 4(b).   I was at one time attracted by this argument, which has the merit of common sense.   But the result contended for can only be achieved by implication, and I do not think that the detailed provisions of cl 4(b) can be supplemented by implication in this way.

Thirdly, Mr Cooke submits that, if the owners are not entitled to demurrage as such, they are entitled to damages equal to the earning capacity of the vessel in the market, which can be assumed to be equal to the demurrage rate in the charter-party.   Such an assumption is sometimes made, in the absence of any other evidence, as it was by agreement in the case of Zim Israel Navigation Co Ltd v Tradax Export SA, [1970] 2 Lloyd's Rep 409, [1971] 2 Lloyd's Rep 91.   But here there was other evidence of the earning capacity of the vessel in the market -- the rate which emerged from the figures for the substitute voyage.   Mr Cooke argued that the spot rate obtainable for the vessel at Augusta on June 3 (when the substitute charter was fixed) is not evidence of the rate which the owners might have been able to obtain at Lavera on June 5, had there not been the delay waiting for order. They would at least have had more time or explore the market.   No doubt it is possible that the rate then would have been different.   But I am confident that the rate obtainable on the substitute

[1989] 1 Lloyd's Rep 361

voyage is a better guide to the vessel's current earning capacity than the demurrage rate in the original charter-party.  That there was no more evidence on that topic is perhaps not surprising, since the owners did not in their pleadings put forward any claim for damages based on a market rate, as an alternative to their claim for demurrage.  Mr Cooke protests that the calculations put forward in his claim B were agreed as figures.  But I do not think that there can have been any agreement as to damages if they were not based on the demurrage rate.  Certainly the Judge did not think that there was.

So I turn to consider the way in which this point was argued before the Judge, as already set out.  This I have found the most elusive point in the whole case.  Mr Cooke says that it is a question of causation: the delay in giving orders caused the laytime not to start when it would have started if prompt orders had been given.  That has considerable force, but it seems to me to erect yet more hypothesis on the existing edifice.  One is required to assume that the charterers would have nominated Augusta on May 29 (Perhaps they have to live with that assumption as it suits them for the purpose of the notional voyage), that the vessel would have arrived there on May 30, that cargo would not have been loaded before June 3, and that no time would have been saved thereafter in the loading and discharging operations.  It is simpler, more realistic, and in my opinion correct to award the owners damages reflecting the earning capacity of the vessel in the market for the period when she was delayed by lack of orders.

So I consider that, instead of their claim B, the owners are entitled to such damages for the period from May 29 to June 3, save for the time taken to sail from Malta to Augusta.  (In this calculation Sunday, May 31, counts, since one is not dealing with laytime or its exceptions).  The appropriate figure is either $7000 per day on the owners' argument, or $3,606 per day according to the charterers.  I consider which is the right figure under the next issue.  But whichever is right, it is immediately offset by the credit which the owners must give for earnings under the substitute charter, at the same rate, for the period from June 3 to June 9 (when the notional voyage under the charterparty would have ended).  The Judge was therefore right to hold that, in effect, claim B failed.

The second issue

Mr Cooke submits that freight and expenses on the substitute voyage must be apportioned over the period from arrival or the start of loading at Tuapse to discharge at Banias.  The approach voyage from Augusta to Tuapse does not feature in that calculation.  The resulting figure is $7000 per day, for which the owners give credit in part D of the claim.  But they claim in part C the whole of the expenses from Augusta to Tuapse, amounting to $17,444.  The total is then deducted from the freight to ascertain the profit of the substitute voyage as a whole.  This gives a figure of $3606 per day as the daily rate of profit for that venture.  The owners are only obliged to give credit at that rate during the period of overlap -- or rather would have been so obliged if the credit had not been used to extinguish their claim B.

They cannot claim separately for the $17,444 expenses of the ballast voyage.

[1989] 1 Lloyd's Rep 361

I appreciate that this conclusion involves a departure from the decision of Mr Justice Bingham in The Concordia C case on a similar point. But he expressly recorded (at p 57 of the report) that the treatment of expenses was not in controversy before him.

Conclusion

The owners are not entitled to $27,766 being demurrage or damages at the demurrage rate for the delay in giving loading port orders. Apart from the sum of $35,543 which the Judge awarded them, they are only entitled to damages at the market rate of $3606 per day. This claim is extinguished by the charterers' entitlement to credit, at the same rate, for the slightly longer period when the notional voyage overlapped the substitute voyage. The owners are also not entitled to the expenses from Augusta to Tuapse. So they recover only the sum of $35,543 and interest which the Judge awarded them. Their appeal should be dismissed.

**JUDGMENTBY-2:** Lord Justice STOCKER

**JUDGMENT-2:**

Lord Justice STOCKER: I agree that this appeal should be dismissed for the reasons stated by Lord Justice Staughton.

I add an observation of my own solely because a difference of opinion seems to have emerged with regard to the basis upon which that result can be achieved. I agree with Lord Justice Balcombe that the reasoning by which Lord Justice Staughton has reached his conclusion was not that pleaded in the points of claim, though the argument that a claim for damages for detention might provide an alternative basis upon which the Judge's finding might be upheld was extensively canvassed before this Court. I agree that the appeal based upon this formulation fails since no damage resulted, the vessel having been returned by the owner sooner than it would have been had the charter voyage been performed. I also agree with Lord Justice Balcombe that the decision of the trial Judge can be supported for the reasons given by him in his judgment and for this reason also I would dismiss this appeal.

