CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
ABS BREAKBULK SERVICES GMBH
366 Main Street
Port Washington, New York 11050
Tel: (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

ABS BREAKBULK SERVICES GMBH,

                              Plaintiff,

                                                    08 CV 4997 (JSR)

        v.

TOTALMAR NAVIGATION CORP.,

                              Defendant.
---------------------------------------------------------------X

### ATTORNEY'S DECLARATION
### IN OPPOSITION TO DEFENDANT'S MOTION
### TO REDUCE THE ATTACHMENT

        Pursuant to 28 U.S.C. § 1746, Owen F. Duffy, declares under the penalty of

perjury:

        1.        I am a member of the Bar of the State of New York, and I am admitted to

practice before this Court.

        2.        I am a partner of the firm of Chalos, O'Connor & Duffy, LLP, attorneys for

the Plaintiff, ABS BREAKBULK SERVICES GMBH (hereinafter "ABS Breakbulk"), in

this action.

1

3.     I am fully familiar with the matters set forth in this Declaration, and, where the matters described herein are not based upon my own personal knowledge, I believe the matters to be true based on documents and information obtained from employees and representatives of the Plaintiff ABS Breakbulk through their agents, underwriters and attorneys.

## **Procedural History**

4.     This action was instituted with the filing of a Verified Complaint by Plaintiff ABS Breakbulk against the Defendant TOTALMAR NAVIGATION CORP. (hereinafter "Totalmar") on May 30, 2008. *See*, Exhibit 1, Verified Complaint.

5.     The Verified Complaint recounted certain facts as follows:

6.     On December 7, 2007, plaintiff ABS BREAKBULK, as owner, entered into a contract of affreightment with defendant TOTALMAR, as charterer, whereby defendant TOTALMAR agreed to charter vessels for two (2) definite shipments with the option for four (4) additional shipments between Shanghai, China and Maracaibo, Venezuela, the first two on specific dates and the four remaining shipments to occur in January of 2008.

7.     The contract of affreightment between plaintiff ABS BREAKBULK and defendant TOTALMAR is a maritime contract entered into on a Baltic and International Maritime Council "GENCON" form with additional rider clauses appended thereto and incorporated by reference (hereinafter collectively referred to as the "maritime contract").

8.     In accordance with the maritime contract, the first shipment was nominated by the defendant TOTALMAR, loaded and transported by plaintiff ABS BREAKBULK aboard the M/V MARJATTA P, and successfully discharged.

9.     In accordance with the maritime contract, the second shipment was nominated by the defendant TOTALMAR, loaded and transported by plaintiff ABS BREAKBULK aboard the M/V GO STAR, and successfully discharged.

10. At the conclusion of the first two (2) shipments under the maritime contract defendant TOTALMAR owed a balance of $42,192.21 to plaintiff ABS BREAKBULK in deadfreight and tally expenses.

11. Further, defendant TOTALMAR exercised the option for the four (4) additional shipments by nominating a third cargo for shipment under the maritime contract.

12. In breach of the maritime contract, defendant TOTALMAR then failed to produce any cargo for the remaining four (4) shipments in January of 2008 having exercised the option for the four (4) additional shipments.

13. As nearly as can now be estimated, this resulted in a total lost profit to plaintiff ABS BREAKBULK of $4,636,241.76.

14. TOTALMAR's failure to produce and/or nominate any further cargo for the remaining four shipments in January of 2008 as it was required to do under the maritime contract constitutes a breach of the maritime contract and, therefore, plaintiff ABS BREAKBULK has an *in personam* maritime claim against defendant TOTALMAR for said breach.

15. The maritime contract between the plaintiff ABS BREAKBULK and defendant TOTALMAR, dated December 7, 2007 provides at Box 25 that any disputes arising out of the maritime contract shall be governed by English law and shall be referred to arbitration in London.

*See*, Exhibit 1, at ¶'s 6 – 15.

6. In connection with the Verified Complaint, and, because the Defendant was not present within the Southern District of New York, Plaintiff ABS Breakbulk requested the issuance of a Process of Maritime Attachment.

7. On May 30, 2008, this Court issued an Order for Issuance of a Process of Maritime Attachment in the case at hand.  *See*, Exhibit 2, Order for Issuance of a Process of Maritime Attachment.

8. In accordance with the Order of this Court, the Clerk of the Court issued a Process of Maritime Attachment and Garnishment against Defendant Totalmar up and to the

amount sued for, *to wit*, $6,171,231.82. *See*, Exhibit 3, Process of Maritime Attachment and Garnishment.

9.    On June 3, 2008, Defendant filed a Notice of Restricted Appearance pursuant to Supplemental Rule E(8). *See*, Exhibit 4, Notice of Restricted Appearance pursuant to Supplemental Rule E(8).

10.    Following a telephonic conference on July 16, 2008, on July 23, 2008, this Court held an initial pretrial conference in this matter. *See*, Exhibit 5, Civil Docket for Case, entry on July 16, 2008, Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on July 16, 2008; *and see*, entry on July 23, 2008, Minute Entry for proceedings held before Judge Jed S. Rakoff: Initial Pretrial Conference held on July 23, 2008.

### The Merits of the Claim in London Arbitration

11.    The maritime contract at the center of the dispute in this matter, the Contract of Affreightment dated December 7, 2007 ("COA"), provides for London arbitration pursuant to English law. *See*, Exhibit 1, Verified Complaint, at ¶ 15; *and see*, Exhibit 6, Declaration of Rahul Wanchoo in Support of Motion to Reduce Maritime Attachment ("Wanchoo Declaration") at ¶ 6.

12.    In accordance with the contract's terms and conditions, the Plaintiff ABS Breakbulk filed a Statement of Claim in the London Arbitration proceedings on July 3, 2008. *See*, Exhibit 7, Claim Submissions; *and see*, Exhibit 6, Wanchoo Declaration at Exhibit 3.

13.    Defendant Totalmar was to have filed its Defense Submissions on or about August 1, 2008, but then requested a delay until August 14, 2008, when again Defendant

4

Totalmar requested an additional extension of time within which to file its Defense

Submissions in the London arbitration. On August 21, 2008, Defendant Totalmar

requested a further extension of time from the London arbitrators, which extension has

been opposed by Plaintiff ABS Breakbulk in the London arbitration proceedings. *Also*

*see*, Exhibit 8, Declaration of Mark Terence O'Neil in Opposition to Defendant's Motion

for a Reduction in the Amount of Security, ("O'Neil Declaration") at ¶ 25 ("Defendant

has repeatedly delayed service of their defence submissions in the London arbitration)."

## The Motion to Reduce

14.     In the meantime, on August 1, 2008, Defendant Totalmar filed the instant

Motion for Reduction in Security. *See*, Exhibit 9, Motion for Reduction in Security.

15.     Defendant Totalmar does not deny the existence of the contract between

Plaintiff ABS Breakbulk and itself in this matter. *See*, Exhibit 10, Defendant's

Memorandum of Law in Support of Defendant's Motion for a Reduction in the Amount of

Security.

16.     Instead Defendant Totalmar argues, based on the foreign law of England,

for a reduction in the amount of the attachment for one part of Plaintiff ABS Breakbulk's

claim. *See*, id.; *and see*, Exhibit 11, Notice of Foreign Law pursuant to F.R. Civ. P. Rule

44.1.

17.     However, English law supports Plaintiff ABS Breakbulk's allegations and

damage calculations in this matter. *See*, Exhibit 8, O'Neil Declaration.

18.     In his Declaration, Mr. O'Neil discusses the case of *Hadley v. Baxendale*

[1854] 9 EXCH 341. *See*, Exhibit 12 attached hereto.

19.    Further, in his Declaration, Mr. O'Neil discusses the case of *Hall v. Pim* [1928] 30 Lloyd's Rep. 159.  *See*, Exhibit 13 attached hereto.

20.    Finally, in his Declaration, Mr. O'Neil discusses the case of Phoebus D Kyprianou Coy v. WM H Pim J&R and Co [1977] 2 Lloyd's Rep. 570. *See*, Exhibit 14 attached hereto.

## **Conclusion**

21.    On the basis of the foregoing, it is respectfully submitted that the Process of Maritime Attachment should not be reduced in this matter.

Dated:  Port Washington, New York
        August 22, 2008

                        CHALOS O'CONNOR & DUFFY, LLP
                        Attorneys for Plaintiff,
                        ABS BREAKBULK SERVICES GMBH,

            By:     _____
                        Owen F. Duffy (OD-3144)
                        366 Main Street
                        Port Washington, New York
                        11050
                        Tel:     516-767-3600
                        Telefax: 516-767-3605
                        Email: ofd@codus-law.com

Declaration of Owen F. Duffy in Opposition

# EXHIBIT 1

08 CV 4997

JUDGE RAKOFF

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
ABS BREAKBULK SERVICES GMBH
366 Main Street
Port Washington, New York 11050
Tel: (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

ABS BREAKBULK SERVICES GMBH,

                                        Plaintiff,

          v.

TOTALMAR NAVIGATION CORP.,

                                        Defendant.
------------------------------------------------------------X

RECEIVED
MAY 30 2008
U.S.D.C. S.D. N.Y.
CASHIERS

08  CV

**VERIFIED COMPLAINT**

          Plaintiff ABS BREAKBULK SERVICES GMBH (hereinafter "ABS

BREAKBULK"), by its attorneys, Chalos, O'Connor & Duffy, as and for its Verified

Complaint against the Defendant, TOTALMAR NAVIGATION CORP., (hereinafter

"TOTALMAR") alleges upon information and belief as follows:

                              JURISDICTION

          1.        This is an admiralty and maritime claim within the meaning of Rule 9(h)

of the Federal Rules of Civil Procedure, and also falls under this Court's admiralty and

maritime jurisdiction pursuant to 28 U.S.C. § 1333.

## THE PARTIES

2.    At all times material hereto, plaintiff ABS BREAKBULK was and still is

a foreign business entity duly organized and existing pursuant to the laws of a foreign

country operating under foreign law with a place of business in Germany.

3.    The plaintiff ABS BREAKBULK was the owner, disponent owner and/or

potential disponent owner of several vessels including the M/V GO STAR and the M/V

PROTECTOR, and the business of ABS BREAKBULK is to charter its vessels to others

for the carriage of cargo in exchange for payments of hire or freight.

4.    At all times material hereto, defendant TOTALMAR was and still is a

foreign corporation organized under and existing by virtue of the laws of the Republic of

Panama and with offices in Venezuela.

5.    The defendant TOTALMAR is engaged in the business of chartering and

operating vessels for the carriage of goods by sea.

## AS AND FOR A CAUSE OF ACTION
### FOR BREACH OF MARITIME CONTRACT

6.    On December 7, 2007, plaintiff ABS BREAKBULK, as owner, entered

into a contract of affreightment with defendant TOTALMAR, as charterer, whereby

defendant TOTALMAR agreed to charter vessels for two (2) definite shipments with the

option for four (4) additional shipments between Shanghai, China and Maracaibo,

Venezuela, the first two on specific dates and the four remaining shipments to occur in

January of 2008.

7.    The contract of affreightment between plaintiff ABS BREAKBULK and

defendant TOTALMAR is a maritime contract entered into on a Baltic and International

2

Maritime Council "GENCON" form with additional rider clauses appended thereto and incorporated by reference (hereinafter collectively referred to as the "maritime contract").

8.    In accordance with the maritime contract, the first shipment was nominated by the defendant TOTALMAR, loaded and transported by plaintiff ABS BREAKBULK aboard the M/V MARJATTA P, and successfully discharged.

9.    In accordance with the maritime contract, the second shipment was nominated by the defendant TOTALMAR, loaded and transported by plaintiff ABS BREAKBULK aboard the M/V GO STAR, and successfully discharged.

10.    At the conclusion of the first two (2) shipments under the maritime contract defendant TOTALMAR owed a balance of $42,192.21 to plaintiff ABS BREAKBULK in deadfreight and tally expenses.

11.    Further, defendant TOTALMAR exercised the option for the four (4) additional shipments by nominating a third cargo for shipment under the maritime contract.

12.    In breach of the maritime contract, defendant TOTALMAR then failed to produce any cargo for the remaining four (4) shipments in January of 2008 having exercised the option for the four (4) additional shipments.

13.    As nearly as can now be estimated, this resulted in a total lost profit to plaintiff ABS BREAKBULK of $4,636,241.76.

14.    TOTALMAR's failure to produce and/or nominate any further cargo for the remaining four shipments in January of 2008 as it was required to do under the maritime contract constitutes a breach of the maritime contract and, therefore, plaintiff

3

ABS BREAKBULK has an *in personam* maritime claim against defendant TOTALMAR for said breach.

15.    The maritime contract between the plaintiff ABS BREAKBULK and defendant TOTALMAR, dated December 7, 2007 provides at Box 25 that any disputes arising out of the maritime contract shall be governed by English law and shall be referred to arbitration in London.

16.    Interest and costs, including attorneys' fees, are routinely awarded to the prevailing party in London arbitration because they are recoverable damages in arbitration pursuant to the London Maritime Arbitration Association's rules.

17.    In accordance with the terms and conditions of the charter party, the plaintiff ABS BREAKBULK is preparing to initiate arbitration proceedings against defendant TOTALMAR in London.

18.    As best as can now be estimated, the plaintiff ABS BREAKBULK expects to recover the following amounts in London arbitration from the defendant TOTALMAR:

|   |   |   |   |
|---|---|---|---|
| A. | Claim for deadfreight on the MV GO STAR | $ | 42,192.31 |
| B. | Claim for lost profit on four voyages | | $4,636,241.76 |
| B. | Estimated interest on claims A and B<br>3 years at 8.5%, compounded quarterly | | $1,342,797.75 |
| C. | Estimated attorneys' fees: | | $ 100,000.00 |
| D. | Estimated arbitration costs/expenses: | | $ 50,000.00 |
| **Total** | | | **$6,171,231.82** |

4

## PRAYER FOR RELIEF

18.     Notwithstanding the fact that the liability of the Defendant is subject to determination by arbitration in London, there are now, or will be during the pendency of this action, certain assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to or claimed by the Defendant within this District and held by various parties, as garnishees.

19.     Plaintiff ABS BREAKBULK believes that some of these assets, *to wit*: bank accounts; payments from the purchasers of other cargoes; freight and/or hire payments being made to other vessel owners U.S. dollars; freight and hire payments from other charterers or shippers of cargo; and/or Clearing House Interbank Payment System (CHIPS) credits; and/or funds being transferred through intermediary banks are located in this District in the possession of garnishees, namely banks or financial institutions located in New York.

20.     As set forth in the accompanying affidavit of George E. Murray, the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure.

21.     Because this Verified Complaint sets forth an *in personam* maritime claim against the Defendant and because the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure, the requirements for a Rule B attachment and garnishment are met and Plaintiff seeks the issuance of process of maritime attachment so that it may obtain security for its claims against the Defendant and/or *quasi*

5

*in rem* jurisdiction over the property of the Defendant so that an eventual judgment and/or award can be satisfied.

WHEREFORE, Plaintiff prays as follows:

A.    That the Defendant be summoned to appear and answer this Verified Complaint;

B.    That the Defendant not being found within this District, as set forth in the Affidavit of George E. Murray, then all of its assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to or claimed by the Defendant within this District up to the amount sued for herein be attached pursuant to Supplemental Rule B and to pay Plaintiff's damages;

C.    That this Court retain jurisdiction over this matter through the entry of a judgment either by this Court, and/or the London arbitration panel, so that judgment may be entered in favor of Plaintiff for the amount of its claim with costs, *i.e.* **$6,171,231.82**, and that a judgment of condemnation and sale be entered against the property arrested and attached herein in the amount of Plaintiff's claim, plus costs to be paid out of the proceeds thereof; and

D.    That Plaintiff has such other and further relief as the Court may determine to be just and proper under the circumstances.

Dated: Port Washington, New York
     May 30, 2008

                    CHALOS, O'CONNOR & DUFFY, LLP
                    Attorneys for Plaintiff,

By:    _____
                    George E. Murray (GM-4172)

Owen F. Duffy (OD-3144)
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600
Fax:  (516) 767-3605

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
ABS BREAKBULK SERVICES GMBH,
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600
Fax:  (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

ABS BREAKBULK SERVICES GMBH,

                                    Plaintiff,

                                                        08  CV  _____  (____ )
              v,
                                                        **VERIFICATION**

TOTALMAR NAVIGATION CORP.,

                                    Defendant.
------------------------------------------------------------------X
STATE OF NEW YORK        :
                                      : ss.
COUNTY OF NASSAU         :

        BEFORE ME, the undersigned authority, personally came and appeared George

E. Murray, who, after being duly sworn, did depose and state:

        1.        That he is an associate in the law firm of Chalos, O'Connor & Duffy LLP,

counsel for the Plaintiff, ABS BREAKBULK SERVICES GMBH, herein;

        2.        That he has read the foregoing complaint and knows the contents thereof;

        3.        That he believes the matters to be true based on documents and

information obtained from employees and representatives of the Plaintiff through its

agents, underwriters and attorneys; and

4.     That the reason that this verification was made by deponent and not by the

Plaintiff is because the officers' verification of Plaintiff could not be obtained within the

time constraints presented by the circumstances of this case.

Dated: Port Washington, New York
      May 29, 2008

                                 CHALOS, O'CONNOR & DUFFY, LLP
                                 Attorneys for Plaintiff,
                                 ABS BREAKBULK SERVICES GMBH

By:

                                 George E. Murray (GM-4172)
                                 Owen F. Duffy (OD-3144)
                                 366 Main Street
                                 Port Washington, New York 11050
                                 Tel:  (516) 767-3600
                                 Fax:  (516) 767-3605

Subscribed and sworn to before me this
May 29, 2008

Notary Public, State of New York

TIMOTHY SEMENORO
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02SE6112804
QUALIFIED IN NASSAU COUNTY
COMMISSION EXPIRES JULY 12, 2008