**JUDGMENTBY-3:** Lord Justice BALCOMBE

**JUDGMENT-3:**

Lord Justice BALCOMBE: I have had the opportunity to read in draft the judgment of Lord Justice Staughton and I agree with him that this appeal should be dismissed. On the second issue in the appeal I agree with his reasoning and there is nothing that I wish to add.

However on the first issue, although I agree with him in the result, for my part I would have upheld the decision of Mr Justice Phillips for the reasons given by him in his judgment.

It is important to see the way in which the owners pleaded their claim.

Points of claim

1. By a voyage charterparty dated London, 8th May 1987, the Plaintiffs, as disponent owners of the MT "Noel Bay" chartered the vessel to the Defendants for a single voyage from "one/two safe port(s) West Coast Italy, including Italian Islands" for discharge at a port to be nominated.

[1989] 1 Lloyd's Rep 361

2.   By subsequent agreement between the parties, the lay days/cancelling provisions of the charter were amended to 30th May/2nd June 1987.

3.   On 29th May 1987, the vessel completed discharge under her previous charter, and charterers were requested to nominate a loading port within the charterparty requirements, but no nomination was made.

4.   The vessel proceeded to Augusta Roads, arriving at 17.42 hours local time on 30th May, and a notice of readiness was tendered.

5.   On 1st June charterers telexed owners as follows:

"PER TELECON MG CORP HEREBY ADVISES THAT THEY WITHDRAW FROM THE ABOVE MENTIONED <u>CHARTER</u> PARTY AND CONSIDER SAME <u>CANCELLED.</u>   PLSE NOTIFY OWNERS IMMEDIATELY."

6.   The owners accepted this repudiation of the charter by the Defendants, and claim <u>damages</u> accordingly.

7.   Following the charterers' repudiation, the owners obtained alternative employment for the vessel, involving a voyage Tuapse in the Black Sea to Banias, Syria.   The vessel sailed from Augusta at 14.30 hours on 3rd June.

8.   The owners' losses are accordingly as follows:

Total costs to owners from 17.12 on 29th May to 18.30 on 17th June (completion of substitute voyage) $237,658.38

Freight earned on substitute voyage 129,479.71

Damages $108,178.67

The claim as formulated by the owners, in the four parts set out by Lord Justice Staughton, was in substitution for the damages as set out in par 8 of the points of claim.   However, at no time was it ever pleaded that there had been a breach of cl 4 of the charter-party which gave rise to a right to damages for detention which had accrued before the charter-party was terminated by the owners' acceptance of the charterers' repudiation, as well as to general damages for loss of freight.   A claim could have been made in this way -- see eg Saxon Ship Company Ltd v Union Steamship Co Ltd, [1898] 4 Com Cas 29; [1900] 5 Com Cas 381, where the pre-repudation claim was a liquidated claim for demurrage, rather than an unliquidated claim for detention -- although for the reasons given by Lord Justice Staughton the owners in fact suffered no loss from the detention of the ship during the time it was awaiting orders from the charterers.   A claim pleaded in this way would avoid the possibility of injustice in the circumstances predicated by Lord Justice Staughton.

However, the claim as pleaded by the owners was simply for damages for the repudiation of the charter-party by the charterers.   On this basis, in my judgment the Judge was right to say that the owners had suffered no loss beyond the $35,543 for loss of freight.   As he said, after setting out the basis of the owners' claim B referred to by Lord Justice Staughton, (and in quoting from his judgment I substitute "the owners" for the "plaintiffs", and "the charterers" for "the defendants"):

Mr Walker does not join issue with the calculations advanced by Mr Cooke.   He does, however, challenge the premises underlying this head of claim.   He submits that no demurrage was in fact incurred and that the claim, in truth, is a claim for wrongful detention.   While, in the absence of

[1989] 1 Lloyd's Rep 361

evidence, a court can properly assume that the demurrage rate in a charter represents the loss caused by detention, it is always open to either party to adduce evidence of the actual loss so caused, or absence of loss. Looking at the whole picture it is clear, submits Mr Walker, that the Owners sustained no loss as a result of detention. The Charterers' repudiation in fact resulted in the Owners having restored to them the disposal of their vessel two days sooner than if the notional contractual voyage to Lavera had been performed. If the Owners receive as damages the net earnings from that notional voyage they are, in fact, better off than if the contract had been performed. They cannot claim additional damages for detention.

Mr Walker put his case another way. The Charterers did not commit two discrete breaches of contract. The failure to nominate a loading port as required by clause 4 was the start of a continuous and repudiatory non-performance of the contract which the Owners accepted on the 3rd June. In these circumstances damages fall to be assessed on the basis that the Owners have been wholly deprived of contractual performance. This requires the Court to consider the position that the Owners would have been in had the Charterers performed properly from first to last. The Owners do not have two separate claims for damages, to be viewed in isolation, but a single claim for the damage flowing from the Charterers' total failure of performance.

In my judgment Mr Walker's submissions are well founded. I do not consider that the Owners had a vested right to damages for breach of cl 4 that survived the termination of the charter by acceptance of the Charterers' repudiation. The notional contractual performance that has to be considered for the purpose of assessing damages is one that begins with a contractual nomination on the 29th May and continues with contractual performance thereafter. It is wrong in principle to build into the notional contractual performance a delay in the provision of cargo resulting in the accrual of demurrage simply because the Charterers' repudiatory non-performance included a failure to provide cargo. It follows that this head of claim is disallowed.

It seems to me that, in the way this claim was pleaded, the Judge was right in dealing with it in the way that he did.

**DISPOSITION:**

Appeal dismissed with costs.

**SOLICITORS:**

William A Crump; Shaw and Croft