2

Declaration of Owen F. Duffy in Opposition

# EXHIBIT 2

JUDGE RAKOFF

08 CV 4997

RAKOFF, J

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
ABS BREAKBULK SERVICES GMBH
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

```
+-------------------------------------+
| USDC SDNY                           |
| DOCUMENT                            |
| ELECTRONICALLY FILED                |
| DOC #: _____            |
| DATE FILED: _5/30/08_               |
+-------------------------------------+
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

ABS BREAKBULK SERVICES GMBH,

                Plaintiff,

          v.

TOTALMAR NAVIGATION CORP.,

                Defendant.

---------------------------------------------------------------X

08 CV _____ (____)

**ORDER FOR
ISSUANCE OF A
PROCESS OF MARITIME
ATTACHMENT**

      Upon reading the Verified Complaint requesting issuance of Process of Maritime

Attachment and Garnishment, and the Affidavit of George E. Murray, Esq. attached

thereto, and the Court finding that the conditions for an attachment under Rule B of the

Supplemental Rules for Admiralty or Maritime Claims Admiralty to the Federal Rules of

Civil Procedure appear to exist, it is this day, by the United States District Court for the

Southern District of New York, hereby

      **ORDERED** that the Clerk shall issue a Process of Maritime Attachment and

Garnishment as prayed for in the Verified Complaint; and it is further

      **ORDERED** that the Process of Attachment issued by the Clerk shall be against all

property, tangible or intangible, including funds, goods, chattels, credits, effects, debts

owned by or owed to the Defendant, TOTALMAR NAVIGATION CORP., or monies to

be paid to discharge a debt owed to the Defendant, including monies being electronically

transferred by or to TOTALMAR NAVIGATION CORP. which are in the possession or

control of, or being transferred through any garnishee within this District, including, without

limitation, property held by or in the possession or control of the following garnishee(s):

1.    ABN Amro Bank N.V.
       55 East 52nd Street
       New York, New York 10055

2.    American Express Bank Ltd.
       c/o Zeichner Ellman & Krause, LLP
       Legal Counsel for Bank of America
       575 Lexington Avenue, 10th floor
       New York, New York 10022

3.    Bank of America, National Association
       c/o Zeichner Ellman & Krause, LLP
       Legal Counsel for Bank of America, N.A.
       575 Lexington Avenue, 10th floor
       New York, New York 10022

4.    Bank of China
       410 Madison Avenue
       New York, New York 10017

5.    Bank of New York
       120 Broadway, 19th Floor
       New York, New York

6.    Barclays Bank
       200 Park Avenue
       New York, New York 10166

7.    BNP Paribas SA
       The Equitable Tower,
       787 Seventh Avenue
       New York, New York 10019

8.    Citibank, N.A.
       Legal Service Intake Unit
       1 Court Square, 7th Floor
       Long Island City, NY 11120

9.   Deutsche Bank Trust Company Americas
     60 Wall Street
     New York, New York 10005

10.  HSBC Bank U.S.A., National Association
     452 Fifth Avenue
     New York, New York

11.  JPMorgan Chase Bank, National Association
     One Chase Manhattan Plaza
     New York, New York 10081

12.  Standard Chartered Bank
     One Madison Avenue
     New York, NY 10010

13.  UBS AG
     299 Park Avenue
     New York, New York, 10017

14.  Wachovia Bank, National Association
     375 Park Avenue
     New York, New York

or any of their affiliates and any other garnishee(s) within this district upon whom a copy

of the Process of Maritime Attachment and Garnishment herein may be served, in an

amount up to the amount sued for, *i.e.*, **US$6,171,231.82**, it is further

**ORDERED** that any person claiming an interest in the property attached or

garnished pursuant to said Order shall, upon application to the Court, be entitled to a

prompt hearing at which the plaintiff shall be required to show why the attachment and

garnishment should not be vacated or other relief granted, and it is further

**ORDERED** that a copy of this Order be attached to and served with the said

Process of Maritime Attachment and Garnishment, and it is further

**ORDERED** that pursuant to Fed. R. Civ. P., Supplemental Rules for Admiralty

or Maritime Claims, Rule B(1)(d)(ii)(C), the Writ of Attachment may be served by any

3

Declaration of Owen F. Duffy in Opposition

# EXHIBIT 3

JUDGE RAKOFF                                    08 CV    4997

## PROCESS OF MARITIME ATTACHMENT AND GARNISHMENT

### THE PRESIDENT OF THE UNITED STATES OF AMERICA

To:    The United States MARSHAL for the SOUTHERN DISTRICT OF NEW YORK

**GREETING:**

**WHEREAS,** a Verified Complaint has been filed in the United States District Court for the Southern District of New York on the 30th day of May, 2008 styled as follows:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

ABS BREAKBULK SERVICES GMBH,

                            Plaintiff,

                                                  08 CV _____ ( ___ )

        v.

TOTALMAR NAVIGATION CORP.,

                            Defendant.
-------------------------------------------------------------------X

in a certain action to recover damages due and owing the said Plaintiff amounting to **US$6,171,231.82,** and praying that a Writ of Attachment and Garnishment be issued against the Defendant pursuant to Rule B(1) of the Supplemental Rules for Admiralty or Maritime Claims, and

**WHEREAS,** this process is issued pursuant to such prayer and requires that the garnishee shall serve his answer, together with answers to interrogatories served with the Verified Complaint, within 20 days after service of process upon him and requires that Defendant shall serve an answer within 30 days after process has been executed, whether by attachment of property or service on the garnishee,

**NOW, THEREFORE,** we do hereby command you that if said Defendant(s) cannot be found within the District, you attach the following up to the amount sued for:

All property, tangible or intangible, including: assets, accounts, freights, hire payments, monies, charter hire, credits, debts owed to the Defendant(s), effects, CHIPS credits, electronic fund transfers, payments for bunkers, cargo, goods or services, bills of lading, cargo and the like belonging to or claimed by the Defendant(s) within this District to the amount sued for herein be attached pursuant to Supplemental Rule B and the same

be attached to pay Plaintiff's damages which are found in the possession of garnishees or which are found in the possession or control of specific garnishees, to wit:

1.  ABN Amro Bank N.V.
    55 East 52nd Street
    New York, New York 10055

2.  American Express Bank Ltd.
    c/o Zeichner Ellman & Krause, LLP
    Legal Counsel for Bank of America
    575 Lexington Avenue, 10th floor
    New York, New York 10022

3.  Bank of America, National Association
    c/o Zeichner Ellman & Krause, LLP
    Legal Counsel for Bank of America, N.A.
    575 Lexington Avenue, 10th floor
    New York, New York 10022

4.  Bank of China
    410 Madison Avenue
    New York, New York 10017

5.  Bank of New York Mellon
    120 Broadway, 19th Floor
    New York, New York

6.  Barclays Bank
    200 Park Avenue
    New York, New York 10166

7.  BNP Paribas SA
    The Equitable Tower,
    787 Seventh Avenue
    New York, New York 10019

8.  Citibank, N.A.
    Legal Service Intake Unit
    1 Court Square, 7th Floor
    Long Island City, NY 11120

9.  Deutsche Bank Trust Company Americas
    60 Wall Street
    New York, New York 10005

10.    HSBC Bank U.S.A., National Association
       452 Fifth Avenue
       New York, New York

11.    JPMorgan Chase Bank, National Association
       One Chase Manhattan Plaza
       New York, New York 10081

12.    Standard Chartered Bank
       One Madison Avenue
       New York, NY 10010

13.    UBS AG
       299 Park Avenue
       New York, New York, 10017

14.    Wachovia Bank, National Association
       375 Park Avenue
       New York, New York

or any other garnishee within this district.

**WITNESS**, the Honorable Judge *Hellstein* Judge of said Court, this      day of May, 2008.

**J. MICHAEL McMAHON**

By: _____
            Clerk

By: _____
           Deputy Clerk

**NOTE:**   This is issued pursuant to Rule B(1) of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure.

person, who is not less than 18 years old, and who is not a party to this action, and it is further

**ORDERED** that service on any garnishee(s) (i.e. any original garnishee or any garnishee herein) is deemed to be effective and continuous service throughout the remainder of the day upon which such service is made commencing from the time of such service through the opening of the garnishee's business the next business day, and it is further

**ORDERED** that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D), that following initial service upon any garnishee by the United States Marshal or any other person designated by Order to make service in this action, supplemental service of the Process of Maritime Attachment and Garnishment shall thereafter be made by way of service of a copy of the Process of Maritime Attachment and Garnishment via facsimile transmission or other verifiable electronic means, including e-mail, to each garnishee so personally served, and it is further

**ORDERED** that supplemental process enforcing this Order may be issued by the Clerk and served without further Order of the Court.

Dated: New York, New York
       May 3ᴏ, 2008

SO ORDERED:

_____
U. S. D. J.

4

Declaration of Owen F. Duffy in Opposition

# EXHIBIT 4

**LAW OFFICES OF RAHUL WANCHOO**
Attorneys for Plaintiff
Empire State Building
350 Fifth Avenue, 59th Floor
New York, New York 10118
Phone:  (646) 593-8866
Fax:     (212) 618-0213
E-mail: rwanchoo@wanchoolaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X

ABS BREAKBULK SERVICES GMBH,

                                Plaintiff,

                - against -

TOTALMAR NAVIGATION CORP.

                                Defendant.

-------------------------------------------------X

ECF CASE

08 Civ 4997 (JSR)

**NOTICE OF RESTRICTED
APPEARANCE PURSUANT TO
SUPPLEMENTAL RULE E(8)**

Totalmar Navigation Corp., by and through undersigned counsel, Law Offices of Rahul

Wanchoo, hereby enters a restricted appearance in this matter pursuant to Supplemental Rule

E(8) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules

of Civil Procedure for the sole purpose of seeking an Order dismissing the Verified Complaint

and vacating the Ex Parte Order for Process of Maritime Attachment against defendant, Totalmar

Navigation Corp.

Dated: New York, New York
        June 3, 2008

                    **LAW OFFICES OF RAHUL WANCHOO**
                    Attorneys for Defendant
                    Totalmar Navigation Corp.

                    By:  _Rahul Wanchoo_
                         Rahul Wanchoo (RW-8725)

Declaration of Owen F. Duffy in Opposition

# EXHIBIT 5

ECF

# U.S. District Court
## United States District Court for the Southern District of New York (Foley Square)
### CIVIL DOCKET FOR CASE #: 1:08-cv-04997-JSR

| | |
|---|---|
| ABS Breakbulk Services Gmbh v. Totalmar Navigation Corp. | Date Filed: 05/30/2008 |
| Assigned to: Judge Jed S. Rakoff | Jury Demand: None |
| Demand: $6,100,000 | Nature of Suit: 120 Contract: Marine |
| Cause: 28:1333 Admiralty | Jurisdiction: Federal Question |

**Plaintiff**

**ABS Breakbulk Services Gmbh**          represented by    **George Edmund Murray**
Chalos, O'Connor & Duffy, LLP
366 Main Street
Port Washington, NY 11050-3120
(516) 767-3600
Fax: (516) 767-3605
Email: gmurray@codus-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Owen Francis Duffy, III**
Chalos, O'Connor & Duffy, LLP
366 Main Street
Port Washington, NY 11050-3120
(516) 767-3600
Fax: (516) 767-3605
Email: ofd@codus-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Totalmar Navigation Corp.**          represented by    **Rahul Wanchoo**
Law Offices of Rahul Wanchoo
357 Westfield Avenue
Ridgewood, NJ 07450
(201) 882-0303
Fax: (201) 301-3576
Email: rwanchoo@wanchoolaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/30/2008 | 1 | COMPLAINT against Totalmar Navigation Corp.. (Filing Fee $ 350.00, Receipt Number 652693)Document filed by ABS Breakbulk Services Gmbh. (mbe) (Entered: 06/03/2008) |
| 05/30/2008 | | SUMMONS ISSUED as to Totalmar Navigation Corp.. (mbe) (Entered: 06/03/2008) |
| 05/30/2008 | | Magistrate Judge Debra C. Freeman is so designated. (mbe) (Entered: 06/03/2008) |
| 05/30/2008 | | Case Designated ECF. (mbe) (Entered: 06/03/2008) |
| 05/30/2008 | 2 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by ABS Breakbulk Services Gmbh.(mbe) (Entered: 06/03/2008) |
| 05/30/2008 | 4 | ORDER FOR ISSUANCE OF A PROCESS OF MARITIME ATTACHMENT that the Clerk shall a Process of Maritime Attachment and Garnishment as prayed for the Verified Complaint; and it is further ORDERED that the Process of Attachment issued by the Clerk shall be against all property, tangible or intangible, including funds, goods, chattels, credits, effects, debts owned by or owed to the Defendants, TOTALMAR NAVIGATION, or monies to be paid to discharge a debt owed to the Defendants, including monies being electronically transferred by or to TOTALMAR NAVIGATION which are in the possession or control of, or being transferred through any garnishee within this District, including, without limitation, property held by or in the possession or control of the following garnishee(s): ABN Amro Bank N.V., American Express Bank Ltd, Bank of America, National Association, Bank of China, Bank of New York, Barclays Bank, BNP Paribas SA, Citibank, N.A., Deutsche Bank Trust Company Americas, National Association, HSBC Bank U.S.C., National Association, JPMorgan Chase Bank, National Association, Standard Chartered Bank, UBS AG, Wachovia Bank, National Association or any of their affiliates and other garnishee(s) within this district upon whom a copy of the Process of Maritime Attachment and Garnishment herein may be served, in an amount up to the amount sued for, i.e., US$6,171,231.82, and it is further, ORDERED, that that any person claiming an interest in the property attached or garnished pursuant to said Order shall, upon application to the Court, be entitled to a prompt hearing at which the Plaintiff shall be required to show why the attachment and garnishment should not vacated or other relief granted; and it is further ORDERED a copy of this Order shall be attached to and served with said Process of Maritime Attachment and Garnishment; and it is further ORDERED, that pursuant to Fed.R.Civ.P., Supplemental Rules for Certain Admiralty and Maritime Claims, Rule B(1)(d)(ii)(C), the Writ of Attachment may be served by any purchee, associate, paralegal, employee or agent of Chalos, O'Connor & Duffy, LLP, who is not less than 18 years old, and who is not a party to this action, in addition the U. S. Marshall, and it is further ORDERED that service on any garnishee(s)(i.e. any original garnishee or any garnishee hereafter) is deemed to be effective and continuous service |

| | | |
|---|---|---|
| | | throughout the remainder of the day upon which such service is made commencing from the time of such service through the opening of the garnishee's business the next business day and it is further ORDERED that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D), that following initial service upon any garnishee by the United States Marshal or any other person designed by Order to make service in this action, supplemental service of the Process of Maritime Attachment and Garnishment via facsimile transmission or other verifiable electronic means, including e-mail, to each garnishee so personally served, and it is further ORDERED that supplemental process enforcing this Order may be issued by the Clerk and served without further Order of the Court. SO ORDERED. (Signed by Judge Alvin K. Hellerstein on 5/30/2008 Part I) (jmi) Modified on 6/11/2008 (jmi). Modified on 6/11/2008 (jmi). (Entered: 06/03/2008) |
| 05/30/2008 | 5 | ORDER APPOINTING A SPECIAL PROCESS SERVER that any partner, associate, agent or paralegal, employee or agent of Chalos, O'Connor & Duffy, LLP who is at least 18 years of age,and is not a party to this action be and is hereby appointed, in addition to the United States Marshal, to serve the Process of Maritime Attachment and Garnishment and Verified Complaint upon the garnishee(s) listed in the Complaint, together with any other garnishee(s) who, based upon information developed subsequent hereto by the Plaintiff, may hold assets for, or on account of, Defendant, TOTALMAR NAVIGATION. SO ORDERED. (Signed by Judge Alvin K. Hellerstein on 5/30/2008 Part I) (jmi) (Entered: 06/03/2008) |
| 05/30/2008 | | MARITIME ATTACHMENT AND GARNISHMENT ISSUED as to Totalmar Navigation Corp. on 5/30/08 in the amount of $171,231.82. (djc) (Entered: 06/05/2008) |
| 06/03/2008 | 3 | NOTICE OF APPEARANCE by Rahul Wanchoo on behalf of Totalmar Navigation Corp. (Wanchoo, Rahul) (Entered: 06/03/2008) |
| 06/03/2008 | 6 | AFFIDAVIT of Owen F. Duffy *as Attorney's Affidavit that Defendant Cannot be Found within the District*. Document filed by ABS Breakbulk Services Gmbh. (Duffy, Owen) (Entered: 06/03/2008) |
| 06/03/2008 | 7 | AFFIDAVIT of George E. Murray *in Application for the Appointment of a Special Process Server*. Document filed by ABS Breakbulk Services Gmbh. (Duffy, Owen) (Entered: 06/03/2008) |
| 06/06/2008 | 8 | NOTICE OF COURT CONFERENCE (ORDER): Status Conference set for 7/23/2008 at 11:00 AM in Courtroom 14B, 500 Pearl Street, New York, NY 10007 before Judge Jed S. Rakoff. (Signed by Judge Jed S. Rakoff on 6/6/08) (db) (Entered: 06/06/2008) |
| 07/16/2008 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 7/16/2008. (tro) (Entered: 08/07/2008) |
| 07/23/2008 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Initial Pretrial Conference held on 7/23/2008. (tro) (Entered: 07/28/2008) |
| 08/01/2008 | 9 | MOTION for Reduction in Security. Document filed by Totalmar Navigation Corp.(Wanchoo, Rahul) Modified on 8/4/2008 (KA). (Entered: 08/01/2008) |

SDNY CM/ECF Version 3.2.19:39:40 AM34

| 08/01/2008 | 10 | MEMORANDUM OF LAW in Support re: 9 for Reduction in the Amount of Security. Document filed by Totalmar Navigation Corp. (Wanchoo, Rahul) Modified on 8/4/2008 (KA). (Entered: 08/01/2008) |
| 08/01/2008 | 11 | DECLARATION of Rahul Wancho in Support re: 9 MOTION for Reduction in the Amount of Security. Document filed by Totalmar Navigation Corp. (Attachments: # 1 Exhibit Ex.1, # 2 Exhibit Ex. 2, # 3 Exhibit Ex. 3, # 4 Exhibit Ex. 4)(Wanchoo, Rahul) Modified on 8/4/2008 (KA). (Entered: 08/01/2008) |
| 08/01/2008 | 12 | AFFIRMATION of Rahul Wanchoo in Support re: 9 MOTION for Reduction in the Amount of Security. Document filed by Totalmar Navigation Corp. (Wanchoo, Rahul) Modified on 8/4/2008 (KA). (Entered: 08/01/2008) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/15/2008 09:42:41 | | |
| **PACER Login:** | fr0689 | **Client Code:** | 500386-021-gem |
| **Description:** | Docket Report | **Search Criteria:** | 1:08-cv-04997-JSR |
| **Billable Pages:** | 2 | **Cost:** | 0.16 |

Declaration of Owen F. Duffy in Opposition

# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

ABS BREAKBULK SERVICES GMBH,

                  Plaintiff,

            - against -

TOTALMAR NAVIGATION CORP.

                  Defendant.

-------------------------------------------------------X

ECF CASE

08 Civ 4997 (JSR)

**DECLARATION OF RAHUL WANCHOO
IN SUPPORT OF MOTION TO
REDUCE MARITIME ATTACHMENT**

RAHUL WANCHOO hereby declares the following pursuant to 28 U.S.C. § 1746:

1.     I am a member of the Bar of the State of New York, and I am admitted to practice before this Honorable Court.

2.     I am a principal in the firm of Law Offices of Rahul Wanchoo, attorneys for Defendant, Totalmar Navigation Corp. ("Totalmar"). I am fully familiar with the matters set forth in this affidavit, and my knowledge of the matters set forth in this affidavit is based on information provided to me by Totalmar, its agents and attorneys and my own independent research.

3.     I submit this affidavit in support of Totalmar's motion to reduce the amount of security awarded to Plaintiff, ABS Breakbulk Services Gmbh ("ABS") pursuant to the Court's ex parte Order for Issuance of a Process of Maritime Attachment dated May 30, 2008 ("Attachment Order").

4.     On May 30, 2008 ABS filed a Verified Complaint in the Southern District of New York to secure and satisfy its claim that Defendant, Totalmar allegedly breached a

contract of affreightment ("COA") dated December 7, 2007 in the amount of $4,678,434.07, plus estimated attorneys' fees and arbitration costs and interest of $1,492,797.75, for a total of $6,171,231.82. Annexed hereto as **Exhibits 1 and 2**, respectively are true and correct copies of the Verified Complaint and the Attachment Order.

5.      Annexed hereto as **Exhibit 3** is a true and correct copy of ABS' Claim Submissions dated July 3, 2008.

6.      The COA between ABS and Totalmar provides for London arbitration and English law. Thus, English substantive maritime law governs ABS' damages for its lost profit claim. Annexed hereto as **Exhibit 4** is a true and correct copy of the English Court of Appeal's decision in <u>SIB International SRL v. Metallgesellschaft Corp.</u>, [1989] 1 Lloyd's Rep 361 (Court of Appeal 1988), which enunciates the principle in calculating owners' damages for charterers' cancellation of the charter.

7.      I declare under the penalty of perjury that the foregoing is true and correct.

_Rahul Wanchoo_

Rahul Wanchoo

New York, New York
Dated: August 1, 2008

2

**LAW OFFICES OF RAHUL WANCHOO**
350 Fifth Avenue, 59th Floor
New York, New York 10118
Phone: (646) 593-8866
Fax:     (212) 618-0213
E-mail: rwanchoo@wanchoolaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ABS BREAKBULK SERVICES GMBH,

                                Plaintiff,          **ECF CASE**

                 -against-                          **08 CV 4997 (JSR)**

TOTALMAR NAVIGATION CORP.

                                Defendant

## <u>NOTICE OF FOREIGN LAW PURSUANT TO F.R. CIV. P. RULE 44.1</u>

PLEASE TAKE NOTICE THAT, Defendant TOTALMAR NAVIGATION CORP.,

pursuant to F.R. Civ. P. Rule 44.1 intends to raise issue of foreign law, namely of English law, as

set out in the attached declaration of Rahul Wanchoo dated August 1, 2008.

Date:   New York, New York
          August 1, 2008

                                        Respectfully submitted,

                                        LAW OFFICES OF RAHUL WANCHOO
                                        Attorneys for Defendant

                                        By:  _Rahul Wanchoo_
                                              Rahul Wanchoo

# EXHIBIT 1

JUDGE RAKOFF

08 CV 4997

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
ABS BREAKBULK SERVICES GMBH
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

ABS BREAKBULK SERVICES GMBH,

      Plaintiff,

  v.

TOTALMAR NAVIGATION CORP.,

      Defendant.
------------------------------------------------------------X



08 CV

**VERIFIED COMPLAINT**

   Plaintiff ABS BREAKBULK SERVICES GMBH (hereinafter "ABS

BREAKBULK"), by its attorneys, Chalos, O'Connor & Duffy, as and for its Verified

Complaint against the Defendant, TOTALMAR NAVIGATION CORP., (hereinafter

"TOTALMAR") alleges upon information and belief as follows:


        <u>JURISDICTION</u>

  1.  This is an admiralty and maritime claim within the meaning of Rule 9(h)

of the Federal Rules of Civil Procedure, and also falls under this Court's admiralty and

maritime jurisdiction pursuant to 28 U.S.C. § 1333.

### THE PARTIES

2.     At all times material hereto, plaintiff ABS BREAKBULK was and still is

a foreign business entity duly organized and existing pursuant to the laws of a foreign

country operating under foreign law with a place of business in Germany.

3.     The plaintiff ABS BREAKBULK was the owner, disponent owner and/or

potential disponent owner of several vessels including the M/V GO STAR and the M/V

PROTECTOR, and the business of ABS BREAKBULK is to charter its vessels to others

for the carriage of cargo in exchange for payments of hire or freight.

4.     At all times material hereto, defendant TOTALMAR was and still is a

foreign corporation organized under and existing by virtue of the laws of the Republic of

Panama and with offices in Venezuela.

5.     The defendant TOTALMAR is engaged in the business of chartering and

operating vessels for the carriage of goods by sea.

### AS AND FOR A CAUSE OF ACTION
### FOR BREACH OF MARITIME CONTRACT

6.     On December 7, 2007, plaintiff ABS BREAKBULK, as owner, entered

into a contract of affreightment with defendant TOTALMAR, as charterer, whereby

defendant TOTALMAR agreed to charter vessels for two (2) definite shipments with the

option for four (4) additional shipments between Shanghai, China and Maracaibo,

Venezuela, the first two on specific dates and the four remaining shipments to occur in

January of 2008.

7.     The contract of affreightment between plaintiff ABS BREAKBULK and

defendant TOTALMAR is a maritime contract entered into on a Baltic and International

Maritime Council "GENCON" form with additional rider clauses appended thereto and incorporated by reference (hereinafter collectively referred to as the "maritime contract").

8.     In accordance with the maritime contract, the first shipment was nominated by the defendant TOTALMAR, loaded and transported by plaintiff ABS BREAKBULK aboard the M/V MARJATTA P, and successfully discharged.

9.     In accordance with the maritime contract, the second shipment was nominated by the defendant TOTALMAR, loaded and transported by plaintiff ABS BREAKBULK aboard the M/V GO STAR, and successfully discharged.

10.     At the conclusion of the first two (2) shipments under the maritime contract defendant TOTALMAR owed a balance of $42,192.21 to plaintiff ABS BREAKBULK in deadfreight and tally expenses.

11.     Further, defendant TOTALMAR exercised the option for the four (4) additional shipments by nominating a third cargo for shipment under the maritime contract.

12.     In breach of the maritime contract, defendant TOTALMAR then failed to produce any cargo for the remaining four (4) shipments in January of 2008 having exercised the option for the four (4) additional shipments.

13.     As nearly as can now be estimated, this resulted in a total lost profit to plaintiff ABS BREAKBULK of $4,636,241.76.

14.     TOTALMAR's failure to produce and/or nominate any further cargo for the remaining four shipments in January of 2008 as it was required to do under the maritime contract constitutes a breach of the maritime contract and, therefore, plaintiff

ABS BREAKBULK has an *in personam* maritime claim against defendant TOTALMAR for said breach.

15.     The maritime contract between the plaintiff ABS BREAKBULK and defendant TOTALMAR, dated December 7, 2007 provides at Box 25 that any disputes arising out of the maritime contract shall be governed by English law and shall be referred to arbitration in London.

16.     Interest and costs, including attorneys' fees, are routinely awarded to the prevailing party in London arbitration because they are recoverable damages in arbitration pursuant to the London Maritime Arbitration Association's rules.

17.     In accordance with the terms and conditions of the charter party, the plaintiff ABS BREAKBULK is preparing to initiate arbitration proceedings against defendant TOTALMAR in London.

18.     As best as can now be estimated, the plaintiff ABS BREAKBULK expects to recover the following amounts in London arbitration from the defendant TOTALMAR:

|       |    |                                                                        |                |
|-------|----|------------------------------------------------------------------------|----------------|
|       | A. | Claim for deadfreight on the MV GO STAR                                 | $   42,192.31  |
|       | B. | Claim for lost profit on four voyages                                   | $4,636,241.76  |
|       | B. | Estimated interest on claims A and B 3 years at 8.5%, compounded quarterly | $1,342,797.75  |
|       | C. | Estimated attorneys' fees:                                             | $ 100,000.00   |
|       | D. | Estimated arbitration costs/expenses:                                  | $   50,000.00  |
| Total |    |                                                                        | $6,171,231.82  |

<u>PRAYER FOR RELIEF</u>

18.   Notwithstanding the fact that the liability of the Defendant is subject to determination by arbitration in London, there are now, or will be during the pendency of this action, certain assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to or claimed by the Defendant within this District and held by various parties, as garnishees.

19.   Plaintiff ABS BREAKBULK believes that some of these assets, *to wit*: bank accounts; payments from the purchasers of other cargoes; freight and/or hire payments being made to other vessel owners U.S. dollars; freight and hire payments from other charterers or shippers of cargo; and/or Clearing House Interbank Payment System (CHIPS) credits; and/or funds being transferred through intermediary banks are located in this District in the possession of garnishees, namely banks or financial institutions located in New York.

20.   As set forth in the accompanying affidavit of George E. Murray, the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure.

21.   Because this Verified Complaint sets forth an *in personam* maritime claim against the Defendant and because the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure, the requirements for a Rule B attachment and garnishment are met and Plaintiff seeks the issuance of process of maritime attachment so that it may obtain security for its claims against the Defendant and/or *quasi*

5

*in rem* jurisdiction over the property of the Defendant so that an eventual judgment and/or award can be satisfied.

WHEREFORE, Plaintiff prays as follows:

A.    That the Defendant be summoned to appear and answer this Verified Complaint;

B.    That the Defendant not being found within this District, as set forth in the Affidavit of George E. Murray, then all of its assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to or claimed by the Defendant within this District up to the amount sued for herein be attached pursuant to Supplemental Rule B and to pay Plaintiff's damages;

C.    That this Court retain jurisdiction over this matter through the entry of a judgment either by this Court, and/or the London arbitration panel, so that judgment may be entered in favor of Plaintiff for the amount of its claim with costs, *i.e.* $6,171,231.82, and that a judgment of condemnation and sale be entered against the property arrested and attached herein in the amount of Plaintiff's claim, plus costs to be paid out of the proceeds thereof; and

D.    That Plaintiff has such other and further relief as the Court may determine to be just and proper under the circumstances.

Dated: Port Washington, New York
        May 30, 2008

                                    CHALOS, O'CONNOR & DUFFY, LLP
                                    Attorneys for Plaintiff,

                          By:    _George E. Murray_____
                                    George E. Murray (GM-4172)

6

Owen F. Duffy (OD-3144)
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600
Fax:  (516) 767-3605

7

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
ABS BREAKBULK SERVICES GMBH,
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ABS BREAKBULK SERVICES GMBH,

                                          Plaintiff,

                                                                    08  CV _____ (____)

                  v.
                                                                    **VERIFICATION**

TOTALMAR NAVIGATION CORP.,

                                          Defendant.
-------------------------------------------------------------X
STATE OF NEW YORK          :
                                          : ss.
COUNTY OF NASSAU          :

BEFORE ME, the undersigned authority, personally came and appeared George

E. Murray, who, after being duly sworn, did depose and state:

1.        That he is an associate in the law firm of Chalos, O'Connor & Duffy LLP,

counsel for the Plaintiff, ABS BREAKBULK SERVICES GMBH, herein;

2.        That he has read the foregoing complaint and knows the contents thereof;

3.        That he believes the matters to be true based on documents and

information obtained from employees and representatives of the Plaintiff through its

agents, underwriters and attorneys; and

4.     That the reason that this verification was made by deponent and not by the

Plaintiff is because the officers' verification of Plaintiff could not be obtained within the

time constraints presented by the circumstances of this case.


Dated: Port Washington, New York
       May 29, 2008


                                   CHALOS, O'CONNOR & DUFFY, LLP
                                   Attorneys for Plaintiff,
                                   ABS BREAKBULK SERVICES GMBH


                          By:      _____
                                   George E. Murray (GM-4172)
                                   Owen F. Duffy (OD-3144)
                                   366 Main Street
                                   Port Washington, New York 11050
                                   Tel:  (516) 767-3600
                                   Fax:  (516) 767-3605


Subscribed and sworn to before me this
May 29 , 2008

_____
Notary Public, State of New York

        TIMOTHY SEMENORO
NOTARY PUBLIC, STATE OF NEW YORK
        NO. 02SE6112804
   QUALIFIED IN NASSAU COUNTY
COMMISSION EXPIRES JULY 12, 2008


                          2

# EXHIBIT 2

JUDGE RAKOFF

08 CV 4997

RAKOFF, J

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
ABS BREAKBULK SERVICES GMBH
366 Main Street
Port Washington, New York 11050
Tel: (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

ABS BREAKBULK SERVICES GMBH,

                                    Plaintiff,

                    v.

TOTALMAR NAVIGATION CORP.,

                                    Defendant.
-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5·30·08

08 CV _____ (___)

**ORDER FOR
ISSUANCE OF A
PROCESS OF MARITIME
ATTACHMENT**

Upon reading the Verified Complaint requesting issuance of Process of Maritime

Attachment and Garnishment, and the Affidavit of George E. Murray, Esq. attached

thereto, and the Court finding that the conditions for an attachment under Rule B of the

Supplemental Rules for Admiralty or Maritime Claims Admiralty to the Federal Rules of

Civil Procedure appear to exist, it is this day, by the United States District Court for the

Southern District of New York, hereby

**ORDERED** that the Clerk shall issue a Process of Maritime Attachment and

Garnishment as prayed for in the Verified Complaint; and it is further

**ORDERED** that the Process of Attachment issued by the Clerk shall be against all

property, tangible or intangible, including funds, goods, chattels, credits, effects, debts

owned by or owed to the Defendant, TOTALMAR NAVIGATION CORP., or monies to

Case 1:08-cv-04997-JSR    Document 14-3    Filed 08/22/2008    Page 17 of 73
Case 1:08-cv-04997-JSR    Document 11-3    Filed 08/01/2008    Page 3 of 5
Case 1:08-cv-04997-JSR    Document 4    Filed 05/30/2008    Page 2 of 4

be paid to discharge a debt owed to the Defendant, including monies being electronically transferred by or to TOTALMAR NAVIGATION CORP. which are in the possession or control of, or being transferred through any garnishee within this District, including, without limitation, property held by or in the possession or control of the following garnishee(s):

1. ABN Amro Bank N.V.
   55 East 52nd Street
   New York, New York 10055

2. American Express Bank Ltd.
   c/o Zeichner Ellman & Krause, LLP
   Legal Counsel for Bank of America
   575 Lexington Avenue, 10th floor
   New York, New York 10022

3. Bank of America, National Association
   c/o Zeichner Ellman & Krause, LLP
   Legal Counsel for Bank of America, N.A.
   575 Lexington Avenue, 10th floor
   New York, New York 10022

4. Bank of China
   410 Madison Avenue
   New York, New York 10017

5. Bank of New York
   120 Broadway, 19th Floor
   New York, New York

6. Barclays Bank
   200 Park Avenue
   New York, New York 10166

7. BNP Paribas SA
   The Equitable Tower,
   787 Seventh Avenue
   New York, New York 10019

8. Citibank, N.A.
   Legal Service Intake Unit
   1 Court Square, 7th Floor
   Long Island City, NY 11120

Case 1:08-cv-04997-JSR    Document 14-3    Filed 08/22/2008    Page 18 of 73

Case 1:08-cv-04997-JSR    Document 11-3    Filed 08/01/2008    Page 4 of 5
Case 1:08-cv-04997-JSR    Document 4    Filed 05/30/2008    Page 3 of 4

9.    Deutsche Bank Trust Company Americas
      60 Wall Street
      New York, New York 10005

10.   HSBC Bank U.S.A., National Association
      452 Fifth Avenue
      New York, New York

11.   JPMorgan Chase Bank, National Association
      One Chase Manhattan Plaza
      New York, New York 10081

12.   Standard Chartered Bank
      One Madison Avenue
      New York, NY 10010

13.   UBS AG
      299 Park Avenue
      New York, New York, 10017

14.   Wachovia Bank, National Association
      375 Park Avenue
      New York, New York

or any of their affiliates and any other garnishee(s) within this district upon whom a copy

of the Process of Maritime Attachment and Garnishment herein may be served, in an

amount up to the amount sued for, *i.e.*, **US$6,171,231.82**, it is further

**ORDERED** that any person claiming an interest in the property attached or

garnished pursuant to said Order shall, upon application to the Court, be entitled to a

prompt hearing at which the plaintiff shall be required to show why the attachment and

garnishment should not be vacated or other relief granted, and it is further

**ORDERED** that a copy of this Order be attached to and served with the said

Process of Maritime Attachment and Garnishment, and it is further

**ORDERED** that pursuant to Fed. R. Civ. P., Supplemental Rules for Admiralty

or Maritime Claims, Rule B(1)(d)(ii)(C), the Writ of Attachment may be served by any

3

Case 1:08-cv-04997-JSR    Document 14-3    Filed 08/22/2008    Page 19 of 73
Case 1:08-cv-04997-JSR    Document 11-3    Filed 08/01/2008    Page 5 of 5
Case 1:08-cv-04997-JSR    Document 4    Filed 05/30/2008    Page 4 of 4

person, who is not less than 18 years old, and who is not a party to this action, and it is

further

**ORDERED** that service on any garnishee(s) (i.e. any original garnishee or any

garnishee herein) is deemed to be effective and continuous service throughout the

remainder of the day upon which such service is made commencing from the time of

such service through the opening of the garnishee's business the next business day, and it

is further

**ORDERED** that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D), that

following initial service upon any garnishee by the United States Marshal or any other

person designated by Order to make service in this action, supplemental service of the

Process of Maritime Attachment and Garnishment shall thereafter be made by way of

service of a copy of the Process of Maritime Attachment and Garnishment via facsimile

transmission or other verifiable electronic means, including e-mail, to each garnishee so

personally served, and it is further

**ORDERED** that supplemental process enforcing this Order may be issued by the

Clerk and served without further Order of the Court.


Dated: New York, New York
       May 30, 2008

                                        SO ORDERED:

                                        _____
                                        U. S. D. J.


4

# EXHIBIT 3

# ReedSmith

# FAX TRANSMITTAL

Reed Smith
Beaufort House
15 St Botolph Street
London EC3A 7EE
Phone: +44 (0)20 7247 6555
Fax: +44 (0)20 7247 5091
DX1066 City / DX18 London
reedsmith.com

**From: Mark O'Neil/Amy Dominguez**
Direct Phone: +44 (0)20 7772 5883/5874
Email: moneil@reedsmith.com/
adominguez@reedsmith.com

**Total Number Of Pages Including Cover Page**

3 July 2008

**Fax to:**

| Name | Company | Fax Number | Phone Number |
|------|---------|------------|--------------|
| Captain Leftakis | | 01480 437567 | |
| Mr. Alan Oakley | | 01279 771968 | |
| **Copy to:** | | | |
| Laurence Marron | | 0208 382 3792 | |

**Our Ref:**    AD\KKN\755121.02099

**Contract of Affreightment dated 7 December 2007 ("COA")**

We should be grateful if the Tribunal would accept this fax as Owners' Claim Submissions. All page references are to the supporting documents attached to these submissions.

**Background**

1.    On 7 December 2007 ABS Breakbulk Services GmbH ("Owners") entered into a Contract of Affreightment ("COA") on an amended Gencon 1994 form with Totalmar Navigation Corp. of Venezuela ("Charterers") pursuant to which the Charterers agreed to charter vessels from Owners for two definite shipments with the option for four additional shipments between Shanghai, China and Maracaibo, Venezuela. A copy of the COA is attached at pages 1-8.

2.    Owners will seek to rely on the terms of the COA. In particular, Owners refer to:

*Box 13 – Freight Rate*

*USD 103.00 PER CBM FIOS LSD*

Reed Smith is a trade name of Reed Smith Richards Butler LLP
Reed Smith Richards Butler LLP is a limited liability partnership registered in England and Wales with registered number OC300620 and its registered office at Beaufort House, Tenth Floor, 15 St Botolph Street, London EC3A 7EE. Reed Smith Richards Butler LLP is regulated by the Solicitors Regulation Authority. A list of the members of Reed Smith Richards Butler LLP, and their professional qualifications, is available at the registered office. The term partner is used to refer to a member of Reed Smith Richards Butler LLP or an employee of equivalent standing.
Reed Smith Richards Butler LLP is associated with Reed Smith LLP of Delaware, USA and the offices referred to below are offices of either Reed Smith Richards Butler LLP or Reed Smith LLP.

NEW YORK ♦ LONDON ♦ HONG KONG ♦ CHICAGO ♦ WASHINGTON, D.C. ♦ BEIJING ♦ PARIS ♦ LOS ANGELES ♦ SAN FRANCISCO ♦ PHILADELPHIA ♦ PITTSBURGH
OAKLAND ♦ MUNICH ♦ ABU DHABI ♦ PRINCETON ♦ NORTHERN VIRGINIA ♦ WILMINGTON ♦ BIRMINGHAM ♦ DUBAI ♦ CENTURY CITY ♦ RICHMOND ♦ GREECE

LONDON-4723779.2-ADOMINGU

*Clause 4 Payment of Freight*

    *(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.*

**Clause 22: Cargo Description**

    *1st Shipment: minimum 400 pieces carriers' option upto vessel full, under/on deck capacity of polycarbonate pipes in loose, dimensions 12.192 m length x 2.6 m diameter/ 12.3 mt uw each where as Charterers guarantee 82.4179 CBM per piece..."*

**Clause 23: Loading & Discharging Port**

    *Loading Port: 1 SPSB AAAA SHANGHAI*

    *Discharge Port: 1 SPSB AAAA MARACAIBO, where 8 m SW Draft*

**Clause 25: ETA & LAYCAN**

    *LAYCAN:   1st Shipment 20/24 December 2007*

                   *2nd Shipment 26/31 December 2007*

    *Then 4 shipments in January 2008 in Charterers' option with laydays to be agreed mutually between parties. All nominations to be latest 5 days prior to start of first layday.*

**Clause 35: Freight Payment & Banking Details**

    *"Freight: USD103.00 per CBM FIOS LSD...."*

3.    On a true construction of Clause 25 of the COA, Charterers' option, if exercised, was for four further shipments, not for "up to" four shipments.

**The Voyages**

4.    In order for Owners to be able to perform their obligations under the COA, Owners were to time charter suitable vessels.

5.    Owners were guaranteed at least two fixtures under the COA and possibly four further fixtures in January 2008 at Charterers' option.

**M/V "MARJATTA P"**

6.    The first nomination by Charterers for a shipment was performed by the M/V "MARJATTA P" in accordance with the terms of the COA.

**M/V "GO STAR"**

7.    The second shipment was nominated by Charterers and performed by the M/V "GO STAR".

-2-

LONDON-4723779.2-ADOMINGU

8. With regard to this nomination, the parties had agreed a different minimum quantity, a different freight rate and laydays with the addition that "terms and conditions as per COA" as set out in the email exchanges of 18, 21 and 27 December 2007 at pages 9-10.

9. The vessel was on demurrage at Shanghai during this fixture for a period of 0.55903 days (invoice and laytime statement attached at 11) and pursuant to clause 7 of the COA Owners now claim $20,963.63 in respect of this period (invoice attached at page 12).

10. Further, it is clear from the correspondence (at pages 13-14) that Charterers confirmed that the minimum amount of the cargo loaded for this shipments would be 410 pieces of pipes, each with a diameter of 2.4 m.

11. However, pursuant to the terms of the COA, the pipes loaded should have had a diameter of 2.6m. As a result, Charterers failed to load the quantity of cargo specified in the COA and the Owners are entitled to and now claim deadfreight in the sum of US$72,332.68 (invoice attached at page 15).

**Tally Expenses**

12. In addition, Owners now claim the outstanding sum of US$40,006.00 for the agreed tally expenses. (Copies of Charterers' agreement to pay this sum and of the relevant tally expenses invoices are attached at pages 16-25).

**Further Nominations**

13. In December 2007/January 2008 the parties started liaising about future fixtures. Pursuant to Clause 25 of the COA the contemporaneous correspondence shows that Charterers elected to exercise their option for the four more shipments/fixtures in emails dated 27 and 28 December and on 8 January and 14 January. (Copies of relevant correspondence are attached at pages 26-30).

14. Despite exercising their option for four further shipments, and in breach of their obligations under the COA, Charterers failed to provide cargoes for lifting during January 2008 or at all. Please see attached correspondence at pages 31-35.

15. As a direct consequence of Charterers' breach as aforesaid, Owners have suffered losses equivalent to the loss of profit on each of the four declared option shipments amounting to $4,626,241.76 based on a profit of $1,159,060.44 per voyage (as set out in the attached table at page 36).

16. And Owners claim:-

(a) Demurrage of $20,963.63, or alternatively damages; and

(b) Deadfreight in the sum of US$61,449.39 or alternatively damages; and

(c) Tally expenses in the sum of US$40,006.00 or alternatively damages; and

(d) The sum of $4,636,241.76, alternatively damages for the claims set out in paragraph 15 above; and

-3-

(e)    Interest in accordance with section 49 of the Arbitration Act 1996; and

(f)    Costs.

Yours faithfully

*Reed Smith*

Mark O'Neil/Amy Dominguez
Partner/Associate
Shipping Group
**Reed Smith**

**If you do not receive all of the pages, please call us at +44 (0)20 7816 3160.**

PLEASE NOTE: The information contained in this facsimile message may be privileged and confidential, and is intended only for the use of the individual(s) or entity named above who has been specifically authorized to receive it. If the reader is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return all pages to the address shown above. Thank you.

LONDON-4723779.2-ADOMINGU

| 1. Shipbroker  OSS GENERAL TRADING LLC, DUBAI | RECOMMENDED  THE BALTIC AND INTERNATIONAL MARITIME COUNCIL  UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994)  (To be used for trades for which no specially approved form is in force)  CODE NAME: "GENCON"  Part I |
|---|---|
| | 2. Place and Date  LONDON      7TH DECEMBER 2007 |
| 3. Owners/Place of business (Cl. 1)  ABS BREAKBULK SERVICES GMBH, ROSTOCK, GERMANY | 4. Charterers/Place of business (Cl. 1)  TOTALMAR NAVIGATION CORP, VENEZUELA |
| 5. Vessel's name (Cl. 1)  ABS TBN | 6. GT/NT (Cl. 1) |
| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1) | 8. Present position (Cl. 1) |
| 9. Expected ready to load (abt.) (Cl. 1)  1ST SHIPMENT - 28TH DECEMBER 2007 | |
| 10. Loading port or place (Cl. 1)  1 SPSB AAAA SHANGHAI | 11. Discharging port or place (Cl. 1)  1 SPSB AAAA MARACAIBO WHERE 8 M SW DRAFT |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1)  1ST SHIPMENT MINIMUM 400 PIECES CARRIERS OPTION UPTO VESSEL FULL, UNDER/ON DECK CAPACITY OF POLYCARBONATE PIPES IN LOOSE, DIMENSIONS 12.192 M LENGTH X 2.6 M DIA/12.5 MT UW EACH WHERE AS CHARTERERS GUARANTEE 82.4179 CBM PER PIECE || |
| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4)  USD 103.00 PER CBM FIOS LSD | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4) |
| 15. State if vessel's cargo handling gear shall not be used (Cl. 5) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl. 6) |
| 17. Shippers/Place of business (Cl. 6) | (a) Laytime for loading  5 DAYS SHINC |
| 18. Agents (loading) (Cl. 6)  CARRIERS' AGENTS | (b) Laytime for discharging  4 DAYS SATPM SHEX |
| 19. Agents (discharging) (Cl. 6)  CHARTERERS' AGENTS SUBJECT APPROVAL OF D.A. INCLUDING AGENCY FEE BY CARRIERS | (c) Total laytime for loading and discharging |
| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7)  DEMURRAGE TO BE ADVISED BUT MAXIMUM USD 60,000 PD/PRHD BENDS | 21. Cancelling date (Cl. 9)  1ST SHIPMENT - 24TH DECEMBER 2007 |
| | 22. General Average to be adjusted at (Cl. 12) |
| 23. Freight Tax (state if for the Owners' account) (Cl. 13 (c)) | 24. Brokerage commission and to whom payable (Cl. 15)  3.75 % OM FREIGHT/DEADFREIGHT/DEMURRAGE WILL BE DEDUCTED FROM OCEAN FREIGHT AND PAYABLE BY CHARTERERS TO OSS DUBAI |
| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19 (a) shall apply) (Cl. 19)  LONDON AND ENGLISH LAW TO APPLY | |
| (a) State maximum amount for small claims/shortened arbitration (Cl. 19) | 26. Additional clauses covering special provisions, if agreed  NOS. 22 to 51 |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"Gencon" Charter (As Revised 1922, 1976 and 1994)**

1.  It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that:

    the said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility) as stated in Box 12 which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near thereto as she may safely get and lie always afloat, and there deliver the cargo.

2.  **Owners' Responsibility Clause**
    The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.
    And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

3.  **Deviation Clause**
    The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

4.  **Payment of Freight**
    (a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.
    (b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost. Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid.
    (c) On delivery. If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally.
    Cash for Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses. See also Clause 36.

5.  **Loading/Discharging**
    (a) Costs/Risks
    The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.
    (b) Cargo Handling Gear
    Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power - pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party - shall not count as laytime or time on demurrage.
    On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master.
    (c) Stevedore Damage

6.  The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability.
    The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.

See Clause 33.

6.  **Laytime**
    *(a) Separate laytime for loading and discharging*
    The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Saturday p.m., Sundays and holidays excepted, unless used, in which event time used shall count.
    The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
    *(b) Total laytime for loading and discharging*
    The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
    (c) Commencement of laytime (loading and discharging)
    Laytime for loading and discharging shall commence at 13.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06.00 hours next day if notice given during office hours after 12.00 hours. Notice of readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.
    If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in port or not, whether in berth or not, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time saved in moving from the place of waiting to the loading/discharging berth shall not count as laytime.
    If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime.
    Time used before commencement of laytime shall count.
    * Indicate alternative (a) or (b) as agreed, in Box 16.

7.  **Demurrage**
    Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable as per Clause 27.
    upon receipt of the Owners' invoice.
    In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is true at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.

8.  **Lien Clause**
    The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.

9.  **Cancelling Clause**
    (a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this Charter Party.
    (b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Line numbers (right margin): 1–145

2

# PART II

## "Gencon" Charter (As Revised 1922, 1976 and 1994)

Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date. 146–153

The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause.

**10. Bills of Lading** 154

Bills of Lading shall be presented and signed by the Master as per the "Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party, or by the Owners' agents provided written authority has been given by Owners to the agents, a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the Owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the Owners than those assumed by the Owners under this Charter Party. 155–163

**11. Both-to-Blame Collision Clause** 164

If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact. 165–177

**12. General Average and New Jason Clause** 178

General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share to the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see Clause 2). 179–182

If General Average is to be adjusted in accordance with the law and practice of the United States of America, the following Clause shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo shippers, consignees or the owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Owners before delivery.". 183–198

**13. Taxes and Dues Clause (See Clauses 31 & 46)** 199

(a) On Vessel –The Owners shall pay all dues, charges and taxes customarily levied on the Vessel, howsoever the amount thereof may be assessed. 200

(b) On cargo –The Charterers shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed. 201–203

(c) On freight –Unless otherwise agreed in Box 23, taxes levied on the freight shall be for the Charterers' account. 204–206

**14. Agency** 207

In every case the Owners shall appoint their own Agent both at the port of loading and the port of discharge. 208–209

**15. Brokerage** 210

A brokerage commission at the rate stated in Box 24 on the freight, dead-freight and demurrage earned is due to the party mentioned in Box 24. 211–212

In case of non-execution 1/3 of the brokerage on the estimated amount of freight to be paid by the party responsible for such non-execution to the Brokers as indemnity for the latter's expenses and work. In case of more voyages the amount of indemnity to be agreed. 213–216

**16. General Strike Clause** 217

(a) If there is a strike or lock-out affecting or preventing the actual loading of 218

(the continuation column)

cargo, or any part of it, when the Vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, the Master or the Owners may ask the Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless the Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, the Owners shall have the option of cancelling this Charter Party. If part cargo has already been loaded, the Owners must proceed with same, (freight payable as loaded quantity only) having liberty to complete with other cargo on the way for their own account. 219–226

(b) If there is a strike or lock-out affecting or preventing the actual discharging of the cargo on or after the Vessel's arrival at or off port of discharge and same has not been settled within 48 hours, the Charterers shall have the option of keeping the Vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging until the strike or lock-out terminates and thereafter full demurrage shall be payable until the completion of discharging, or of ordering the Vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charter Party and of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance to the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion. 227–242

(c) Except for the obligations described above, neither the Charterers nor the Owners shall be responsible for the consequences of any strikes or lock-outs preventing or affecting the actual loading or discharging of the cargo. 243–246

**17. War Risks ("Voywar 1993")** 247

(1) For the purpose of this Clause, the words: 248

(a) The "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and 249–250

(b) "War Risks" shall include any war (whether actual or threatened) act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all Vessels or imposed selectively against Vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel. 251–261

(2) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks: provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement. 262–277

(3) The Owners shall not be required to continue to load cargo for any voyage, or to sign bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been 278–296

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

3

**PART II**
## "Gencon" Charter (As Revised 1922, 1976 and 1994)

carried to the discharging port and if the extra distance exceeds 100 miles, 297
to additional freight which shall be the same percentage of the freight 298
contracted for as the percentage which the extra distance represents to 299
the distance of the normal and customary route, the Owners having a lien 300
on the cargo for such expenses and freight. 301

(d) If at any stage of the voyage after the loading of the cargo commences, it 302
appears that, in the reasonable judgment of the Master and/or the 303
Owners, the Vessel, her cargo, crew or other persons on board the Vessel 304
may be, or are likely to be, exposed to War Risks on any part of the route 305
(including any canal or waterway) which is normally and customarily used 306
in a voyage of the nature contracted for, and there is another longer route 307
to the discharging port, the Owners shall give notice to the Charterers that 308
this route will be taken. In this event the Owners shall be entitled, if the total 309
extra distance exceeds 100 miles, to additional freight which shall be the 310
same percentage of the freight contracted for as the percentage which the 311
extra distance represents to the distance of the normal and customary 312
route. 313

(e) The Vessel shall have liberty:- 314
(i) to comply with all orders, directions, recommendations or advice as to 315
departure, arrival, routes, sailing in convoy, ports of call, stoppages, 316
destinations, discharge of cargo, delivery or in any way whatsoever which 317
are given by the Government of the Nation under whose flag the Vessel 318
sails, or other Government to whose laws the Owners are subject, or any 319
other Government which so requires, or any body or group acting with the 320
power to compel compliance with their orders or directions; 321
(ii) to comply with the orders, directions or recommendations of any war 322
risks underwriters who have the authority to give the same under the terms 323
of the war risks insurance; 324
(iii) to comply with the terms of any resolution of the Security Council of the 325
United Nations, any directives of the European Community, the effective 326
orders of any other Supranational body which has the right to issue and 327
give the same, and with national laws aimed at enforcing the same to which 328
the Owners are subject, and to obey the orders and directions of those who 329
are charged with their enforcement; 330
(iv) to discharge at any other port any cargo or part thereof which may 331
render the Vessel liable to confiscation as a contraband carrier; 332
(v) to call at any other port to change the crew or any part thereof or other 333
persons on board the Vessel where there is reason to believe that they may 334
be subject to internment, imprisonment or other sanctions; 335
(f) where cargo has not been loaded or has been discharged by the 336
Owners under any provisions of this Clause, to load other cargo for the 337
Owners' own benefit and carry it to any other port or ports whatsoever, 338
whether backwards or forwards or in a contrary direction to the ordinary or 339
customary route. 340

(g) If in compliance with any of the provisions of sub-clauses (2) to (5) of this 341
Clause anything is done or not done, such shall not be deemed to be a 342
deviation, but shall be considered as due fulfilment of the Contract of 343
Carriage. 344

**18.  General Ice Clause** 345
*Port of loading* 345
(a) In the event of the loading port being inaccessible by reason of ice when the 346
Vessel is ready to proceed from her last port or at any time during the voyage or 347
on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the 348
Master for fear of being frozen in is at liberty to leave without cargo, and this 349
Charter Party shall be null and void. 350
(b) If during loading the Master, for fear of the Vessel being frozen in, deems it 351
advisable to leave, he has liberty to do so with what cargo he has on board and 352
to proceed to any other port or ports with option of completing cargo for the 353
Owners' benefit for any port or ports including port of discharge. Any part 354
cargo thus loaded under this Charter Party to be forwarded to destination at the 355
Vessel's expense but against payment of freight, provided that no extra 356

expenses are thereby caused to the Charterers, freight being paid on quantity 358
delivered (in proportion if lumpsum), all other conditions as per this Charter 359
Party. 360
(c) In case of more than one loading port, and if one or more of the ports are 361
closed by ice, the Master or the Owners to be at liberty either to load the part 362
cargo at the open port and fill up elsewhere for their own account as under 363
section (b) or to declare the Charter Party null and void unless the Charterers 364
agree to load full cargo at the open port. 365
*Port of discharge* 366
(a) Should ice prevent the Vessel from reaching port of discharge the 366
Charterers shall have the option of keeping the Vessel waiting until the re- 367
opening of navigation and paying demurrage or of ordering the Vessel to a safe 368
and immediately accessible port where she can safely discharge without risk of 369
detention by ice. Such orders to be given within 48 hours after the Master or the 370
Owners have given notice to the Charterers of the impossibility of reaching port 371
of destination. 372
(b) If during discharging the Master for fear of the Vessel being frozen in deems 373
it advisable to leave, he has liberty to do so with what cargo he has on board and 374
to proceed to the nearest accessible port where she can safely discharge. 375
(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall 376
apply and the Vessel shall receive the same freight as if she had discharged at 377
the original port of destination, except that if the distance of the substituted port 378
exceeds 100 nautical miles, the freight on the cargo delivered at the substituted 379
port to be increased in proportion. 380
381

**19.  Law and Arbitration** 381
* (a) This Charter Party shall be governed by and construed in accordance with 382
English law and any dispute arising out of this Charter Party shall be referred to 383
arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or 384
any statutory modification or re-enactment thereof for the time being in force. 385
Unless the parties agree upon a sole arbitrator, one arbitrator shall be 386
appointed by each party and the arbitrators so appointed shall appoint a third 387
arbitrator, the decision of the three-man tribunal thus constituted or any two of 388
them, shall be final. On the receipt by one party of the nomination in writing of 389
the other party's arbitrator, that party shall appoint their arbitrator within 390
fourteen days, failing which the decision of the single arbitrator appointed shall 391
be final. 392
For disputes where the total amount claimed by either party does not exceed 393
the amount stated in Box 25** the arbitration shall be conducted in accordance 394
with the Small Claims Procedure of the London Maritime Arbitrators 395
Association. 396
* (b) This Charter Party shall be governed by and construed in accordance with 397
Title 9 of the United States Code and the Maritime Law of the United States and 398
should any dispute arise out of this Charter Party, the matter in dispute shall be 399
referred to three persons at New York, one to be appointed by each of the 400
parties hereto, and the third by the two so chosen; their decision or that of any 401
two of them shall be final, and for purpose of enforcing any award, this 402
agreement may be made a rule of the Court. The proceedings shall be 403
conducted in accordance with the rules of the Society of Maritime Arbitrators, 404
Inc.., 405
For disputes where the total amount claimed by either party does not exceed 406
the amount stated in Box 25** the arbitration shall be conducted in accordance 407
with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, 408
Inc.., 409
* (c) Any dispute arising out of this Charter Party shall be referred to arbitration at 410
the place indicated in Box 25, subject to the procedures applicable there. The 411
laws of the place indicated in Box 25 shall govern this Charter Party. 412
(d) If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply. 413
* (a), (b) and (c) are alternatives; indicate alternative agreed in Box 25. 414
Where no figure is supplied in Box 25 in Part I, this provision only shall be void but 415
the other provisions of this Clause shall have full force and remain in effect. 417

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## RIDER CLAUSES TO CHARTER PARTY DATED 7TH DECEMBER 2007
## ALBATROSS TBNS
## LOADING: SHANGHAI DISPORT: MARACAIBO
## CARGO OF PIPES

### CLAUSE 22: CARGO DESCRIPTION
1ST SHIPMENT: MINIMUM 400 PIECES CARRIERS' OPTION UPTO VESSEL FULL, UNDER/ON DECK CAPACITY OF POLYCARBONATE PIPES IN LOOSE, DIMENSIONS 12.192 M LENGTH X 2.6 M DIAMTER/ 12.3 MT UW EACH WHERE AS CHARTERERS GUARANTEE 82.4179 CBM. PER PIECE.

UNDER/ON DECK WITH MAXIMUM 5 TIERS LIMITS UPTO VESSEL'S CAPACITY.
MASTER/OWNERS TO DECLARE QUANTITY TO BE LOADED PRIOR TO VESSEL'S ARRIVAL LOAD PORT TO CHARTERERS AND CHARTERERS' AGENTS.
NO PART CARGO OPTION.
CARGO WILL BE LOADED UNDER/ON DECK AT CARRIER'S OPTION.
CARGO ON DECK BILL(S) OF LADING TO BE MARKED 'SHIPPED ON DECK, WITHOUT ANY RESPONSIBILITY TO OWNERS FOR LOSS OR DAMAGE HOWSOEVER CAUSED SAME TO BE FOR CHARTERERS/SHIPPERS/RECEIVERS' RISK AND ACCOUNT.

### CLAUSE 23: LOADING & DISCHARGING PORTS
LOADING PORT: 1 SPSB AAAA SHANGHAI

DISCHARGE PORT: 1 SPSB AAAA MARACAIBO, WHERE 8 M SW DRAFT

### CLAUSE 24: PRE-ARRIVAL NOTICES
CARRIERS/MASTER TO PROVIDE APPROXIMATE 5/3/2/1 DAYS ETA NOTICE AT BOTH ENDS.

### CLAUSE 25: ETA & LAYCAN
LAYCAN: 1ST SHIPMENT   20/24  DECEMBER 2007
         2ND SHIPMENT  26/31 DECEMBER 2007
THEN 4 SHIPMENTS IN JANUARY 2008 IN CHARTERERS' OPTION WITH LAYDAYS TO BE AGREED MUTUALLY BETWEEN PARTIES.
ALL NOMINATIONS TO BE LATEST 5 DAYS PRIOR TO START OF FIRST LAYDAY.

### CLAUSE 26: LAYTIME
LOAD/DISCHARGE RATE 5 TOTAL DAYS SHINC LOAD/4 DAYS SAT PM SHEX UU DISCHARGE.

### CLAUSE 27: DEMURRAGE
ALL TIME USED LOAD/DISCHARGE/WAITING AFTER LAYTIME EXPIRES AT LOADPORT OR DISCHARGE PORT WILL COUNT AS DEMURRAGE TO BE ADVISED UPON NOMINATION AND WILL BE PAID BY CHARTERERS BUT AT THE RATE OF MAXIMUM USD60,000.00 PER DAY PRO RATA FOR PART OF THE DAY.

AT BOTH LOAD AND DISCHARGE PORTS ANY DEMURRAGE TO BE PAID TO OWNERS WITHIN 14  CALENDAR DAYS AFTER COMPLETION DISCHARGE AGAINST FULL SUPPORTED DOCUMENTS PRESENTED BY CARRIERS TO CHARTERERS.

MASTER TO SIGN NOTICE OF READINESS AND STATEMENT OF FACTS AT EACH PORT.

HALF DESPATCH ALL PORTS.

### CLAUSE 28:
OWNERS TO GUARANTEE VESSEL'S EQUIPMENT IN GOOD WORKING ORDER, VESSEL TO GIVE FREE USE OF ENERGY, SUPPLY LIGHTS AS ONBOARD FOR NIGHT WORK, IF REQUIRED, FREE OF EXPENSES TO THE CHARTERERS.

### CLAUSE 29: OVERTIME
OVERTIME TO BE FOR THE PARTY ORDERING SAME, EXCEPT CREW'S AND OFFICERS OVERTIME WHICH IS ALWAYS FOR OWNERS ACCOUNT.

OVERTIME ORDERED BY PORT
TO BE FOR CHARTERERS ACCOUNT.

2
AUTHORITIES AT LOAD/DISCHARGE PORTS

**CLAUSE 30: ARBITRATION**
DELETED.

**CLAUSE 31: TAXES AND DUES**
ANY TAXES / DUES / DUTIES ON FRT A/O CARGO OR CALCULATED ON SAME TO BE FOR
CHARTERER'S ACCOUNT BENDS.

ANY TAXES / DUES / DUTIES ON VESSEL'S FLAG/CREW/OWNERSHIP TO BE FOR
CARRIERS' ACCOUNT BENDS.

**CLAUSE 32:**
OWNERS GUARANTEE VESSEL COMPLIES WITH NORMAL REGULATIONS/CERTIFICATES
(ISM/DOC/SMC/ISPS/P&I, ETC.) TO PERFORM SUCH VOYAGE AND ANY DELAYS OR
EXPENSES RESULTING THEREAFTER SHALL BE FOR OWNERS ACCOUNT.

**CLAUSE 33:**
CHARTERERS ARE TO LOAD/STOW, LASH, UNLASH, SECURE, UNSECURE, TALLY
AND DISCHARGE THE CARGO AT THEIR RISK AND EXPENSE UNDER THE SUPERVISION
OF THE CAPTAIN.
CHARTERERS TO BE RESPONSIBLE FOR STOWING CARGO AT THEIR RISK / EXPENSE.

CHARTERERS TO BE RESPONSIBLE FOR ANY STEVEDORES DAMAGE DONE TO THE
VESSEL. IF ANY DAMAGE, SAME TO BE SETTLED/PAID BY CHARTERERS WITHIN FIFTEEN
15) DAYS.

CLAUSE 5 PARAGRAPH C TO APPLY AND SUPERCEDES WHERE APPLICABLE.

**CLAUSE 34:**
NEW JASON CLAUSE, NEW BOTH TO BLAME COLLISION CLAUSE, P&I BUNKER
DEVIATION CLAUSE AND GENERAL CLAUSE PARAMOUNT, WHEN APLICABLE, TO BE
INCORPORATED IN THIS CHARTER PARTY.

**CLAUSE 35: FREIGHT PAYMENT & BANKING DETAILS**
FREIGHT: USD103.00 PER CBM FIOS LSD. 100% LESS COMMISSION TO BE PAID DIRECTLY
TO OWNERS NOMINATED ACCOUNT WITHIN 5 BANKING DAYS AFTER COMPLETED
LOADING OF CARGO AND SIGNING/RELEASING OF BILLS OF LADING MARKED FREIGHT
PAYABLE AS PER CHARTER PARTY.
FREIGHT TO BE DEEMED EARNED UPON LOAD AND DISCOUNTLESS, NON-RETURNABLE
VESSEL A/O CARGO LOST OR NOT LOST.

OWNERS BANKING DETAILS:

**CLAUSE 36**
CARRIERS PERFORMER VESSEL TBN HOWEVER PERFORMING VESSEL TO BE GEARED,
SINGLEDECK/BULKCARRIER, MAXIMUM 25 YEARS, HIGHEST CLASS LLOYDS OR
EQUIVALENT.

OWNERS NOMINATE THE FOLLOWING VESSEL OR SIMILAR SUBSTITUTE FOR 1ST CARGO:

M/V 'MAIROULI' OR SIMILAR SUBSTITUTE ETA SHANGHAI 20TH AGW WP
53.206MTS DWT ON 12.303M SSW, BLT 2005
BC - 4X30.5CR - GRAIN : 68.927,4 CBF
PANAMA FLAG

FINAL PERFORMING VESSEL TO BE CONFIRMED LATEST 5 DAYS PRIOR 1ST LAYDAY.

3

ALL SUBJECTS STEM APPROVAL TO BE          LIFTED FROM CHARTERERS' SIDE WITHIN 24 HOURS AFTER RECEIPT OF NOMINATION OF PERFORMING VESSEL AND NOT TO BE UNREASONABLY WITHHELD.

**CLAUSE 37: AGENCY**
CARRIERS' AGENTS LOADPORT/ CHARTERERS' AGENTS DISCHARGE PORT SUBJECT APPROVAL OF D.A. INCLUDING AGENCY FEE BY CARRIERS.

**CLAUSE 38:**
BILL OF LADING FIGURES TO BE USED AS PER SHIPPERS QUANTITY.
BILL OF LADING TO BE MARKED "FREIGHT PAYABLE AS PER CHARTER PARTY"

IN CASE OF REMARKS ON MATE'S RECEIPT, CARRIER ISSUE CLEAN ON BOARD BILLS OF LADING AGAINST CHARTERERS' AND SHIPPERS' LOI IN OWNERS' P&I CLUB WORDING (CARGO NEW PRODUCED). THIS APPLIES FOR 'NORMAL' CARGO REMARKS BUT NOT FOR HEAVILY DAMAGED CARGO. IN CASE OF HEAVY DAMAGES, MASTER IS ENTITLED TO REJECT THE CARGO.
IF BILL(S) OF LADING MARKED FREIGHT PREPAID WILL BE HELD WITH LOADPORT AGENTS' CUSTODY UNTIL CHARTERERS' SWIFT CONFIRMATION OF FULL FREIGHT RECEIVED BY CARRIERS BY THEM.

**CLAUSE 39: LEGAL PRIORITY**
CHARTER PARTY TERMS SHALL ALWAYS SUPERSEDE BILL OF LADING TERMS WHENEVER CONTRADICTORY.

**CLAUSE 40:**
DELETED.

**CLAUSE 41: CLEANING HOLDS**
THE CHARTERERS SHALL PROVIDE AND LAY ALL DUNNAGE MATERIAL AS REQUIRED FOR THE PROPER STOWAGE AND PROTECTION OF THE CARGO ONBOARD, THE OWNERS ALLOWING USE OF ALL DUNNAGE AVAILABLE ON BOARD. THE CHARTERERS SHALL BE RESPONSIBLE FOR AND PAY THE COST OF REMOVING THEIR DUNNAGE AFTER DISCHARGE OF THE CARGO UNDER THIS CHARTER PARTY AND TIME TO COUNT UNTIL DUNNAGE HAS BEEN REMOVED.

**CLAUSE 42: DETENTION**
DETENTION, IF ANY, DUE NON PRODUCTION CARGO AND/OR DOCUMENTS NOT READY, SHOULD BE SAME AMOUNT AS DEMURRAGE AND HAS TO BE SETTLED EVERY 10 CALENDAR DAYS IN ARREAR FROM EACH LOAD/DISCHARGE PORTS AGAIN WITH FULL SUPPORTED DOCUMENTS PRESENTED BY CARRIERS TO CHARTERERS.

**CLAUSE 43: SHIFTING**
ANY SHIFTING REQUIRED TO BE FOR ACCOUNT AND TIME OF PARTY ORDERING SAME.

**CLAUSE 44: ORIGINAL BILL OF LADING**
IF ORIGINAL BILL(S) OF LADING IS NOT AVAILABLE AT DISCHARGING PORT UPON VESSEL'S ARRIVAL, THE CARRIERS/MASTER TO ALLOW DISCHARGE OF CARGO INTO CUSTODY OF THE PORT AGAINST CHARTERERS' AND RECEIVERS' LOI AS PER OWNERS' P AND I WORDING.

**CLAUSE 45: OVERTIME**
OVERTIME, IF ANY, TO BE PAID BY ORDERING PARTY.

**CLAUSE 46: EXTRA INSURANCE**
EXTRA INSURANCE DUE TO VESSEL'S AGE AND/OR FLAG, IF ANY, FOR CHARTERERS' ACCOUNT BOTH ENDS.

EXTRA WAR RISK PREMIUM, IF ANY, TO BE FOR CHARTERERS' ACCOUNT BOTH ENDS.

7

4

**CLAUSE 47:**
TERMS AND CONDITIONS TO BE KEPT STRICTLY CONFIDENTIAL AND IF ANY BREACH OF
CHARTER PARTY WITHOUT FORCE MAJEURE CONDITIONS, THE PARTY CAUSING THIS
BREACH WILL BE FULLY RESPONSIBLE.

**CLAUSE 48:**
CARGO WILL BE LOADED UNDER/OPN DECK. CARRIERS' OPTION CARGO ON DECK.
BILLS OF LADING TO BE MARKED 'SHIPPED ON DECK WITHOUT ANY RESPONSIBILITY TO
OWNERS FOR LOSS OR DAMAGE HOWSOEVER CAUSED' AND SAME TO BE FOR
CHARTERERS/SHIPPERS/RECEIVERS' RISK AND ACCOUNT.

**CLAUSE 49:**
IN THIS WHOLE CONTRACT OCEAN FREIGHT LEVEL NOT TO CHANGE WHATEVER
WHETHER INTERNATIONAL MARITIME MARKETING SITUATION CHANGES OR NOT.

**CLAUSE 50:**
DELETED.

**CLAUSE 51: SHIPPERS**
SHIPPERS ARE
JIAFANG STEEL PIPES CO., LTD.
818 JINHANG RD. PUDONG NEW DISTRICT
SHANGHAI, PRC
ATTENTION: FLETCHER XI - ++ 86 - 139 - 0191 9501

CONSIGNEES ARE
ATN INDUSTRIES.

CARRIERS ARE
ABS BREAKBULK SERVICES GMBH, ROSTOCK, GERMANY.

8

Doc-No. 1091799  18/DEC/2007  18:41 (UTC +0100) JT

ANDREW / JUERGEN

RE: PIPES SHANGHAI / MARACAIBO
--

THKS YRS BELOW. OWNERS AGREE TO CHANGE LAYDAYS FOR NEXT LOT TO 3RD WEEK JAN 2008, I.E. 14/20.01 WITH LOADING SHANGHAI AND TERMS AND CONDITIONS AS PER COA. AS DISCUSSED ENDAVOUR TO NOMINATE 7 DAYS IN ADVANCE AND SHALL KEEP CHRTRS CLOSELY INFORMED

ACCORDING TO OUR TELCON ALSO UNDERSTOOD THAT THE LOT THEREAFTER IS SCHEDULED FOR WEEK 4, I.E. 21/27.01.08 WHICH KINDLY CONFIRM.

BESTREGARDS

STA BREMEN
JUERGEN TORBECK

+


----------Original message----------

TO..: "see transport agentur gmbh"
FROM: Thurlestone Shipping Ltd
DATE: 18-DEC-2007 17:17
MSG.: 2265981
Panamax@Thurlestone-shipping.com


juergen / andrew
pertelcon

Rcvd flwg fm chrs:

In view of the difficulty in loading at Ningbo, Charterers propose the following to Owners to shift the Laycan of first week of Jan 2008 for 3rd week of Jan 2008 and loading will take place at Shangahi as previously agreed to load about 430 pipes.

Please confirm ok and when vessel can be nominated

Await your news


Unquote


rgrds

9

Doc-No. 1095402  27/DEC/2007  09:53 (UTC +0100) JT

ANDREW / JUERGEN

RE: PIPES CONTRACT CHINA / MARACAIBO

STILL HAVE TO COME BACK TO BELOW MESSAGE. REGRET DELAY IN REPLY , WHICH WAS
DUE TO THE X-MAS HOLIDAYS HERE.

FOR GOOD ORDERS SAKE WLD LIKE TO POINT OUT FOLL

- THE TWO JANUARY LOTS ARE NOT SUB STEM BUT ONLY SUBJECT TO CHRTRS / SHIPPERS /
RECVSR APPROVAL OF VSL, WHICH NOT TO BE UNREASONABLY WITHHELD,
- CHANGED DIMENSIONS NOTED, HOWEVER,  MIN FRT TO BE BASED ON PIPES AS PER
CP-DESCR. ALSO HAVE TO SEE WHETHER THE PRESENT PIPES AGAIN HAVE A DIA OF
ABT 2,70 MTRS, IN WHICH CASE OWNERS MIGHT  COME BACK ON THIS ISSUE.

BRGDS

STA BREMEN
JUERGEN TORBECK


-----------Original message-----------

TO..: "see transport agentur gmbh"
FROM: Thurlestone Shipping Ltd
DATE: 21-DEC-2007 15:32
MSG.: 2272999
Panamax@Thurlestone-shipping.com


juergen / andrew

dear andrew

re pipes contract

foll rcvd
quote

Be advised following:

For end jan two lots booked earlier , still sub stem/chrts/shippers/rcvrs approval

pipes dimmensions slightly changed

OD 2.4 x 12.192 mt x 14.50 mm / 10.3 TONS
Max 5 tiers high loading

otherwise as agreed

pls be guided accordingly

unquote

rgrds

10



## LAYTIME STATEMENT
## MV "GO STAR" ABS 1054
### LOADING AT SHANGHAI
ACCT: TOTALMAR NAVIGATION CORP. - C/P DD 07.12.07.

**SHANGHAI**

| | | | |
|---|---|---|---|
| VSL ARRIVED ROADS | SUNDAY | 20.01.2008 | 10:00 hrs |
| NOR TENDERED | SUNDAY | 20.01.2008 | 10.00 hrs |
| NOR ACCEPTED | | as per c/p | |
| TIME STARTS TO COUNT | SUNDAY | 20.01.2008 | 14:00 hrs |
| COMMENCED LOADING | THURSDAY | 24.01.2008 | 20.00 hrs |
| COMPLETED LOADING | SATURDAY | 26.01.2008 | 12.00 hrs |
| COMPLETED LASHING | SATURDAY | 26.01.2008 | 12:30hrs |

| D | H | M |
|---|---|---|
| 5 | 0 | 0 |

| TIME ALLOWED | 5 DAYS SHINC |
|---|---|

**TIME USED**

| DAY | DATE | FROM | TO | REMARKS |
|---|---|---|---|---|
| **SHANGHAI** | | | | |
| SUNDAY | 20.01.2008 | 14:00 | 24.00 | |
| MONDAY | 21.01.2008 | 00.00 | 24:00 | |
| TUESDAY | 22.01.2008 | 00:00 | 24.00 | |
| WENSDAY | 23.01.2008 | 00:00 | 24.00 | |
| THURSDAY | 24.01.2008 | 00:00 | 08.45 | |
| | | 08.45 | 17.50 | NTC SHIFTING |
| | | 17.50 | 24.00 | |
| FRIDAY | 25.01.2008 | 00.00 | 24.00 | |
| SATURDAY | 26.01.2008 | 00.00 | 12:30 | |

| | | |
|---|---|---|
| 0 | 10 | 0 |
| 1 | 0 | 0 |
| 1 | 0 | 0 |
| 1 | 0 | 0 |
| 0 | 8 | 45 |
| 0 | 0 | 0 |
| 0 | 6 | 10 |
| 1 | 0 | 0 |
| 0 | 12 | 30 |

| TOTAL TIME USED | | 5 | 13 | 25 |
|---|---|---|---|---|

| TIME ON DEMURRAGE | | 0,55903 days | 0 | 13 | 25 |
|---|---|---|---|---|---|

| DEMM USD.37.500,- PDPR / HD => | 20.963,63 USD |
|---|---|

DT / JL
29.01.2008

CC

CALC
FI





STA See Transport Agentur GmbH – Martinistraße 29 – D-28195 Bremen

TOTALMAR NAVIGATION CORP
VENEZUELA

Liner Service
Operating
Chartering
Transport Contracting
Agents
Transport Consulting

BREMEN, 29TH JANUARY 2008
DT / JL

INVOICE NO. 4810 /01 /2008

MV "GO STAR" / ABS 1054
SHANGHAI / MARACAIBO
GENCON C/P DATED 07.12.2007

TO:   DEMURRAGE SHANGHAI

AS PER ATTACHED LAYTIME STATEMENT                      **D E B I T**
0,55903 DAYS AT US\$ 37.500,00 PER DAY / PRO RATA
                                                       US\$ 20.963,63

IN FAVOUR OF ABS
                                                       US\$ 20.963,63
                                                       E. & O. E.

PAYABLE WITHIN 14 DAYS

PLEASE INSTRUCT YOUR BANKERS TO SEND PAYMENT ORDER BY TESTED TELEX / CABLE OR
SWIFT DIRECTLY AS FIRST GERMAN BANK – WITHOUT INTERMEDIARY OF ANOTHER BANK – TO:

BANKHAUS NEELMEYER, BREMEN  (GERMANY)
SWIFT / BIC:  NEELDE22
IBAN: DE09 290 200 00 0000 20 4319
ACCT. NO.: 204319
IN FAVOUR OF: STA SEE TRANSPORT AGENTUR GMBH

CC: CALC.   CC: FIN.   CC: BOOK

Martinistraße 29, D-28195 Bremen
Telefon: 0421 / 339 46 -0
Telefax: 0421 / 337 82 88
Telex: 244 307
E-mail: info@sta-seetransport.de
www.sta-seetransport.de

Bankhaus Neelmeyer, Bremen
BLZ 290 200 00
SWIFT/BIC: NEELDE22
IBAN:
DE97 290 200 00 0000 01 5324
Kto-Nr. 15324

Geschäftsführer:
B. Henning, J. Torbeck, A. Henning
Amtsgericht Bremen HRB 87 42
VAT-Nr. DE 11 44 31 615

member of



Doc-No. 1096675  28/DEC/2007  22:28 (UTC +0100) JT

ANDREW / JUERGEN

RE: PIPES CHINA / MARACAIBO
--

RECVD YRS BELOW. NOTED CHRTRS COMMENT RE NINGBO CARGO AND ALSO RE SHANGHAI LOTS END JAN.
FULLY APPRECIATE CHRTRS COMMENTS AND LET'S TRY TO SORT OUT ONCE WE ARE HAVING " NORMAL "
WORKING PERIODS AGAIN. IT WLD BE APPRECIATED IF CHRTRS CAN CONFIRM THAT SHIPPERS FOR SHANGHAI
LOTS WILL BE SAME AS FOR PRESENT SHIPMENTS.

KNOW THAT CHRTRS ARE IN CONTACT WITH OWNERS REP AS WELL AND CAN ASSURE THEM THAT WE ARE TRYING
BEST TO SOLVE THE MATTERS IN THE MUTUAL INTERESTS.

+

RE MV MARJATTA P
--

AGAIN CAN ONLY CONFIRM THAT WE ARE TRYING UTMOST TO SOLVE THIS MATTER IN CHINA. ARE AWARE OF
THE PROBLEMS WHICH CAN ARISE IF THE PIPES WILL NOT BE LOADED, HOWEVER, A DECISION OF THE PORT
AUTHORITY IS BEYOND OUR CONTROL. WE AS WELL THINK, THAT IT IS RIDICOLOUS NOT TO LOAD
OUTSTANDING PIPES ON HOLD NO 5 WHEN WE HAVE LOADED ON TOP OF THE OTHER HOLDS.
HAVING SAID THAT, WE ARE OF THE OPINION THAT THE VSL SHLD SAIL IN CASE NO POSITIVE REACTION
FROPM PORT AUTHORITIES CAN BE REACHED BY TOMORROW IN ORDER TO MINIMIZE DAMAGES. IF CHRTRS ARE
OF DIFFERENT OPINION THEY HAVE TO LET US KNOW BY RETURN. CHRTRS CAN BE ASSURED THAT WE ARE
TRYING OUR UTMOST TO SOLVE THE PROBLEM, THEMORESO AS THEY ALSO HAVE BEEN IN DIRECT CONTACTG
WITH OUR REPRESENTATIVE.

IF CHRTRS INSIST TO LET VSL WAIT FOR INDEFINITE TIME  WE NEED TO HAVE THEIR INSTRUCTIONS BY
RETURN - OTHERWISE WE WILL PROCEED AS ABOVE.

ANDREW, PLS CALL ME, IF YOU HAVE GOT INSTRUCTIONS FROM CHRTRS AS I AM NOT WATCHING THE
COMPUTER ALL THE NIGHT

BEST REGARDS

STA BREMEN
JUERGEN TORBECK


-----------Original message-------------
TO..: "see transport agentur gmbh"
FROM: Thurlestone Shipping Ltd
DATE: 28-DEC-2007 21:02
MSG.: 2277349
Panamax@Thurlestone-shipping.com


juergen / andrew



re  ningbo contract

it seems that mic at atn usa has left for holidays and will not be back before 4th jan when we
can continue and try finalize the deal, plse try keep carriers calm until then , chrts
promised will start firm negotiations

re shanghai lots ex end jan

chrts rcvd confirmation for ttl 820 pipes (OD 2.4 x 12.192 mt x 14.50 mm / 10.3 TONS)  for end
jan dates , therefore they asking ows to nominate min/max 410 pipes vsl for 20/25 jan and
min/max 410 pipes vsl for 26/31 jan dates , pls confirm owners agreement to above , however
after albatross advised , factory not confirming same it may delay to beg february dates ,
they need to make double check to be safe side once more with factory and can come back
confirmation latest 4 or 5th jan or even trying to reach mic via mobile for earlier , however
what chrts says , all pipes out of shanghai will be given to albatross as per contract agreed
bcs they are happy with albatross,  if no loading end jan then beg feb or slight later but at
the end definetly loading with albatross

re marjetta p - missing 17 pieces

owners comments noted. we have checked from our source as well there seems to be a problem in
the port and chrs are asking owners full cooperation to convince the port authority to load
balance 17 pcs since this is a big vessel and 17 pcs more cannot be the cause of a problem. it
will be become a big problems for chrs if these pcs are left behind. there is going to be new
shift tomorrow 8 am and hopefully problem can be solved with owners assistance.

chrts request tomorrow as soon as marjetta p complete loading and sailed , asking ows to send

frt invoice and advising actual qtty loaded pipes .

please keep us informed

rgrds

14



STA See Transport Agentur GmbH – Martinistraße 29 – D-28195 Bremen

**TOTALMAR NAVIGATION CORP**
**VENEZUELA**

Liner Service
Operating
Chartering
Transport Contracting
Agents
Transport Consulting

BREMEN, 26TH JANUARY 2008
DT / -

**INVOICE NO. 4809 /01 /2008**

**MV "GO STAR" / ABS 1054**
**SHANGHAI / MARACAIBO**
**GENCON C/P DATED 07.12.2007**

TO:   SEAFREIGHT

                                                                        **D E B I T**

LOADED
400 PCS (DIA 2,40M) = 28.090,368 CBM / ABT 4.160,0 MTS
· 31 PCS (DIA 2,60M) =   2.554,956 CBM / ABT   381,3 MTS
430 PCS                   = 30.645,324 CBM / ABT 4.541,3 MTS

AT US$ 103,00 PER CBM FIOS L/S/D – L/D 5DAYS SHINC / 4DAYS SHEX      US$  3.156.468,37

PLUS  10 PIPES (DIA 2,4M) SHORT SHIPPED TTL 702,259CBM

AT US$ 103,00 PER CBM                                                US$    72.332,68
                                                                    US$  3.228.801,05

LESS 3,75 % COMMISSION                                               US$   121.080,04

IN FAVOUR OF ABS                                                     US$  3.107.721,01
                                                                    E. & O. E.



**PAYABLE WITHIN 5 BANKINGDAYS AFTER COMPLETION OF LOADING**

PLEASE INSTRUCT YOUR BANKERS TO SEND PAYMENT ORDER BY TESTED TELEX / CABLE OR
SWIFT DIRECTLY AS FIRST GERMAN BANK – WITHOUT INTERMEDIARY OF ANOTHER BANK – TO:

**BANKHAUS NEELMEYER, BREMEN  (GERMANY)**
**SWIFT / BIC:  NEELDE22**
**IBAN: DE09 290 200 00 0000 20 4319**
**ACCT. NO.: 204319**
**IN FAVOUR OF:  STA SEE TRANSPORT AGENTUR GMBH**

Martinistraße 29, D-28195 Bremen
Telefon: 0421 / 339 46-0
Telefax: 0421 / 337 82 98
Telex: 244 307
E-mail: info@sta-seetransport.de
www.sta-seetransport.de

Bankhaus Neelmeyer, Bremen
BLZ 290 200 00
SWIFT/BIC: NEELDE22
IBAN:
DE97 290 200 00 0000 01 5324
Kto-Nr. 15324

Geschäftsführer:
B. Hansing, J. Torbeck, A. Hansing
Amtsgericht Bremen HRB 8742
VAT-Nr. DE 11 44 31 615

member of

15

Juergen / Reyes

Many thanks for message bellow, content duly noted and Totalmar can propose following in reply to your bellow message:

As you know we are presently seeking compensation from ATN for various incidents that occurred between them and Totalmar during the shipments of pipes that were carried out for them as for contracts that both parties signed to fulfill such business, it happened that after they had confirmed verbally to us that Totalmar would perform the 6th shipment something occurred and they decided to do it with somebody else that is why we are trying to get the dead freight out of the 5th shipment (go star) which as per our charter party with them we have sufficient evidence to demonstrate in and arbitration proceeding that they did not comply with charter party terms. In this respect we are prepare to offer Owners as indicated previously that even though we inform the Owners in advanced that we did not had the 6th shipment confirmed to us so Owners did not really incurred in any lost we are prepare to offer the following as Totalmar has already started the Arbitration proceeding against ATN for various matters as demurrage claims that ATN has failed to paid and dead freight on the first shipment M/V Skala and the dead freight of the M/V Go Star; Totalmar offers Owners to give Owners 50 % of the amount of dead freight pending from ATN to Totalmar for the dead freight of the Go Star's claim and the confirmation that all shipments that Totalmar gets from China will be negotiated with Owners at a reasonable rate for both parties.

The dates and rates will be negotiated as soon as Totalmar gets the final written confirmation from our client which is not ATN whom may or may not get part of the pipes that will come from China as per information that we know.

Above is firm to Owners as long as Owners will lift the legal proceeding that they had started against Totalmar, also Totalmar confirms that will remit the outstanding US$ 40,006.00 immediately.

Await your prompt confirmation to above.

Best regards

Eng. Reyes Hernández
Totalmar Group
e-mail: totalmar@cantv.net
Ph: +58 212 2868686
Fax: +58 212 2870115
Mob: +58 414 3057475

-----Mensaje original-----
De: info@sta-seetransport.de [mailto:info@sta-seetransport.de]
Enviado el: Viernes, 06 de Junio de 2008 10:38 a.m.
Para: totalmar@cantv.net
Asunto: Doc-No. 1224164

Doc-No. 1224164  6/JUN/2008  16:37 (UTC +0200) JT

TO: TOTALMAR CARACAS

REYES / JUERGEN

RE: PIPES SHANGHAI / MARACAIBO
    CP DD 07/12/07

RECVD YR MESSAGE OF YESTERDAY NIGHT.

16



STA See Transport Agentur GmbH – Martinistraße 29 – D-28195 Bremen

**TOTALMAR NAVIGATION CORP.**
Avda. Francisco de Miranda
Centro Plaza
Piso 18, Oficina F, Los Palos Grandes
Caracas
Venezuela

Liner Service
Operating
Chartering
Transport Contracting
Agents
Transport Consulting

BREMEN, 9ᵀᴴ JUNE, 2008
DT / -

**INVOICE NO. 4864/06/2008**

**MV "ATLANTICA" / ASL 905**

TO:

**D E B I T**

TALLY EXPENSES AS PER ATTACHED INVOICE

RMB 141.541,50

LESS CREDIT RECEIVED

RMB   42.462,45

RMB   99.079,05

AT ROE 7,35

IN FAVOUR OF STA

US$    13.480,14
E. & O. E.

**BENEFICIARY BANK: BANKHAUS NEELMEYER (BREMEN, GERMANY)**
SWIFT: NEELDE22
IBAN: DE09 290 200 00 0000 20 4319
ACCT. NO.: 204319
IN FAVOUR OF: STA SEE TRANSPORT AGENTUR GMBH

**CORRESPONDENT BANK: BANK OF NEW YORK**
SWIFT: IRVTUS3NXXX

CC: CALC,   CC: FIN,   CC: BOOK

Martinistraße 29, D-28195 Bremen
Telefon: 0421 / 330 46-0
Telefax: 0421 / 397 82 88
Telex: 244 307
E-mail: info@sta-seetransport.de
www.sta-seetransport.de

Bankhaus Neelmeyer, Bremen
BLZ 290 200 00
SWIFT/BIC: NEELDE22
IBAN:
DE97 290 200 00 0000 01 5324
Kto-Nr. 15324

Geschäftsführer:
B. Hensing, J. Tarbeck, A. Hensing
Amtsgericht Bremen HRB 87 42
VAT-Nr. DE 11 44 31 616

member of



17

中国 外轮理货总公司

CHINA OCEAN SHIPPING TALLY COMPANY

SHANGHAI BRANCH
STATE PATENT NO.
9031881529

HEAD OFFICE

## STATEMENT OF TALLY ACCOUNT

0700081525

Vessel: ATLANTICA    Voy. No. 508    Nationality: MALTA
Tally commenced on: 12/13/2007    Tally completed on: 12/16/2007    Date of issue: 12/17/2007

| Tally items | Quantity | Unit | Charging rate | Amount(Yuan) |
|---|---|---|---|---|
| Basic tallying for break-bulk cargo | | | | |
| Kinds of cargo No. 4 | 35958 | R/T | 2.10 | 76,591.90 |
| Surcharges for sunday/holiday cargo | | | | |
| Kinds of cargo No. 4 | 6017 | R/T | 2.10 | 12,636.70 |
| Surcharges for night shift | | | | |
| Kinds of cargo No. 4 | 14497 | R/T | 1.05 | 14,895.66 |
| Surcharges for overweight/lengthy cargo | | | | |
| Kinds of cargo No. 4 | 35853 | R/T | 1.05 | 37,646.00 |
| Charges of preparing tally papers | 5871 | | | 780.00 |
| Traffic expenses by land | | | | 315.00 |

Amount totalled(in words) one hundred and forty-one thousand five hundred and forty-one yuan fifty Jun    ¥141,641.60

Prepared by: 任艳梅    1/1

Checked by:

In charge:

CHINA-CT-3ROM-16

18



上海中外运船务代理有限公司
CHINA MARINE SHIPPING AGENCY SHANGHAI CO.,LTD.

# CREDIT NOTE

DATE:2008-05-26

TO: STA BREMEN

M.V ATLANTICA   904/905

| CONTENTS | AMOUNT (RMB) |
|---|---|
| 30%DISCOUNT FOR TALLY FEE | RMB43462.45 |
| TOTAL | RMB42462.45 SAY FORTY TWO THOUSAND FOUR HUNDRED AND SIXTY TWO POINT FOUR FIVE RMB ONLY |

CHINA MARINE SHIPPING AGENCY SHANGHAI COMPANY LTD

电话总机：021-63757000转接各部        地址：上海市福建中路188号，中外运大厦
Tel:0086-21-63757000   Sinotrans Mansion No.188 Fujian Rd.(C)200001 Shanghai,China

19



STA See Transport Agentur GmbH – Martinistraße 29 – D-28195 Bremen

**TOTALMAR NAVIGATION CORP.**
Avda. Francisco de Miranda
Centro Plaza
Piso 18, Oficina F, Los Palos Grandes
Caracas
Venezuela

Liner Service
Operating
Chartering
Transport Contracting
Agents
Transport Consulting

BREMEN, 9TH JUNE, 2008
JT/FG

INVOICE NO. 4865/06/2008

MV "MARJATTA P" / ABS 1053

TO:

|                                            |  **DEBIT**        |
|--------------------------------------------|-------------------|
| TALLY EXPENSES AS PER ATTACHED INVOICE     | RMB 155.401,74    |
| LESS CREDIT RECEIVED                       | RMB  46.620,51    |
|                                            | RMB 108.781,23    |
| AT ROE 7,32                                |                   |
| IN FAVOUR OF STA                           | US$   14.860,82   |
|                                            | E. & O. E.        |

**BENEFICIARY BANK: BANKHAUS NEELMEYER (BREMEN, GERMANY)**
**SWIFT: NEELDE22**
**IBAN: DE09 290 200 00 0000 20 4319**
**ACCT. NO.: 204319**
**IN FAVOUR OF: STA SEE TRANSPORT AGENTUR GMBH**

**CORRESPONDENT BANK: BANK OF NEW YORK**
**SWIFT: IRVTUS3NXXX**

CC: CALC,   CC: FIN,   CC: BOOK

| | | | |
|---|---|---|---|
| Martinistraße 29, D-28195 Bremen | Bankhaus Neelmeyer, Bremen | Geschäftsführer: | member of |
| Telefon: 0421 / 339 45 -0 | BLZ 290 200 00 | B. Hensing, J. Tarbeck, A. Hensing | |
| Telefax: 0421 / 337 62 66 | SWIFT/BIC: NEELDE22 | Amtsgericht Bremen HRB 87 42 | |
| Telex: 244 307 | IBAN: | VAT-Nr. DE 11 44 31 615 | |
| E-mail: info@sta-seetransport.de | DE37 290 200 00 0000 01 5324 | | |
| www.sta-seetransport.de | Kto-Nr. 15324 | | |



20

HEAD OFFICE
1. West Beijing Road 14, Chongwen
District Beijing, P.R.China
Post code 100740  Fax (010) 65121037
Tax free customs clearance

中国外轮理货总公司

CHINA OCEAN SHIPPING TALLY COMPANY

SHANGHAI BRANCH

STATE PATENT NO. 附件

95318819.9

## STATEMENT OF TALLY ACCOUNT

Vessel: __MARIATH P__  Voy No. __1053__  Nationality: __MALTA__  Date of list: 01/08/2008  0800005690

Tally commenced on: __12/23/2007__  Tally completed on: __12/29/2007__

| Tally Items | Quantity | Unit | Charging rate | Amount (Yuan) | |
|---|---|---|---|---|---|
| Basic tallying for break-bulk cargo | | | | | 附注 |
| Kinds of cargo No.1 | 2 | R/T | 4.28 | 8.55 | |
| Kinds of cargo No.4 | 41288 | R/T | 2.10 | 86,715.80 | |
| Surcharge for night shift | | | | | |
| Kinds of cargo No.4 | 28078 | R/T | 1.05 | 24,231.90 | 附注 |
| Surcharge for non-cargo holds | | | | | |
| Kinds of cargo No.1 | 2 | R/T | 2.14 | 4.28 | |
| Surcharge for overweight/lengthy cargo | | | | | |
| Kinds of cargo No.4 | 41286 | R/T | 1.05 | 43,357.65 | |
| Charges of preparing tally papers | 6186 | | | 760.05 | |
| Traffic expenses by land | | | | -315.00 | 附注 |
| Amount total: (in words) one hundred and fifty five thousand four hundred and one yuan seventy four fen | | | | ￥155,401.74 | |

In charge: __任绍斌__  Checked by: __任绍斌__  Prepared by: __曲素英__  No.:1040  E  —  0900006890上海外轮理货有限公司  上海分公司

CT-FROM-16                                        /S                              CORISD SHANGHAI



上海中外运船务代理有限公司
CHINA MARINE SHIPPING AGENCY SHANGHAI CO., LTD.

# CREDIT NOTE

DATE:2008-05-26

TO: STA BREMEN

M.V MARJATTA P    1052/1053

| CONTENTS | AMOUNT (RMB) |
|---|---|
| 30%DISCOUNT FOR TALLY FEE | RMB46620.51 |
| TOTAL | RMB46620.51 SAY FORTY SIX THOUSAND SIX HUNDRED AND TWENTY POINT FIVE ONE RMB ONLY |

CHINA MARINE SHIPPING AGENCY SHANGHAI COMPANY LTD

电话总机：021-63757000转接各部          地址：上海市福建中路188号，中外运大厦
Tel:0086-21-63757000  Sinotrans Mansion No.188 Fujian Rd. (C)200001 Shanghai,China

22



Liner Service
Operating
Chartering
Transport Contracting
Agents
Transport Consulting

STA See Transport Agentur GmbH – Martinistraße 29 – D-28195 Bremen

TOTALMAR NAVIGATION CORP.
Avda. Francisco de Miranda
Centro Plaza
Piso 18, Oficina F, Los Palos Grandes
Caracas
Venezuela

BREMEN, 9TH JUNE, 2008
JT/FG

INVOICE NO. 4366/06/2008

MV "GO STAR" / ABS 1054

TO:

**D E B I T**

TALLY EXPENSES AS PER ATTACHED INVOICE                    RMB 119.982,90

LESS CREDIT RECEIVED                                      RMB  35.994,87

                                                         RMB  83.988,03

                          AT ROE 7,20

IN FAVOUR OF STA                                         US$   11.665,04
                                                         E. & O. E.


BENEFICIARY BANK: BANKHAUS NEELMEYER (BREMEN, GERMANY)
SWIFT: NEELDE22
IBAN: DE09 280 200 00 0000 20 4319
ACCT. NO.: 204319
IN FAVOUR OF: STA SEE TRANSPORT AGENTUR GMBH

CORRESPONDENT BANK: BANK OF NEW YORK
SWIFT: IRVTUS3NXXX


CC: CALC,   CC: FIN,   CC: BOOK

Martinistraße 29, D-28195 Bremen
Telefon: 0421 / 339 46 -0
Telefax: 0421 / 337 82 86
Telex: 244 307
E-mail: info@sta-seetransport.de
www.sta-seetransport.de

Bankhaus Neelmeyer, Bremen
BLZ 290 200 00
SWIFT/BIC: NEELDE22
IBAN:
DE97 290 200 00 0000 01 5324
Kto-Nr. 15324

Geschäftsführer:
B. Hansing, J. Torbeck, A. Hansing
Amtsgericht Bremen HRB 8742
VAT-Nr. DE 11 44 31 615

member of



23

HEAD OFFICE

中国外轮理货公司
CHINA OCEAN SHIPPING TALLY COMPANY

STATE PATENT NO. 9531881.9

# STATEMENT OF TALLY ACCOUNT

0900016687

Vessel: 　　　　　　　Voy.No. 1054　Nationality: 　　　Date of list.: 02/09/2008

Tally commenced on: 01/24/2008　　Tally completed on: 01/26/2008

| Tally items | Quantity | Unit | Charging rate | Amount(Yuan) |
|---|---|---|---|---|
| Basic tallying for break-bulk cargo | | | | |
| Kinds of cargo No. 4 | 30648 | R/T | 2.10 | 64,360.80 |
| Surcharges for sunday/holiday cargo | | | | |
| Kinds of cargo No. 4 | 6365 | R/T | 9.10 | 11,266.60 |
| Surcharges for night shift | | | | |
| Kinds of cargo No. 4 | 10746 | R/T | 1.05 | 11,283.30 |
| Surcharges for overweight/lengthy cargo | | | | |
| Kinds of cargo No. 4 | 30648 | R/T | 1.05 | 32,180.40 |
| Charges of preparing tally papers | 4543 | | | 576.90 |
| Traffic expenses by land | | | | - 315.00 |

Amount totalled(in words) one hundred and nineteen thousand nine hundred and eighty two yuan
ninety ten　　　　　　　　　　　　　　　　　　　　　Amount: ￥119,982.90

In charge:　　　Checked by:　　Prepared by:　　Nc:1040　B — 0900016687

CT-FROM-16.　　　　　　　　　　1/1

中国外轮理货总公司
上海分公司
COSTACO SHANGHAI



EISA 上海远东国际船舶代理有限公司
SHANGHAI FAREAST INTERNATIONAL SHIPPING AGENCY LTD.

# CREDIT NOTE

28TH MAY, 2008.

Messrs. ASL C/O STA BREMEN

MV. "GO STAR"

| Contents | Amount |
|---|---|
| 30% DISCOUNT FOR TALLY FEE | RMB35,994.87 |
| **TOTAL** | RMB35,994.87 |
| | SAY THIRTY FIVE THOUSAND NINE HUNDRED AND NINETY FOUR POINT EIGHT SEVEN RMB ONLY |

Shanghai Fareast International Shipping Co., Ltd.

MA LI ZHANG

(Signature N stamp)

25

TO..: "see transport agentur gmbh"
FROM: Thurlestone Shipping Ltd
DATE: 27-DEC-2007 13:54
MSG.: 2275981


Panamax@Thurlestone-shipping.com


juergen / andrew

GOT FOLL REPLIES FOR YOU


REF NINGBO


2. FOR ALL OPERATORS SHOWING INTEREST ON NINGBO PIPES CONTRACT , DUE LINER IN OWS AGENTS OWS TO SATISFY
    WITH LOADPORT RESTRICTIONS

3. ALBATROSS SHOULD MAKE UP MIND AND BRING THEIR LINER IN FREIGHT FOR NINGBO URGENTLY OR SHOULD ADVISE
    SORRY WE ARE OUT AND IF THEY ARE INTERESTED , SHOULD INVESTIGATE , ASK WHY 25000 DWT RESTRICTION UN WHICH
    BASE REASON , FYG CHRTS THKS OWS COMMENTS AND WILL ARRANGE STEVEDORING/LABOURS/LASHING MATERIALS ETC

4. MARJATTA - WE NEED URGENTLY OWS/MASTER CONFIRMATION 500 PIECES WILL BE LOADED WITHOUT ANY PROBLEM

5. END JANUARY 2 LOTS EX SHANGHAI 20/25 JAN AND 25/30 JAN , CHRTS CAN ADVISE 20/25 JAN ARE THERE BUT 25/30 JAN
    MAY POSTPONE TO FEBRUARY DATES OR CHRTS MAY CHANGE LOAD PORT , AS NOT TO BE CONSIDER FULLY FIRM UNTIL
    THINGS ARE CLEAR , EXPECTING CHRTS OFFICIAL RESPONSE ON SAME INCLUDING 2.7M DIAMETER CASE


RGRDS

26

Doc-No. 1095944  27/DEC/2007  17:15 (UTC +0100) JT

TO: THURLESTONE

ANDREW / JUERGEN

RE: PIPE CONTRACT CHINA / MARACAIBO
-

RECVD YR TODAYS MESSAGE WITH THE VARIOUS ITEMS RAISED. MEANWHILE HAVE
ALREADY REPLIED TO ITEMS 2/3 AND ITEM 4.

COMING TO ITEM 5 WLD LIKE TO COMMENTS AS FOLLOWS

- CONSIDER THE 2 SHIPMENTS EX SHANGHAI AS FULLY AND FIRM FIXED IN ACCORDANCE
WITH EARLIER REACPS. IN CASE OF LATER SHIPMENT DATES FOR 2ND OUSTANDING
SHIPMENT, HAVE TO SEE ONCE WE ARE NEARER TO THE ACTUAL DATES.
CLD CHRTRS KINDLY CONFIRM TO US WHETHER SHIPPERS FOR THESE CONSIGNMENTS ARE
AGAIN " SHANGHAI JIAFANG STEEL PIPE CO. LTD ".

THKS AND BEST REGARDS

STA BREMEN
JUERGEN TORBECK

27

TO..: "see transport agentur gmbh"
FROM: Thurlestone Shipping Ltd
DATE: 08-JAN-2008 11:15
MSG.: 2298010
Panamax@Thurlestone-shipping.com

daniel / andrew
cc andreas

foll rcvd

quote

Marjetta p – frt payment

According to chrs, they have instructed yesterday their bankers to facilitate the payment accordingly. As
soon as they have swift copy will forward same , however usualy
ows seen the money before we send swift copy

ref 2 lots ex shanghai end jan dates

20/25 jan shipment is confirmed with 410 pipes. With dia 2.4m for sure pls nominate vsl as per cp

26/31 jan shipment awaiting confirmation on dates , most probably will move to beg feb and most
probably also 410 pieces reverting with more details

ref Ningbo coa
Chrs are awaiting reply fm shippers when they will finalize all the documents required. Hope to be able
to get some negotiation ongoing , will revert on their opening

unquote

rgrds

Doc-No. 1106615  14/JAN/2008  16:48 (UTC +0100) JT

to: thurlestone

andrew / juergen

to: oss dubai - attn ozi

re: pipes shanghai / maracaibo
--

being back in the office right now, wld like to in form you ( and at the same time confirm to chrtrs ) our discussions.

first of all wld like to thank chrtrs very much for enabling me to them / the port and last but not least venezuela. thks for the nice reception and assistance given during my stay over there.

coming to the outstanding items wld like to summarize / comments as follows:

- mv go star has been confirmed by chrtrs for 410 pcs pipes at 2,40 mtrs of plus 30 pcs pipes at 2,60 od. frt will be based on actual cubic ( 410 X 2,40 mtrs pipes plus 30 x 2,60 mtrs pipes)  at the agreed rate of usd 103,- p cbm fios lsd.

stowage plan has been sent to you earlier - however with 31 pcs of 2,60 mts od ( instead of 30 ), as this is the info we had got fm china earlier
on this basis we can only load an additional 15 pcs nested pipes on deck.

however, our chinese contact tell us that it might be that not all of the 2,40 mtrs od pipes are ready but only abt 390 pcs. if this is the case, we cld load additionally 30 pcs nested pipes on deck.

- next vsl bss end jan ex shanghai

have calculated on bss of marjatta p the intake. the 410 pcs of pipes with 1,40 mtrs dia can all be loaded under deck. this wld leave the deck open for nested pipes. that vsl cld take 105 pcs nested pipes on deck. so basically, one shld calculated with abt 100 pcs nested pipes on deck for such a vsl.

trust this is of assistance. awaiting chrtrs confirmation.

- frt payment. are glad to be able to finally confirm receipt of freight. so our bankers are even more fast to trace the money than chrtrs bankers to sent the swift confirmation. anyhow, money recvd and one headache less. thks

that's it for the time being

best regards
sta bremen
juergen torbeck

29

TO..: "see transport agentur gmbh"
FROM: Thurlestone Shipping Ltd
DATE: 14-JAN-2008 16:08
MSG.: 2313887
Panamax@Thurlestone-shipping.com

Attn Juergen

Below crossing with yrs just now:


foll rcvd

qte

5th nomination laycan 20/25 jan.
6th nomination laycan 26/31 jan but as said on the phone this shipment has not been confirmed by the
rcvrs yet which we are working on. i have informed
Chrs that vessel similar to marjetta p can load about 100 nested pipes on deck and they are working on
same

uqte

Await yours

Rgds

TO..: "see transport agentur gmbh"
FROM: Thurlestone Shipping Ltd
DATE: 18-JAN-2008 21:05
MSG.: 2325385
Panamax@Thurlestone-shipping.com

juergen/andrew

shipment jan 26/31 ex shanghai

rcvd flwg fm chrts

quote

kindly be advised that shippers have not cargo ready for referred laydays, they will inform new laydays
when cargo ready for shipment.

we have already informed mr. juergen of als, whom confirmed ok, but we should advice the new laydays
once we know them.
be advised accordingly.

unquote

rgrds

31

TO..: "see transport agentur gmbh"
FROM: Thurlestone Shipping Ltd
DATE: 22-JAN-2008 09:06
MSG.: 2332721
Panamax@Thurlestone-shipping.com

JUERGEN / ANDREW

ozi / andrew

finally got hold of juergen

1sty he comments that chrts already nominated the 6th lifting 25-31jan and only friday did they say they
could not make the dates
now chrts seem to want a liner in rate , which albatross will investigate but they firstly need
to know from shippers/charterers

1) what agreement shippers are having in relation to port cost under the c.o.a
2) if albatross are able to negotiate with the terminal that shippers are already having or are they bound
   to agree with costs already agreed between shippers and terminal
3) if above is no then can albatross use their own berth under liner in terms ?

once we have this info then albatross can give chrts a liner in optional rate


++

coming back to ningbo

it is albatross sole intention to transport pipes to shanghai

have shippers confirmed that they happy for this procedure?

before they can arrange the transportation they need to know urgently

are shippers intending to bed/nest the pipes from factory

location of factory

how many pipes can the factory produce on daily basis

+

also need to know value of the pipes for insurance purposes

it is albatross int to load one nested pipe per truck and reckon 1shipment every  5-7 days

can shippers provide enough pipes ( 250-270 pieces) every 5-7 days ?

plse urgently advise in order to get everything in line
rgds



> ========= Original Message ========= <
rcvd foll
quote.

ref 6th lot ex shanghai

32

urgently adv ows best min rate liner in free out bss against usd 103 flos

++

re ningbo contract

Kindly please request Albatross to offer firm for the Ningbo contract with the option to take cargo from Ningbo port and ex factory Ningbo and Shangahi to deliver same to Maracaibo basis liner in free out as discussed.

Above offer should include Owners commitment to truck cargo from Factory Ningbo to Shanghai and to place on handy maxes vessel; please indicate maximum intake per vessel from either port.

also advise route and daily transportation qtty

Appreciate very much your prompt reply.

unquote

rgrds
ozi

33

Doc-No. 1112738  22/JAN/2008  11:11 (UTC +0100) JT

TO: THURLESTONE

ANDREW / JUERGEN

RE:  PIPES CHINA / MARACAIBO
—

RECVD CHRTRS LAST MESSAGE OF YESTERDAY NIGHT. WLD LIKE TO COMMENT AS
FOLLOWS:

- NEXT LOT EX SHANGHAI: FRANKLY ARE A BIT SURPRISED ABOUT THE QUESTION ASKED.
THIS LIFTING HAD ALREADY BEEN NOMINATED TO OWNERS SEVERAL TIMES, LAST TIME
WITH DATES 26/30.01 AND IS A CLEAR FIXTURE WITH ABS. ONLY ON FRIDAY LAST OWNERS
HAVE BEEN INFORMED THAT DATES APPARENTLY CANNOT BE KEPT AND NEW DATES TO BE
ADVISED. NOW ALL OF A SUDDEN THERE IS THE QUESTION OF " LINER IN " ?

ANYHOW, CAN ADVISE THAT WE HAVE GOT INDICATION OF LINER IN EXPENSES AT
SHIPPERS TERMINAL NO 14 OF ABT USD 4,80 P CBM GROSS. THIS IS NOT CONSIDERING THE
TIME FACTOR.

- CARGO EX NINGBO
WERE OFFERING ON FRIDAY LAST FOR THESE SHIPMENTS BASED ON TRANSSHIPMENT VIA
SHANGHAI.  AT THAT TIME CHRTRS STATED THAT THEY SOFAR DID NOT TAKE UP
TRANSSHIPMENT BY TRUCK  WITH SHIPPERS AND THAT THEY WLD HAVE TO CHECK
WHETHER SAME WLD BE ALLOWED. THIS DESPITE THE FACT THAT WE WERE DISCUSSING
ALSO TO LOAD NESTED PIPES IN TRANSSHIPMENT ON DECK OF THE NEXT SHANGHAI
LOADER. HAVE NOT HEARD FROM CHRTRS IN THIS RESPECT.

THE OFFER OF FRIDAY LAST CLD BE AMENDED IN THE WAY THAT IT IS ABS OPTION TO LOAD
EITHER AT NINGBO OR SHANGHAI. THE INTAKES HAD BEEN DISCUSSED AND AVDISED
EARLIER: FROM NINGBO IT WAS ABT 150/170 PCS AND FROM SHANGHAI ABT 250/270 PCS.

FOR ARRANGING AND NEGOTIATING TRANSSHIPMENT FINALLY DO NEED FIRM COMMITMENT
OF CHRTRS AND FOLL INFO
- LOCATION OF FACTORY
- CONDITIONS OF SHIPPER: ? FOT INCL BEDDING  ?
- HOW MANY PIPES CAN BE LOADED BY SHIPPERS PER DAY
- VALUE OF PIPES

AS A GUIDE IN RESPECT TO TRANSSHIPMENT CAN INFORM CHRTRS THAT PRESENTLY ABS
WLD EMPLOY ABT 35 / 40 TRUCKS PER DAY, ROUTE WLD BE VIA HIGHWAY.

TRUST ABOVE OF ASSISTANCE. AWAIT CHRTRS FIRM CONFIRMATION

BEST REGARDS

STA BREMEN
JUERGEN TORBECK

34

Doc-No. 1116353  26/JAN/2008  13:55 (UTC +0100) JT

TO: THURLESTONE, LONDON - ATTN ANDREW
TO: OSS DUBAI - ATTN OZI

TOP URGENT !!

RE: PIPES SHANGHAI / MARACAIBO
--

INDERSTOOD FROM CHINA THAT THE NEXT SHIPMENT OF PUIPES EX SHANGHAI ALLBGEDLY MIS BEING FIXED
WITH ARMADA ON MV " KANG CHING ". CAN HARDLY BELIEVE THIS BUT ASK YOU TO URGENTLY CHECK WITH
CHRTRS.

IN CASE THIS INFORMATION IS TRUE, WE WOUILD NOT ONLY BE DISAPPOINTED, BUT ARE HOLDING CHRTRS
FULLY RESPONSISIBLE FOR ALL CONSEQUENCES OUT OF THEIR BREACH OF CONTRACT AND ARE RESERVING ALL
OWNERS RIGHTS ALSO OUT OF THE FIRST SHIPMENTS.

AWAIT YOURS URGENTLY

BEST REGARDS

STA BREMEN
JUERGEN TORBECK

35



36

# EXHIBIT 4

FOCUS - 13 of 33 DOCUMENTS

SIB INTERNATIONAL SRL v METALLGESELLSCHAFT CORPO-
RATION (THE "NOEL BAY")

COURT OF APPEAL (CIVIL DIVISION)

*[1989] 1 Lloyd's Rep 361*

**HEARING-DATES:** 9 December 1988

9 December 1988

## CATCHWORDS:

Charter-party (Voyage) -- Repudiation -- Charterers in breach -- Owners concluded substitute charter -- Whether owners entitled to claim demurrage they would have earned -- Whether owners could claim expenses of ballast voyage.

## HEADNOTE:

By a charter-party dated May 8, 1987 the disponent owners let their vessel Noel Bay to the charterers for the carriage of a part cargo of clean unleaded gasoil from a port or ports on the west coast of Italy (including Italian islands) to a wide range of European ports. The charter provided inter alia that the total laytime in running hours was 72 hours, demurrage was to be at the rate of US $8,500 per day and that the charterers' were to nominate a loading port before the vessel left her previous port of call or on the signing of the charter if she had already sailed. Freight was payable at a percentage over Worldscale.

The vessel finished her previous employment at Malta on May 29, at 17 12 hours. That was the latest time for the charterers to give orders for a loading port but they did not do so.

On the same day at 18 24 hours she anchored off Malta awaiting instructions for a loading port. On May 30 at 11 24 hours she sailed for Augusta in Sicily and arrived at the roads at 17 42 hours.

On June 1 the charterers gave notice that they were withdrawing from the charter which they considered to be cancelled. The owners, on June 3 accepted that conduct as a repudiation and con-cluded a substitute charter for the carriage of a cargo from Tuapse on the eastern shore of the Black Sea to Banias in Syria. The vessel arrived at Tuapse on June 7 and completed discharge at Banias on June 17.

The owners claimed damages from the charterers. It was assumed that the charterers would have ordered the vessel to load at Augusta and to discharge at Lavera in the South of France and that such voyage would have started on June 3 and ended on June 9. The owners claimed a profit of $35,543 they would have made on the voyage; $27,766 by way of demurrage in that the 72 hours would have been consumed in the loading and discharging in addition to the four and a half days spent waiting for orders; and $17,444 being the expenses incurred in the ballast voyage from Au-

gusta to Tuapse.  The owners contended that the proportion which would have been earned up to June 9 when the notional voyage to Lavera ended was $12,538 and they gave credit for this amount.

The charterers accepted that a profit of $35,543 would have been made but they rejected the owners' claims for demurrage and the expenses incurred on the ballast voyage.  They argued that the approach voyage from Augusta to Tuapse should be considered as part of the voyage from Tuapse to Banias which on their calculation resulted in a profit of $3606 per day.  The charterers claimed that they were entitled to credit at the rate of $3606 per day for the period of overlap between the notional voyage from Augusta to Lavera and the actual voyage from Augusta via Tuapse to Banias.

Held, by QB (Com Ct) (PHILLIPS, J), that the owners were only entitled to $35,543.72 plus interest.

The owners appealed contending that they should have been awarded $68,216.66.

Held, by CA (BALCOMBE, STOCKER and STAUGHTON, LJJ), that (1) the owners claim for $17,444 failed; the approach voyage from Augusta to Tuapse was part of the process of earning freight under the substitute charter; the expenses of it should be added to those that were incurred in subsequent stages at Tuapse and Banias and on the loaded voyage, the total was then deducted from the freight to ascertain the profit of the substitute voyage as a whole and this gave a daily rate of profit of $3606 for the venture; the owners were only obliged to give credit at that rate during the overlap period; they could not claim separately for the $17,444 expenses of the ballast voyage (see p 366, col 2; p 367, col 1);

(2) (per BALCOMBE and STOCKER LJJ), that at no time was it ever pleaded that there had been a breach of cl 4 of the charter which gave rise to a right to damages for detention which had accrued before the charter was terminated by the owners' acceptance of the charterers' repudiation, as well as to general damages for loss of freight; the claim as pleaded was simply for damages for repudiation of the charter and the learned Judge was right to say that the owners had suffered no loss beyond the $35,543 for loss of freight; the appeal would be dismissed (see p 367, cols 1 and 2; p 368, cols 1 and 2).

## CASES-REF-TO:

Johnson v Agnew, (HL) [1980] AC 367;

Maredelanto Compania Naviera SA v Bergbau-Handel GmbH (The Mihalis Angelos) (CA) [1970] 2 Lloyd's Rep 43; [1971] 1 QB 164;

Rheinoel GmbH v Huron Libenan Co (The Concordia C), [1985] 2 Lloyd's Rep 55;

Saxon Steamship Co Ltd v Union Steamship Co Ltd (1898) 4 Com Cas 29; (1900) 5 Com Cas 381;

Zim Israel Navigation Co Ltd v Tradax Export SA, (CA) [1971] 2 Lloyd's Rep 91; [1970] 2 Lloyd's Rep 409.

## INTRODUCTION:

[1989] 1 Lloyd's Rep 361 Page 3

This was an appeal by the disponent owners SIB International SRL from the decision of Mr Justice Phillips awarding them $35,543.72 against the charterers Metallgesellschaft Corporation for the wrongful repudiation of the charter.

The further facts are stated in the judgment of Lord Justice Staughton.

**COUNSEL:**

Mr Julian Cooke for the owners; Mr Paul Walker for the charterers.

**PANEL:** Lord Justice BALCOMBE, Lord Justice STOCKER and Lord Justice STAUGHTON

**JUDGMENTBY-1:** Lord Justice STAUGHTON

**JUDGMENT-1:**

Lord Justice STAUGHTON: In 1987 the plaintiffs, SIB International SRL, were time chartered owners of the mt Noel Bay. I shall call them "the owners". By a charter-party dated May 8, 1987 they chartered the vessel to the defendants, Metallgesellschaft Corporation ("the charterers") for the carriage of a part cargo of clean, unleaded gasoil from a port or ports on the west coast of Italy (including Italian islands) to a wide range of European ports. On June 1, 1987 the charterers purported to withdraw from the <u>charter</u>-party, saying that they considered it <u>cancelled.</u> The owners on June 3 treated that conduct as a wrongful repudiation and accepted it as such.

On July 2 the owners issued a writ claiming <u>damages</u> from the charterers. It became apparent that liability was not disputed, and that the only issue was as to damages. That was tried by Mr Justice Phillips, and on Apr 19 he gave judgment for the owners for $35,543.72 and interest. From that judgment the owners now appeal. They say in their notice of appeal that they should have been awarded $68,216.66. It is a refreshing change to have a case on such recent facts before this Court.

The charter-party

This provided for laydays not to commence before May 20, and for a cancelling date of May 24 if the vessel were not ready by then; but those dates were extended by agreement. There were the following further terms:

H. Total laytime in running hours 72

I. Demurrage per day: US dollars 8,500 per day or pro rata.

4. (a) Prior to the Vessel's readiness to sail from the last previous port of call or on signing this charter if the Vessel has already sailed, Charterer shall nominate the port(s) of loading or port(s) of discharge, as the case may be, or order the Vessel to one of the following destinations for wireless orders naming such port(s):

Quoin Island

Land's End

Gibraltar

Suez

[1989] 1 Lloyd's Rep 361

Aruba

If the Vessel is ordered to one of such destinations for orders, Charterer shall thereafter nominate the actual loading or discharged port(s) by wireless as soon as practicable.

(b) After loading or discharging port(s) have been nominated, Charterer may change such port(s) and/or vary their rotation consistent with Part 1 and bills of lading, if any, and Owner shall issue instructions necessary to give effect to such change.   If such change is made, or a destination for wireless orders is given, any time by which the steaming time to the port(s) to which the Vessel is finally ordered exceeds that which would have been taken if the Vessel had been ordered to proceed to such port(s) in the first instance shall count as laytime or, if the Vessel is on demurrage, as time on demurrage . . .

6.   Upon arrival at customary anchorages at each port of loading or discharge, the Master shall give the Charterer notice by letter, telegraph, wireless or telephone thta the Vessel is ready to load or discharge cargo, berth or no berth, and laytime or, if the Vessel is on demurrage, time on demurrage shall commence upon the expiration of six (6) hours after receipt of such notice . . .

8.   Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part 1(1) for all time that laytime therein specified is exceeded by the time taken to load and discharge cargo and the time which, under the provisions of this Charter, counts as laytime or time on demurrage.

Freight was payable at a percentage over Worldscale, which of course makes provision for voyages from any of a great many loading ports to any of a great many discharging ports.

Further facts

The vessel finished her previous employment at Malta, on May 29 at 17 12 hours when she cleared outwards.   That was the latest time for the charterers to give orders for a loading port pursuant to cl 4(a), or for one of the other destinations mentioned in that clause.   But they did not do so.

On the same day at 18 24 hours she anchored off Malta awaiting instructions for a loading port.  On May 30 at 11 24 hours she sailed for Augusta (which is in Sicily).   On the same day at 17 42 hours she arrived at Augusta roads and waited there.   On June 1, as already mentioned, the charterers gave notice that they withdrew from the charter-party.   And on June 3 the owners accepted that conduct as a repudiation, and concluded a substitute charter for the carriage of a cargo from Tuapse (on the eastern shore of the Black Sea) to Banias in Syria.   The vessel arrived at Tuapse pursuant to that charter-party on June 7, and completed discharge at Banias on June 17.

The principles involved

At first sight the owners' claim for damages fell to be assessed on well-settled principles, albeit with a good deal of tiresome attention to detail.   The owners are entitled to be placed in the same position, financially, as they would have enjoyed if the contract had not been broken.   That involves a comparison of the money they would have earned, less expenses, on the contract voyage with the money they in fact earned, less expenses, on the substitute voyage.   Fixed items, such as insurance, crew wages and repairs, which can more or less accurately be described as overheads for this purpose, may be disregarded since they are the same on both sides of the account.   But one problem that almost invariably arises, and does in this case, is that the substitute voyage lasts for longer than the voyage under the original charter-party.   The solution commonly adopted is to take

[1989] 1 Lloyd's Rep 361        Page 5

a proportion of the profits on the substitute voyage to set off against the profits lost on the original voyage; otherwise one would be involved in calculations to the end of the ship's working life.

Another problem is that the vessel may have been better -- or worse -- placed for future employment at the end of one voyage than at the end of the other. That is commonly a factor which is said to be relevant. But there is nothing to suggest that it has any importance in this case.

A third difficulty arises where the charterer -- the guilty party -- had an option as to the way in which he could require the original contract to be performed. In such a case it is established law that, at any rate if the option has not already been exercised at the date of the breach, the charterer must be assumed to have exercised the option in a way most favourable to himself. Here the calculation of the profit that would have been made on the original voyage is based on the assumption that the charterers would have ordered the vessel to load at Augusta, and to discharge at Lavera in the South of France. There has been no dispute about that; both sides agree that the calculation must be based on that assumption.

There is one unusual feature of this case, which gives rise to the main issue in dispute. It is that, when repudiation was accepted on June 3, the charterers had already been in breach for five days by failing to give loading port orders. In consequence the vessel had been idle for the greater part of the period; all that she had accomplished was the short voyage from Malta to Augusta, in two stages occupying some seven and a half hours in all. It is the treatment of that period of idleness which causes the greatest problem.

The rival calculations

The owners' claim is in four parts. Part A considers a notional voyage starting on June 3 (when repudiation was accepted) from Augusta with cargo to Lavera. It would have taken 6.17 days, ending on June 9; the freight payable would have been $90,350, and the expenses (other than fixed expenses which I have described as overheads) $54,806; the profit $35,543.

Part B is controversial. It alleges that, in meal or in malt, the owners would have earned $27,766 by way of demurrage on that voyage, because 72 hours would have been consumed in loading and discharging in addition to the period of over four and a half days spent waiting for orders. The precise formulation of this claim, and in particular whether it is meal (demurrage as such) or malt (damages in the like amount) will need careful attention later.

Part C claims the expenses of the voyage from Augusta to Tuapse, in the sum of $17,444. This sum is said to have been spent by the owners in <u>mitigation</u> of their loss, in order to take up substitute employment.

Part D allows credit for a proportion of the profit earned on the substantive voyage. The calculation starts on arrival of the vessel at Tuapse, and ends on discharge at Banias. The figures are:

Duration of voyage 9.77 days

Freight $125,019

Expenses 56,618

Profit $68,480, or $7,000 per day.

[1989] 1 Lloyd's Rep 361

There is a minor error in that calculation, of no consequence.  The proportion which would have been earned up to June 9, when the notional voyage to Lavera would have ended, is $12,538. For that the owners give credit.

The charterers' calculation accepts, at any rate in this Court, part A of the owners' claim -- the profit of $35,543 that would have been made on the notional voyage from Augusta to Lavera.  Before the Judge the charterers argued that there should be deducted the expenses of the voyage from Malta to Augusta; but the Judge rejected that argument, and there is no cross-appeal.  He was plainly right to do so, for the owners did not save or avoid those expenses when they accepted the charterers' repudiation; the expenses had already been incurred.  Another way of putting the same point is that, if one is comparing what actually happened with what would have happened if the contract had been performed, those expenses occur on both sides.  So they can be left out of account.

The charterers altogether reject part B of the owners' claim (demurrage or damages in the like amount that would have been payable on the notional voyage), and the Judge agreed with them. His reasoning will be considered later.

On Parts C and D the charterers adopted a different method.  They argued that the approach voyage from Augusta to Tuapse should be considered as part of the cargo voyage from Tuapse to Banias.  Their figures are:

Duration of voyage 14.15 days

Freight $125,019

Expenses 74,062

Profit $51,036, or $3,606 per day.

There is a minor error in arithmetic, as there is in the owners' calculation.  The charterers say that they are entitled to credit at the rate of $3606 per day for the period of overlap between the notional voyage from Augusta to Lavera, and the actual voyage from Augusta via Tuapse to Banias. If they can uphold the Judge's treatment of the notional voyage, which is considered later, the overlap is only two days, and the charterers waive their claim for any credit.  But if they do not uphold the Judge's treatment they do claim credit, for an overlap of six days.

The first issue

This arises on the owners' claim B.  Before the Judge it was put in this way:

If orders for the loading port had been given in accordance with clause 4 of the charter, the vessel would have been able to arrive at Augusta and tender NOR by not later than 0200 on 30th May, with the result that laytime would have commenced on 0800 on 30th May and expired at 0800 on 3rd June.

Thus by 1424 on 3rd June the vessel would have been on demurrage for 6 hours 24 minutes, and on the ba is that a further three days (the allowed lay-time) had been used in loading and discharging, the vessel would have earned demurrage as follows: 3,266666 days x $8,500 = $27,766.66.

Thus it was argued that the owners could recover not only $35,543 under claim A as damages for repudiation of the charter-party, but also the additional sum of $27,766 as lost demurrage.  The

[1989] 1 Lloyd's Rep 361                                    Page 7

precise calculation is explained, for the curious, by the fact that May 31, 1987 was a Sunday and so excepted from laytime.

Mr Walker for the charterers submits, and the Judge accepted, that there are two answers to this claim. The first is that the notional voyage in performance of the charter-party must be calculated on the hypothesis that there was no breach of any kind by the charterers, and in particular no failure to give prompt orders for a loading port. On that basis the notional voyage would have begun on May 29 at Malta, continued to Augusta for loading, and ended at Lavera on June 5. That, Mr Walker submits, is the true no-breach assessment. The owners recover their loss of $35,543 and no more.

There are in my judgment two answers to that contention: it is not law, and it is not just. As to the law, I accept the submission of Mr Cooke for the owners that the value of the contract which they lost must be assessed as at June 3, the date when repudiation was accepted and they lost it. Whatever events had already occurred by then are facts, and cannot be altered by hypothesising. By that time the charterers had been in breach of contract for five days, and the owners had an accrued right to complain of that breach. (I leave aside for the moment whether they had any accrued right to damages or demurrage.) I find support for this treatment in Maredelanto Compania Naviera Sa v Bergbau-Handel GmbH (The Mihalis Angelos), [1970] 2 Lloyd's Rep 43; [1971] 1 QB 164. There Lord Justice Megaw said (at p 58; p 209):

In my view, where there is an anticipatory breach of contract, the breach is the repudiation once it has been accepted, and the other party is entitled to recover by way of damages the true value of the contractual rights which he has thereby lost, subject to his duty to mitigate. If the contractual rights which he has lost were capable by the terms of the contract of being rendered either less valuable or valueless in certain events, and if it can be shown that those events were, at the date of acceptance of the repudiation, predestined to happen, then in my view the damages which he can recover are not more than the true value, if any, of the rights which he has lost, having regard to those predestined events.

See also Johnson v Agnew, [1980] AC 367, a case concerning a contract for the sale of land where there had evidently been a substantial charge in its market value. The House of Lords held that the damages should be assessed on the date when the remedy of specific performance became aborted (eg per Lord Wilberforce at p 401).

Guidance is said also to be found in Rheinoel GmbH v Huron Liberian Co (The Concordia C), [1985] 2 Lloyd's Rep 55. There Mr Justice Bingham was faced with an award of arbitrators for both freight differential and damages for detention. The Judge varied the award. However, it is impossible to ascertain from the report precisely what the arbitrators awarded and on what facts. Whatever it was, Mr Justice Bingham did not wholly agree with it. So I cannot regard the case as of assistance on this particular point.

As to the justice of the treatment proposed by Mr Walker and accepted by the Judge, it seems to me that on other facts it could be most unjust. Suppose that the owners had reasonably waited not five days but 15 days for orders, and then accepted the charterers' conduct as a repudiation. Their damages would still by Mr Walker's method have been $35,543 and no more; that method would still have required a hypothesis of no breach at all, so that the notional voyage would have begun on May 29 and ended on June 5. But the repudiation would in fact only have been accepted on June 13 (after waiting 15 days for orders), and the owners would only have been free to take other em-

[1989] 1 Lloyd's Rep 361                                                    Page 8

ployment for their vessel on that date.   They would receive no compensation at all for the period from June 5 to 13.

Since preparing this judgment I have seen in draft the judgment to be delivered by Lord Justice Balcombe.   I agree that the owners' points of claim did not accord with the way that their case was put at the trial; they contained no calculations such as were later to be found in parts A to D of the claim at trial; instead the figures in par 8 (which Lord Justice Balcombe sets out) were calculated on a different basis, which I would have thought difficult to sustain.

It seems to me that by allowing parts A to D of the claim to be put forward, the Judge must by implication have been allowing any necessary amendment to the points of claim.   So I feel entitled to conclude that the owners are, in principle, entitled to the loss which they suffered by delay for five days through the charterers' breach of contract, as well as the loss by repudiation amounting to $35,543.   But Mr Walker's second argument, which the Judge also accepted, is that the damages for five days' delay must be assessed by reference to the vessel's earning capacity at the market rate, and not by the liquidated sum of $8,500 per day payable as demurrage.

As will appear shortly, I agree with that treatment; and the result of it is that the owners' claim for additional loss is extinguished by the credit which they must give for profit earned on a proportion of the substitute voyage.   Consequently the difference of view between Lord Justice Balcombe and myself is not material to the outcome of this appeal.

In support of the demurrage figure Mr Cooke sought to rely on three arguments not put forward in the Court below.   The first was that the charterers had in fact ordered the vessel to wait off Malta; as such an order could only be given for one of the destinations named in cl 4(a), Malta must be deemed to have been one of the destinations; in consequence time lost waiting should be treated as laytime by reason of cl 4(b).   That argument might well face difficulty in law.   But it also requires a basis of fact which was not pleaded and not found by Mr Justice Phillips, viz that the charterers did order the vessel to wait off Malta.   In the circumstances this Court ruled that the argument could not be pursued.

The second point was that, as failure to give any orders at all is worse than a change of orders or an interim order to one of the destinations mentioned in cl 4(a), it ought a fortiori to be included in the events which cause laytime to run under cl 4(b).   I was at one time attracted by this argument, which has the merit of common sense.   But the result contended for can only be achieved by implication, and I do not think that the detailed provisions of cl 4(b) can be supplemented by implication in this way.

Thirdly, Mr Cooke submits that, if the owners are not entitled to demurrage as such, they are entitled to damages equal to the earning capacity of the vessel in the market, which can be assumed to be equal to the demurrage rate in the charter-party.   Such an assumption is sometimes made, in the absence of any other evidence, as it was by agreement in the case of Zim Israel Navigation Co Ltd v Tradax Export SA, [1970] 2 Lloyd's Rep 409, [1971] 2 Lloyd's Rep 91.   But here there was other evidence of the earning capacity of the vessel in the market -- the rate which emerged from the figures for the substitute voyage.   Mr Cooke argued that the spot rate obtainable for the vessel at Augusta on June 3 (when the substitute charter was fixed) is not evidence of the rate which the owners might have been able to obtain at Lavera on June 5, had there not been the delay waiting for order. They would at least have had more time or explore the market.   No doubt it is possible that the rate then would have been different.   But I am confident that the rate obtainable on the substitute

[1989] 1 Lloyd's Rep 361

Page 9

voyage is a better guide to the vessel's current earning capacity than the demurrage rate in the original charter-party. That there was no more evidence on that topic is perhaps not surprising, since the owners did not in their pleadings put forward any claim for damages based on a market rate, as an alternative to their claim for demurrage. Mr Cooke protests that the calculations put forward in his claim B were agreed as figures. But I do not think that there can have been any agreement as to damages if they were not based on the demurrage rate. Certainly the Judge did not think that there was.

So I turn to consider the way in which this point was argued before the Judge, as already set out. This I have found the most elusive point in the whole case. Mr Cooke says that it is a question of causation: the delay in giving orders caused the laytime not to start when it would have started if prompt orders had been given. That has considerable force, but it seems to me to erect yet more hypothesis on the existing edifice. One is required to assume that the charterers would have nominated Augusta on May 29 (Perhaps they have to live with that assumption as it suits them for the purpose of the notional voyage), that the vessel would have arrived there on May 30, that cargo would not have been loaded before June 3, and that no time would have been saved thereafter in the loading and discharging operations. It is simpler, more realistic, and in my opinion correct to award the owners damages reflecting the earning capacity of the vessel in the market for the period when she was delayed by lack of orders.

So I consider that, instead of their claim B, the owners are entitled to such damages for the period from May 29 to June 3, save for the time taken to sail from Malta to Augusta. (In this calculation Sunday, May 31, counts, since one is not dealing with laytime or its exceptions). The appropriate figure is either $7000 per day on the owners' argument, or $3,606 per day according to the charterers. I consider which is the right figure under the next issue. But whichever is right, it is immediately offset by the credit which the owners must give for earnings under the substitute charter, at the same rate, for the period from June 3 to June 9 (when the notional voyage under the charterparty would have ended). The Judge was therefore right to hold that, in effect, claim B failed.

The second issue

Mr Cooke submits that freight and expenses on the substitute voyage must be apportioned over the period from arrival at the start of loading at Tuapse to discharge at Banias. The approach voyage from Augusta to Tuapse does not feature in that calculation. The resulting figure is $7000 per day, for which the owners give credit in part D of the claim. But they claim in part C the whole of the expenses from Augusta to Tuapse, amounting to $17,444. The combined result is that, although the owners give credit for a total of $12,538 under part D, their claim for $17,444 in part C exceeds that figure. It is, at the least, unusual for mitigation to increase the damages.

In my judgment the Judge was right to reject this treatment of the substitute voyage. The approach voyage from Augusta to Tuapse was part of the process of earning freight under the substitute charter. The expenses of it should be added to those that were incurred in subsequent stages, at Tuapse and Banias and on the loaded voyage. The total is then deducted from the freight to ascertain the profit of the substitute voyage as a whole. This gives a figure of $3606 per day as the daily rate of profit for that venture. The owners are only obliged to give credit at that rate during the period of overlap -- or rather would have been so obliged if the credit had not been used to extinguish their claim B.

They cannot claim separately for the $17,444 expenses of the ballast voyage.

[1989] 1 Lloyd's Rep 361                                         Page 10

I appreciate that this conclusion involves a departure from the decision of Mr Justice Bingham in The Concordia C case on a similar point. But he expressly recorded (at p 57 of the report) that the treatment of expenses was not in controversy before him.

Conclusion

The owners are not entitled to $27,766 being demurrage or damages at the demurrage rate for the delay in giving loading port orders. Apart from the sum of $35,543 which the Judge awarded them, they are only entitled to damages at the market rate of $3606 per day. This claim is extinguished by the charterers' entitlement to credit, at the same rate, for the slightly longer period when the notional voyage overlapped the substitute voyage. The owners are also not entitled to the expenses from Augusta to Tuapse. So they recover only the sum of $35,543 and interest which the Judge awarded them. Their appeal should be dismissed.

**JUDGMENTBY-2:** Lord Justice STOCKER

**JUDGMENT-2:**

Lord Justice STOCKER: I agree that this appeal should be dismissed for the reasons stated by Lord Justice Staughton.

I add an observation of my own solely because a difference of opinion seems to have emerged with regard to the basis upon which that result can be achieved. I agree with Lord Justice Balcombe that the reasoning by which Lord Justice Staughton has reached his conclusion was not that pleaded in the points of claim, though the argument that a claim for damages for detention might provide an alternative basis upon which the Judge's finding might be upheld was extensively canvassed before this Court. I agree that the appeal based upon this formulation fails since no damage resulted, the vessel having been returned by the owner sooner than it would have been had the charter voyage been performed. I also agree with Lord Justice Balcombe that the decision of the trial Judge can be supported for the reasons given by him in his judgment and for this reason also I would dismiss this appeal.

**JUDGMENTBY-3:** Lord Justice BALCOMBE

**JUDGMENT-3:**

Lord Justice BALCOMBE: I have had the opportunity to read in draft the judgment of Lord Justice Staughton and I agree with him that this appeal should be dismissed. On the second issue in the appeal I agree with his reasoning and there is nothing that I wish to add.

However on the first issue, although I agree with him in the result, for my part I would have upheld the decision of Mr Justice Phillips for the reasons given by him in his judgment.

It is important to see the way in which the owners pleaded their claim.

Points of claim

1. By a voyage charterparty dated London, 8th May 1987, the Plaintiffs, as disponent owners of the MT "Noel Bay" chartered the vessel to the Defendants for a single voyage from "one/two safe port(s) West Coast Italy, including Italian Islands" for discharge at a port to be nominated.

[1989] 1 Lloyd's Rep 361

2.  By subsequent agreement between the parties, the lay days/cancelling provisions of the charter were amended to 30th May/2nd June 1987.

3.  On 29th May 1987, the vessel completed discharge under her previous charter, and charterers were requested to nominate a loading port within the charterparty requirements, but no nomination was made.

4.  The vessel proceeded to Augusta Roads, arriving at 17.42 hours local time on 30th May, and a notice of readiness was tendered.

5.  On 1st June charterers telexed owners as follows:

"PER TELECON MG CORP HEREBY ADVISES THAT THEY WITHDRAW FROM THE ABOVE MENTIONED <u>CHARTER</u> PARTY AND CONSIDER SAME <u>CANCELLED.</u>  PLSE NOTIFY OWNERS IMMEDIATELY."

6.  The owners accepted this repudiation of the charter by the Defendants, and claim <u>damages</u> accordingly.

7.  Following the charterers' repudiation, the owners obtained alternative employment for the vessel, involving a voyage Tuapse in the Black Sea to Banias, Syria.  The vessel sailed from Augusta at 14.30 hours on 3rd June.

8.  The owners' losses are accordingly as follows:

Total costs to owners from 17.12 on 29th May to 18.30 on 17th June (completion of substitute voyage) $237,658.38

Freight earned on substitute voyage 129,479.71

Damages $108,178.67

The claim as formulated by the owners, in the four parts set out by Lord Justice Staughton, was in substitution for the damages as set out in par 8 of the points of claim.  However, at no time was it ever pleaded that there had been a breach of cl 4 of the charter-party which gave rise to a right to damages for detention which had accrued before the charter-party was terminated by the owners' acceptance of the charterers' repudiation, as well as to general damages for loss of freight.  A claim could have been made in this way -- see eg Saxon Ship Company Ltd v Union Steamship Co Ltd, [1898] 4 Com Cas 29; [1900] 5 Com Cas 381, where the pre-repudiation claim was a liquidated claim for demurrage, rather than an unliquidated claim for detention -- although for the reasons given by Lord Justice Staughton the owners in fact suffered no loss from the detention of the ship during the time it was awaiting orders from the charterers.  A claim pleaded in this way would avoid the possibility of injustice in the circumstances predicated by Lord Justice Staughton.

However, the claim as pleaded by the owners was simply for damages for the repudiation of the charter-party by the charterers.  On this basis, in my judgment the Judge was right to say that the owners had suffered no loss beyond the $35,543 for loss of freight.  As he said, after setting out the basis of the owners' claim B referred to by Lord Justice Staughton, (and in quoting from his judgment I substitute "the owners" for the "plaintiffs", and "the charterers" for the "defendants"):

Mr Walker does not join issue with the calculations advanced by Mr Cooke.  He does, however, challenge the premises underlying this head of claim.  He submits that no demurrage was in fact incurred and that the claim, in truth, is a claim for wrongful detention.  While, in the absence of

[1989] 1 Lloyd's Rep 361

evidence, a court can properly assume that the demurrage rate in a charter represents the loss caused by detention, it is always open to either party to adduce evidence of the actual loss so caused, or absence of loss.   Looking at the whole picture it is clear, submits Mr Walker, that the Owners sustained no loss as a result of detention.   The Charterers' repudiation in fact resulted in the Owners having restored to them the disposal of their vessel two days sooner than if the notional contractual voyage to Lavera had been performed.   If the Owners receive as damages the net earnings from that notional voyage they are, in fact, better off than if the contract had been performed.   They cannot claim additional damages for detention.

Mr Walker put his case another way.   The Charterers did not commit two discrete breaches of contract.   The failure to nominate a loading port as required by clause 4 was the start of a continuous and repudiatory non-performance of the contract which the Owners accepted on the 3rd June.   In these circumstances damages fall to be assessed on the basis that the Owners have been wholly deprived of contractual performance.   This requires the Court to consider the position that the Owners would have been in had the Charterers performed properly from first to last.   The Owners do not have two separate claims for damages, to be viewed in isolation, but a single claim for the damage flowing from the Charterers' total failure of performance.

In my judgment Mr Walker's submissions are well founded.   I do not consider that the Owners had a vested right to damages for breach of cl 4 that survived the termination of the charter by acceptance of the Charterers' repudiation.   The notional contractual performance that has to be considered for the purpose of assessing damages is one that begins with a contractual nomination on the 29th May and continues with contractual performance thereafter.   It is wrong in principle to build into the notional contractual performance a delay in the provision of cargo resulting in the accrual of demurrage simply because the Charterers' repudiatory non-performance included a failure to provide cargo.   It follows that this head of claim is disallowed.

It seems to me that, in the way this claim was pleaded, the Judge was right in dealing with it in the way that he did.

**DISPOSITION:**

Appeal dismissed with costs.

**SOLICITORS:**

William A Crump; Shaw and Croft

Declaration of Owen F. Duffy in Opposition

# EXHIBIT 7

# ReedSmith

## FAX TRANSMITTAL

Reed Smith
Beaufort House
15 St Botolph Street
London EC3A 7EE
Phone: +44 (0)20 7247 6555
Fax: +44 (0)20 7247 5091
DX1066 City / DX18 London
reedsmith.com

**From: Mark O'Neil/Amy Dominguez**
Direct Phone: +44 (0)20 7772 5883/5874
Email: moneil@reedsmith.com/
adominguez@reedsmith.com

**Total Number Of Pages Including Cover Page**

3 July 2008

**Fax to:**

| Name | Company | Fax Number | Phone Number |
|---|---|---|---|
| Captain Leftakis | | 01480 437567 | |
| Mr. Alan Oakley | | 01279 771968 | |

**Copy to:**

| | | | |
|---|---|---|---|
| Laurence Marron | | 0208 382 3792 | |

**Our Ref:** AD\KKN\755121.02099

**Contract of Affreightment dated 7 December 2007 ("COA")**

We should be grateful if the Tribunal would accept this fax as Owners' Claim Submissions. All page references are to the supporting documents attached to these submissions.

**Background**

1.   On 7 December 2007 ABS Breakbulk Services GmbH ("Owners") entered into a Contract of Affreightment ("COA") on an amended Gencon 1994 form with Totalmar Navigation Corp. of Venezuela ("Charterers") pursuant to which the Charterers agreed to charter vessels from Owners for two definite shipments with the option for four additional shipments between Shanghai, China and Maracaibo, Venezuela.  A copy of the COA is attached at pages 1-8.

2.   Owners will seek to rely on the terms of the COA. In particular, Owners refer to:

*Box 13 – Freight Rate*

*USD 103.00 PER CBM FIOS LSD*

Reed Smith is a trade name of Reed Smith Richards Butler LLP.
Reed Smith Richards Butler LLP is a limited liability partnership registered in England and Wales with registered number OC300820 and its registered office at Beaufort House, Tenth Floor, 15 St Botolph Street, London EC3A 7EE. Reed Smith Richards Butler LLP is regulated by the Solicitors Regulation Authority. A list of the members of Reed Smith Richards Butler LLP, and their professional qualifications, is available at the registered office. The term partner is used to refer to a member of Reed Smith Richards Butler LLP or Reed Smith LLP.

Reed Smith Richards Butler LLP is associated with Reed Smith LLP of Delaware, USA and the offices referred to below are offices of either Reed Smith Richards Butler LLP or Reed Smith LLP.

NEW YORK ♦ LONDON ♦ HONG KONG ♦ CHICAGO ♦ WASHINGTON, D.C. ♦ BEIJING ♦ PARIS ♦ LOS ANGELES ♦ SAN FRANCISCO ♦ PHILADELPHIA ♦ PITTSBURGH
OAKLAND ♦ MUNICH ♦ ABU DHABI ♦ PRINCETON ♦ NORTHERN VIRGINIA ♦ WILMINGTON ♦ BIRMINGHAM ♦ DUBAI ♦ CENTURY CITY ♦ RICHMOND ♦ GREECE

LONDON-4723779.2-ADOMINGU

*Clause 4 Payment of Freight*

   *(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.*

**Clause 22: Cargo Description**

   *1ˢᵗ Shipment: minimum 400 pieces carriers' option upto vessel full, under/on deck capacity of polycarbonate pipes in loose, dimensions 12.192 m length x 2.6 m diameter/ 12.3 mt uw each where as Charterers guarantee 82.4179 CBM per piece..."*

**Clause 23: Loading & Discharging Port**

   *Loading Port: 1 SPSB AAAA SHANGHAI*

   *Discharge Port: 1 SPSB AAAA MARACAIBO, where 8 m SW Draft*

**Clause 25: ETA & LAYCAN**

   *LAYCAN:    1st Shipment 20/24 December 2007*

            *2ⁿᵈ Shipment 26/31 December 2007*

   *Then 4 shipments in January 2008 in Charterers' option with laydays to be agreed mutually between parties. All nominations to be latest 5 days prior to start of first layday.*

**Clause 35: Freight Payment & Banking Details**

   *"Freight: USD103.00 per CBM FIOS LSD...."*

3.    On a true construction of Clause 25 of the COA, Charterers' option, if exercised, was for four further shipments, not for "up to" four shipments.

**The Voyages**

4.    In order for Owners to be able to perform their obligations under the COA, Owners were to time charter suitable vessels.

5.    Owners were guaranteed at least two fixtures under the COA and possibly four further fixtures in January 2008 at Charterers' option.

**M/V "MARJATTA P"**

6.    The first nomination by Charterers for a shipment was performed by the M/V "MARJATTA P" in accordance with the terms of the COA.

**M/V "GO STAR"**

7.    The second shipment was nominated by Charterers and performed by the M/V "GO STAR".

LONDON-472377#.2-ADOMINGU

8.    With regard to this nomination, the parties had agreed a different minimum quantity, a different freight rate and laydays with the addition that "terms and conditions as per COA" as set out in the email exchanges of 18, 21 and 27 December 2007 at pages 9-10.

9.    The vessel was on demurrage at Shanghai during this fixture for a period of 0.55903 days (invoice and laytime statement attached at 11) and pursuant to clause 7 of the COA Owners now claim $20,963.63 in respect of this period (invoice attached at page 12).

10.    Further, it is clear from the correspondence (at pages 13-14) that Charterers confirmed that the minimum amount of the cargo loaded for this shipments would be 410 pieces of pipes, each with a diameter of 2.4 m.

11.    However, pursuant to the terms of the COA, the pipes loaded should have had a diameter of 2.6m. As a result, Charterers failed to load the quantity of cargo specified in the COA and the Owners are entitled to and now claim deadfreight in the sum of US$72,332.68 (invoice attached at page 15).

**Tally Expenses**

12.    In addition, Owners now claim the outstanding sum of US$40,006.00 for the agreed tally expenses. (Copies of Charterers' agreement to pay this sum and of the relevant tally expenses invoices are attached at pages 16-25).

**Further Nominations**

13.    In December 2007/January 2008 the parties started liaising about future fixtures. Pursuant to Clause 25 of the COA the contemporaneous correspondence shows that Charterers elected to exercise their option for the four more shipments/fixtures in emails dated 27 and 28 December and on 8 January and 14 January. (Copies of relevant correspondence are attached at pages 26-30).

14.    Despite exercising their option for four further shipments, and in breach of their obligations under the COA, Charterers failed to provide cargoes for lifting during January 2008 or at all. Please see attached correspondence at pages 31-35.

15.    As a direct consequence of Charterers' breach as aforesaid, Owners have suffered losses equivalent to the loss of profit on each of the four declared option shipments amounting to $4,626,241.76 based on a profit of $1,159,060.44 per voyage (as set out in the attached table at page 36).

16.    And Owners claim:-

    (a)    Demurrage of $20,963.63, or alternatively damages; and

    (b)    Deadfreight in the sum of US$61,449.39 or alternatively damages; and

    (c)    Tally expenses in the sum of US$40,006.00 or alternatively damages; and

    (d)    The sum of $4,636,241.76, alternatively damages for the claims set out in paragraph 15 above; and

LONDON-4723779.2-ADOMINGU

(e)     Interest in accordance with section 49 of the Arbitration Act 1996; and

(f)     Costs.

Yours faithfully

*Reed Smith*

Mark O'Neil/Amy Dominguez
**Partner/Associate**
**Shipping Group**
**Reed Smith**

**If you do not receive all of the pages, please call us at +44 (0)20 7816 3160.**

PLEASE NOTE: The information contained in this facsimile message may be privileged and confidential, and is intended only for the use of the individual(s) or entity named above who has been specifically authorized to receive it. If the reader is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return all pages to the address shown above. Thank you.

LONDON-4723779.2-ADOMINGU

Declaration of Owen F. Duffy in Opposition

# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ABS BREAKBULK SERVICES GMBH,

               Plaintiff,                           08 CV 4997 (JSR)

        v.

TOTALMAR NAVIGATION CORP.,

               Defendant.
-------------------------------------------------------------X

## DECLARATION OF MARK TERENCE O'NEIL IN OPPOSITION TO DEFENDANT'S MOTION FOR A REDUCTION IN THE AMOUNT OF SECURITY

MARK TERENCE O'NEIL, pursuant to 28 U.S.C. § 1746, hereby declares and states under penalty of perjury:

1.    I am a partner in the London office of law firm Reed Smith Richards Butler LLP, counsel for the Plaintiff, ABS Break Bulk Services GmbH ("ABS Breakbulk") in England. I am admitted to practice in England by the Law Society of England & Wales and have legal experience in maritime and commercial law in the U.K. I make this declaration, in response to the motion of the Defendant, Totalmar Navigation Corp ("Totalmar") for a reduction in the amount of security, based upon my own knowledge and documents provided to me by ABS Breakbulk.

2.    In particular I have been asked to respond on the points of English law raised in the Declaration of Rahul Wanshoo, Esq.'s Declaration in Support of Motion to Reduce Maritime Attachment dated 1 August 2008.

3.    I set out below an explanation on how the quantum of ABS Breakbulk's claim in the London arbitration proceedings has been calculated under English law, in order to show that the amount of security sought under the Rule B attachment appropriately reflects the level of ABS Breakbulk's claim.

### Basic Principles Under English Law

4.    First I consider that it is necessary to set out the basic principles of English law to establish how damages are calculated.

5.  In *Hadley v Baxendale* [1854] 9 EXCH 341, it was established that in relation to breaches of contract, an innocent party is entitled to recover from the party in breach those losses that may (i) fairly and reasonably be considered as arising naturally, (i.e. according to the usual course of things) from such breach of contract itself, or (ii) reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as a probable result of the breach of it.  To be recoverable under either of these two limbs, the test is to show that losses must have been "liable to result" and "not unlikely".

6.  In the context of the *Hadley v Baxendale* test when dealing with more unusual types of losses which would fall within the second limb, the claimant must show that the party in breach had actual knowledge at the time that the relevant contract was entered into that the particular losses being claimed were likely to result from the breach in question. This is still the leading case on damages.

7.  Turning now to consider claims for loss of profits, in *Hall v Pim [1928] 30 Lloyd's Rep. 159*, on recovery of losses under sub-contracts, it was held that the level of damages should be the difference between the price at which they had bought the cargo and the price at which they had resold it, rather than the difference between the contract price and the market value of the cargo at the date of the breach.  As a result the innocent party was entitled to recover lost profits.

8.  Finally, in *Phoebus D Kyprianou Coy v WM H Pim J&R and Co [1977] 2 Lloyd's Rep. 570*, it was held that the party in breach, even though it was in breach before the end of the shipment period, was not entitled to have damages assessed by reference to the earlier date of the breach (which was more favourable to it) but instead the innocent party was entitled to have damages assessed by reference to the end of the respective shipment period.

**Applying English Case-law to the facts**

9.  Clause 25 of the Contract of Affreightment ("COA") provides that *"then four shipments in January 2008 in charterers' option with lay days to be agreed mutually between the parties.  All nominations to be latest five days prior to start of first lay day"*.

10. The losses incurred by ABS Breakbulk fall within the second limb of *Hadley v Baxendale*.  Since Totalmar declared its option to fix four further vessels and then failed to nominate them, ABS Breakbulk suffered losses and are entitled to any lost profits for the entire shipment period.

11. If those losses had not been in Totalmar's contemplation at the time of entering the contract, the COA would have provided for six fixtures, rather than two definite and four optional fixtures.  Totalmar were not prepared to commit to six definite fixtures from the outset as they knew that their liability would be potentially for all six fixtures, if they were to act in breach.

12. The option clause in the COA permitted Totalmar to decide after the first two fixtures whether it could perform the remaining four. It was a provision that permitted Totalmar to see how the first two fixtures were working before they committed to the remaining

- 2 -

four. Totalmar clearly knew that once the option clause was exercised, they would be liable for all losses in the event of their subsequent non-performance.

13. Once Totalmar had elected to exercise the provisions in this clause, by nominating the vessel for the first shipment under the COA option, they were contractually obliged to nominate all four shipments in January. In effect the clause is an "all or nothing" provision. Even though Totalmar's breach occurred before the first shipment, when they failed to load a cargo onto the nominated vessel, it is clear that Totalmar are liable for the losses ABS Breakbulk suffered in respect of all four fixtures, since damages should be assessed by reference to the end of the shipment period (i.e. the whole option period of the COA).

## Application of the "NOEL BAY"

14. Having set out how damages should be calculated under English law I turn now to consider the case relied on by Totalmar. The Defendant relies on the case of the "NOEL BAY" and quotes the following from the Judgment:

> *"the owners are entitled to be placed in the position financially as they would have enjoyed if the contract had not been broken, that involved a comparison of the money they would have earned, less expenses, on the contract voyage with the money they in fact earned less expenses, on the substitute voyage".*

15. In the first part of this sentence, the Judge confirms the position under English law. As a result it is clear that ABS Breakbulk are entitled to be put in a position financially that they would have been in had Totalmar complied with their obligations under the COA and performed all four fixtures under the elected option.

16. Given that Totalmar failed to load cargo after nominating a vessel from ABS Breakbulk, ABS Breakbulk could not perform the voyage. Furthermore there was simply no substitute voyage or substitute cargo to load. ABS Breakbulk were therefore not in a position to mitigate their losses, as quite simply they could not be mitigated. In any event the quantum of ABS Breakbulk's claim takes into account deductions for expenses (see below at paragraph 21).

17. In the "NOEL BAY" owners claimed hypothetical damages from charterers for the profit they would have made on a voyage had it been performed, together with demurrage which again would have been incurred had the voyage been performed. In that case it was held on appeal that the owners were entitled to only their lost profits, not to the expenses, demurrage etc.

18. The demurrage claimed by ABS Breakbulk is in relation to a voyage which was actually performed. The vessel, "GO STAR", was on demurrage at Shanghai for a period of 0.55903 days and pursuant to the terms of the COA, ABS Breakbulk are entitled to claim US$20,963.63 in respect of this period.

19. The "NOEL BAY" does not assist in this case, other than to reconfirm that under English law ABS Breakbulk are entitled to be placed in the position that they would have been in

- 3 -

had Totalmar not acted in breach of the COA and therefore are entitled to recover as damages their potential profit, together with any outstanding claims in relation to the fixtures already performed.

## Calculation of Quantum

20.  With regard to how ABS Breakbulk have calculated the damages which arise as a result of Totalmar's breach of its obligations, they have done so on the basis of the rates of a comparable vessel which was offered to ABS Breakbulk at that time at a rate of US$40,000 per day with an estimated intake of 470 pieces of pipes under/on deck.

21.  As can be seen in ABS Breakbulk's damages calculation (attached).  The likely income on that vessel was US$4,012,558 less total expenses in the sum of US$2,853,497.56 which leaves an estimated total profit of US$1,159,060.44 on each of the option fixtures.

22.  Since damages are due for the whole of the COA shipment period, Totalmar are liable for Owners' loss of profits for all four shipments which Owners calculate to be US$4,636,241.76.

## London Arbitration Proceedings

23.  ABS Breakbulk's claim in the arbitration amounts to US$4,758,660.78, it is therefore appropriate that ABS Breakbulk are fully secured for this sum.

24.  Given that ABS Breakbulk anticipate making a full recovery in the London arbitration of (i) their loss of profits of US$4,636,241.76; (ii) demurrage of US$20,963.63; (iii) deadfreight of US$61,449.39 and (iv) tally expenses in the sum of US$40,006.00, the level of security sought under the Rule B attachments should remain at its current level.

25.  The additional sums claimed for demurrage, deadfreight and tally expenses relate to voyages which have been performed pursuant to the COA and which are due and owing. As far as ABS Breakbulk are aware they are not in dispute albeit that the Defendant has repeatedly delayed service of their defence submissions in the London arbitration.

26.  I would therefore respectfully ask that the motion by the Defendant to reduce the amount of security be dismissed, where it is clear that Plaintiff ABS Breakbulk is entitled to these sums under English law, being the law of the COA and the law and jurisdiction where this dispute will be resolved.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: London, England
       August 22, 2008


- 4 -

MARK TERENCE O'NEIL

- 5 -

Declaration of Mark Terence O'Neil,
London Solicitor, in Opposition

# EXHIBIT 1



Declaration of Owen F. Duffy in Opposition

# EXHIBIT 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X

ABS BREAKBULK SERVICES GMBH,                    ECF CASE

                          Plaintiff,            08 Civ 4997 (JSR)

                                                **NOTICE OF MOTION**

                - against -

TOTALMAR NAVIGATION CORP.

                          Defendant.

-------------------------------------------------X

SIRS:

    PLEASE TAKE NOTICE, that Defendant, Totalmar Navigation Corp.

("Totalmar"), by its attorneys Law Offices of Rahul Wanchoo, will move this Court,

before the Honorable Judge Rakoff, United States District Court Judge, at the United

States Courthouse for the Southern District of New York, on Tuesday, August 22, 2008

at 4:00 p.m., which is the time established by the Court, for an Order reducing the ex

parte order of maritime attachment obtained by the Plaintiff, together with such other,

further and different relief as the Court may deem just and proper.

    PLEASE TAKE FURTHER NOTICE that, as agreed by all appearing counsel,

opposing papers, if any, must be served so as to be received by Totalmar's counsel no

later than August 15, 2008.

Dated: New York, New York
       August 1, 2008

                          LAW OFFICES OF RAHUL WANCHOO
                          Attorneys for Defendant

                          *Rahul Wanchoo*
                          Rahul Wanchoo (RW 8725)

Declaration of Owen F. Duffy in Opposition

# EXHIBIT 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ABS BREAKBULK SERVICES GMBH,

                    Plaintiff,

          -against-

TOTALMAR NAVIGATION CORP.

                    Defendant

ECF CASE

08 CV 4997 (JSR)

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR A REDUCTION IN THE AMOUNT OF SECURITY

LAW OFFICES OF RAHUL WANCHOO
350 Fifth Avenue, 59th Floor
New York, New York 10118
Phone: (646) 593-8866
Fax:    (212) 618-0213
E-mail: rwanchoo@wanchoolaw.com

Of Counsel:

Rahul Wanchoo, Esq.

### PRELIMINARY STATEMENT

This matter involves a claim by Plaintiff, ABS Breakbulk Services GmbH ("ABS") against Defendant, Totalmar Navigation Corp. ("Totalmar") for damages for an alleged breach of a maritime Contract of Affreightment ("COA"). The thrust of ABS' claim is that Totalmar, inter alia, elected to exercise its option for four additional shipments but failed to provide cargoes for these shipments during January 2008. ABS is claiming that as a consequence of Totalmar's alleged breach of the COA it has suffered a loss of profit on each of the four option shipments amounting to $4,636,241.76 based on a notional profit of $1,159,060.44 per voyage.

The merits of this matter are subject to arbitration at London under English law, and are not before this Court. Instead, this action is ancillary to the London arbitration proceedings and was brought by ABS for the purpose of obtaining security pursuant to Rule B. Defendant, Totalmar hereby moves for a reduction in the amount of security pursuant to Rule E(6) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

### FACTS

Although the merits of this matter are not before the Court, a brief outline of the relevant background facts remains necessary. We also respectfully refer the Court to the facts set forth in the accompanying declaration of Rahul Wanchoo dated August 1, 2008 (Wanchoo Decl.).

Pursuant to a COA dated December 7, 2007, Totalmar agreed to charter vessels from ABS for two definite shipments with the option for four additional shipments between Shanghai, China and Maracaibo, Venezuela. Wanchoo Decl., Ex. 1 ¶6; Ex. 3 at 1-8. Pursuant to the COA, Totalmar nominated the first shipment which was performed by the M.V. MARJATTA. Totalmar also nominated the second shipment which was performed by M.V. GO STAR. For

2

the first two shipments ABS claims that it owed a balance of $42,192.21 for dead freight and tally expenses[1]. Wanchoo Decl., Ex. 1 ¶10. With respect to the four option shipments, while Totalmar did exercise its option for the first of the four shipments, it was unable to provide any cargo for this shipment because of the breach by its sub-charterer, ATN Industries Inc. ABS contends that by electing to exercise the first of the four additional shipments, Totalmar was allegedly committed to provide cargo for the remaining three shipments (shipments 4, 5 and 6) for lifting during January 2008. While the merits of that claim are to be decided by the London arbitrators, Totalmar respectfully submits that ABS' damages for its alleged loss of profit on the four option shipments in the amount of $4,636,241.76 is grossly overstated.

ABS has commenced arbitration proceedings against Totalmar in London and has submitted its Claim Submissions to the arbitrators on July 3, 2008. See Wanchoo Decl., Ex. 3.

## ARGUMENT

### THE SECURITY DEMANDED BY
### ABS SHOULD BE REDUCED

As discussed below, there is good cause for determining that the amount of security demanded by ABS in its application for a Rule B attachment for its alleged lost profit on the four optional voyages is vastly overstated and accordingly should be reduced in keeping with Rule E(6).

Rule E(6) provides as follows:

> Whenever security is taken the court may, on motion and hearing,
> for good cause shown, reduce the amount of security given.

Furthermore, ABS bears the burden of proof as to why the attachment should not be reduced. Rule E(4)(f) provides as follows:

---

[1] Totalmar does not seek a reduction in the amount of security for ABS' claim of dead freight and tally expenses stated in its Verified Complaint in the amount of $42,192.21.

3

> Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest attachment should not be vacated or other relief granted consistent with these rules.

In these proceedings, ABS must demonstrate that the amount requested to be attached can be justified, otherwise the Court should reduce the amount of security given.

1.    **ABS' Claim of "Lost Profit" is Grossly Exaggerated**

In calculating its claim of $4,636,241.76 for lost profit on the four shipments, ABS assumes that it stood to turn a profit of $1,159,060.44 per voyage. Wanchoo Decl., Ex.3 ¶ 15. ABS multiplies this figure by 4, the four option shipments to arrive at a total sum of $4,636,241.76. ABS' calculation in support of its lost profit claim is clearly flawed as it fails to give credit to Totalmar for any profit made on the substitute voyage or voyages and/or show that it had in fact time chartered suitable vessels to perform its obligation under the COA.

Pursuant to the COA between ABS and Totalmar, freight was payable at $103 per cubic meter free in out stowed, lashed and dunnaged. Wanchoo Decl., Ex. 3 at 6. Based on the COA freight rate ABS calculates a gross income of $3,989,808.00 on a notional voyage from Shanghai to Maracaibo. Id. at 36. Against this gross income, ABS has deducted certain expenses saved of $2,853,497.56 to arrive at a profit of $1,159,060.44 per voyage. Id. However, ABS has not given credit to Totalmar for any profit that it made on the third option shipment. Similarly, ABS has not provided any evidence to show that it had in fact time chartered suitable vessels to perform the option shipments 4, 5 and 6. In the absence of such evidence, ABS' claim for alleged lost profit of $1,159,060.44 based on shipment No 3 is entirely speculative and grossly exaggerated.

4

The principles involved in calculating owners' damages for charterers' cancellation of the charter are well settled. As the COA is governed by English law, we respectfully refer the Court to the English case of <u>SIB International SRL v. Metallgesellschaft Corp.</u>, [1989] 1 Lloyd's Rep 361 (Court of Appeal 1988) for a discussion of the damages awarded to the owners following charterers' cancellation of the charter. <u>See</u> Wanchoo Decl., Ex. 4. As stated by Lord Justice Staughton:

> The owners are entitled to be placed in the same position, financially as they would have enjoyed if the contract had not been broken. <u>That involves a comparison of the money they would have earned, less expenses, on the contract voyage with the money they in fact earned, less expenses, on the substitute voyage.</u>

<u>Id.</u> (emphasis added). In that case the Court of Appeals held that owners' claim for lost profit was "extinguished by the charterers' entitlement to credit, at the same [market] rate, for the slightly longer period when the notional voyage overlapped the substitute voyage". Id. at 10. In the present case, ABS has not provided any evidence as to the "market" rate to enable the Court to determine whether it has suffered any lost profit on the four option shipments.

ABS' claim of "lost profit" is grossly overstated. The amount of security which ABS should be permitted to retain in support of its lost profits claim must be reduced to the amount of ABS' <u>actual</u> lost profits for the four shipments claimed. ABS should be required to demonstrate its actual lost profits, otherwise, the security required to be posted by Totalmar should be reduced to no more than ABS' claim for dead freight and tally expenses in the amount of $42,192.21. Wanchoo Decl., Ex.1 ¶ 10.

2.   **The Amount of Security Which May Be Awarded For interest and Fees Should be Similarly Be Reduced.**

ABS' Verified Complaint sought security for interest at the rate of 8.5%, compounded quarterly over a period of three years on the principal sum $4,678,434.07. As the principal sum of ABS' claim must be reduced to reflect the true amount of the lost profits claim, the amount of security for interest on the principal damage claim must also be reduced.

Likewise, the amount permitted for security in respect to ABS' attorney's fees and arbitrator's fees in London must also be proportionately reduced.

## CONCLUSION

For all the foregoing reasons, Totalmar respectfully submits that the attachment should be reduced, to reflect ABS's true lost profit claim.

Dated: New York, New York
        August 1, 2008

**LAW OFFICES OF RAHUL WANCHOO**
Attorneys for Defendant


By: _Rahul Wanchoo_____
     Rahul Wanchoo (RW-8725)

Declaration of Owen F. Duffy in Opposition

# EXHIBIT 11

**LAW OFFICES OF RAHUL WANCHOO**
350 Fifth Avenue, 59th Floor
New York, New York 10118
Phone:  (646) 593-8866
Fax:      (212) 618-0213
E-mail: rwanchoo@wanchoolaw.com


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ABS BREAKBULK SERVICES GMBH,

                                Plaintiff,          **ECF CASE**

            -against-                              **08 CV 4997 (JSR)**

TOTALMAR NAVIGATION CORP.

                                Defendant

---

### NOTICE OF FOREIGN LAW PURSUANT TO F.R. CIV. P. RULE 44.1

PLEASE TAKE NOTICE THAT, Defendant TOTALMAR NAVIGATION CORP.,

pursuant to F.R. Civ. P. Rule 44.1 intends to raise issue of foreign law, namely of English law, as

set out in the attached declaration of Rahul Wanchoo dated August 1, 2008.


Date:   New York, New York
          August 1, 2008


                              Respectfully submitted,

                              LAW OFFICES OF RAHUL WANCHOO
                              Attorneys for Defendant

                              By:  _Rahul Wanchoo_
                                    Rahul Wanchoo

Declaration of Owen F. Duffy in Opposition

# EXHIBIT 12

Westlaw.UK

(1854) 9 Ex. 341
1854 WL 7208 (Ex Ct), (1854) 9 Ex. 341, 156 E.R. 145
(Cite as: (1854) 9 Ex. 341)

*341 Hadley and Another v. Baxendale and Others

Exchequer Court

Ex Ct

Alderson, B.

Feb. 23, 1854 [FN1]

*342 Where two parties have made a contract, which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e. according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it.--Where the plaintiffs, the owners of a flour mill, sent a broken iron shaft to an office of the defendants, who were common carriers, to be conveyed by them, and the defendants' clerk, who attended at the office, was told that the mill was stopped, that the shaft must be delivered immediately, and that a special entry, if necessary, must be made to hasten its delivery; and the delivery of the broken shaft to the consignee, to whom it had been sent by the plaintiffs as a pattern, by which to make a new shaft, was delayed for an unreasonable time; in consequence of which, the plaintiffs did not receive the new shaft for some days after the time they ought to have received it, and they were consequently unable to work their mill from want of the new shaft, and thereby incurred a loss of profits:--Held, that, under the circumstances, such loss could not be recovered in an action against the defendants as common carriers.

FN1 Decided in Hilary Vacation.

[ S. C. 2 C. L. R. 517 ; 23 L. J. Ex. 179 ; 18 Jur. 358 ; 2 W. R. 302 . Applied, Smeed v. Foord, 1859, 1 El. & El.

602 ; Gee v. Lancashire and Yorkshire Railway Company, 1860, 6 H. & N. 216 ; Wilson v. Lancashire and Yorkshire Railway Company, 1861, 9 C. B. (N. S.) 632 ; Woodger v. Great Western Railway Company, 1867, L. R. 2 C. P. 321 ; Cory v. Thames Ironworks Company, 1868, L. R. 3 Q. B. 189 ; Engel v. Fitch, 1868, L. R. 3 Q. B. 323; L. R. 4 Q. B. 668 ; Prehn v. Royal Bank of Liverpool, 1870, L. R. 5 Ex. 97 ; Smith v. Green, 1875, 1 C. P. D. 94 ; Sanders v. Stuart, 1876, 1 C. P. D. 328 ; Wilson v. General Iron Screw Colliery Company, 1877, 47 L. J. Q. B. 240 ; Smith v. Day, 1882, 21 Ch. D. 428 ; Hamilton v. Magill, 1883, 12 L. R. Ir. 186 ; Rodocanachi v. Milburn, 1886, 17 Q. B. D. 320: affirmed, 18 Q. B. D. 67 ; Williams v. Peel River Land Company, 1886, 55 L. T. 693 ; Hammond v. Bussey, 1887, 20 Q. B. D. 80 ; Couper v. Richards, 1887, 3 T. L. R. 739 ; White v. Peto, 1888, 58 L. T. 713 ; Ebbetts v. Conquest, [1895] 2 Ch. 377: affirmed , [1896] A. C. 490 ; M & Neill v. Richards, [1899] 1 Ir. R. 85 ; Acius v. Great Western Colliery Company, [1899] 2 Q. B. 413 . Not applied, Collard v. South Eastern Railway, 1861, 7 H. & N. 79 ; Larios v. Bonany, 1873, L. R. 5 P. C. 358 ; Bradshaw v. Lancashire and Yorkshire Railway, 1875, L. R. 10 C. P. 193 ; Skinner v. City of London Marine Insurance Corporation, 1885, 14 Q. B. D. 887 ; Marsh v. Joseph, [1897] 1 Ch. 231 . Discussed, Simons v. Patchett, 1857, 7 E. & B. 568 ; Wilson v. Newport Dock Company, 1866, 4 H. & C. 232; L. R. 1 Ex. 177 ; Horne v. Midland Railway Company, 1873, L. R. 8 C. P. 131 ; Elbinger Actien-Gesellschafft v. Armstrong, 1874, L. R. 9 Q. B. 478 ; Sawdon v. Andrew, 1874, 30 L. T. 25 ; Irvine v. Midland Great Western Railway, 1880, 6 L. R. Ir. 55 ; Finlay v. Chirney, 1888, 20 Q. B. D. 500 ; The Argentino, 1888, 13 P. D. 197: affirmed, 14 A. C. 519 . Dissented from, Boyd v. Fitt, 1863, 14 Ir. C. L. R. 43 . Distinguished, Lilley v. Doubleday, 1881, 7 Q. B. D. 512 ; Clare v. Dobson, [1911] 1 K. B. 42 . Referred to, De

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1854) 9 Ex. 341
1854 WL 7208 (Ex Ct), (1854) 9 Ex. 341, 156 E.R. 145
**(Cite as: (1854) 9 Ex. 341)**

Mattos v. Gibson, 1860, 1 J. & H. 79 ; Bain v. Fothergill, 1874, L. R. 7 H. L. 177 ; Baxendale v. London , Chatham, and Dover Railway Company, 1874, L. R. 10 Ex. 45 ; Hobbs v. London and South Western Railway Company, 1875, L. R. 10 Q. B. 117 ; Grebert-Borgnis v. Nugent, 1885, 15 Q. B. D. 89 : South African Territories v. Wallington, [1897] 1 Q. B. 692 ; Bostock v. Nicholson, [1904] 1 K. B. 737 ; Cointat v. Myham, [1913] 2 K. B. 222 .]

The first count of the declaration stated, that, before and at the time of the making by the defendants of the promises hereinafter mentioned, the plaintiffs carried on the business of millers and mealmen in copartnership, and were proprietors and occupiers of the City Steam-Mills, in the city of Gloucester, and were possessed of a steam-engine, by means of which they worked the said mills, and therein cleaned corn, and ground the same into meal, and dressed the same into flour, sharps, and bran, and a certain portion of the said steam-engine, to wit, the crank shaft of the said steam-engine, was broken and out of repair, whereby the said steam-engine, was prevented from working, and the plaintiffs were desirous of having a new crank shaft made for the said mill, and had ordered the same of certain persons trading under the name of W. Joyce & Co., at Greenwich, in the county of Kent, who had contracted to make the said new shaft for the plaintiffs; but before they could complete the said new shaft it was necessary that the said broken shaft should be forwarded to their works at Greenwich, in order that the said new shaft might be made so as to fit the other parts of the said engine which were not injured, and so that it might be substituted for the said broken shaft; and the plaintiffs were desirous of sending the said broken shaft to the said W. Joyce & Co. for *343 the purpose aforesaid; and the defendants, before and at the time of the making of the said promises, were common carriers of goods and chattels for hire from Gloucester to Greenwich, and carried on such business of common carriers, under the name of "Pickford & Co.;" and the plaintiffs, at the request of the defendants, delivered to them as such carriers the said broken shaft, to be conveyed by

the defendants as such carriers from Gloucester to the said W. Joyce & Co., at Greenwich, and there to be delivered for the plaintiffs on the second day after the day of such delivery, for reward to the defendants; and in consideration thereof the defendants then promised the plaintiffs to convey the said broken shaft from Gloucester to Greenwich, and there on the said second day to deliver the same to the said W. Joyce & Co. for the plaintiffs. And although such second day elapsed before the commencement of this suit, yet the defendants did not nor would deliver the said broken shaft at Greenwich on the said second day, or to the said W. Joyce & Co. on the said second day, but wholly neglected and refused so to do for the space of seven days after the said shaft was so delivered to them as aforesaid.

The second count stated, that, the defendants being such carriers as aforesaid, the plaintiffs, at the request of the defendants, caused to be delivered to them as such carriers the said broken shaft, to be conveyed by the defendants from Gloucester aforesaid to the said W. Joyce & Co., at Greenwich, and there to be delivered by the defendants for the plaintiffs, within a reasonable time in that behalf, for reward to the defendants; and in consideration of the premises in this count mentioned, the defendants promised the plaintiffs to use due and proper care and diligence in and about the carrying and conveying the said broken shaft from Gloucester aforesaid to the said W. Joyce & Co., at Greenwich, and there delivering the same for the plaintiffs in a reasonable time then following . for the carriage, *344 conveyance, and delivery of the said broken shaft as aforesaid; and although such reasonable time elapsed long before the commencement of this suit, yet the defendants did not nor would use due or proper care or diligence in or about the carrying or conveying or delivering the said broken shaft as aforesaid, within such reasonable time as aforesaid, but wholly neglected and refused so to do; and by reason of the carelessness, negligence, and improper conduct of the defendants, the said broken shaft was not delivered for the plaintiffs to the said W. Joyce & Co., or at Greenwich, until the expiration of a long and unreasonable time after the defendants

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1854) 9 Ex. 341
1854 WL 7208 (Ex Ct), (1854) 9 Ex. 341, 156 E.R. 145
(Cite as: (1854) 9 Ex. 341)

received the same as aforesaid, and after the time when the same should have been delivered for the plaintiffs; and by reason of the several premises, the completing of the said new shaft was delayed for five days, and the plaintiffs were prevented from working their said steam-mills, and from cleaning corn, and grinding the same into meal, and dressing the meal into flour, sharps, or bran, and from carrying on their said business as millers and mealmen for the space of five days beyond the time that they otherwise would have been prevented from so doing, and they thereby were unable to supply many of their customers with flour, sharps, and bran during that period, and were obliged to buy flour to supply some of their other customers, and lost the means and opportunity of selling flour, sharps, and bran, and were deprived of gains and profits which otherwise would have accrued to them, and were unable to employ their workmen, to whom they were compelled to pay wages during that period, and were otherwise injured, and the plaintiffs claim 300l.

The defendants pleaded non assumpserunt to the first count; and to the second payment of 25l. into Court in satisfaction of the plaintiffs' claim under that count. The plaintiffs entered a nolle prosequi as to the first count; and as to the second plea, they replied that the sum paid *345 into Court was not enough to satisfy the plaintiffs' claim in respect thereof; upon which replication issue was joined.

At the trial before Crompton, J., at the last Gloucester Assizes, it appeared that the plaintiffs carried on an extensive business as millers at Gloucester; and that, on the 11th of May, their mill was stopped by a breakage of the crank shaft by which the mill was worked. The steam-engine was manufactured by Messrs. Joyce & Co., the engineers, at Greenwich, and it became necessary to send the shaft as a pattern for a new one to Greenwich. The fracture was discovered on the 12th, and on the 13th the plaintiffs sent one of their servants to the office of the defendants, who are the well-known carriers trading under the name of Pickford & Co., for the purpose of having the shaft carried to Greenwich. The plaintiffs'

servant told the clerk that the mill was stopped, and that the shaft must be sent immediately; and in answer to the inquiry when the shaft would be taken, the answer was, that if it was sent up by twelve o'clock any day, it would be delivered at Greenwich on the following day. On the following day the shaft was taken by the defendants, before noon, for the purpose of being conveyed to Greenwich, and the sum of 2l. 4s. was paid for its carriage for the whole distance; at the same time the defendants' clerk was told that a special entry, if required, should be made to hasten its delivery. The delivery of the shaft at Greenwich was delayed by some neglect; and the consequence was, that the plaintiffs did not receive the new shaft for several days after they would otherwise have done, and the working of their mill was thereby delayed, and they thereby lost the profits they would otherwise have received.

On the part of the defendants, it was objected that these damages were too remote, and that the defendants were not liable with respect to them. The learned Judge *346 left the case generally to the jury, who found a verdict with 25l. damages beyond the amount paid into Court.

Whateley, in last Michaelmas Term, obtained a rule nisi for a new trial, on the ground of misdirection.

Keating and Dowdeswell (Feb. 1) shewed cause. The plaintiffs are entitled to the amount awarded by the jury as damages. These damages are not too remote, for they are not only the natural and necessary consequence of the defendants' default, but they are the only loss which the plaintiffs have actually sustained. The principle upon which damages are assessed is founded upon that of rendering compensation to the injured party. This important subject is ably treated in Sedgwick on the Measure of Damages. And this particular branch of it is discussed in the third chapter, where, after pointing out the distinction between the civil and the French law, he says (page 64), "It is sometimes said, in regard to contracts, that the defendant shall be held liable for those damages only which both parties may fairly be supposed to have at the time contemplated as likely

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1854) 9 Ex. 341
1854 WL 7208 (Ex Ct), (1854) 9 Ex. 341, 156 E.R. 145
(Cite as: (1854) 9 Ex. 341)

to result from the nature of the agreement, and this appears to be the rule adopted by the writers upon the civil law." In a subsequent passage he says, "In cases of the civil law made a broad distinction" (page 66); and he adds, that "in such cases the debtor was liable for all the consequences." It is difficult, however, to see what the ground of such principle is, and how the ingredient of fraud can affect the question. For instance, if the defendants had maliciously and fraudulently kept the shaft, it is not easy to see why they should have been liable for these damages, if they are not to be held so where the delay is occasioned by their negligence only. In speaking of the rule respecting the breach of a contract to transport *347 goods to a particular place, and in actions brought on agreements for the sale and delivery of chattels, the learned author lays it down, that, "In the former case, the difference in value between the price at the point where the goods are and the place where they were to be delivered, is taken as the measure of damages, which, in fact, amounts to an allowance of profits; and in the latter case, a similar result is had by the application of the rule, which gives the vendee the benefit of the rise of the market price" (page 80). The several cases, English as well as American, are there collected and reviewed. [Parke, B. The sensible rule appears to be that which has been laid down in France, and which is declared in their code-- Code Civil , liv. iii. tit. iii. ss. 1149, 1150, 1151 , and which is thus translated in Sedgwick (page 67): "The damages due to the creditor consist in general of the loss that he has sustained, and the profit which he has been prevented from acquiring, subject to the modifications hereinafter contained. The debtor is only liable for the damages foreseen, or which might have been foreseen, at the time of the execution of the contract, when it is not owing to his fraud that the agreement has been violated. Even in the case of non-performance of the contract, resulting from the fraud of the debtor, the damages only comprise so much of the loss sustained by the creditor, and so much of the profit which he has been prevented from acquiring, as directly and immediately results from the non-performance of the contract."] If that rule is to be adopted, there was ample evidence in the present

case of the defendants' knowledge of such a state of things as would necessarily result in the damage the plaintiffs suffered through the defendants' default. The authorities are in the plaintiffs' favour upon the general ground. In Nurse v. Barns (1 Sir T. Raym. 77) , *348 which was an action for the breach of an agreement for the letting of certain iron mills, the plaintiff was held entitled to a sum of 500l., awarded by reason of loss of stock laid in, although he had only paid 10l. by way of consideration. In Borradaile v. Brunton (8 Taunt. 535, 2 B. Moo. 582) , which was an action for the breach of the warranty of a chain cable that it should last two years as a substitute for a rope cable of sixteen inches, the plaintiff was held entitled to recover for the loss of the anchor, which was occasioned by the breaking of the cable within the specified time. [Alderson, B. Why should not the defendant have been liable for the loss of the ship? Parke, B. Sedgwick doubts the correctness of that report. [FN2] Martin, B. Take the case of the non-delivery by a carrier of a delicate piece of machinery, whereby the whole of an extensive mill is thrown out of work for a considerable time; if the carrier is to be liable for the loss in that case, he might incur damages to the extent of 10,000l. Parke, B., referred to Everard v. Hopkins (2 Bulst. 332) .] These extreme cases, and the difficulty which consequently exists in the estimation of the true amount of damages, supports the view for which the plaintiffs contend, that the question is properly for the decision of a jury, and therefore that this matter could not properly have been withdrawn from their consideration. In Ingram v. Lawson (6 Bing. N. C. 212) the true principle was acted upon. That was an action for a libel upon the plaintiff, who was the owner and master of a ship, which he advertised to take passengers to the East Indies; and the libel imputed that the vessel was not seaworthy, and that Jews had purchased her to take out convicts. The Court held, that evidence shewing that the plaintiff's *349 profits after the publication of the libel were 1500l. below the usual average, was admissible, to enable the jury to form an opinion as to the nature of the plaintiff's business, and of his general rate of profit. Here, also, the plaintiffs have not sustained any loss beyond that which

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1854) 9 Ex. 341
1854 WL 7208 (Ex Ct), (1854) 9 Ex. 341, 156 E.R. 145
**(Cite as: (1854) 9 Ex. 341)**

was submitted to the jury. Bodley v. Reynolds (8 Q. B. 779) and Kettle v. Hunt (Bull. N. P. 77) are similar in principle. In the latter, it was held that the loss of the benefit of trade, which a man suffers by the detention of his tools, is recoverable as special damage. [Parke, B. Suppose, in the present case, that the shaft had been lost, what would have been the damage to which the plaintiffs would have been entitled?] The loss they had sustained during the time they were so deprived of their shaft, or until they could have obtained a new one. In Black v. Baxendale (1 Exch. 410) , by reason of the defendant's omission to deliver the goods within a reasonable time at Belford, the plaintiff's agent, who had been sent there to meet the goods, was put to certain additional expenses, and this Court held that such expenses might be given by the jury as damages. In Brandt v. Bowlby (2 B. & Ald. 932) , which was an action of assumpsit against the defendants, as owners of a certain vessel, for not delivering a cargo of wheat shipped to the plaintiffs, the cargo reached the port of discharge but was not delivered; the price of the cargo at the time it reached the port of discharge but was not delivered; the price of the cargo at the time it reached the port of destination was held to be the true rule of damages. "As between the parties in this cause," said Parke, J., "the plaintiffs are entitled to be put in the same situation as they would have been, if the cargo had been delivered to their order at the time when it was delivered to the wrong party; and the sum it would have fetched at that time is the amount of the loss sustained by the non-performance of the defendants' contract." The recent decision of this Court, in     Waters     v.     Towers(8     Ex.     401)     , *350 seems to be strongly in the plaintiffs' favour. The defendants there had agreed to fit up the plaintiffs' mill within a reasonable time, but had not completed their contract within such time; and it was held that the plaintiffs were entitled to recover, by way of damages, the loss of profit upon a contract they had entered into with third parties, and which they were unable to fulfil by reason of the defendants' breach of contract. [Parke, B. The defendants there must of necessity have known that the consequence of their not completing their contract would be to stop the

working of the mill. But how could the defendants here know that any such result would follow?] There was ample evidence that the defendants knew the purpose for which this shaft was sent, and that the result of its nondelivery in due time would be the stoppage of the mill; for the defendants' agent, at their place of business, was told that the mill was then stopped, that the shaft must be delivered immediately, and that if a special entry was necessary to hasten its delivery, such an entry should be made. The defendants must, therefore, be held to have contemplated at the time what in fact did follow, as the necessary and natural result of their wrongful act. They also cited Ward v. Smith (11 Price, 19) ; and Parke, B., referred to Levy v. Langridge (4 M. & W. 337) .

FN2 The learned Judge has frequently observed of late that the 8th Taunton is of but doubtful authority, as the cases were not reported by Mr. Taunton himself.

Whateley, Willes, and Phipson, in support of the rule (Feb. 2). It has been contended, on the part of the plaintiffs, that the damages found by the jury are a matter fit for their consideration; but still the question remains, in what way ought the jury to have been directed? It has been also urged, that, in awarding damages, the law gives compensation to the injured individual. But it is clear that complete compensation is not to be awarded; for instance, the non-payment of a bill of exchange might *351 lead to the utter ruin of the holder, and yet such damage could not be considered as necessarily resulting from the breach of contract, so as to entitle the party aggrieved to recover in respect of it. Take the case of the breach of a contract to supply a rick-cloth, whereby and in consequence of bad weather the hay, being unprotected, is spoiled, that damage could not be recoverable. Many similar cases might be added. The true principle to be deduced from the authorities upon this subject is that which is embodied in the maxim: "In jure non remota causa sed proxima spectatur." Sedgwick says (page 38), "In regard to the quantum of damages, instead of adhering to the term compensation, it would be far more accurate to say, in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1854) 9 Ex. 341
1854 WL 7208 (Ex Ct), (1854) 9 Ex. 341, 156 E.R. 145
**(Cite as: (1854) 9 Ex. 341)**

the language of Domat, which we have cited above, 'that the object is to discriminate between that portion of the loss which must be borne by the offending party and that which must be borne by the sufferer.' The law in fact aims not at the satisfaction but at a division of the loss." And the learned author also cites the following passage from Broom's Legal Maxims: "Every defendant," says Mr. Broom, "against whom an action is brought experiences some injury or inconvenience beyond what the costs will compensate him for." [FN3] Again, at page 78, after referring to the case of Flureau v. Thornhill (2 W. Blac. 1078) , he says, "Both the English and American Courts have generally adhered to this denial of profits as any part of the damages to be compensated and that whether in cases of contract or of tort. So, in a case of illegal capture, Mr. Justice Story rejected the item of profits on the voyage, and held this general language: 'Independent, however, of all authority, I am satisfied upon principle, that an allowance of damages upon the basis of a calculation of profits is inadmissible. *352 . The rule would be in the highest degree unfavourable to the interests of the community. The subject would be involved in utter uncertainty. The calculation would proceed upon contingencies, and would require a knowledge of foreign markets to an exactness, in point of time and value, which would sometimes present embarrassing obstacles; much would depend upon the length of the voyage, and the season of arrival, much upon the vigilance and activity of the master, and much upon the momentary demand. After all, it would be a calculation upon conjectures, and not upon facts; such a rule therefore has been rejected by Courts of law in ordinary cases, and instead of deciding upon the gains or losses of parties in particular cases, a uniform interest has been applied as the measure of damages for the detention of property.'" There is much force in that admirably constructed passage. We ought to pay all due homage in this country to the decisions of the American Courts upon this important subject, to which they appear to have given much careful consideration. The damages here are too remote. Several of the cases which were principally relied upon by the plaintiffs are distinguishable. In Waters v. Towers (1 Exch.

401) there was a special contract to do the work in a particular time, and the damage occasioned by the non-completion of the contract was that to which the plaintiffs were held to be entitled. In Borradale v. Brunton (8 Taunt. 535) there was a direct engagement that the cable should hold the anchor. So, in the case of taking away a workman's tools, the natural and necessary consequence is the loss of employment: Bodley v. Reynolds (8 Q. B. 779) . The following cases may be referred to as decisions upon the principle within which the defendants contend that the present case falls: Jones v. Gooday (8 M. & W. 146) , Walton v. Fothergill (7 Car. & P. 392) , Boyce v. Bayliffe (1 Camp. 58) and Archer v. Williams (2 C. & K. 26) . *353 The rule, therefore, that the immediate cause is to be regarded in considering the loss, is applicable here. There was no special contract between these parties. A carrier has a certain duty cast upon him by law, and that duty is not to be enlarged to an indefinite extent in the absence of a special contract, or of fraud or malice. The maxim "dolus circuitu non purgatur," does not apply. The question as to how far liability may be affected by reason of malice forming one of the elements to be taken into consideration, was treated of by the Court of Queen's Bench in Lumley v. Gye (2 E. & B. 216) . Here the declaration is founded upon the defendants' duty as common carriers, and therefore there is no pretence for saying that they entered into a special contract to bear all the consequences of the non-delivery of the article in question. They were merely bound to carry it safely, and to deliver it within a reasonable time. The duty of the clerk, who was in attendance at the defendants' office, was to enter the article, and to take the amount of the carriage; but a mere notice to him, such as was here given, could not make the defendants, as carriers, liable as upon a special contract. Such matters, therefore, must be rejected form the consideration of the question. If carriers are to be liable in such a case as this, the exercise of a sound judgment would not suffice, but they ought to be gifted also with a spirit of prophecy. "I have always understood," said Patteson, J., in Kelly v. Partington (5 B. & Ad. 651) , "that the special damage must be the natural result of the thing

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1854) 9 Ex. 341
1854 WL 7208 (Ex Ct), (1854) 9 Ex. 341, 156 E.R. 145
(Cite as: (1854) 9 Ex. 341)

done." That sentence presents the true test. The Court of Queen's Bench acted upon that rule in Foxall v. Barnett (2 E. & B. 928) . This therefore is a question of law, and the jury ought to have been told that these damages were too remote; and that, in the absence of the proof of any other damage, the plaintiffs were entitled to nominal damages *354 only: Tindall v. Bell (11 M. & W. 232) . Siordet v. Hall (4 Bing. 607) and De Vaux v. Salvador (4 A. & E. 420) are instances of cases where the Courts appear to have gone into the opposite extremes--in the one case of unduly favouring the carrier, in the other of holding them liable for results which would appear too remote. If the defendants should be held responsible for the damages awarded by the jury, they would be in a better position if they confined their business to the conveyance of gold. They cannot be responsible for results which, at the time the goods are delivered for carriage, are beyond all human foresight. Suppose a manufacturer were to contract with a coal merchant or mine owner for the delivery of a boat load of coals, no intimation being given that the coals were required for immediate use, the vendor in that case would not be liable for the stoppage of the vendee's business for want of the article which he had failed to deliver: for the vendor has no knowledge that the goods are not to go to the vendee's general stock. Where the contracting party is shewn to be acquainted with all the consequences that must of necessity follow from a breach on his part of the contract, it may be reasonable to say that he takes the risk of such consequences. If, as between vendor and vendee, this species of liability has no existence, a fortiori the carrier is not to be burthened with it. In cases of personal injury to passengers, the damage to which the sufferer has been held entitled is the direct and immediate consequence of the wrongful act.

FN3 Broom's Legal Maxims, p. 95; Davies v. Jenkins, 11 M. & W. 755 .

Cur. adv. vult.

**The judgment of the Court was now delivered by**

**ALDERSON, B.**

We think that there ought to be a new trial in this case; but, in so doing, we deem it to be *355 expedient and necessary to state explicitly the rule which the Judge, at the next trial, ought, in our opinion, to direct the jury to be governed by when they estimate the damages.

It is, indeed, of the last importance that we should do this; for, if the jury are left without any definite rule to guide them, it will, in such cases as these, manifestly lead to the greatest injustice. The Courts have done this on several occasions; and, in Blake v. Midland Railway Company (18 Q. B. 93) , the Court granted a new trial on this very ground, that the rule had not been definitely laid down to the jury by the learned Judge at Nisi Prius.

"There are certain established rules," this Court says, in Alder v. Keighley (15 M. & W. 117) , "according to which the jury ought to find." And the Court, in that case, adds: "and here there is a clear rule, that the amount which would have been received if the contract had been kept, is the measure of damages if the contract is broken."

Now we think the proper rule in such a case as the present is this:--Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a *356 breach of contract under these special circumstances so known and communicated. But, on the other hand, if these

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1854) 9 Ex. 341
1854 WL 7208 (Ex Ct), (1854) 9 Ex. 341, 156 E.R. 145
**(Cite as: (1854) 9 Ex. 341)**

special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract. For, had the special circumstances been known, the parties might have specially provided for the breach of contract by special terms as to the damages in that case; and of this advantage it would be very unjust to deprive them. Now the above principles are those by which we think the jury ought to be guided in estimating the damages arising out of any breach of contract. It is said, that other cases such as breaches of contract in the non-payment of money, or in the not making a good title to land, are to be treated as exceptions from this, and as governed by a conventional rule. But as, in such cases, both parties must be supposed to be cognisant of that well-known rule, these cases may, we think, be more properly classed under the rule above enunciated as to cases under known special circumstances, because there both parties may reasonably be presumed to contemplate the estimation of the amount of damages according to the conventional rule. Now, in the present case, if we are to apply the principles above laid down, we find that the only circumstances here communicated by the plaintiffs to the defendants at the time the contract was made, were, that the article to be carried was the broken shaft of a mill, and that the plaintiffs were the millers of that mill. But how do these circumstances shew reasonably that the profits of the mill must be stopped by an unreasonable delay in the delivery of the broken shaft by the carrier to the third person? Suppose the plaintiffs had another shaft in their possession put up or putting up at the time, and that they only wished to *357 send back the broken shaft to the engineer who made it; it is clear that this would be quite consistent with the above circumstances, and yet the unreasonable delay in the delivery would have no effect upon the intermediate profits of the mill. Or, again, suppose that, at the time of the delivery to the carrier, the machinery of the mill had been in other respects defective, then, also, the same results would follow. Here it is true that the shaft was actually sent

back to serve as a model for a new one, and that the want of a new one was the only cause of the stoppage of the mill, and that the loss of profits really arose from not sending down the new shaft in proper time, and that this arose from the delay in delivering the broken one to serve as a model. But it is obvious that, in the great multitude of cases of millers sending off broken shafts to third persons by a carrier under ordinary circumstances, such consequences would not, in all probability, have occurred; and these special circumstances were here never communicated by the plaintiffs to the defendants. It follows, therefore, that the loss of profits here cannot reasonably be considered such a consequence of the breach of contract as could have been fairly and reasonably contemplated by both the parties when they made this contract. For such loss would neither have flowed naturally from the breach of this contract in the great multitude of such cases occurring under ordinary circumstances, nor were the special circumstances, which, perhaps, would have made it a reasonable and natural consequence of such breach of contract, communicated to or known by the defendants. The Judge ought, therefore, to have told the jury, that, upon the facts then before them, they ought not to take the loss of profits into consideration at all in estimating the damages. There must therefore be a new trial in this case.

Rule absolute.

(c) Sweet & Maxwell Limited

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Declaration of Owen F. Duffy in Opposition

# EXHIBIT 13

WestlawUK

(1928) 30 Ll. L. Rep. 159

1928 WL 23441 (HL), (1928) 30 Ll. L. Rep. 159
(Cite as: (1928) 30 Ll. L. Rep. 159)

**\*159 R. & H. Hall, Ltd. v. W. H. Pim, Junr., &
Co., Ltd.**

House of Lords.

HL

Monday, Nov. 21, 1927; Mar. 2, 1928.

Before Viscount Haldane, Viscount Dunedin,
Lord Shaw, Lord Phillimore and Lord
Blanesburgh.

Sale of goods--Breach--Measure of damages -
-Agreement by A to sell wheat c.i.f. to B-
-Subsequent string contracts B-C-D --Admitted
failure of A to tender documents to B--Claim by
B against A for damages representing loss of
profit on resale and for indemnity against claims
by C and D--Contemplation of parties when con-
tract entered into -- Finding of arbitrator that
chances of resale by B or of B taking delivery
about equal--Hammond v. Bussey, 20 Q.B.D. 79,
discussed--London Corn Trade Association Aus-
tralian Wheat Contract No. 12 as evidencing in-
tention to resell -- Application of rule in Hadley
v. Baxendale.

This was an appeal of Messrs. R. & H. Hall, Ltd.,
Belfast, which arose out of their action against
Messrs. Wm. H. Pim, Junr., & Co., Ltd., London,
for damages for breach of contract by not tender-
ing to the Belfast company the documents for a
cargo of wheat.

The dispute between the parties arose under a
contract made on Form 12 of the London Corn
Trade Association and dated Nov. 3, 1925,
whereby the London company, on account of
principals whom they guaranteed, sold to the Bel-
fast company a cargo of about 7000 tons of Aus-
tralian wheat c.i.f. to any safe port in the United
Kingdom. By another contract the Belfast com-
pany agreed to sell a cargo of Australian wheat to
Messrs. Christopher Williams & Co., Bristol. By
another contract Messrs. Williams agreed to sell a
cargo of Australian wheat to Messrs. Pim as
brokers for account of Messrs. Suzuki & Co., Ltd.

In the following January, Messrs. Pim, the origin-
al sellers, procured the consent of the parties con-
cerned that the sale by Messrs. Hall to Messrs.
Williams should be treated as a resale of their
purchase from Messrs. Pim, and that the sale by
Messrs. Williams to Messrs. Suzuki should be
treated as a resale of their purchase from Messrs.
Hall. On Jan. 29, 1926, Messrs. Pim gave to
Messrs. Hall notice of appropriation of their con-
tract with them of the cargo of the steamship *In-
dianic*. This appropriation was duly passed on by
Messrs. Hall to Messrs. Williams, and by them to
Messrs. Pim for account of Messrs. Suzuki.
Messrs. Pim never tendered to Messrs. Hall the
documents covering the cargo, but instead de-
livered them to another firm under a different
contract. It was admitted that by doing so they
committed a breach of their contract with Messrs.
Hall, and the question in the appeal was the meas-
ure of damages for the breach.

Mr. Justice Rowlatt decided that Messrs. R. & H.
Hall were entitled to recover from Messrs. Pim,
Junr., the difference between the price at which
they had bought and the price at which they had
resold the cargo, together with an indemnity for
damages and costs which Messrs. Hall would
have to pay to the buyers who had bought from
them. The Court of Appeal held (27 Ll.L.Rep.
253) that the measure of damages was limited to
the difference between the price for which the
cargo was bought and the price at which similar
wheat could have been bought in the market at
the date of the breach.

**Representation**

Sir John Simon, K.C., Mr. A. T. Miller, K.C., and
Mr. Cecil W. Lilley (instructed by Messrs.
Thomas Cooper & Co.) appeared for the appel-
lants; Mr. Rayner Goddard, K.C., and Mr. D. B.
Somervell (instructed by Messrs. Coward,
Chance & Co.) represented the respondents.

Sir JOHN SIMON protested against the idea that
this was a question of working out \*160 the
chances like those of a bookmaker. It was not
merely corn, but a particular cargo of corn that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1928) 30 Ll. L. Rep. 159
1928 WL 23441 (HL), (1928) 30 Ll. L. Rep. 159
(Cite as: (1928) 30 Ll. L. Rep. 159)

the respondents had agreed to sell, and the inference to be drawn from the nature of the contract and the circumstances of the case was that a resale was contemplated by the parties as likely, in the ordinary course, to take place. Upon the respondents' failure to tender documents, the appellants were unable to implement their contract of resale by purchase in the market and the measure of damages was the loss actually suffered by the appellants.

COUNSEL submitted that in considering the question of damages regard must be had to what must be taken to have been in the contemplation of the parties at the time when the respondents completed the arrangements—that the cargo to be appropriated under the contract of Nov. 3, 1925, should be appropriated under the other contracts. That was the ground, he thought, on which Mr. Justice Rowlatt said that what was to be treated as in the contemplation of the parties was not a question of fact for the jury, but a matter of law, though it might depend on facts to be found by the jury.

Thursday, Nov. 24, 1927.

Mr. RAYNER GODDARD, for the respondents, contended that motive for breach of contract was not material to the measure of damages. It was important to notice that in point of fact there never was a resale by Hall of the particular cargo which they bought from Pim. There were three sales in question: (1) the sale from Pim to Hall; (2) from Hall to Williams, and (3) from Williams to Suzuki. Each of these transactions took place in November at different dates, and each was a perfectly independent contract. In no sense were Hall selling to Williams that which they had bought from Pim, nor did Williams sell to Suzuki that which they bought from Hall. There was no obligation upon any one of them to pass the name of any particular ship. The question of the sale which arose two months afterwards had no relation to the original contract, in which there was no pretence, so far as the sale was concerned, that these goods were specific goods.

On the findings of the arbitrator a resale by the appellants was not within the contemplation of the parties, and no inference could be drawn from the form of the contract that a resale was in the contemplation of the parties. If there was no question of resale at all, he submitted that the damages which were recoverable if that specific cargo was not delivered would be based on the value of any other wheat cargo afloat at that time. Damages in respect of a Derby winner would, of course, be different from damages in respect of a Ford car. In the case of the latter the damage was simply the price of another Ford car, and in the same way the damages in the present case meant the price of another cargo of wheat.

Monday, Nov. 28, 1927.

Judgment was reserved.

Friday, Mar. 2, 1928.

**JUDGMENT.**

Viscount Haldane

, in moving that the appeal should be allowed, said: On one point this case has given me some anxiety. Not about the principle of law applicable, for I think that it is clear, but as to the proper inference as to the facts to which to apply it. After study of the contract I have coma to the conclusion that it is contained in the document of Nov. 3, 1925, and must be taken to have been entered into on that date. Although, on the face of it, this contract relates to a cargo of Australian wheat, this is to be shipped in a first-class vessel of a certain qualification, from a port in Australia as per bills of lading to be dated at specified future dates, the load being also specified, as well as the use of the shipping documents. The conditions which are incorporated into the contract are those of the London Corn Trade Association. They provide for notice of appropriation, including ship's name, date of bills of lading, and of approximate quantity loaded. These particulars are to be given by the shipper within a limited time, and by each other seller within a similarly limited time. A valid notice of appropriation shall not be withdrawn, but if the vessel is named in the contract no notice of appropriation is to be deemed to be necessary. Provisional invoice based on bill of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1928) 30 Ll. L. Rep. 159
1928 WL 23441 (HL), (1928) 30 Ll. L. Rep. 159
(Cite as: (1928) 30 Ll. L. Rep. 159)

lading weight, with ship's name and date of bill or bills of lading, is to be sent by the shipper to his buyer within seven days after date of arrival in Europe, and by other sellers to their buyers respectively in due course after receipt. There are then provisions for arbitration in accordance with the practice of the London Corn Trade Association.

I have come to the conclusion that the contract is one, not merely for the sale of corn in bulk, but for the sale of the cargo of an individual ship which is either specifically identified or is to be so identified. This contract was effectively made on Nov. 3, 1925, and I think that what took place between the parties a little later neither adds anything to its binding character nor detracts from that character.

*161 I think further that the contract and the conditions which it incorporates show that it was contemplated that the cargo might be passed on by way of sub-sale if the buyer did not choose to keep it for himself, and that the seller in such a care contracted to put the buyer in a position to fulfil his sub-contracts if he entered into them. They were regarded by the terms of the original contract as sub-contracts which the original buyer was to be in a position to enter into, with stipulations which bound the original seller to enable the original buyer to fulfil them. Whether the latter was likely to enter into such sub-contracts and pass the cargo down a chain of resale is not material. It is enough that the contract contemplated by its terms that he should have the right to do so if he chose.

This being the case, there has been an admitted breach. The original seller has failed to deliver at the due date, and the seller has been left open to claims, from his sub-buyers based on the contracts made with them in reliance on the clauses in the document of Nov. 3.

Under these circumstances I am of opinion that the measure of damages is clear. It is not merely the amount of damage, measured by loss in the market, which arises in the usual course of business from the breach. It extends, whenever the special circumstances require this, to such possible damages as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it. This is in accordance with that is called the second branch of the rule in Hadley v. Baxendale, (1854), 9 Ex. 341 , a rule which is fully explained by Lord Esher, M.R., in Hammond v. Bussey, 20 Q.B.D. 79. He points out that the principle is not to be confined to a subcontract already actually made at the date of the original contract, but applies also to the case of a sub-contract which will probably be made. There is no doubt that the law is correctly explained in Hammond v. Bussey, and I am of opinion that the case before me depends on a question of construction which comes directly within it and must be answered in accordance with the appellants' contention.

I find myself unable to take the view which prevailed in the Court of Appeal, where the judgment of Rowlatt, J., was reversed. I do not think that the real question is one of probability or of circumstances foreseen by the seller. It is to my mind a pure question of the terms of the contract itself, and I am of opinion that these terms provided for the case of resale. Whether such a resale was likely or not does not matter, if, as I think, the buyers stipulated for power to make it being provided.

I therefore think that the judgment of the Court of Appeal ought to be reversed and that of Rowlatt, J., restored; and that the respondents should pay to the appellants their costs in this House and in the Courts below.

Viscount Dunedin:

There is, I believe, a general agreement that the law as to the calculation of damages due under breaking of a contract is settled by the case of Hadley v. Baxendale, (1854), 9 Ex. 341 , as explained in Hammond v. Bussey, 20 Q.B.D. 79. The difficulty lies in the application to the facts of each case.

I take, in their order, the three points which Fry, L.J., in Hammond's case, said must be determined before the final question is put. Firstly: what are

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1928) 30 Ll. L. Rep. 159
1928 WL 23441 (HL), (1928) 30 Ll. L. Rep. 159
(Cite as: (1928) 30 Ll. L. Rep. 159)

the damages which actually resulted from the breach? Undoubtedly, loss of profit and also--though I shall revert to this--damages which the appellant would have to pay to his sub-vendee Williams. Secondly: was the contract made under any special circumstance, and, if so, what? And thirdly: what, at the time of the making of the contract, was the common knowledge of the parties?

I take these two together. This was a sale, not of wheat, but of a cargo of wheat, and the particular cargo was according to the terms of the bargain to be identified by nomination before a certain date. It was well known to both parties that it was a common practice in the trade to resell cargoes while still afloat, and the contract itself, apart from common knowledge, shows this distinctly by the provisions of Condition 1, which were quoted by the noble Lord who preceded me. Then there is the correspondence as to the actual appropriation of the *Indianic*. I do not use this correspondence as explaining the contract itself, which was of date in November previous, but I do use it as an additional proof, if proof were needed, of the perfect familiarity of the respondent with the practice of successive resales of cargo afloat, or, as it is termed, of a "string of contracts." The respondent necessarily knew that as soon as he nominated a cargo the delivery of that cargo, and of no other, could alone satisfy the contract.

In the light of these facts, I put to myself the crucial question as expressed by Fry, L.J., who is therein repeating what had already been said byLord Esher, M.R. :--

    What my Court reasonably suppose to have been in the contemplation of the parties as the probable result of a breach of the contract, assuming the parties to have applied their minds to the contingency of there being such a breach?

Be it observed that it is for the Court to decide this question; not for the jury, or, as in a case like the present, for the arbitrator, although it is in the provence of the jury or arbitrator to find any actual fact which will help the Court to arrive at the supposition.

In following Fry, L.J., as to the matter *162 to be

considered before the final question is put, I do exactly what the learned Lord Chief Justice did in this case. He, however, proceeds as follows. He quotes the finding of the arbitrators:--

    The arbitrators are unable to find that it was in the contemplation of the parties or ought to have been in the contemplation of Messrs. Pim at that time that the cargo would be resold or was likely to be resold before delivery; in fact, the chances of its being resold as a cargo and of its being taken delivery of by Messrs. Hall were about And he then continues:--

    In other words, as I understand the meaning of that finding of fact, not only do the arbitrators say that upon the materials before them they could not find that a resale was within the contemplation of the parties, and, therefore, possibly damages from breach of subsequent contracts within the scope of the measure of damage, but they actually state as a fact that the chances of this cargo being resold, or of its not being resold, were equal, and, therefore, that it is idle to speak of a likelihood or of a probability of a resale.

Now on this I have two observations to make. The arbitrators' findings that they are unable to find, &c., must be read in the light of what was said just before the passage quoted, namely:--

    It was not suggested on behalf of Messrs. Hall that they had at the time of the transaction of Nov. 3, 1925, expressly notified Messrs. Pim of any intention on their part to resell the cargo; and in the circumstances . . .

If more were meant, it was usurping the province of the Court. And further, and here, I think, is the key to the learned Judge's decision, after setting out that they state as a fact that the chances of the cargo being resold, or not being resold, were about equal, he adds words which they do not use, "and therefore that it is idle to speak of a likelihood or a probability of a resale."

My Lords, with deference to the learned Judge, it is here that I part company with him. I do not think that "probability," as it is used in Hammond v. Bussey, means that the chances are all in favour of the event whatever its happening. To

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1928) 30 Ll. L. Rep. 159
1928 WL 23441 (HL), (1928) 30 Ll. L. Rep. 159
(Cite as: (1928) 30 Ll. L. Rep. 159)

make a thing probable it is enough, in my view, that there is an even chance of its happening. That is the criterion I apply, and in view of the fact which I have said above I think there was here in the contemplation of parties the probability of a resale. And if that was so the results of a broach on the part or the first seller, as the sale was of a named cargo, meant inevitably default on the part of the first buyer. I think, therefore, that there was material on which Rowlatt, J., could come to the conclusion he did.

The result of the default which did ensue was two-fold. The appellant lost his profit, but also he had to pay damages to his buyer. It is argued that although there may be liability for the first item, there could not be for the second. Rowlatt, J., held that the two were inseparable. The Court of Appeal did not have to consider the point. In my opinion the one is the corollary of the other.

There is a case in which the two items are allowed, viz., Grebert-Borgnis v. Nugent, 15 Q.B.D. 85. It may be distinguished from this case in respect that Brett, M.R., distinctly states that the intention to make a special contract had been communicated to the first seller, but, in my opinion, that must be taken along with the considered opinion which the same learned Judge, Lord Esher, M.R., gave in Hammond v. Bussey. If what the Court holds to have been in contemplation of the parties is tantamount to actual knowledge, then I think the reasoning of the former case applies to this.

It was stated that this opened an interminable vista of successive contracts and successive damages. This is not so. There is a practical check in two ways. The contracts must have been entered into before the time of delivery, and they must be contracts in accordance with the market, not extravagant and unusual bargains. This last point is well settled in decided cases.

I am, therefore, of opinion that the appeal should be allowed and that the judgment of Rowlatt, J., should be restored.

Lord Shaw of Dunfermline:

I agree with both of my noble and learned friends who have preceded me. But I wish specially to say that I think the main difficulty in this case is removed by the terms of the contract itself. By that contract, which is dated Nov. 3, 1925, the appellants sold to the respondents a cargo of Australian wheat to be carried from Australia per a ship to be named. The ship was duly and timeously named and the contract was thus complete, and the subject of the sale thus identified was shipped for London on a c.i.f. contract. The form of contract was the form of the London Corn Trade Association, of which the appellants and respondents are members. The appellants broke this contract of sale by failing to make a tender of documents and to deliver. The question of the case is: what is the measure of damages for this breach?

Between the date of the contract and the date when delivery could have been given but was refused in London a period of several months elapsed. During that period the appellants, purchasers, sold to a firm, Williams, at an enhanced price. Thereafter, Williams again sold it a price still further enhanced. The market was a rising market. It is not suggested that these prices were out of the ordinary course of business. Had this been so, different considerations might quite well have arisen. This however, is the very *163 common case of specific goods sold for an appointed future delivery, the market between the dates of sale and delivery being a fluctuating market.

When refusal to deliver occurred, it is unquestionable that the original buyer and all subsequent buyers were unable to do business for want of the cargo. The position, accordingly, is that buyer No. 1 lost his own profit, so did buyer No. 2. Further, No. 2, being also unable to complete the sale made by him, is confronted with a claim for damages for which he asks to be relieved by No. 1. In short, although the string in this case is not very long, there is a short string of contracts the subject of all of which was the specific cargo. Its delivery would have made the whole transactions work out smoothly and in order. Its non-delivery raises a series of losses all of which accumulate upon the head of buyer No. 1.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1928) 30 Ll. L. Rep. 159
1928 WL 23441 (HL), (1928) 30 Ll. L. Rep. 159
(Cite as: (1928) 30 Ll. L. Rep. 159)

Page 6

The question is: is the seller of the goods, in view of the terms of this contract for sale and delivery of a cargo of wheat or of the nature of the case which the facts disclose, entitled to plead that the measure of damages is simply the difference of price of a similar class and quantity of wheat in London on the date of the breach as compared with the sale price of the cargo contracted for? Or is the merchant in breach liable for the losses incurred as between the buyer and the sub-purchasers from him, as described? It is manifest that the former measure would result in the original buyer being cast in losses of profit and in respect of claims for loss of profits for which he would not be adequately recouped.

I do not think that this would be according to law. My principal reason is that I think that the two parties had actually provided for the very case of sub-sales, which has caused these extra losses. I think it right to cite the conditions. By Condition 1 of the contract it is provided that

Notice of appropriation with ship's name . . . shall be given . . . within 10 days from date of bill of lading, and *by each other seller* within the 10 days, or in due course if received by him after that time . . . and *shall be passed on by each other seller to his buyer in due course* on receipt.

I am italicizing the words of the provision referred to.

The eighth condition is for arbitration, and the clause contains these words:--

But when buyer claims arbitration . . . he shall, *if he is the last buyer,* appoint his arbitrator, and give notice of such appointment *to his seller* not later than 10 running days after final discharge of shipment, but *if he is an intermediate buyer* then in due course after receiving notice from his buyer. If the claim is for condition the seller, if he is the shipper, his house or representative or agent in Europe, shall appoint and instruct his arbitrator, within three business days after receipt of buyer's nomination; and *if he is an intermediate seller,* then in due course after receipt of nomination from his seller.

Further, the strike clause provides with regard to notices by cable naming the ports that "all such

notices *shall be passed on in due course.*"

It appears to me, my Lords, to be out of the question under such a contract to maintain that the parties did not merely contemplate, but actually provided for, the case of intermediate transactions taking place and, indeed, for the carrying forward of the obligations to meet such successive transactions. It may be mentioned that the sub-contracts in the present case, that is, the contracts between the original purchaser and subsequent purchasers from him, were all in the same form, carrying forward the transaction in a similar way, applying in short the same London Corn Trade Association rules.

The case, therefore, is that the non-performance of this contract must be plainly known beforehand by both parties to be a non-performance of a contract in which intermediate sales may in the custom of business take place. I am of opinion that in such circumstances the damages due from a person in breach of such a contract ought to be measured so as to cover the losses occurring to the original contracting party by reason not only of his individual claims, but of the claims which he is required to meet in consequence of his inability in turn to hand over the shipping documents or deliver the cargo as contracted.

I do not assent to the view which would prevent this result, because it is not established that the original contractor and buyer cannot be said to have considered all such damage probable. To what extent in a contract of goods for future delivery the extent of damages is in contemplation of parties is always extremely doubtful. The main business fact is that they are thinking of the contract being performed and not of its being not performed. But with regard to the latter, if their contract shows that there were instances or stages which made ensuing losses or damage a not unlikely result of the breach of the contract, then all such results must be reckoned to be within not only the scope of the contract, but within the contemplation of parties as to its breach.

Losses may result, of which there are instances in the case books, in which, for instance, the carrier delaying the supply of machinery could not be re-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

sponsible for the loss of profits of the mill of which it was a part. But, upon the other hand, if trade losses occur under a contract which points to a series of people dealing in the specific goods sold and entitled by contract to receive those goods, then it is in no way unreasonable to charge the seller declining to deliver the goods with the losses which have occurred to the string of *164 dealers which the nature of the contract and of the case provided for supplying in turn.

The present instance naturally fits into the oft-quoted *dicta* in Hadley v. Baxendale. It appears to me that a sensible rule clearly covers the loss not only of the original contractor's profit which he has been prevented from earning, but also the loss sustained by him in being saddled with the claims of those to whom he had, in a contemplated course of trade, disposed of the goods. I think that Hadley v. Baxendale as a decision results in such a rule. Nor do I think much is to be gained by an ultra analysis which divides Baron Alderson's well-known sentence into two portions which are to be reckoned as necessarily and always two distinct and different cases. The sentence is this (9 Ex. at p. 354):--

Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach or contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it.

These two things, arising naturally from or the probable result of the breach, need not be anti-thetically treated: they may run into each other and, indeed, be one. I think, for instance, that in this case, where the string of sales was to the knowledge of the breaker of the contract within the very scope of the conditions of his bargain, it was fairly and reasonably to be expected, not only, to use the language of the judgment, as "arising naturally, i.e., according to the usual course of things, from such breach," but also

"such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. " What has happened was not only a natural result--that damages might accumulate all along the line--but further, that that very damage was a reasonable contemplation of both the parties as the probable, by which I think is truly meant the not unlikely, result of the breach of the bargain.

Your Lordships who have preceded me have referred to Lord Esher's judgment in Hammond v. Bussey , and in elucidating the passage from Hadley v. Baxendalewhich I have just cited Lord Esher says this (20 Q.B.D. at p. 89):--

In any case it seems to me clear that the rule would apply to the case of a sub-contract which within the knowledge of the defendant was in the ordinary course of business sure to be made.

Again, I would venture to read that as a sub-contract which, in the ordinary course of business, was not unlikely to be made, because I am quite sure that, speaking beforehand with regard to a speculation in goods for future delivery, it could hardly be ever postulated that interim transfer and sale was a sure thing. It was one of the chances of the business, and it may have been a not unlikely thing, but it humbly appears to me to be sufficient in law that the chance of a not unlikely thing in the course of a business in a particular article for future delivery should be one of those chances which must be reckoned to have been within the contemplation of parties when sub-contracts or transfers were the matter of express agreement between them. The whole case may be said to be summed up in Lord Esher's view (*sup.*, at p. 89):--

We must say, using our knowledge of business and affairs, what may reasonably be supposed to have been in the contemplation of the parties as the result of a breach of the contract under the circumstances.

In allusion to the judgment of the noble and learned Lord Chief Justice in this case, I would respectfully observe that I do not think that in such a contract people come to contemplate with

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

any exactitude the particular probable results which would follow from a breach; say, that there would be a probable chance of reselling at a profit or that the chance of that would be even with their not selling at a profit. What the parties to a contract such as this do is not to estimate that the chances will be one way or the other or will have this amount of probability or the other, but simply to contemplate that trade chances are not unlikely to occur, and to make a contract to cover such chances if any.

In the present case it is established that the seller had not only (1) contracted in full view of intermediate sales being possibly made on a rising and profitable market, but further (2) was actually aware before he refused delivery that such sales had been made; and (3) shortly before delivery was due the market had fallen, and he was aware of that also. To permit him to measure the damages applicable to a special article or a special cargo by the rate thus fallen would be to put a premium on breach of contract and be of the worst example.

Lord Phillimore:

I concur. The rules of law as to the measure of damages may be conveniently stated as follows. Whether the action be one of tort or of contract, the defendant against whom judgment passes must pay all damages which naturally flow from his wrong action or his breach of contract. To these, in the case of breach of contract, the law superadds in appropriate cases those damages which, though they do not always or oven usually flow from the breach of contract, are, at the time of making the contract, recognised by the parties as those which in the particular case may result from a *165 failure. These are called damages in the contemplation of the parties, not because the parties contemplate a breach of contract, but because they recognise that a breach or failure is possible, and they reckon that these damages may flow from that breach. I designedly use the word "may." There may be cases where the word to be used might be "will," but there are also cases and more common cases where the word to use is "may."

If a seller of an article or a carrier who undertakes to deliver is informed that the purchaser or the future receiver can or will apply the article in one way only, the only special damages to which he would be liable, in case of failure, are those damages which would arise because the article is not there to meet that particular form of application. But if he knows that it could be applied in any one of two or three or more several ways, it may well be a term of his agreement that he undertakes to be responsible for the damages which flow from the article being ultimately destined for use in any one of these ways.

It is all a question of contract. He may know that a particular use is, or particular uses are, intended, and yet he may decline to make himself responsible for any special damage arising from his failure. Notice will not do of itself, nor will knowledge. But if the tribunal which tries the case comes to the conclusion that he contracted to sell or to carry on terms that he should be responsible for damage which might accrue from his failure to provide for any one of certain objects, then he must be held liable. He has contracted on these terms, and there is an end of it. One caution I would add--it is not what the parties may contemplate or may have contemplated, but what the parties do contemplate or have contemplated as that which may happen.

When these principles come to be applied to the present case, it seems to me clear that in accordance with the very elaborate form of this contract the respondents, as sellers of this cargo of Australian wheat to be shipped within a particular period, knew that the appellants to whom they sold it might well sell it over again and make a profit on the resale, and that the purchasers from them might sell it for a third time and make a further profit, and that indeed the string--to use the expression which we find in this case-- might even continue further. This being so, the respondents as sellers must be taken to have consented to this state of things and thereby to have made themselves liable to pay to the appellants their profit on a resale. I think also that they must be taken to have known that the appellants would be in a like position with regard to those to whom

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1928) 30 Ll. L. Rep. 159
1928 WL 23441 (HL), (1928) 30 Ll. L. Rep. 159
(Cite as: (1928) 30 Ll. L. Rep. 159)

they had sold, and therefore be in addition entitled to protection from the respondents to the extent of this further liability.

My Lords, I think that decides the case. It is true that the cargo was originally not identified and might be a cargo of Australian wheat loaded on any ship capable of carrying the amount (7000 tons) and sailing within the prescribed period. But it was part of the condition of the sale that by a particular date long before its arrival in this country the cargo on board a particular ship should be designated; and though it is quite true that the respondents might have designated the *Indianic*, and the appellants might have had two or more such cargoes and might have designated some other ship to their buyers, it is also true that they might have designated this ship, as in fact they did. They were given permission to designate this ship, and consequently to identify the cargo which they were to get from the respondents with a cargo which they were going to sell over to their vendees, as in fact they did.

My Lords, it is, I think, desirable that we should express our opinions upon the general question, because if it should be the case that we are putting a construction upon these corn contracts which those who deal on the Corn Exchange did not anticipate, and if the somewhat heavy liabilities which we are thereby imposing have not been intended to be created, there will be an opportunity to revise the form of contract.

But I could decide this case quite well on the special circumstances which it discloses. The letters sent by the brokers on behalf of Messrs. Pim on Jan. 27 to Messrs. Hall and to the firm which purchased from them (viz., Messrs. Christopher Williams & Co.) invited the recipients to agree that there was an identity of the cargo sold to Messrs. Hall with the cargo resold to Messrs. Christopher Williams. And as the arbitrators find:--
The object of this agreement was to secure that the cargo which (as provided by Clause 1 of the conditions on the back of the contract) would eventually be appropriated to the contract between Messrs. Hall and Messrs. Pim would be passed on by each buyer to his seller throughout

the series.

No doubt, as Scrutton, L.J., observes, the only way in which the profit can be secured in such a case as this is to treat the several parties as on a string, each dealing in turn with a specific piece of property. It is, perhaps, unfortunate that the learned Lord Chief Justice thought himself precluded by the form of the procedure from deciding the case upon this ground.

I see nothing in the way of form to prevent our so deciding. This is not the case of an action but of a reference to a commercial arbitration, and there is nothing in the papers to show that the whole question of the relations between the parties was not open to the arbitrators. Indeed, the way in which they state the third of Messrs. Hall's contentions shows that this point was before them. Whether *166 you call it a working out of the principal contract or of a subsidiary contract made by the parties with a knowledge of the effect which it would have upon the first contract, does not seem to matter. Whatever may have been the motive of Messrs. Pim when they caused their brokers to write the letters of Jan. 27, they must abide by the consequences. They cannot complain if the identification has turned against them. I think that this appeal should succeed.

Lord Blanesburgh:

The contract of Nov. 3, 1925, is on a printed form prepared by the London Corn Trade Association for use among its members. It is a form adaptable by appropriate variation of terms, not only to contracts for the sale of cargoes of wheat "for shipment," but also to contracts for the sale of such cargoes "on passage." Primarily, no doubt, the form is applicable to cargoes "for shipment "--to cargoes, that is to say, which, in the contract, only identified by description, are to be made specific by subsequent appropriation. But it is fitted also to define the terms of a contract where the cargo in question is specific at its date--where, for example, the carrying vessel is actually named, it being in that case provided by Condition 1 that "no appropriation shall be deemed to be necessary." But be the contract of the one type or of the other it will be a contract for the sale of a cargo

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1928) 30 Ll. L. Rep. 159
1928 WL 23441 (HL), (1928) 30 Ll. L. Rep. 159
(Cite as: (1928) 30 Ll. L. Rep. 159)

of wheat made specific before, and in most cases long before, the due date of delivery. Under both types of contract the seller by the conditions may be in breach by failing either duly to furnish provisional invoices of the cargo by that time specific or to make a due tender of documents when the date of delivery arrives. But under a contract of the first type, that is to say, under such a contract as that of Nov. 3, 1925, the seller may further be in breach under Condition 1 by failing to give notice of appropriation within the limits of time in that behalf prescribed. And this additional opportunity for breach is in the present case important. It lay at the root of, and probably induced, the strange procedure adopted by the respondents in January and February, 1926, upon the result of which the issue between the parties to this appeal may properly and, as I think, very wholesomely be made to turn.

My Lords, it is, in my judgment, clear upon the correspondence that the respondents in January, 1926, for reasons which unfortunately were opposed to any consideration for the then situation of the appellants, did determine that under their contract of Nov. 3 there was to be no delivery, and that their buyers the appellants were to be left content with payment of compensation for its breach. The respondents were at that time in full knowledge of the appellants' sub-contract with Williams, and, had their determination just referred to been consistent with any regard for the appellants' position thereunder, their course would have been clear. They would simply have intimated to the appellants that it was not their intention to appropriate any cargo to their own contract. Had they done so the difficulties to the appellants created by the course the respondents actually took would never have emerged, because the appellants, being upon such an intimation admittedly entitled to receive from the respondents by way of compensation the difference between the contract price and the then current market price of a cargo of wheat of the contract description, could without further expense have secured their profit under their sub-contract with Williams, not yet specific, by themselves going into the market and acquiring, for example from Messrs. Rank, who we know had one available, a

cargo suitable for appropriation to its service. In these circumstances the question which I now desire to pose is whether the respondents as a result of the alternative procedure which for highly interested reasons they then adopted have succeeded in depriving the appellants of any right to that profit as an item in the compensation now exigible when the fact is that as the direct result of the respondents' final breach that profit is now lost to the appellants.

The position of the respondents in January, 1926, is, I think, made very clear on the contracts and correspondence exhibited to the special case. If the conclusions and inferences properly deducible therefrom bear hardly upon them they have only themselves to thank for that result. They were invited by the arbitrators to make any supplementary explanations they thought fit. They refused the invitation. They were content to be judged on the materials then available to the Tribunal. And they must take the consequences of their reticence.

By the contract of Nov. 3, 1925 (which I will now call Contract A) the respondents on behalf of principals had, presumably in anticipation of a falling market, agreed with the appellants to sell the quantity of wheat in question for 52s. 3d. a quarter. On Nov. 21 the appellants by contract, which I will now call Contract B, sub-sold the wheat to Williams at 56s. 9d. a quarter. On Nov. 25, by contract which I will now call Contract C, the respondents on behalf of a second set of principals purchased the cargo from Williams at 59s. 3d. a quarter. The three contracts A, B and C, except as to dates, names of parties and prices, are identical in form. Under each, the latest date of appropriation is Feb. 10, 1926. By the end of January the rising market of November had become a falling market. But on Jan. 29 it was still as high as 60s. a quarter. At that date, accordingly, the respondents' principals under Contract A stood to be heavy losers because the last date of appropriation was near. On the other hand, if, before the delivery date, the market fell, as it was then rightly anticipated that it would, the respondents' second set of principals—buyers under Contract C—stood to have paid much more for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1928) 30 Ll. L. Rep. 159
1928 WL 23441 (HL), (1928) 30 Ll. L. Rep. 159
(Cite as: (1928) 30 Ll. L. Rep. 159)

their wheat than they need have done.

**\*167** Accordingly, if the speculative interests, in temporary eclipse, of both sets of principals were to be accommodated, it was desirable, in the interests of the A principals --if I may so describe them--that on a falling market their date of breach should be postponed as long as possible; while in the interests of the C principals it was desirable that, while they should be left with their right to compensation intact for any failure by their sellers to tender documents under Contract C, it should be made impossible for these sellers to tender any documents which they as buyers could be required to accept. The action of the respondents then taken was calculated to subserve both these desirable ends.

First, in order that the failure by the respondents to tender documents under Contract A might automatically involve a similar failure on the part of the sellers under Contract C, it was necessary that the three contracts A, B and C should by agreement with the appellants and Williams be brought upon a string. This agreement the respondents asked for and obtained. Next, in order that there should be no breach by themselves of Contract A on Feb. 10, it was necessary that an intimation of the appropriation of some cargo to its service should before that date be made. This was made possible by the purchase from Messrs. Rank, on Jan. 29, of the *Indianic* cargo and the immediate intimation of its appropriation to the contract.

But, thirdly, it being necessary that the respondents' A principals should not finally be chargeable with the purchase price of that cargo--for it was bought at the still high price of 60s. a quarter and their selling price was 52s. 3d. only--and it being equally necessary in the interests of the respondents' C principals that the documents of the cargo so appropriated should not be available for tender under contract C, the *Indianic* cargo having served its purpose of appropriation was at once resold by the respondents to Messrs. Rank at 59s. 11 1/2 d. a quarter, with the result that, the respondents' A principals having obtained the benefit of appropriation at a cost of 1/2 d. a quarter,

the *Indianic* cargo disappears into space.

But not entirely so. Under Contract A provisional invoices had to be sent to the appellants within seven days after arrival of shipping documents in Europe. Accordingly, presumably in order that there might not by default in this regard be any accelerated breach of Contract A, the respondents on Feb. 26, 1926, sent to the appellants' brokers a provisional invoice of the cargo per *Indianic*, although long before that date--on Jan. 29 to be precise --the respondents had ceased to have any interest whatever in that cargo.

Thus were the desired ends achieved. And fortune favoured the respondents' enterprise. The market did fall. The respondents' only apparent breach of Contract A was in their failure to tender documents. If they are right in their contention as to the proper measure of the damages they must pay--and that contention has been upheld by the Court of Appeal--these damages have been reduced to a minimum. Further, a good tender of documents under Contract C was never made. The respondents' own default, as was anticipated, made such a tender impossible.

The result therefore speaks for itself so far as their C principals are concerned. No other conclusion than that it was the intended result is, I think, on the correspondence possible. That the purchase from Messrs. Rank of the *Indianic* cargo, its appropriation to Contract A, its immediate re-sale to Messrs. Rank, the service of the entirely unreal provisional invoice, were all intended to subserve the purposes indicated, I cannot, in the absence of any other explanation, doubt. Any doubt I might otherwise have felt is surely resolved by the respondents' reply on Mar. 24, 1926, to a letter from the appellants' solicitors asking why the *Indianic* documents had not been tendered. "The documents," they say, "were not tendered because they were never available under your clients' contract."

My Lords, I am myself by no means satisfied that there was in this case any proper appropriation intimated within the true intent and meaning of the contract. I am quite satisfied that there was none within what I may call the honour of the contract.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1928) 30 Ll. L. Rep. 159
1928 WL 23441 (HL), (1928) 30 Ll. L. Rep. 159
**(Cite as: (1928) 30 Ll. L. Rep. 159)**

I have the gravest doubt also whether the so-called provisional in voice was, in view of the ownership of the *Indianic* cargo at its date, a provisional invoice within the meaning of Contract A at all. Moreover, in view of the later action of the respondents and of their contention in these proceedings as to the proper measure of the damages they must pay, I am quite at a loss to understand how the respondents in pressing Williams to come upon the string could telegraph to him on Jan. 29 as they did: "Prospect missing profit if you do not confirm definitely."

But I will assume in favour of the respondents that they were entirely within their rights in all that they did in January and February and that the only question is whether as a result of their action then they have escaped all liability in respect of the appellants' loss of profit on their sub-contract and have reduced the damages payable by them under Contract A to the sum of 2s. a quarter. In my opinion they have not. Contract A imposed upon the respondents the obligation to make the wheat cargo specific by appropriation on or before Feb. 10, but it left them free to compound with their buyers for breach in that respect by paying instead the difference between the contract price of the wheat and its then market price. On Jan. 29 the respondents, confronted with that alternative and in full knowledge of the appellants' sub-contract, whose fortunes had at their own instance and request been definitely linked with those of Contract A. *168 elected for their own interested reasons to notify and did notify for Contract A an appropriated cargo.

With reference to such a situation I have myself no difficulty in holding that it must be taken to have been within contemplation at the contract date "assuming the parties to have applied their minds to the contingency" as Fry, L.J., puts it in Hammond v. Bussey, that in the event of default by the sellers subsequently to tender documents their liability to their buyers in damages would be in exact correspondence with what it would have been if the contract had been specific all through and if to the knowledge of the sellers the sub-contract had at the date of that contract then existed or been in contemplation. That in such a case

the loss of profit on the sub-contract brought about by the sellers' breach of the main contract is recoverable by the buyer in his damages cannot be doubted. Equally, to my mind, must it be taken to have been within the contemplation of the parties that such loss was recoverable in the circumstances of this case.

My Lords, as I read Scrutton, L.J.'s, judgment, he would have reached the same conclusion but for his view that the respondents' special default here involved the breach of a contract made at the time of appropriation and was not a breach of the original contract with which alone this arbitration is concerned. The special breach referred to may have been all that, but it was, I think, much more, as I have endeavoured to show. It was a default by the respondents in the carrying out of the original contract in such circumstance as that for its full consequences it was within the contemplation of the parties to that contract that the party in default should be liable.

Accordingly, with my noble friend Lord Phillimore, I am of opinion that this case may be decided on its special facts, and I am the more ready so to decide it because it is in my judgment wholesome that it should be made to appear that the action of the respondents in this matter has failed of its purpose. But, my Lords, I am in entire agreement also with the rest of your Lordships who have reached the same conclusion on the more general view of the case. I have nothing to add to the observations already made on that aspect of it.

On both grounds my opinion is that the order of the Court of Appeal should be discharged and that of Rowlatt, J., be restored.

The appeal was allowed, with costs.

(c) Lloyds of London Press Lim- ited

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Declaration of Owen F. Duffy in Opposition

# EXHIBIT 14

Westlaw UK

[1977] 2 Lloyd's Rep. 570
1977 WL 59582 (QBD (Comm Ct)), [1977] 2 Lloyd's Rep. 570
(Cite as: [1977] 2 Lloyd's Rep. 570)

**\*570** Phoebus D. Kyprianou Coy. v. WM. H. Pim Jnr. & Co. Ltd.

Queen's Bench Division (Commercial Court)

QBD (Comm Ct)
June 30, July 21, 1977

Before Mr. Justice Kerr

Sale of goods (f.o.b.) -- Default in performance -- Quantum of damages -- Falling market -- Whether damages should be the difference between the contract price and the market price at the shipment date or earlier -- Whether buyers' 10 per cent. option on contract quantities should be deducted in assessment of damages -- GAFTA 79A, cl. 17.

By three contracts made in January, 1975, on GAFTA form no. 79A, the sellers agreed to sell to the buyers 1250 tons, 1500 tons and 5000 tons respectively of English Horse and/or Tic Beans (10 per cent. more or less at buyers' option), f.o.b. buyers' tonnage at Lowestoft at prices of <<PoundsSterling>>68 per ton for the first two contracts and <<PoundsSterling>>68.50 for the third. The shipment periods were between Feb. 1 and Apr. 15, 1975.

On Feb. 15, 1975, the buyers took delivery of 919 tons under the second contract but apart from this they nominated no tonnage and took no delivery under any of the contracts. They were therefore admittedly in default in respect of a total of 7750 tons.

Between the contract dates and the last shipment dates of each contract, the market price of beans of this description fell so that at the end of each shipment period the prices were <<PoundsSterling>>65 per ton for the second contract, <<PoundsSterling>>63 per ton for the first contract and << PoundsSterling>>62.50 per ton for the third.

The sellers sent the buyers a number of telexes

warning them of their default but received no reply. On Apr. 15 they sent the following telex:

Eng Horse Tic Beans . . . despite our efforts to obtain nominations to lift beans we have not heard one word from you and since it is not possible for you to perform your part of the outstanding contracts with us this is a formal notice that you are in default . . . Under the terms of our contracts we hereby hold you in default and under the terms of our contracts intend to sell out against you and hold you responsible for any losses occasioned thereby.

Clause 17(a) of the contract provided:

*Default:*--In default of fulfillment of contract by either party the other, at his discretion, shall have the right, either, after giving notice by letter or telegram to sell or purchase, as the case may be, against the Defaulter and the Defaulter shall make good the loss, if any, on such purchase or**\*571** sale on demand, or to claim at arbitration the losses occasioned by such default.

The third contract had a clause which stated:

Shipment to be spread evenly over the period of shipment with a minimum 5 days' spread between each shipment.

The question of damages was referred to arbitration, and the Board of Appeal of GAFTA awarded damages to the sellers on the basis of the difference between the respective contract and market prices but stated its award in the form of a special case, the question of law for the decision of the Court being:

Whether the Buyers are liable to the Sellers in damages for the buyers' admitted default in the performance of contracts 00302, 00306 and 00309 and, if so, (i) on what basis damages are to be assessed; and (ii) whether storage charges are recoverable from the Buyers and, if so in what sum.

The buyers appealed on the ground that (i) the sellers had exercised an option in the nature of an election under cl. 17(a) and it was not open to them to claim damages on the ordinary basis of the difference between the contract and market prices; (ii) the dates used by the Board were

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1977] 2 Lloyd's Rep. 570
1977 WL 59582 (QBD (Comm Ct)), [1977] 2 Lloyd's Rep. 570
(Cite as: [1977] 2 Lloyd's Rep. 570)

wrong because the buyers would have been in default earlier than the last shipment date when insufficient time remained to nominate and load the necessary ships; (iii) as the contract quantities were expressed to be 10 per cent. more or less at buyers' option, damages should be assessed on 90 per cent. of the quantities.

Held, by Q.B. (Com. Ct.) (KERR, J.), that

(1) the sellers were entitled to damages in the ordinary way i.e. based on the difference between the contract prices and the appropriate market price because cl. 17(a) contained no option in the sense of an irrevocable election but merely a choice of remedies (see p. 579, col. 2); furthermore, the sellers' telex of Apr. 15 was not an unequivocal exercise of any option (see p. 579, col. 2);

(2) while the buyers were in breach before the end of each shipment period they were not entitled to have damages assessed by reference to such earlier dates because (i) the breaches were not breaches of condition and even if they were the sellers were entitled to treat the contract as subsisting (see p. 580, col. 1); and (ii) the sellers were entitled to wait until the end of each shipment period when the buyers were certainly and irretrievably in default and have damages assessed by reference to that date (see p. 580, cols. 1 and 2);

(3) the question of the buyers' option had not been raised before the Board of Appeal so it could only be decided here if no additional facts which might have been found could affect it (see p. 581, col. 1);

--The Lily Prima, [1976] 2 Lloyd's Rep. 487, applied.

(4) in view of its likely effect on other arbitrations, the question of the buyers' option would be remitted to the Board of Appeal providing three conditions were satisfied: (i) that the buyers pay 90 per cent. of the damages immediately, (ii) that the buyers pay the costs of the hearing and the award, (iii) that it be open to the sellers to re-argue the question of storage before the Board (see p. 581, col. 2; p. 582, col. 1);

(5) the primary award of the Board would be affirmed unless it was remitted on the conditions indicated (see p. 582 col. 1).

The following cases were referred to in the judgment:

Lavarack v. Woods of Colchester Ltd., [1967] 1 Q.B. 278;

Lily Prima, The, [1976] 2 Lloyd's Rep. 487;

Thornett and Fehr and Yuills Ltd., Re, [1921] 1 K.B. 219.

This was a special case stated by the Board of Appeal of GAFTA in a dispute between the sellers, Wm. H. Pim Jnr. & Co. Ltd., and the buyers, Phoebus D. Kyprianou Coy., concerning the quantum of damages payable by the buyers to the sellers for failure to take delivery of the contract goods.

The arbitration award dated Jan. 27, 1977, provided inter alia:

'1. This is an Appeal by Phoebus D. Kyprianou Coy of Beirut, as. Appellant Buyers, (hereinafter referred to as 'the Buyers') against three Awards, each dated 3rd November 1975, made by Mr. G. C. Mace as Umpire, in favour of Wm. H. Pim Jnr. & Co. Ltd. of London as Respondent Sellers (hereinafter referred to as 'the Sellers') in Arbitrations held under the Arbitration Rules of The Grain and Feed Trade Association Limited (hereinafter referred to as 'GAFTA') . . .

2. Those Awards related to three contracts, numbered 00306, 00302 and 00309 respectively, for the sale and purchase of English Horse and/or Tic Beans. For the sake of convenience, we shall hereafter deal with the contracts, so far as possible, in their numerical order (which does not correspond with the numerical order of the Awards of Arbitration).

3. Award No. A 2120 was made in respect of contract no. 00302 . . . and by that Award the said Umpire awarded that the Buyers should pay to the Sellers within 14 days from the date of that Award, in respect of 1250 long tons English Horse and/or Tic Beans, the sum of <<PoundsSterling>>6875.00 as damages for non-fulfilment of contract, being the difference between the contract price of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1977] 2 Lloyd's Rep. 570
1977 WL 59582 (QBD (Comm Ct)), [1977] 2 Lloyd's Rep. 570
(Cite as: [1977] 2 Lloyd's Rep. 570)

Page 3

<<PoundsSterling>>68.00 per 2240 lbs and a resale price of <<PoundsSterling>>62.50 per 2240 lbs F.O.B. on 1250 tons, together with interest at the rate of 10% per annum from 16th April, 1975 to the date of that Award.

*572 4. By Award No. A 2119 in respect of contract no. 00306 . . . the said Umpire awarded that the Buyers should pay to the Sellers within 14 days from the date of that Award in respect of 581 long tons English Horse and/or Tic Beans the sum of <<PoundsSterling>>3195.50 as damages for non-fulfilment of contract, being the difference between the contract price << PoundsSterling>>68.00 per 2240 lbs, and a re-sale price of <<PoundsSterling>> 62.50 per 2240 lbs F.O.B., together with interest at the rate of 10% per annum from 16th April, 1975 to the date of that Award.

5. By Award No. A 2121 in respect of contract no. 00309 . . . the said Umpire awarded that the Buyers should pay to the Sellers within 14 days from the date of that Award in respect of 3869 long tons English Horse and/or Tic Beans the sum of <<PoundsSterling>>23,214.00 as damages for non-fulfilment of contract, being the difference between the contract price of <<PoundsSterling>>68.50 per 2240 lbs and re-sale price of <<PoundsSterling>>62.50 per 2240 lbs F.O.B., together with interest at the rate of 10% per annum from 16th April, 1975 to the date of that Award, and further awarded that the Buyers should pay to the Sellers within fourteen days from the date of that Award the sum of << PoundsSterling>>2659.00 in respect of extra storage charges incurred, together with interest at the rate of 10% per annum from 30th May 1975, to the date of that Award.

6. The Buyers were dissatisfied with the said Awards, and in accordance with the said Arbitration Rules appealed to a Board of Appeal to be elected in accordance with the Rules and Regulations of GAFTA and Messrs. W. H. Defoe (Chairman), W. J. Barnard, D. M. Mc L. Clark, and E. H. Halmshaw were duly elected as the Board of Appeal to hear and determine the said Appeal. The Hearing of the Appeal took place on

8th November 1976.

7. NOW WE, the said Board of Appeal, constituted as aforesaid having heard and considered the evidence and documents tendered by the parties and also the arguments of Counsel on their behalf, and having been requested by the Buyers to state our Award in the form of a Special Case DO HEREBY STATE THIS OUR AWARD in the form of a Special Case under Section 21 (1) (b) of the Arbitration Act, 1950. We find the following facts:

8. By a contract no. 00302 dated 8th January 1975 on Form No. 79A of GAFTA -- contract for United Kingdom and Eire grain F.O.B. -- (hereinafter referred to as 'contract 00302') the Sellers sold and the Buyers bought 1250 tons of 2240 lbs each 10% more or less at Buyer's option of English Horse and/or Tic Beans, mixed or up to 100% of either, crop 1974, at a price of <<PoundsSterling>> 68.00 per 2240 lbs delivered free on board Buyers' tonnage at Lowestoft, loading during 20th February/31st March 1975 both dates inclusive at Buyers' call.

9. By a further contract no. 00306 dated 17th January 1975, also on Form No. 79A of GAFTA (hereinafter referred to as 'contract 00306') the Sellers sold and the Buyers bought 1500 tons of 2240 lbs each 10% more or less at Buyers' option of English Horse and/or Tic Beans, mixed or up to 100% of either, crop 1974, at a price of <<PoundsSterling>>68.00 per 2240 lbs delivered free on board Buyers' tonnage, at Lowestoft, loading during 13th February/15th March 1975 both dates inclusive at Buyers' call.

10. By a further contract no. 00309 dated 30th January 1975 also on Form No. 79A of GAFTA (hereinafter referred to as 'contract 00309') the Sellers sold and the Buyers bought 5000 tons of 2240 lbs each 10% more or less at Buyers' option of English Horse and/or Tic Beans, mixed or up to 100% of either, crop 1974 at a price of <<PoundsSterling>>68.50 per 2240 lbs delivered free on board Buyers' tonnage at Lowestoft loading during 1st February/15th April 1975, both dates inclusive at Buyers' call the Contract further providing 'shipment to be spread evenly over the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

period of shipment with a minimum 5 days spread between each shipment'.

11. Save as aforesaid each contract was in materially identical terms, and contained (inter alia) the following further provisions:--

Lines 21/24 --
'At time of loading guaranteed Basis 18% Moisture, Maximum 19% Moisture. Allowance 1% for 1% in excess of 18% up to maximum 19%. Fractions in proportion. Maximum 3% Admixture. Maximum 3% damaged Beans which includes weeviled and holed, but excludes broken Beans and half Beans'.
Lines 50/53 --
'8 PAYMENT -- Buyers to open within ten days of contract confirmed irrevocable letter of credit with Moscow Narodny Bank providing for payment by net cash in London on presentation of, and in exchange for, shipping documents. When payment is due on a non-business day, Buyers shall have the option of taking up the documents on the previous business day -- payment to be made not later than 12 noon . . .'
Lines 83/86 --
'17 DEFAULT -- (a) In default of fulfilment of contract by either party the other, at his discretion, shall have the right, either, after giving notice by letter or telegram to sell or purchase, as the case may be, against the Defaulter and the Defaulter shall make good the loss, if any, on such purchase or sale on demand, or to*573 claim at arbitration the losses occasioned by such default . . .'

12. It was agreed by Counsel that clause 12 of each contract (lines 61/65) -- EXTENSION OF DELIVERY PERIOD -- had been deleted.

13. At all material times the Sellers could, if required, have supplied and shipped the goods under the contracts and each of them by means of goods in silo at Lowestoft and/or supply contracts with UK farmers or suppliers.

14. Under contract 00302 the Buyers failed to lift any goods, either within the delivery period specified or at all.

15. Likewise, under contract 00306 with the exception of 919 tons shipped on the 'Hippo Sailer' on or about 15th February 1975, the Buyers failed to lift any goods, either within the specified shipment period or at all.

16. Further, under contract 00309, Buyers failed to lift any goods, either within the specified shipment period or at all.

17. On 12th March 1975 the Sellers telexed the Buyers:
'Horse Tic Beans most important you inform us when you intend ship beans under various contracts we have with you also pse extend validity of credit until at least 20th April and also amend credit to provide shipment up to 15th April stop View you agreed spread shipment beans evenly over the contract period we consider you should have shipped a good proportion of the contracts by now stop For your guidance our competitive (sic) are nominating regular coasters and it [is] most difficult for us to have a warehouse full of unshipped beans stop Pse relay above to Mr. Kyprianou and request him advise immediately regarding the above matter.'
. . . No reply was sent to that telex, but on 21st March 1975 Moscow Narodny Bank Ltd. sent to the Sellers advice of amendment No. 9 to Credit No. E 84071/23318, which amendment accorded with the request made in the telex of 12th March 1975 . . .

18. On 3rd April 1975 the Sellers sent a further telex to the Buyers for the personal attention of Mr. Kyprianou:
'English Horse/Tic Beans
We have telephoned your office several times and have been unable to contact you as we understand you have been in Cairo -- the reason we have been trying to contact you is that we should like to have some information as to when you intend ship the beans which you have purchased from us stop Quite frankly we are rather perturbed (sic) at the lack of information from you and view that we have supported you with our exclusive offers feel that if there was any reason why you should not fulfil your part of the contract you should take us in to your confidence and explain

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1977] 2 Lloyd's Rep. 570
1977 WL 59582 (QBD (Comm Ct)), [1977] 2 Lloyd's Rep. 570
(Cite as: [1977] 2 Lloyd's Rep. 570)

Page 5

the reason for your inability to lift the beans -- we can then take the necessary steps to protect our mutual interests -- we have incurred expensive storage and interest charges and look to you for an early reply stop We feel strongly that you have not entered into the spirit of our contracts as negotiated in London -- if you have any problems we should like to know so that we can be helpful if possible . . .'

19. On 15th April 1975 the Sellers again telexed the Buyers:

'Eng Horse Tic Beans reference contracts which we have open with your company despite our efforts to obtain nominations to lift beans we have not heard one word from you and since it is not possible for you to perform your part of the outstanding contracts with us this is a formal notice that you are in default of the following contracts

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAY-ABLE

Under the terms of our contracts we hereby hold you in default and under the terms of our contracts intend sell out against you and hold you responsible for any losses occasioned thereby' . . .

20. The terms of the telex dated 15th April, and indeed the earlier telex dated 3rd April are somewhat misleading, in that by various contracts, some of which predated one or both of these telexes, the Sellers sold to other buyers goods which, whilst not conforming exactly to the description of the beans the subject of contracts 00302, 00306 and 00309, were nevertheless the beans earmarked by the Sellers to fulfil these three contracts. The description of the beans in contracts 00302, 00306 and 00309 was described to us in evidence as 'Egyptian quality' and that description is one required by certain buyers, and is slightly more stringent in its terms than the description under which these beans are customarily sold. We accept that, at the dates when the Sellers were reselling the goods, there was no market for beans under that description, but the best prices that could be obtained for the beans were under the description under which they were resold. We further accept that, save in exceptional circumstances, beans of the description under*574

which these beans were resold will fulfil the description of 'Egyptian quality'.

21. In each alleged resale the goods are described as 'English Horse and/or Tic Beans, Crop 1974, mixed or up to 100% of either . . . At time of loading guaranteed 18% Moisture 2% Admixture . . .' and, with one exception, the contracts were on GAFTA Form No. 79A for sale F.O.B. Lowestoft. The contracts were as follows:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAY-ABLE

Total:5300 tons

The exceptional contract was that dated 10th April 1975 to Grands Moulins D'Aizenay, which was made on CIF terms on GAFTA Form No. 79, the destination being nominated as 'free out le Sables D'Olonne'. It is our opinion that the resale price of this exceptional contract is not inconsistent with the prices on the other contracts.

22. On 23rd April the Sellers wrote to the Buyers alleging default on 1250 tons in respect of contract 00302, 581 tons out of 1500 tons on contract 00306 and 5000 tons on contract 00309, and enclosing invoices based upon a '. . . market price on the default dates . . .' of <<PoundsSterling>>62.50 . . . nowhere do the Sellers specify the 'default dates' with precision, nor do they claim storage charges. Prior to the despatch of this telex, the Sellers had telexed the brokers, Whitson, Nielson & Francis Ltd. requesting '. . . a fair market price on 31/3/75 and 15/4/75 . . .'; the telex is dated 21st April 1975 and the reply dated 22nd April 1975 states 'Think price of <<PoundsSterling>> 62.50 per long ton FOB could be substantiated . . .'

23. Thereafter, not having received a reply to the letter of 23rd April 1975, the Sellers sent a telex reminder to the Buyers on 1st May 1975 . . . and when it transpired from a telephone conversation that mail had not been reaching Beirut, they telexed the terms of their letter of 23rd April and the enclosed invoices on 8th May 1975 . . .

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 6

24. This telex elicited a blank denial of the claim by the Buyers, in a telex dated 9th May 1975 to the Sellers which read 'Surprised your telex regret your claim unfounded' . . .

25. In subsequent telex exchanges between 12th May 1975 and 15th May 1975 . . . the Sellers attempted to clarify the allegation that the claim was ' unfounded' but their efforts met with no success and so by letter dated 16th May . . . and telex dated 19th May 1975 . . . they referred the dispute to arbitration and nominated Mr. S. J. Smith as their arbitrator. The Buyers nominated Mr. M. P. Meadows.

26. On 29th May 197[5] Lowestoft Storage and Shipping Co. Ltd. rendered to the Sellers their Invoice No. 3786 for 'Rent charges on Beans', for << PoundsSterling>>2141.17, with a 15% Interim Surcharge of <<PoundsSterling>> 321.18, and V.A.T. at a rate of 8% on the total of both items, a further charge of <<PoundsSterling>>196.99 . . . The charges for weeks 1/4/75 to 7/4/75 and 8/4/75 to 15/4/75 predate the last shipment date under contract 00309 and those for weeks 22/4/75 to 28/4/75 and following are attributable solely to movements of beans into the silo after the last shipment date; accordingly in our opinion only the charge for the week 15/4/75 to 21/4/75, <<PoundsSterling>>499.60, is reasonably attributable to any default of the Buyers, together with a 15% Interim Surcharge thereon which we calculate at <<PoundsSterling>>74.94.

27. No evidence was led before us as to whether or not the Sellers were registered for V.A.T. and therefore able to offset the charge to V.A.T. or claim reimbursement. Our experience of the trade leads us to the conclusion that the Sellers were registered for V.A.T.

28. There was further produced to us a telex from Lowestoft Storage and Shipping Co. Ltd. to the brokers R. Simon & Co. Ltd. dated 9th*575 September 1975 . . . the material part of which reads:--
'Referring to your enquiry we cannot load vessels larger than 1900 tons and maximum draught in the port is 15 ft. 6 in. We can load such a vessel in 3 days and are unable to load more than one vessel at a time . . .'
We accept as accurate the information quoted.

29. Although Sellers originally based their claim in respect of contract 00309 on the full quantity of 5000 tons, the learned Umpire, in award A2121, only awarded damages on 3869 tons out of 5000 tons. We were unable to reconcile the discrepancy of 1131 tons under contract 00309. Nevertheless, comparing the headings of Awards A2119 and A2121 the inference can be drawn that in making Award A2121 the Umpire appreciated that the claim extended to the full quantity of 5000 tons although he limited his Award to 3869 tons.

## 30. Contentions of the Buyers

The Buyers contended before us as follows:

I. (a) (i)
The dates of default in respect of contract 00302 and contract 00306 are in each case six days before the last day of the respective shipment period. Each parcel could have been loaded in one vessel, taking three days to load, and there is a minimum obligation under each contract to give at least three clear days' notice before probable readiness to load. On this basis the default dates are respectively 25th March 1975 for contract 00302 and 9th March 1975 for contract
I. (a) (ii)
Applying the same principles in respect of contract 00309, and postulating three shipments (the minimum to comply with the tonnage restrictions of the port) each of one third of the contract quantity, and further spreading those shipments 'evenly over period of shipment', three shipments each of just over 1600 tons would have been completed at intervals of about three weeks, say by 20th February, 11th March and 30th March, and so the relevant default dates are 14th February, 5th March and 24th March.
I. (b) (i)
Alternatively, if the last date for shipment is the date of default, then in respect of contracts 00302 and 00306 the relevant default dates are 31st March 1975 and 15th March 1975.
· I. (b) (ii)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1977] 2 Lloyd's Rep. 570
1977 WL 59582 (QBD (Comm Ct)), [1977] 2 Lloyd's Rep. 570
**(Cite as: [1977] 2 Lloyd's Rep. 570)**

As to contract 00309, spreading the shipments as before, but looking to the last date for shipment, the default dates are 20th February, 11th March and 30th March.

II. (a)

The dates for assessment of damages are the dates when the goods should have been accepted (Section 50 (3) Sale of Goods Act 1893 ) i.e. the dates when shipping documents would have been presented, and paid for under the letters of credit. In respect of contracts 00302 and 00306, allowing for non-business days, the dates are respectively 1st April 1975 and 18th March 1975.

II (b)

As to contract no. 00309, again allowing for non-business days, the dates are 24th February 1975, 13th March 1975 and 1st April 1975.

(see C. Sharpe and Co. Limited v. Nosawa(1917) K.B. 814).

III (a)

Clause 17 (a) of GAFTA Form 79A confers upon Sellers, as the wronged party, a true option, either to re-sell against the Buyers, or to claim damages upon the basis of the market. The latter alternative is dealt with at paragraphs 30 I and II above. But if the Sellers exercise their option to re-sell, then they lose the right to claim on the basis of the market, and so become entitled to the difference between the re-sale price and the contract price. The exercise of the option must be preceded by notice to the Buyers, and notice of intention to re-sell must also be given promptly by the Sellers following the default. If the Sellers notify the Buyers that they are exercising the option to re-sell, the fact of the notification results in them being limited to the right to damages given by the first part of clause 17(a).

(b) The Sellers exercised their option to re-sell against the Buyers in respect of all three contracts on 15th April.

(c) There are two separate reasons why the Buyers are not bound to pay the difference between the contract price and the re-sale price. The first is that it was far too late to re-sell against the Buyers in respect of contract nos. 00302 and 00306, and the second that Sellers had already re-sold 3200 tons of the contract goods before they gave notice to the Buyers of their intention to re-sell against them. As to the balance of 2100 tons sold after notice was given to the Buyers, a claim in respect of that quantity will founder upon the other difficulties (i) of being too late after the default dates, and (ii) that the goods re-sold were not of the description of the contract goods.

*576 IV Sellers are precluded from claiming damages on the balance of 11 31 tons of contract 00309, this not being awarded on by the Umpire and therefore not the subject matter of this appeal.

V As to storage charges, the Sellers are not entitled to claim storage charges, because they exercised the first option under clause 17 (a).

### 31. Contentions of the Sellers

The Sellers contended:

I (a) (i)

As to contracts 00302 and 00306, shipment after 31st March and 15th March respectively would have not have been contractual, and therefore the breach must have become final under those two contracts on the respective dates for final performance.

I (a) (ii)

The approach at paragraph 1741 [of] Benjamin's Sale of Goods (1974 edition) is right -- namely that the default date of the last date of shipment should be adopted for the sake of certainty. From the point of view of calculating damages, under an F.O.B. contract the right approach is to adopt either the last date of shipment, or perhaps the date when documents would be tendered -- the next business day. On this basis damages on contracts 00302 and 00306 should be decided on the basis of 31st March and 15th March respectively, or possibly 1st April and 16th March respectively.

I (b)

As to contract 00309, it is not possible to pin down with any exactitude dates for shipment by applying the provision 'shipment to be spread evenly over the shipping period, minimum five days spread between each shipment'. The most

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1977] 2 Lloyd's Rep. 570
1977 WL 59582 (QBD (Comm Ct)), [1977] 2 Lloyd's Rep. 570
(Cite as: [1977] 2 Lloyd's Rep. 570)

Page 8

that can be said with any precision is that there should be more than one shipment, and that there must be a gap of five days between shipments. The question to ask is 'when were the Buyers in inevitable breach of the shipment terms,' and Sellers would contend for 26th March in relation to half the contract quantity, and 16th April in relation to the balance.

II As to clause 17 (a) of GAFTA Form No. 79A, this is not a true option clause. To the extent that a proper re-sale is established, then damages should be awarded on that basis. If not, Sellers should not be shut out of an alternative remedy.

III As to quantum, the award of damages only upon the basis of 3869 tons of the 5000 tons covered by contract 00309 was based on a false premise. There is no reason for restricting the calculation of damages to 3869 tons; further, clause 17 of the GAFTA Arbitration Rules gives the Board of Appeal discretion to admit the claim.

IV As to storage charges, a proper construction of clause 17 (a) would not preclude the claim of storage charges.

32. As is customary, we invited the parties to lodge with us, within 21 days from the date of the hearing, agreed questions of law and their requested findings of fact. The Sellers submitted questions of law and requested findings of fact within the period specified. The Buyers had not agreed those questions of law, nor did they submit requested findings of fact. Accordingly we gave them notice to submit requested findings of fact and, if possible, agree questions of law, by 10th December 1976. They did not comply with that further request. The Sellers subsequently submitted amended (but not agreed) questions of law.

### 33. The Questions of Law

The questions of law for the decision of the Court are:

(a) Whether the Sellers' claim for damages is barred or otherwise limited by reference to the telex sent by the Respondents to the Appellants on 15th April 1975; and

(b) Whether the Buyers are liable to the Sellers in damages for the Buyers' admitted default in the performance of contracts 00302, 00306 and 00309 and, if so,

(i) on what basis damages are to be assessed;

(ii) whether storage charges are recoverable from the Buyers and, if so, in what sum.

34. Subject to the decision of the Court upon the Questions of Law set out at paragraph 33 hereof WE FIND as follows:

(a) That the Sellers' purported exercise by the telex of 15th April 1975 of the option conferred by clause 17 (a) of GAFTA Form No. 79A was bad in respect of all three contracts. Nevertheless, Sellers are not thereby precluded from claiming damages based upon the market value of the contract goods as at the respective dates of default.

(b) That the Buyers are liable to the Sellers in damages for the Buyers' admitted default in the performance of all three contracts and

(i) that in the interest of certainty and consistency the default date under each of the three contracts was the last date for*577 shipment; that is in respect of contract 00302, 31st March 1975 in respect of contract no. 00306, 15th March 1975 and in respect of contract 00309, 15th April 1975; that the damages payable by the Buyers to the Sellers should be based on the market value of the contract goods on those respective dates; that the market value of the contract goods on 15th March 1975 was <<PoundsSterling>>65.00 per ton of 2240 lbs, on 31st March 1975 <<PoundsSterling>>63.00 and on 15th April 1975 <<PoundsSterling>>62.50; that in respect of contract 00309 the Sellers are entitled to claim damages on the mean contract quantity of 5000 tons; and

(ii) Sellers are entitled to recover such storage charges of Lowestoft Storage & Shipping Co. Ltd. as are reasonably attributable to the default of the Buyers, together with 15% Interim Surcharge, but exclusive of V.A.T.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1977] 2 Lloyd's Rep. 570
1977 WL 59582 (QBD (Comm Ct)), [1977] 2 Lloyd's Rep. 570
(Cite as: [1977] 2 Lloyd's Rep. 570)

Page 9

35. Accordingly WE AWARD AND DIRECT as follows:

(a) That the Award of Mr. G. C. Mace No. A2120 dated 3rd November 1975 in respect of contract 00302 be and is hereby varied and in substitution therefor WE AWARD THAT the Buyers shall pay to the Sellers within fourteen days from the date of this Award the sum of <<PoundsSterling>>6250.00 as damages for non-fulfilment of contract, being the difference between the contract price of << PoundsSterling>>68.00 per 2240 lbs and a resale price of <<PoundsSterling>> 63.00 per 2240 lbs F.O.B. on 1250 tons, together with interest at the rate of 10% per annum from 1st April 1975 to the date of this Award.

(b) That the Award of Mr. G. C. Mace No. A2119 dated 3rd November 1975 in respect of contract 00306 be and is hereby varied and in substitution therefor WE AWARD THAT the Buyers shall pay to the Sellers, within fourteen days from the date of this Award the sum of <<PoundsSterling>>1743.00, as damages for non-fulfilment of contract, being the difference between the contract price of <<PoundsSterling>>68.00 per 2240 lbs and a re-sale price of << PoundsSterling>>65.00 per 2240 lbs F.O.B. on 581 tons, together with interest at the rate of 10% per annum from 16th March 1975 to the date of this Award.

(c) That the Award of Mr. G. C. Mace No. A2121 dated 3rd November 1975 be and is hereby varied and in substitution therefor WE AWARD THAT the Buyers shall pay to the Sellers within fourteen days from the date of this Award the sum of <<PoundsSterling>>30,000.00 as damages for non-fulfilment of contract, being the difference between the contract price of <<PoundsSterling>>68.50 per 2240 lbs and a re-sale price of <<PoundsSterling>>62.50 per 2240 lbs F.O.B. on 5000 tons, together with interest at the rate of 10% per annum from 15th April 1975 to the date of this Award, and we further award that Buyers shall pay to Sellers within fourteen days from the date of this Award the sum of << PoundsSterling>>574.54 in respect of extra stor-age charges incurred, together with interest at the rate of 10% per annum from 30th May 1975, to the date of this Award.

(d) That the Buyers shall pay the costs and expenses of this our Award and Special Case . . .

(e) That the Buyers shall pay the costs of the Sellers of and occasioned by this Appeal, and that such costs be taxed in the High Court in default of agreement.

(f) That if the Court shall decide that the Buyers are under any different liability then we respectfully request the Court to remit our Award to us so we may appropriately amend it in the light of the Court's observations, and make such further findings of fact as may be occasioned thereby.

36. If the Court shall in answer to the question of law in paragraph 33 (a) hereof hold that the Sellers claim for damages is barred, then our Award in paragraph 35 hereof shall be set aside, and in substitution therefor WE AWARD AND DIRECT as follows:

(a) That the Awards of Mr. G. C. Mace Nos. A2120, A2119 and A2121 dated 3rd November 1975 be and are hereby set aside.

(b) That the Sellers' claim fails, and that the Sellers shall pay the costs and expenses of this our Award and Special Case . . .

(c) That the Sellers shall pay to the Buyers their costs of and occasioned by this Appeal such costs to be taxed in the High Court in default of agreement.

(d) That the Sellers shall bear and pay the total fees and expenses of the original arbitration proceedings before the Umpire . . .

37. If the Court shall, in answer to the question of law at paragraph 33 (a) hereof hold that the Sellers claim for damages is limited but not barred, then we respectfully request the Court to remit our Award to us so that we may appropriately amend it in the light of the Court's observations, and make such further findings of fact as may be occasioned thereby.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1977] 2 Lloyd's Rep. 570
1977 WL 59582 (QBD (Comm Ct)), [1977] 2 Lloyd's Rep. 570
(Cite as: [1977] 2 Lloyd's Rep. 570)

Page 10

38. In the event of this Special Case not being set down for hearing within six weeks from the date hereof then our Award set out at paragraph 35 hereof no longer be contingent upon the decision of the Court on*578 the questions of law raised in paragraph 33 hereof and will be a final Award.

39. The costs of the setting down and of the argument of this Special Case we respectfully leave in the discretion of the Court.'

**Representation**

Mr. David Johnson (instructed by Messrs. Richards, Butler & Co.) for the appellant buyers; Mr. Anthony Hallgarten (instructed by Messrs. Wm. A. Crump & Son) for the respondent sellers.

The further facts are stated in the judgment of Mr. Justice Kerr.

Judgment was reserved.

Thursday, July 21, 1977

**JUDGMENT**

Mr. Justice KERR:

This is an award in the form of a special case stated by the Board of Appeal of GAFTA. It arises out of three contracts on GAFTA form no. 79A for the sale of English Horse and/or Tic Beans of a certain description by the respondents as sellers to the appellants as buyers 'free on board buyers' tonnage at Lowestoft'. The material details of the contracts are as follows:

1. *Date:* Jan. 8, 1975.
   *Quantity:* 1250 tons, 10 per cent. more or less at buyers' option.
   *Shipment period:* Feb. 20/Mar. 31, 1975, both dates inclusive at buyers' call.
   *Price:* <<PoundsSterling>>68 per ton.

2. *Date:* Jan. 17, 1975.
   *Quantity:* 1500 tons, 10 per cent. more or less at buyers' option.

*Shipment period:* Feb. 13/Mar. 15, 1975, both dates inclusive at buyers' call.

*Price:* <<PoundsSterling>>68 per ton.

3. *Date:* Jan. 30, 1975.
   *Quantity:* 5000 tons, 10 per cent. more or less at buyers' option.

*Shipment period:* Feb. 1/Apr. 15, 1975, both dates inclusive at buyers' call. The contract also provided:

Shipment to be spread evenly over the period of shipment with a minimum 5 days' spread between each shipment.
*Price:* <<PoundsSterling>>68.50 per ton.

On Feb. 15, 1975, the buyers took delivery of 919 tons under the second contract. Apart from this they nominated no tonnage and took no delivery under any of the contracts. They are therefore admittedly in default in respect of 1250 tons under the first contract, 581 tons under the second, and 5000 tons under the third, making a total of 6831 tons. The issues or law raised relate purely to the quantum of damages.

There is a preliminary issue which I will mention shortly to get it out of the way. The sellers resold 5300 tons of the total quantity of 6831 tons to which the dispute relates. It was argued that from a finding in the special case it should be inferred that the beans which the sellers had earmarked for delivery under these contracts did not conform to the contract description. I say nothing about the possible relevance of such a finding in law, because on my construction of the award there is no such finding. There is merely a finding that the beans which the sellers had in store and subsequently resold could properly be sold under the description used in these contracts as well as under the description used in the contracts of resale. Moreover, the award expressly finds:

At all material times the sellers could, if required, have supplied and shipped the goods under the contracts and each of them by means of goods in silo at Lowestoft and/or supply contracts with U.K. farmers or suppliers.

In my judgment this point therefore disappears from my scene.

It is clear that between the dates of the contracts in January, 1975, and the last shipment date, Apr. 15, 1975, the market price of beans of this de-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1977] 2 Lloyd's Rep. 570
1977 WL 59582 (QBD (Comm Ct)), [1977] 2 Lloyd's Rep. 570
(Cite as: [1977] 2 Lloyd's Rep. 570)

scription was falling. Thus, it is found that, as against the contract prices of <<PoundsSterling>>68 and <<PoundsSterling>>68.50 per ton, on Mar. 15, the last shipment date under the second contract, the market value was << PoundsSterling>>65 per ton, on Mar. 31, the last shipment date under the first contract, it was <<PoundsSterling>>63 per ton, and on Apr. 15, the last shipment date under the third contract, it was <<PoundsSterling>>62.50 per ton. The Board of Appeal has in each case awarded damages to the sellers on the basis of the difference between the contract prices and these respective market prices. In total they have awarded <<PoundsSterling>>37,993 together with << PoundsSterling>>574.54 for extra storage charges under the third contract and interest at the rate of 10 per cent. The buyers challenge these awards. Their contentions mainly seek to establish that the damages should in each case have been assessed on earlier dates, when the market was still higher.

Before turning to these contentions I must first deal with a different contention raised by the buyers. It arises out of cl. 17 (a) of form no. 79A which was in each case in the following terms:

*Default:*-- In default of fulfilment of contract by either party the other, at his discretion, shall have the right, either, after giving notice by letter or telegram or*579 purchase, as the case may be, against the Defaulter and the Defaulter shall make good the loss, if any, on such purchase or sale on demand, or to claim at arbitration the losses occasioned by such default.

What happened was that the sellers sent a number of telexes to the buyers which all remained unanswered. However, the buyers now contend that these constituted the exercise of an option in the nature of an election under this provision, and that it is now no longer open to the sellers to claim damages on the ordinary basis of the difference between the contract and market prices. In this connection I must set out the material parts of the telexes and summarise the facts found.

On Mar. 12 the sellers telexed the buyers as follows:

Horse Tic Beans most important you inform us when you intend ship beans under various contracts we have with you also pse extend validity of credit until at least 20th April and also amend credit to provide shipment up to 15th April stop View you agreed spread shipment beans evenly over the contract period we consider you should have shipped a good proportion of the contracts by now stop For your guidance our competitice (sic) are nominating regular coasters and it most difficult for us to have a warehouse full of unshipped beans stop Pse relay above to Mr. Kyprianou and request him advise immediately regarding the above matter.

There was no reply, but the letter of credit was amended as requested. On Apr. 3 the sellers sent a further telex, again requesting information when the buyers would ship, this also remained unanswered. On Apr. 15 they telexed again as follows:

Eng Horse Tic Beans reference contracts which we have open with your company despite our efforts to obtain nominations to lift beans we have not heard one word from you and since it is not possible for you to perform your part of the outstanding contracts with us this is a formal notice that you are in default of the following contracts:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Under the terms of our contracts we hereby hold you in default and under the terms of our contracts intend sell out against you and hold you responsible for any losses occasioned thereby.

Before this telex was sent the sellers had in fact already resold a total of 3200 tons between Mar. 27 and Apr. 10 at a price of <<PoundsSterling>>62.50 f.o.b. or the equivalent on a c.i.f. basis. On Apr. 16 and 23 they then resold further quantities of 1500 and 600 tons at f.o.b. prices of <<PoundsSterling>> 62.50 and <<PoundsSterling>>62.00 respectively, so that the total resales after this telex were 2100 tons. The buyers' contention now is that the telex of Apr. 15 constituted the exercise of an irrevocable option under cl. 17 (a) whereby the sellers elected

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1977] 2 Lloyd's Rep. 570
1977 WL 59582 (QBD (Comm Ct)), [1977] 2 Lloyd's Rep. 570
(Cite as: [1977] 2 Lloyd's Rep. 570)

to claim compensation solely on the basis of a re-sale against the buyers and that the only claim now open to them is therefore the difference between the contract prices and the prices obtained on the subsequent resales of 2100 tons.

In my judgment this contention is untenable. I do not think that cl. 17 (a) contains an option in the sense of an irrevocable election. It merely provides the innocent party with a choice of remedies, but if he wishes to avail himself of the right to sell or purchase against the defaulter, then he must first give notice so that the defaulter has a further opportunity of performing. The notice is a condition precedent to this choice of remedy. But if for any reason the proposed sale or purchase against the defaulter does not then take place, it does not follow that the innocent party is deprived of his right to claim damages by arbitration. The contrary conclusion could lead to grossly unfair, if not absurd results, and there is no reason for construing the contract in this way. Furthermore, the sellers' telex of Apr. 15 was on any view not an unequivocal exercise of any option; it merely gave notice of the sellers' then intention, which in the event they did not pursue by demanding compensation on this basis. It follows that in my judgment they are entitled to damages in the ordinary way, i.e. based on the difference between the contract prices and the appropriate market prices.

This brings me to the next issue: what are the appropriate dates for ascertaining the market prices? The Board of Appeal have in each case taken the last day of the respective shipment periods, Mar. 15, Mar. 31 and Apr. 15. I have already mentioned the market prices which they found for those dates, on which they based their awards of damages. They ask that the case be remitted to them in the event of the Court being of the opinion that these are not the right dates.

The buyers challenge these dates on two grounds. First, they say that they were under an obligation to spread the shipments evenly over the shipment periods. They contend that this became a requirement of all the contracts by reason of the sellers' telex of Mar. 12 which I have quoted. But this is

clearly untenable, since this telex could not vary the contracts*580 unilaterally. They then point out, correctly, that this was an express term of the third and largest contract, and that this also provided that there was to be a minimum of five days' spread between each shipment. They also rely on a finding that at Lowestoft no ships larger than 1900 tons could load, that it would take three days to load each of them, and that only one ship could be loaded at any time. The buyers accordingly contend that, at any rate in relation to the third contract, they were already in default on dates earlier than the final shipment date, and that the damages should be assessed on the basis of such earlier defaults by deciding by what dates the buyers should reasonably have lifted what quantities.

In my judgment this argument is wholly fallacious, quite apart from the fact that it comes ill from the party in default. Under the third contract the buyers were no doubt already in breach substantially before the end of the shipment period by having failed to lift parts of the contract quantity as required. But it by no means follows that the buyers are entitled to have the damages assessed by reference to such earlier dates, whatever these might be and whatever might be considered reasonable part shipments for each of them. There are at least two reasons, apart from the difficulty of computing the damages with any precision on this basis. First, I do not think that these breaches were breaches of condition. Even if they were, it was open to the sellers to keep the contract alive, as they did. Secondly, the argument fails to take account of the reasoning which underlies the conventional measure of damages for non-acceptance or non-delivery, i.e. the difference between the contract and market prices. This reasoning is that on a certain date there is a clear default, with the result that the innocent party can resort to the market to sell the unaccepted goods or to buy the undelivered goods. It is on this date that the market price becomes the appropriate basis for the damages to be awarded. But the date of default must be certain. In the present case, however, the sellers could never safely resort to the market until the end of the respective shipment periods. They could not safely

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1977] 2 Lloyd's Rep. 570
1977 WL 59582 (QBD (Comm Ct)), [1977] 2 Lloyd's Rep. 570
(Cite as: [1977] 2 Lloyd's Rep. 570)

treat the buyers as having repudiated their obligations before these dates. There were no fixed quantities to be lifted on or before fixed dates. It would have been tantamount to buying litigation if the sellers had taken it upon themselves, in effect, to seek to prescribe to the buyers the quantities which they should have lifted by certain dates. The sellers were certainly under no obligation to take this risk. They were entitled to wait until the end of the shipment period, when the buyers were certainly and irretrievably in default, and to have the damages assessed on that date. I do not accept the buyers' submission that this approach conflicts with ss. 50(3) and 51(3) of the Sale of Goods Act, 1893. These provide that in the case of an available market the measure of damages is prima facie to be ascertained by the difference between the contract price and the market price 'at the time or times when the goods ought to have been accepted' or 'ought to have been delivered'. If the contract is properly kept alive by the innocent party until the end of the period allowed for delivery or acceptance, as in the present case, then it does no violence to these words to apply them at the end of the period.

The buyers' second contention is similar in character. They contend that they were in any event inevitably in breach some days before the end of the respective shipment periods, when insufficient time remained to nominate and load the necessary ships. In my view the same considerations apply to this contention as those with which I have just dealt. The breach is not final until the end of the shipment period; at any rate, the sellers were not obliged to treat it as final until then. The buyers relied on a passage in Benjamin's Sale of Goods (1974) art. 1741, but I see nothing inconsistent in this. The relevant passage reads:

It would seem that if the buyer fails to give shipping instructions capable of taking effect by the end of the shipment period, this will constitute the final breach so that damages will be assessed by reference to the market at the end of the period; though in strict logic a case could be made for arguing that the relevant time is the last point of the shipment period at which shipping instructions could have been given so as to enable the goods to be shipped by the end of the period.

The first part of this sentence appears to accord with my view that one takes the end of the shipment period. The second part, although prefaced by the words, 'in strict logic', does not really appear to be advocated by the learned editor. In my view, if the seller does nothing, as he is entitled, one should take the end of the shipment period. Apart from the reasons already stated, it would introduce unnecessary complexity and uncertainty to seek to ascertain on what earlier date timeous performance became impossible. Excessive logical refinement is often impracticable in the assessment of damages, and I can see no good reason for resorting to it in order to assist the party in breach.

Finally, the buyers advance a further argument which caused me greater difficulty. The contractual quantity was in each case subject to the proviso '10% more or less at Buyers' option'. The Board of Appeal in each *581 case assessed the damages on the basis of the contractual or mean quantities, in effect ignoring the options. The buyers now contend that the damages should only have been assessed on the basis of 90 per cent., because this was the limit of the buyers' legal obligation, and because it must be assumed in their favour that they would have performed the contract in the way most beneficial to themselves. The principle is well established: see the authorities summarised in McGregor on Damages, 13th ed., art. 270, and in particular Re Thornett and Fehr and Yuills Ltd., [1921] 1 K.B. 219 and Lavarack v. Woods of Colchester Ltd.[1967] 1 Q.B. 278, . The buyers' difficulty, however, is that the point was not raised in the arbitration; the Board of Appeal never had the opportunity of dealing with it. The issue is whether it is open to the buyers to seek to take the point now. Both Counsel agreed, as I do, that the test is conveniently provided in the following passage from the judgment of Lord Justice Cairns in The Lily Prima [1976] 2 Lloyd's Rep. 487 at p. 505, where he said:

There is high authority for the proposition that a fresh point of law can be taken provided it arises on the facts found in the case, and that no additional facts which might have been found could affect it . . .

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1977] 2 Lloyd's Rep. 570
1977 WL 59582 (QBD (Comm Ct)), [1977] 2 Lloyd's Rep. 570
(Cite as: [1977] 2 Lloyd's Rep. 570)

and then he refers to a number of authorities.

Mr. Johnson, for the buyers, submitted that this test was satisfied; he said that it was a pure question of law and that no additional facts could have been found in the special case which might affect it. Mr. Hallgarten, for the sellers, disputed this. He submitted that if the point had been taken before the Board of Appeal it would have been relevant to consider whether there was any trade custom or practice affecting this issue, and also about the probable quantities which the buyers would in fact have shipped in the light of the convenience of chartering vessels of particular sizes, &c.

Although the point was not fully argued before me, on the authorities referred to above the probability as to what would have happened if the buyers had performed clearly appears to be irrelevant. It is simply a question of the limits of the buyers' legal obligation. It also seems unlikely that there is any binding trade custom which governs the position, and a trade practice which treated '5% more or less' as not conferring a true option was held to be ineffective in Re Thornett and Fehr and Yuills Ltd. (sup.)

However, Counsel's and my own experience is that for many years trade tribunals such as GAFTA have been awarding damages on the basis of the mean quantity, disregarding the options. This practice is no doubt why the point did not occur to Counsel for the buyers on the hearing of the appeal. In these circumstances I am reluctant to decide this important point here on the basis of an afterthought, without giving the Board of Appeal the opportunity of dealing with it, since it would affect very large numbers of arbitrations. My inclination is therefore to remit the special case to the Board of Appeal under my inherent jurisdiction to enable the point to be considered. If in law there is no answer to it as seems likely on the material before me, then the buyers should not lose about <<PoundsSterling>>4000 merely because the point was overlooked below.

However, I would only be willing to remit the special case on three conditions. First, the buyers on any view owe 90 per cent. to the sellers, and

there should be no further delay in payment. It is well-known that there are at present many pending appeals and special cases involving the Board of Appeal of GAFTA. There would be no justification for keeping the sellers out of their money to the extent of 90 per cent. during the delay caused by remission. The remission would therefore be conditional on the buyers paying 90 per cent. of the sums awarded and of the outstanding interest within a period on which I will hear Counsel. Failing such payment the full awards will become unconditional and final. Secondly, the buyers will have to pay all the costs of this hearing, as would have followed from my judgment on the other points in any event. They will also have to pay all the costs of the award in accordance with its terms. Thirdly, the sellers have asked that in the event of the award being remitted on this point, it should also be open to them to re-argue a point on the storage charges for which they claim to have been awarded insufficient compensation. Since there may be something in this point I think that this would only be fair, and it is expressly covered by the question of law.

It arises in this way. As already mentioned, the Board of Appeal have awarded damages on the basis of the difference between the contract and market prices at the end of the respective shipment periods. For this purpose they have disregarded any obligation on the buyers to lift parts of the contractual quantities on earlier dates, and in my judgment they were right to do so for the reasons already stated, in particular because the contracts remained alive until the end of the shipment periods. However, the sellers contend that in relation to the third contract, the only one in which there was an express obligation to spread shipments evenly over the shipment period, the sellers are also entitled to damages for any extra storage charges which may have been incurred because the buyers failed to lift anything before the end of the shipment period, as they were required to*582 do. If the sellers suffered any such loss, then they would in my judgment be entitled to some compensation for it. The sellers were not only entitled to have the whole quantity of 5000 tons shipped and out of store by Apr. 15, the end

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1977] 2 Lloyd's Rep. 570
1977 WL 59582 (QBD (Comm Ct)), [1977] 2 Lloyd's Rep. 570
**(Cite as: [1977] 2 Lloyd's Rep. 570)**

of the shipment period, but to a large extent before this date by evenly spread shipments with a minimum of five days' interval between them. Such damages would clearly have to be awarded on a somewhat rough and ready basis, allowing for reasonable quantities and approximate dates, but this would not be wrong in principle and well within the experience of the Board of Appeal. On the material before me, however, I am not clear whether there would be any justification for any additional award for storage charges, because quantities went both into and out of store between Mar. 27 and May 24 and there is no information about any earlier period. Accordingly, if the award is remitted on the question of the buyers' option only to accept 90 per cent., then the sellers should also have a further opportunity of arguing this issue on the storage charges.

The question of law is as follows:
    Whether the Buyers are liable to the Sellers in damages for the Buyers' admitted default in the performance of contracts 00302, 00306 and 00309 and, if so,
        (i) on what basis damages are to be assessed;
        (ii) whether storage charges are recoverable from the Buyers and, if so, in what sum.

My answer is that the primary award of the Board of Appeal will be affirmed in every respect unless it is remitted on the conditions which I have indicated.

(c) Lloyds of London Press Lim- ited

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.